NONCONFIDENTIAL

**No. 2023-1334**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

**NOVARTIS PHARMA AG, NOVARTIS TECHNOLOGY LLC, NOVARTIS PHARMACEUTICALS CORPORATION,**

*Appellants,*

**v.**

**REGENERON PHARMACEUTICALS, INC.,**

*Appellee.*

_____

On Appeal from a Final Written Decision of the
Patent Trial and Appeal Board, No. IPR2021-00816

_____

**APPELLANTS' CORRECTED PRINCIPAL BRIEF**

_____

Elizabeth Holland
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 610-6365

William G. James II
ALLEN & OVERY LLP
1101 New York Avenue, N.W.
Washington, DC 20005
(202) 683-3895

William M. Jay
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4190

Joshua Weinger
Gerard J. Cedrone
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

July 3, 2023

*Counsel for Appellants*

# PATENT CLAIMS AT ISSUE

## U.S. Patent No. 9,220,631:

**1.** A pre-filled, terminally sterilized syringe for intravitreal injection, the syringe comprising a glass body forming a barrel, a stopper and a plunger and containing an ophthalmic solution which comprises a VEGF-antagonist, wherein:

(a) the syringe has a nominal maximum fill volume of between about 0.5 ml and about 1 ml,

(b) the syringe barrel comprises from about 1 µg to 100 µg silicone oil,

(c) the VEGF antagonist solution comprises no more than 2 particles >50 µm in diameter per ml and wherein the syringe has a stopper break loose force of less than about 11N.

**2.** A pre-filled syringe according to claim **1**, wherein the syringe barrel has an internal coating of silicone oil that has an average thickness of about 450 nm or less.

**3.** A pre-filled syringe according to claim **1**, wherein the syringe barrel has an internal coating of from about 3 µg to about 100 µg silicone oil.

**4.** A pre-filled syringe according to claim **1**, wherein the silicone oil is DC365 emulsion.

**5.** A pre-filled syringe according to claim **1**, wherein the VEGF antagonist solution further comprises one or more of (i) no more than 5 particles ≥25 µm in diameter per ml, and (ii) no more than 50 particles ≥10 µm in diameter per ml.

**6.** A pre-filled syringe according to claim **1**, wherein the VEGF antagonist solution meets USP789.

**7.** A pre-filled syringe according to claim **1**, wherein the VEGF antagonist is an anti-VEGF antibody.

**8.** A pre-filled syringe according to claim **7**, wherein the anti-VEGF antibody is ranibizumab.

**9.** A pre-filled syringe according to claim **8**, wherein the ranibizumab is at a concentration of 10 mg/ml.

**10.** A pre-filled syringe according to claim **8**, wherein the silicone oil has a viscosity of about 350 cP, and the VEGF antagonist solution further comprises one or more of (i) no more than 5 particles ≥25 µm in diameter per ml, and (ii) no more than 50 particles ≥10 µm in diameter per ml.

**11.** A pre-filled syringe according to claim **1** wherein the VEGF antagonist is a non-antibody VEGF antagonist.

**12.** A pre-filled syringe according to claim **11**, wherein the non-antibody VEGF antagonist is aflibercept or conbercept.

**13.** A pre-filled syringe according to claim **12**, wherein the non-antibody VEGF antagonist is aflibercept at a concentration of 40 mg/ml.

**14.** A pre-filled syringe according to claim **1**, wherein the syringe has a stopper break loose force of less than about 5N, and wherein the syringe has a stopper slide force of less than about 5N.

**15.** A pre-filled syringe according to claim **14**, wherein the stopper break loose force or stopper slide force is measured using a filled syringe, at a stopper travelling speed of 190 mm/min, with a 30 G×0.5 inch needle attached to the syringe.

**16.** A pre-filled syringe according to claim **1**, wherein the syringe has a stopper slide force of less than about 11N.

**17.** A blister pack comprising a pre-filled syringe according to claim **1**, wherein the syringe has been sterilised using $H_2O_2$ or EtO.

**18.** A blister pack comprising a pre-filled syringe according to claim **17**, wherein the outer surface of the syringe has ≤1 ppm EtO or $H_2O_2$ residue.

**19.** A blister pack comprising a pre-filled syringe according to claim **17,** wherein the syringe has been sterilised using EtO or $H_2O_2$ and the total EtO or $H_2O_2$ residue found on the outside of the syringe and inside of the blister pack is ≤0.1 mg.

**20.** A blister pack comprising a pre-filled syringe according to claim **18,** wherein ≤5% of the VEGF antagonist is alkylated.

**21.** A blister pack comprising a pre-filled syringe according to claim **17**, wherein the syringe has been sterilised using EtO or $H_2O_2$ with a Sterility Assurance Level of at least $10^{-6}$.

**22.** A pre-filled syringe according to claim **1**, wherein the syringe barrel has an internal coating of from about 1-50 µg silicone oil.

**23.** A pre-filled syringe according to claim **1**, wherein the silicone oil has a viscosity of about 350 cP.

**24.** A method of treating a patient suffering from an ocular disease selected from choroidal neovascularisation, we age-related macular degeneration, macular edema secondary to retinal vein occlusion (RVO) including both branch RVO (bRVO) and central RVO (cRVO), choroidal neuvascularisation secondary to pathologic myopia (PM), diabetic macular edema (DME), diabetic retinopathy, and proliferative retinopathy, comprising the step of administering an ophthalmic solution to the patient using a pre-filled syringe according to claim **1**.

**25.** The method of claim **24**, further comprising an initial priming step in which the physician depresses the plunger of the pre-filled syringe to align the pre-determined part of the stopper with the priming mark.

**26.** A method according to claim **24**, wherein the VEGF antagonist administered is a non-antibody VEGF antagonist and wherein the patient has previously received treatment with an antibody VEGF antagonist.

# CERTIFICATE OF INTEREST

Counsel for Appellants certifies the following:

1.   **Represented Entities.**  Provide the full names of all entities represented by undersigned counsel in this case.  Fed. Cir. R. 47.4(a)(1).

Novartis Pharma AG
Novartis Technology LLC
Novartis Pharmaceuticals Corporation

2.   **Real Party in Interest.**  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.  Fed. Cir. R. 47.4(a)(2).

None.

3.   **Parent Corporations and Stockholders.**  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  Fed. Cir. R. 47.4(a)(3).

*Novartis Pharma AG:*              Novartis AG
*Novartis Technology LLC:*         Novartis AG
*Novartis Pharmaceuticals Corp.:* Novartis AG

4.   **Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

*Allen & Overy LLP:*              Nicholas K. Mitrokostas

*Goodwin Procter LLP:*            Linnea Cipriano
                                  Duncan Greenhalgh

**5.     Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

Yes; see Notice of Related Case Information filed contemporaneously with this brief.

**6.     Organizational Victims and Bankruptcy Cases.**  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None.

July 3, 2023                                          /s/ *William M. Jay*
                                                            William M. Jay

# TABLE OF CONTENTS

Introduction ...................................................................1

Jurisdictional Statement....................................................5

Statement of the Issues on Appeal .....................................5

Statement of the Case .....................................................6

    I.   Technological Background.............................................6

        A.   Prefilled syringes offer a number of advantages over traditional syringes................................................6

        B.   Skilled artisans faced several challenges in adapting prefilled syringes for intravitreal injection of VEGF antagonists. ...................................................7

        C.   Others tried—and failed—to develop a prefilled syringe that addresses these issues. .................................11

        D.   Novartis's claimed inventions satisfy the need for a terminally sterilized prefilled syringe for intravitreal injection of VEGF antagonists with low silicone oil.............13

    II.   Procedural History....................................................15

        A.   Regeneron seeks *inter partes* review of the '631 patent.......15

        B.   The Board holds all 26 claims of the '631 patent obvious....19

Summary of the Argument ...................................................22

Standard of Review ...........................................................25

Argument .......................................................................25

    I.   The Board erred in holding that independent claim 1—and, thus, all of the dependent claims—are obvious based on Sigg and Boulange.............................................................25

        A.   A skilled artisan would not have been motivated to use Stopper C from Boulange. ...................................26

1.    Boulange teaches away from the use of Stopper C in
      a prefilled syringe for intravitreal injection. ................. 26

2.    The Board's motivation analysis rests on hindsight
      and non-prior art. ............................................. 32

3.    The Board wrongly disregarded half the basis for
      Boulange's teaching away. ................................... 36

4.    Boulange does not motivate a skilled artisan to use
      Stopper C for eye injections specifically. ..................... 38

5.    Regeneron's expert declaration cannot sustain the
      Board's motivation analysis. ................................ 40

B.    A skilled artisan would not have reasonably expected
      success in combining Boulange's Stopper C with Sigg's
      terminal sterilization method. .............................. 42

      1.    A person of ordinary skill would not have known
            how to design a syringe to withstand Sigg's terminal
            sterilization. .......................................... 43

      2.    The Board's reasonable-expectation analysis relies
            on non-prior art. ....................................... 45

      3.    The remaining evidence does not support the
            Board's reasonable-expectation finding. ................. 47

II.   The Board erred in holding that dependent claim 21 is
      obvious based on Sigg and Boulange. ......................... 52

      A.    A skilled artisan would not have been motivated to
            achieve a sterility assurance level of $10^{-6}$ or greater
            using ethylene oxide or hydrogen peroxide. ............... 53

      B.    A skilled artisan would not have reasonably expected to
            succeed in achieving a sterility assurance level of $10^{-6}$ or
            greater using ethylene oxide or hydrogen peroxide. ........ 57

III.  Objective indicia refute the Board's obviousness
      determination. .............................................. 59

A.  The Board improperly discounted evidence of licensing
and commercial success. ........................................................ 59

    1.  Genentech's licensing and the success of the
Lucentis prefilled syringe provide strong evidence
that the claims of the '631 patent are not obvious. ....... 59

    2.  The Board discounted licensing and commercial
success based on a flawed view of nexus ........................ 63

B.  The Board erred in its ultimate weighing of the objective
indicia. ................................................................................ 68

Conclusion ............................................................................. 70

## CONFIDENTIAL MATERIAL OMITTED

Material omitted on p. 12 describes nonpublic, commercially sensitive information related to Genentech's product-development efforts.

Material omitted on pp. 35-36 describes nonpublic, commercially sensitive information related to the specifications of Regeneron's Eylea prefilled syringe.

Material omitted on pp. 61-65 describes nonpublic, commercially sensitive information related to the design of Genentech's Lucentis prefilled syringe.

# TABLE OF AUTHORITIES

**Cases:**

*3M Innovative Props. Co. v. Avery Dennison Corp.*,
    350 F.3d 1365 (Fed. Cir. 2003) ............................................................ 55

*Allergan, Inc. v. Sandoz Inc.*,
    796 F.3d 1293 (Fed. Cir. 2015) ............................................................ 31

*Apple Inc. v. Samsung Elecs. Co.*,
    839 F.3d 1034 (Fed. Cir. 2016) (en banc) ........................................... 59

*Arctic Cat Inc. v. GEP Power Prod., Inc.*,
    919 F.3d 1320 (Fed. Cir. 2019) ............................................................ 34

*AstraZeneca AB v. Mylan Pharm., Inc.*,
    19 F.4th 1325 (Fed. Cir. 2021) ............................................... 27, 30, 31

*Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*,
    725 F.3d 1341 (Fed. Cir. 2013) ............................................................ 32

*Cordis Corp. v. Bos. Sci. Corp.*,
    561 F.3d 1319 (Fed. Cir. 2009) ............................................................ 35

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    567 F.3d 1314 (Fed. Cir. 2009) ............................................................ 27

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
    885 F.3d 1367 (Fed. Cir. 2018) ............................................................ 25

*Ecolochem, Inc. v. S. California Edison Co.*,
    227 F.3d 1361 (Fed. Cir. 2000) ............................................................ 66

*Fox Factory, Inc. v. SRAM, LLC*,
    944 F.3d 1366 (Fed. Cir. 2019) ............................................................ 65

*Institut Pasteur & Université Pierre & Marie Curie v. Focarino*,
    738 F.3d 1337 (Fed. Cir. 2013) ............................................... 60, 66, 67

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
   821 F.3d 1359 (Fed. Cir. 2016) .......................................................... 25

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
   751 F.3d 1327 (Fed. Cir. 2014) .......................................................... 38

*KSR Int'l v. Teleflex, Inc.*,
   550 U.S. 398 (2007) .......................................................................... 38

*Leo Pharm. Prod., Ltd. v. Rea*,
   726 F.3d 1346 (Fed. Cir. 2013) .......................................................... 68

*Millennium Pharms., Inc. v. Sandoz Inc.*,
   862 F.3d 1356 (Fed. Cir. 2017) .......................................................... 68

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) .......................................................................... 57

*Par Pharm., Inc. v. TWi Pharms., Inc.*,
   773 F.3d 1186 (Fed. Cir. 2014) .......................................................... 38

*PersonalWeb Techs., LLC v. Apple, Inc.*,
   917 F.3d 1376 (Fed. Cir. 2019) .......................................................... 25

*Samsung Elecs. Co. v. Elm 3DS Innovations, LLC*,
   925 F.3d 1373 (Fed. Cir. 2019) .......................................................... 42

*Santarus, Inc. v. Par Pharmaceutical, Inc.*,
   694 F.3d 1344 (Fed. Cir. 2012) .......................................................... 30

*WBIP, LLC v. Kohler Co.*,
   829 F.3d 1317 (Fed. Cir. 2016) .......................................................... 60

*Yeda Research v. Mylan Pharm. Inc.*,
   906 F.3d 1031 (Fed. Cir. 2018) .......................................................... 46

**Statutes:**

28 U.S.C. §1295(a)(4)(A) ....................................................................... 5

35 U.S.C. §141(c) .................................................................................... 5

35 U.S.C. §311(b) ........................................................................ 34

35 U.S.C. §319 ............................................................................ 5

**Regulations:**

21 C.F.R. §20.61(c) ..................................................................... 46

# GLOSSARY

'631 patent ................. U.S. Patent No. 9,220,631 (Appx264-276)

Board ......................... Patent Trial and Appeal Board

Boulange ................... PCT Publication No. WO 2009/030976 A1 to Boulange et al. (March 12, 2009) (Ex. 1008, Appx3923-3954)

EtO ............................ ethylene oxide

$H_2O_2$ ........................... hydrogen peroxide

µg .............................. microgram, a unit of mass equal to $1 \cdot 10^{-6}$ grams

N ............................... Newton, a unit of force equal to 1 kg·m/s$^2$

Novartis..................... Appellants Novartis Pharma AG, Novartis Technology LLC, and Novartis Pharmaceuticals Corporation

PFS ........................... prefilled syringe

Regeneron ................. Appellee Regeneron Pharmaceuticals, Inc.

SAL........................... sterility assurance level

Sigg........................... PCT Publication No. WO 2011/006877 to Sigg et al. (Jan. 20, 2011) (Ex. 1007, Appx3888-3922)

VEGF......................... vascular endothelial growth factor

VHP .......................... vaporized hydrogen peroxide

# STATEMENT OF RELATED CASES

No other appeal from the same underlying proceeding was previously before this or any other appellate court.

The following cases will directly affect or be directly affected by this Court's decision in the pending case:

*Novartis Pharma AG v. Regeneron Pharmaceuticals Inc.*,
N.D.N.Y. No. 1:20-cv-690

*Regeneron Pharmaceuticals Inc. v. Novartis Pharma AG*,
N.D.N.Y. No. 1:21-cv-1066; 2d Cir. No. 22-427

**INTRODUCTION**

Injecting a medication directly into a patient's eye is a delicate undertaking. The eye is a sensitive organ that is uniquely susceptible to infection and damage. For this reason, a doctor must administer an eye injection in a single, continuous maneuver by applying a consistent, low force to the syringe. And the syringe itself must be carefully sterilized— but without contaminating or degrading the medication inside.

These challenges long stymied the development of prefilled syringes for biological products called "VEGF antagonists," which are used to treat common, serious eye conditions like wet macular degeneration. A physician administers a VEGF antagonist by "intravitreal" injection—that is, injection into the eye's vitreal cavity. As of 2012, it was conventional wisdom that a prefilled syringe had to be lubricated with large amounts of silicone oil to achieve the right forces and consistency for a safe intravitreal injection. But silicone oil has a significant drawback: it can leach into the drug over time and end up in a patient's eye after injection. As for the risk of infection, a prefilled syringe can be sterilized in its final packaging (a process known as "terminal sterilization"), but when the syringe contains a biological product like a VEGF antagonist, the gases

used to sterilize the syringe can damage or contaminate the medication. Before 2012, no one had managed to develop a terminally sterilized pre-filled syringe for intravitreal injection of VEGF antagonists that over-came these lubrication and sterilization obstacles. Indeed, another major pharmaceutical company, Genentech, had tried and failed.

Where Genentech failed, Novartis succeeded, developing a prefilled syringe that overcame both challenges. The patented syringe achieves low forces *without* large amounts of silicone oil. And it protects the VEGF antagonist from the gases used to terminally sterilize the syringe.

The Patent Trial and Appeal Board has now deemed that innova-tion unpatentable. Granting appellee Regeneron Pharmaceuticals' peti-tion for *inter partes* review, the Board held that all 26 claims of Novartis's U.S. Patent No. 9,220,631 are obvious over the prior art. That decision was wrong, and this Court should reverse it.

First, the Board erred as to independent claim 1, from which all other claims depend. The Board concluded that a person of ordinary skill in 2012 would have combined a terminally sterilized prefilled syringe from one prior-art patent application ("Sigg") with a particular compo-nent—known as "Stopper C"—from another prior-art patent application

("Boulange"). But Stopper C was not even Boulange's invention: it was the inferior comparator that Boulange used to show the superiority of its own stopper, which used a novel coating. According to Boulange, Stopper C—which lacked that coating—was "markedly inferior," and its force profile was not "acceptable for a medical device." Appx3943 (19:7); Appx3945 (21:5). Boulange thus teaches sharply away from the use of Stopper C—and, at the very least, would not have motivated a skilled artisan to use it in a delicate intravitreal injection. Moreover, neither Boulange nor Sigg furnishes any reasonable expectation that a syringe for this type of medication could successfully withstand Sigg's terminal sterilization method. The Board brushed aside these problems only by relying on hindsight and evidence outside the prior art, and by redefining terms in the key references themselves.

Second, and separately, the Board erred in holding that the same references rendered dependent claim 21 obvious. That claim requires a prefilled syringe to undergo terminal sterilization with ethylene oxide or hydrogen peroxide to achieve a "Sterility Assurance Level" of at least $10^{-6}$—meaning that, after sterilization, there is at most a one-in-a-million chance of finding a contaminant on the syringe. But Sigg never teaches

or suggests the use of ethylene oxide or hydrogen peroxide to achieve a sterility assurance level of $10^{-6}$ or greater. And Regeneron's expert conceded that achieving that sterility assurance level without unacceptably degrading the drug product can require extensive experimentation. In ruling otherwise, the Board ignored this testimony, misread Sigg, and drew improper inferences from non-prior-art prosecution history.

Finally, objective indicia of nonobviousness refute the Board's obviousness determination. Most notably, after failing to develop its own syringe, Genentech licensed the '631 patent and marketed a syringe containing Novartis's claimed technology with enormous commercial success. The Board itself acknowledged the long-felt need and failure of others. But it mused that Genentech's blockbuster licensed syringe might have found success not because of the claimed medication or prefilled syringe presentation, but because of unclaimed features of its stopper. The evidence does not bear out that speculation: the value of Genentech's product comes from the fact that it combines a VEGF antagonist with a prefilled syringe—just as claimed in the '631 patent. The Board erred in disregarding these signs of nonobviousness and in its ultimate weighing of the objective indicia.

## JURISDICTIONAL STATEMENT

The Board issued its final written decision on October 25, 2022. Appx1-128. Novartis filed a timely notice of appeal on December 23, 2022. Appx1913-1923. This Court has jurisdiction under 28 U.S.C. §1295(a)(4)(A) and 35 U.S.C. §§141(c) and 319.

## STATEMENT OF THE ISSUES ON APPEAL

1.    Whether the Board erred in holding that independent claim 1 is obvious over a combination of prior-art references including Sigg and Boulange because the Board misconstrued the prior art and relied on impermissible hindsight.

2.    Whether the Board erred in holding that dependent claim 21 is obvious over the same prior-art combination because the Board misconstrued the prior art, relied on improper hindsight, and overlooked relevant expert testimony.

3.    Whether the Board improperly disregarded objective indicia of nonobviousness based on a flawed nexus analysis and erred in weighing the objective indicia.

# STATEMENT OF THE CASE

## I.    Technological Background

### A.    Prefilled syringes offer a number of advantages over traditional syringes.

As its name suggests, a "prefilled" syringe (sometimes abbreviated "PFS") is a syringe that comes loaded with the right dose of a particular drug.  Appx3477-3478 (¶36); Appx13351 (¶37).  Prefilled syringes are safer than traditional syringes because they avoid the contamination and dosing errors that can occur when a provider must draw the medication from a separate vial before injecting it.  Appx13351-13353 (¶38).  Pre-filled syringes also save patients time and money: they "require[] fewer steps to administer" and "provide reduced therapy and injection cost[s]."  Appx5473; Appx13351-13353 (¶38).  And prefilled syringes are less wasteful than the traditional syringe-and-vial system, which requires providers to discard unused medication whenever the separate vial con-tains more of the drug than the patient needs.  Appx13351-13353 (¶38).

A prefilled syringe consists of several components, including a glass barrel, a stopper made of a polymer (such as rubber), a plunger rod that moves the stopper, and a tip closure (such as a cap).  Appx3478-3479

(¶38); Appx13353-13354 (¶39).  The following image illustrates a typical configuration:



Appx13353.  During storage, the stopper and tip closure act as seals that contain the medication inside the barrel.  Appx13353-13354 (¶39).

The parts of the syringe that come into contact with the drug product (*e.g.*, the barrel and stopper) are collectively known as the "primary packaging."  Appx3478 (¶37); Appx13371 (¶70).  This primary packaging is often enclosed in additional "secondary packaging" (*e.g.*, plastic wrapping, foil wrapping, Tyvek pouches, or blister packs) that does not make direct contact with the drug product.  Appx3478 (¶37); Appx13371 (¶70).

**B.    Skilled artisans faced several challenges in adapting prefilled syringes for intravitreal injection of VEGF antagonists.**

The '631 patent is directed not just to prefilled syringes, but to prefilled syringes for a unique and highly specialized procedure: intravitreal injection of a VEGF antagonist.  A VEGF antagonist inhibits a signal

protein called vascular endothelial growth factor (VEGF), whose overexpression in the body can cause conditions like wet macular degeneration—a "leading cause of blindness." Appx3956; Appx13366 (¶59). To administer a VEGF antagonist, a healthcare provider injects the medication "directly into the vitreous cavity of the eye," Appx4028, as depicted in maneuver "B" in the image below:



**Figure 8** Schematic representation of an intraocular administration: (**A**) anterior chamber injection, (**B**) intravitreal injection, and (**C**) retrobulbar injection.

Appx4028.

Developing a prefilled syringe for this sensitive procedure presents a number of design challenges, because the eye is uniquely susceptible to infection and damage. Appx21680-21681 (¶61). To prevent injury to this important organ, a prefilled syringe must have at least two characteristics: a carefully calibrated force profile and a properly sterilized exterior.

1.  To avoid damage to the eye, a healthcare professional must administer an intravitreal injection "[u]sing a single smooth continuous maneuver." Appx14318; *see* Appx21687 (¶70).  This kind of even delivery is possible only with careful calibration of a prefilled syringe's "break-loose force" (the force required to move the stopper from its resting position at the beginning of an injection) and its "slide" or "glide force" (the force required to keep the stopper moving once it has started).  Appx13354-13356 (¶¶40-41).  These forces must be low—otherwise, "the high force of hand muscle contraction" needed to carry out the injection can lead to "unintentional lateral movements of the ophthalmologist's hand," resulting in complications like "bleeding" and "damage to ocular tissues." Appx21706 (¶99); *see also* Appx21686-21688 (¶¶67-71); Appx22500 (17:14-21).  These forces must also be consistent and predicable over time.  A healthcare provider "develops a 'muscle memory' and a consistent routine for performing" intravitreal injections, and "[i]f the break-loose force or slide force is higher than expected, the result may be unacceptable hand tremor, overly forceful injection . . . , or lateral forces on the eye"— any of which can result in injury.  Appx21688 (¶71).

As of 2012, glass syringes were typically "siliconized"—lubricated with silicone oil—to ensure acceptable break-loose and slide forces. Appx3488 (¶54); Appx13356 (¶42); *see* Appx4058; Appx5478-5479. But there were well-documented disadvantages to using large amounts of silicone oil. In particular, the oil can contaminate the drug product over time and accumulate in a patient's eye. Appx13357 (¶42); *see* Appx5982 (presenting "a series of 15 eyes of 15 patients with intravitreal silicone droplets as a consequence of intravitreal injections"); Appx6071 (reporting "three cases of intravitreal silicone oil droplets").

2. Because the inside of the eye experiences less immune response than other parts of the body, bacterial contamination can have devastating consequences—including blindness. Appx21695-21696 (¶¶84-86). Thus, a safe intravitreal injection also requires the exterior of a prefilled syringe to be appropriately sterilized. *See, e.g.*, Appx267 (1:14-17). One sterilization strategy, called "terminal sterilization," entails sterilizing a prefilled syringe in its final packaging—after it has already been filled with the drug product—to minimize the chance of recontamination. Appx13358-13359 (¶¶45-46); *see* Appx267 (1:18-21). To do this, the syringe and its packaging are typically placed under a vacuum and then

exposed to a gas like ethylene oxide (EtO) or vaporized hydrogen peroxide (VHP). Appx13360-13361 (¶¶49-50); *see* Appx4677-4680.

These procedures, too, pose significant challenges. Exposure to a vacuum can cause parts of a syringe assembly to come apart or leak. Appx13360-13361 (¶49). And if ethylene oxide or vaporized hydrogen peroxide enters the syringe, it can degrade the biologic medication inside, as well as other sensitive materials, including polymers that make up key parts of the syringe. Appx13361 (¶¶49-50); *see* Appx3890; Appx4636; Appx5614. Ethylene oxide sterilization also leaves behind a toxic residue that must be reduced to safe levels before the device is stored and used. Appx13361 (¶49); *see* Appx4677-4678 (cautioning that "[t]race residuals from ETO sterilization are . . . associated with adverse effects, so effective aeration . . . is essential for safe use"). For all these reasons, the stopper of a prefilled syringe that will undergo terminal sterilization, especially one containing a VEGF antagonist, must maintain a tighter seal than the stopper of a run-of-the-mill syringe. Appx21241-21246 (¶¶48-54).

### C. Others tried—and failed—to develop a prefilled syringe that addresses these issues.

Before Novartis pioneered the claimed inventions, artisans had been unable to overcome the challenges described above: no one had

succeeded in developing a terminally sterilized prefilled syringe for in-travitreal injection of VEGF antagonists with low amounts of silicone oil.

Genentech had tried to develop such a syringe—but its efforts had failed. In 2004, Novartis began to collaborate with Genentech on ranibi-zumab, a VEGF antagonist that Genentech developed and marketed in the United States under the trade name Lucentis. Appx21994-21995 (¶¶5-6). At the time, Genentech was working on a prefilled syringe to commercialize Lucentis. Appx21995 (¶7). Genentech thought it had de-veloped an ▉[chem.] process that could ▉action▉ the syringes without ▉result▉ the ▉component▉ . Appx21996 (¶11). During FDA-mandated sta-bility testing, however, Genentech discovered that ▉[chem.] from the ▉action▉ ▉ process was ▉result▉ the syringe and ▉result▉ the drug. Appx21996 (¶11); *see* Appx16192-16214; Appx18082. As a result, "Genentech decided to discontinue ▉commercial decision▉ ." Appx17900; *see* Appx21996-21997 (¶12). Genentech also tried ▉action▉ its syringes with ▉[chem.] , but this method, too, proved unsuccessful. Appx21998-21999 (¶17); *see* Appx18434-18435 ("▉[chem.] is not recom-mended for ▉action▉ of ▉product▉ due to the increased risk of ▉[product] ▉ exposure to ▉chem.▉ and lack of ▉commercial consideration▉ ."). In the

end, Genentech gave up and Novartis developed its own syringe—an embodiment of the claimed inventions—to which Genentech took a license to commercialize Lucentis. Appx21999 (¶18); Appx16863-16885.

A different company succeeded in marketing a prefilled syringe for intravitreal injection of the VEGF antagonist pegaptanib (marketed as Macugen) before 2012, but the Macugen product contained large quantities of silicone oil. Appx6684 (¶160); Appx6726 (¶237); Appx20679 (184:19-22). As a result, reports associated that syringe with accumulation of silicone droplets in patients' eyes. Appx13357 (¶42); *see* Appx6071; Appx3496-3497 (¶66); Appx22508 (51:20-52:5).

### D.  Novartis's claimed inventions satisfy the need for a terminally sterilized prefilled syringe for intravitreal injection of VEGF antagonists with low silicone oil.

Novartis overcame these obstacles, developing a prefilled syringe with a unique combination of desirable characteristics. The syringe's stopper and barrel maintain a tight seal during terminal sterilization, thereby protecting sensitive VEGF antagonists. Appx267 (2:6-46). And the stopper's design allows the syringe to maintain consistent—and consistently low—break-loose forces, all *without* the copious amounts of silicone oil that characterized previous syringes. Appx267 (1:61-67).

Novartis described and claimed the novel features of its inventions in the '631 patent, which is entitled to a priority date of at least October 23, 2012,[1] and issued on December 29, 2015.  Independent claim 1 recites:

> A pre-filled, terminally sterilized syringe for intravitreal injection, the syringe comprising a glass body forming a barrel, a stopper and a plunger and containing an ophthalmic solution which comprises a VEGF-antagonist, wherein:
>
> (a) the syringe has a nominal maximum fill volume of between about 0.5 ml and about 1 ml,
>
> (b) the syringe barrel comprises from about 1 µg [microgram] to 100 µg silicone oil,
>
> (c) the VEGF antagonist solution comprises no more than 2 particles >50 µm in diameter per ml and wherein the syringe has a stopper break loose force of less than about 11 [newtons (N)].

Appx276 (19:2-12).

Dependent claim 21 recites a packaged version of that prefilled syringe, sterilized to a particular level.  Specifically, dependent claim 17 claims "[a] blister pack comprising a pre-filled syringe according to claim 1, wherein the syringe has been sterilised using $H_2O_2$ [*i.e.*, hydrogen

---

[1] Before the Board, Novartis argued that the '631 patent is entitled to a priority date of July 3, 2012, while Regeneron argued that October 23, 2012, is the priority date.  The Board declined to resolve the dispute because doing so would "make[] no difference in [the Board's] ultimate patentability determination."  Appx4 n.6.

peroxide] or EtO." Appx276 (20:7-9).  Dependent claim 21, in turn, claims

the blister pack and syringe according to claim 17, but "sterilized using

EtO or $H_2O_2$ with a Sterility Assurance Level of at least $10^{-6}$." Appx276

(20:21-23).

## II.    Procedural History

### A.    Regeneron seeks *inter partes* review of the '631 patent.

Regeneron filed multiple petitions for *inter partes* review of the '631

patent.  In this case, the only one instituted, Regeneron relied on several

prior-art references—including Boulange and Sigg—as well as several

non-prior-art references.

1.  Boulange is an international patent application concerning the

use of a polymer called "Parylene C" to coat the stopper of a syringe.

Appx3923-3954.  Boulange does not deal with ophthalmic applications.

According to Boulange, a Parylene C coating can provide for rela-

tively low break-loose and slide forces between the syringe's components,

allowing the syringe to use significantly less silicone oil.  Appx3930,

Appx3942.  To support its claims, Boulange describes several tests com-

paring two stoppers coated with Parylene C (Stoppers B1 and B2) against

two stoppers without Parylene C (Stoppers A and C).[2]  Based on the results of those tests, Boulange repeatedly disparages Stopper C.

One of the tests—reported in Example 3 and the associated Table 5—examined the break-loose forces of the four stoppers before and after accelerated aging.  Appx3942-3942.  The experiment used syringes lubricated with 40 µg of silicone oil[3] and stoppers separately lubricated with 5, 15, or 50 µg of silicone oil.  Appx3942-3943 (explaining that Example 3 uses the same lubrication as Example 2); *see* Appx3941 (Example 2).  After one month of accelerated aging, the example shows, Stopper C's break-loose force nearly doubled (from 4.7 N to 8.4 N), while Stopper B1 saw next to no change (from 2.2 N to just 2.8 N).  Appx3943 tbl.5.  Boulange's conclusion: "The results obtained with a piston having no coating (piston C) are markedly inferior" to those of the Parylene C-coated Stopper B1.  Appx3943.

Example 5 (Table 7) of Boulange likewise recounts an experiment that examined the four stoppers' pre- and post-aging break-loose forces,

---

[2] Stoppers A and C were made of different variants of butyl rubber, but were otherwise identical.  Appx3938-3939.

[3] Each syringe used 4 µg/cm$^2$ over an internal surface area of 10 cm$^2$.  Appx3942-3944; Appx3590.

this time with either 40 or 500 µg of silicone oil on each syringe and no additional silicone oil applied to the stoppers. Appx3944-3946. The example explains that even before aging, Stopper C's forces (including a 3.9 N break-loose force) "d[id] not appear to be acceptable for a medical device." Appx3945. The example then contrasts those forces "with piston B1, which is provided with the coating of the invention [Parylene C]," and observes that the latter stopper's pre-aging forces (including a 2.1 N break-loose force) were "entirely compatible with the way in which a medical device . . . is used." Appx3945. Post-aging Stopper C performed even worse: Example 5 observes that "[a]fter one month of ageing, the friction forces . . . for pistons A and C had increased appreciably, especially the [break-loose force]," while "the friction forces . . . of pistons B1 had increased very little." Appx3945.

2. Sigg is a patent application concerning methods for terminally sterilizing the outer surface of prefilled medical devices containing sensitive medications. Appx3888-3922. The named inventor on that application, Dr. Jürgen Sigg, is a Novartis scientist who specializes in prefilled syringes; he was the technical lead in the development of the Lucentis

17

prefilled syringe and is a named inventor of the '631 patent.  *See* Appx264; Appx21994 (¶¶2-3).

After discussing some of the challenges associated with terminal sterilization of prefilled syringes containing sensitive drugs, *see* Appx3889-3890, the prior-art Sigg application discloses and claims methods of terminal sterilization using vaporized hydrogen peroxide and beta radiation, *see* Appx3891-3922.  The reference also discusses the concept of a "sterility assurance level" (SAL), which measures the odds of finding a contaminant on a syringe after sterilization.  Appx3895.  As relevant here, claim 15 of Sigg claims a method of decontamination using beta radiation that yields "a $10^{-6}$ Sterility Assurance Level on the outside of the container surface" (that is, a one-in-a-million chance of finding a contaminant on the container surface).  Appx3914; *see* Appx21582 (¶41).  Sigg does not disclose or claim a method of achieving that sterility assurance level using vaporized hydrogen peroxide.

3.  In addition to these prior-art references, Regeneron also based its obviousness arguments on non-prior art.  For example, Regeneron introduced and relied on nonpublic details about the Macugen prefilled syringe, as well as confidential data about its own Eylea prefilled syringe.

*See, e.g.*, Appx1164-1165; Appx1169; Appx1171. These details—redacted from public versions of Regeneron's filings before the Board—do not appear in any prior-art printed publications.

### B.  The Board holds all 26 claims of the '631 patent obvious.

The Board instituted an *inter partes* review and held all 26 claims of the '631 patent obvious. Appx1-128; Appx573.

1. The Board concluded that independent claim 1 was obvious because "a [person of ordinary skill in the art] would have been motivated to combine Sigg's terminally sterilized [prefilled syringe] containing a VEGF-antagonist with Boulange's low-silicone and low break loose/gliding force syringe"—that is, Stopper C—"and the combination would have had a reasonable expectation of success." Appx54.

The Board rejected Novartis's argument that Boulange did not motivate the use of Stopper C because that stopper's force profile changes unpredictably over time. Appx55-61. The Board observed that "Stopper C's forces after aging are within the claimed range," and that the increase in Stopper C's break-loose force after simulated aging are comparable to forces in Regeneron's Eylea syringe (as demonstrated by post-priority-date confidential data). Appx57-58. The Board accepted that Boulange

19

described "Stopper C as 'markedly inferior' to Stopper B1," but it "[did]
not see this as a teaching away." Appx59.

The Board also concluded that a person of ordinary skill in the art
would have had a reasonable expectation that "Boulange's pre-filled sy-
ringe would have been compatible with Sigg's terminal sterilization
method." Appx62. In the Board's view, a person of ordinary skill would
have "known that siliconized Stopper C was suitable for a terminally ster-
ilized [prefilled syringe] comprising a VEGF-antagonist because sili-
conized rubber stoppers had already been used for that purpose in the
Macugen [prefilled syringe]." Appx56. The Board also stated that "it was
standard in the art to design pre-filled syringes like those in Boulange to
be gas-tight," Appx63, and that "the VHP method disclosed in Sigg . . .
can be done at ambient pressure," Appx65.

2. The Board next found all of the '631 patent's dependent claims
obvious. As relevant to this appeal,[4] the Board concluded that dependent
claim 21, like claim 1, was obvious over a combination of prior-art

---

[4] Claims 2 through 26 ultimately depend from claim 1. On appeal, the
only dependent claim on which Novartis presents separate arguments is
claim 21. *See infra*, pp. 52-59. For the remaining dependent claims, No-
vartis rests on its arguments regarding independent claim 1. *See infra*,
pp. 25-52.

references grounded in Sigg and Boulange.  Appx108-111.  Novartis had

explained that Sigg does not disclose a process that yields a sterility as-

surance level of $10^{-6}$ *using vaporized hydrogen peroxide or ethylene oxide*,

as claimed.  Appx109.  But the Board disagreed, reasoning that "Sigg

defines 'sterility' for a health care product as $10^{-6}$ and describes VHP as

a 'sterilization' treatment."  Appx110.  Novartis had also explained that

Regeneron's own expert refuted the existence of a reasonable expectation

of success—among other things, he acknowledged that achieving a steril-

ity assurance level of $10^{-6}$ without unacceptably degrading the drug prod-

uct can require "extensive experimentation."  Appx1659-1660 (quoting

Appx23965 (113:11-114:9)).  The Board failed to address this argument.

3.  Finally, the Board rejected Novartis's explanation that objective

indicia—including Genentech's failure, Genentech's licensing of the '631

patent, and the success of Genentech's licensed Lucentis prefilled syringe

product—confirmed the nonobviousness of the claimed invention.  The

Board concluded that there was no showing "that the Lucentis PFS is

coextensive with the claims."  Appx75.  In the Board's view, "[t]he claims

of the '631 patent are broader than the Lucentis PFS," and "several un-

claimed features"—such as "new design features to the plunger rod and

21

stopper"—"are significant to the structure and function of the Lucentis PFS and these unclaimed features also contribute to the success of the Lucentis PFS." Appx75; Appx77.

## SUMMARY OF THE ARGUMENT

I.    The Board erred in holding independent claim 1 obvious.

A.    Regeneron's proffered combination of references relies on Boulange's Stopper C, but Boulange itself taught against using Stopper C in a medical device.  That is unsurprising: Stopper C was the deficient comparator that Boulange used to contrast its own invention, a stopper coated in a special polymer that Boulange credited with reducing the need for silicone oil and achieving gas-tightness.  The force needed to use a syringe with Stopper C—which lacked Boulange's special polymer— varied significantly over time, a highly undesirable property especially for an ophthalmic presentation.

The Board dismissed Boulange's teaching away, but its reasoning improperly relied on the claimed force range in Novartis's patent and on sealed data from Regeneron's FDA submissions.  Neither is in the prior art.  And even putting aside the Board's legal error, Regeneron's own expert admitted that Boulange was "[n]ot very motivat[ing]."  Appx20670

(147:13-148:4). The reference is not substantial evidence supporting the Board's finding.

B.    Achieving terminal sterilization of a prefilled syringe containing a VEGF antagonist was an extraordinary technical challenge. Regeneron's own expert acknowledged the difficulty of that undertaking. Yet the Board thought that the combination of Sigg and Boulange provided a reasonable expectation of success, bolstered by another prefilled syringe product on the market.

That was error. To begin, the FDA file for the other product (Macugen) was not prior art at all. Compounding the problems, Sigg never teaches how to achieve terminal sterilization with a given syringe product. And while the Board assumed that Boulange taught a gas-tight syringe that could protect the medication, it focused on the wrong stopper again: Boulange's teachings emphasize the gas-tightness of its stopper with the polymer coating (Parylene C), *not* of Stopper C, which has no such coating. And in fact, Boulange's syringe was not terminally sterilized.

II.    Even if the Board were correct in holding the independent claim obvious, that would not be sufficient to invalidate dependent claim

23

21, which claims achieving a particular sterility assurance level. The Board purported to find that Sigg taught how to achieve that level, but only by redefining a key term in Sigg (which did not use "sterilization" as a synonym for "sterility"). Nor did Sigg provide a basis for expecting success in achieving the claimed level: the art acknowledged, and Regeneron's expert agreed, that achieving the claimed sterility assurance level "without adversely affecting the essential safety and function" of the medication in the prefilled syringe can be "impossible," or require extraordinary experimentation. Sigg provided no path through that wilderness.

III.   This is a patent with extraordinary objective indicia of nonobviousness. There was a long-felt need for a prefilled syringe presentation, given the potential gains in both sterility and precision for eye injections. Genentech, among others, tried and failed to achieve the claimed invention; it had to take a license from Novartis, and when it did, it achieved blockbuster commercial success. The Board acknowledged the long-felt need and failure of others, but refused to give this patent credit for the commercial success it enabled. Instead, the Board posited that the success might have come from some unclaimed feature, such as a tip cap—

not the medication, not the prefilled syringe presentation, and not the sterility level. That was legal error. Correctly understood, the robust objective indicia confirm the patentability of Novartis's invention.

## STANDARD OF REVIEW

"Obviousness is a question of law based on underlying findings of fact." *DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1373 (Fed. Cir. 2018) (quotation marks omitted). The Court reviews the Board's legal conclusions de novo and its underlying factual findings for substantial evidence. *Id.* at 1374. Substantial-evidence review asks "whether a reasonable fact finder could have arrived at the agency's decision, which requires examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *PersonalWeb Techs., LLC v. Apple, Inc.*, 917 F.3d 1376, 1381 (Fed. Cir. 2019).

## ARGUMENT

I. **The Board erred in holding that independent claim 1—and, thus, all of the dependent claims—are obvious based on Sigg and Boulange.**

Regeneron failed to show either that "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention" or "that the skilled artisan would have had a reasonable expectation of success in doing so." *E.g.*, *Intelligent Bio-*

*Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016).  The Board's conclusion that Regeneron met its burden rests on legal errors, such as relying on non-prior art and on the path of the inventor, and fails to grapple with the teachings showing the unsuitability of Regeneron's combination—especially for use in the eye.

## A.     A skilled artisan would not have been motivated to use Stopper C from Boulange.

The Board's obviousness determination hinged on its determination that a skilled artisan would have been motivated to select Stopper C from Boulange for use in an intravitreal injection device.  Appx55-61.  But Boulange does not even address the use of syringes in intravitreal injections—a uniquely sensitive procedure that requires more than just a run-of-the-mill device.  And even if a skilled artisan would have had a reason to turn to Boulange, Boulange unequivocally disparages Stopper C.  The Board's contrary conclusion rests on flawed legal analysis and a misguided view of the evidence.

### 1.     Boulange teaches away from the use of Stopper C in a prefilled syringe for intravitreal injection.

As this Court has repeatedly explained, a reference "is said to teach away from the claimed invention if a skilled artisan, upon reading the

26

reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken in the claim." *AstraZeneca AB v. Mylan Pharm., Inc.*, 19 F.4th 1325, 1337 (Fed. Cir. 2021) (quotation marks omitted). In other words, a reference teaches away where it "criticize[s], discredit[s], or otherwise discourage[s] investigation into the invention claimed." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009). Boulange does just that.

As discussed above, an intravitreal injection device *must* have a break-loose force that is not only low, but also consistent and predictable. *See supra*, pp. 9-11. Regeneron's own expert acknowledged that increases in a syringe's break-loose force during storage are "undesirable, and potentially dangerous to the patient." Appx3490-3491 (¶59). And even though Boulange does not assess the particularly risky context of intravitreal injections, it emphasizes that even for more routine medical uses, "the coefficient of friction[] of the region of contact" between the stopper and the rest of a syringe must be "maintained over time, even after prolonged storage." Appx3928.

Boulange disparages Stopper C for failing to satisfy these very criteria. According to Boulange, the only stoppers that maintain low, predictable break-loose forces without large amounts of silicone oil are stoppers coated in Parylene C. Appx3937-3950. Indeed, that is Boulange's central teaching. Appx3937-3950. But when it comes to Stopper C, which lacks the Parylene C coating, Boulange warns about unsuitable break-loose forces that increase unpredictably over time. Appx3942-3946. These warnings would have steered a skilled artisan away from using Stopper C in a prefilled syringe for intravitreal injections.

The disparagement begins in Example 3, which reports an experiment in which the Boulange inventors took measurements of various stoppers' break-loose forces immediately after assembly and then again after accelerated aging. Appx3942-3943; *see* Appx3937-3941. Both the syringes and the stoppers were lubricated with silicone oil. Appx3942; *see* Appx3941. The results, collected in Table 5, reveal that Stopper C's break-loose force (abbreviated "B," *see* Appx3939) nearly doubled during storage—from 4.7 N to 8.4 N when used with the lowest amount of

silicone oil.  Appx3943 tbl.5.[5]  Stopper B1, by contrast, saw next to no change, with an increase from 2.2 N to just 2.8 N.  Appx3943 tbl.5.  As Boulange summarizes, "friction forces . . . increase[d]" after aging "in the case of comparative pistons A and C, whereas they remain[ed] practically unchanged and below 4 N in the case of inventive piston B1."  Appx 3943.  In light of these results, Boulange strongly discourages the use of Stopper C, calling it "markedly inferior" to Stopper B1.  Appx3943.

These discouraging statements are reinforced by even more disparagement just two pages later.  In Example 5, Boulange recounts another experiment measuring several stoppers' pre- and post-aging break-loose forces, this time with the syringes lubricated but not the stoppers.  In discussing the pre-aging break-loose forces, Example 5 explains that Stopper C's forces—including its 3.9 N break-loose force—"do[] not appear to be acceptable for a medical device."  Appx3945.  The example directly contrasts Stopper C "with piston B1" in this regard; according to Boulange, the pre-aging forces of Stopper B1—including its 2.1 N break-loose force—were "entirely compatible with the way in which a medical

---

[5] More silicone oil did not mitigate the aging effect: the break-loose force doubled when Stopper C was used with ten times more silicone oil.  *See* Appx3943 tbl.5.

device . . . is used." Appx3945. The example then discusses the stoppers'
post-aging break-loose forces, observing that "[a]fter one month of ageing,
the friction forces . . . for pistons A and C had increased appreciably, es-
pecially the [break-loose force]," whereas "the friction forces . . . of pistons
B1 had increased very little." Appx3945.

These statements are textbook examples of teaching away. Indeed,
this Court has previously *reversed* decisions for failure to recognize teach-
ing away on highly similar evidence. For instance, in *Santarus, Inc. v.
Par Pharmaceutical, Inc.*, 694 F.3d 1344 (Fed. Cir. 2012), the Court ob-
served that a prior-art reference taught away from a particular alterna-
tive where it "ruled out" that alternative and identified a different alter-
native as "offer[ing] the best possibilities." *Id.* at 1355. This Court thus
held the relevant claims nonobvious even though the district court had
rejected a teaching-away finding.

Boulange's disparagement of Stopper C also presents a clearer in-
stance of teaching away than *AstraZeneca*, which involved a prior-art ref-
erence that—like Boulange—compared certain "control" formulations to
certain "novel" formulations. *See* 19 F.4th at 1336. In *AstraZeneca*, even
though the reference "d[id] not contain explicit disparagement of the

control formulations," this Court nevertheless agreed with the district court that a skilled artisan "would have been discouraged from incorporating the [control] formulations" because experimental data about the performance of the control formulations "cut against the very goal a skilled artisan would have been trying to achieve." *Id.* at 1337-1338 (citation and brackets omitted); *accord Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1305-1306 (Fed. Cir. 2015) (explaining that the prior art taught away from using the compound benzalkonium chloride in certain eye medications because the prior art revealed several eye-related side effects associated with that chemical). Here, of course, Boulange contains both discouraging data *and* "explicit" disparagement. Just as in this Court's prior cases, a skilled artisan reading Boulange would have been actively discouraged from developing Stopper C.[6]

---

[6] Regeneron offered an obviousness combination based on Boulange's favored Stopper B1, but the Board did not reach it. *See* Appx27 n.17. For good reason: Stopper B1 is coated with Boulange's preferred Parylene C, and a skilled artisan would have expected that coating to be unsuitable for use in a terminally sterilized prefilled syringe containing a VEGF antagonist. Appx21535-21536 (¶¶44-46); Appx21547-21549 (¶¶66-67). As explained below, Boulange does not purport to address eye injections. *See infra*, pp. 38-40.

**2.    The Board's motivation analysis rests on hindsight and non-prior art.**

The Board's conclusion that a skilled artisan "would not have been deterred" by Boulange's disparagement of Stopper C rested on two key legal errors. With those legal errors corrected, there is no basis for disregarding Boulange's clear teaching away.

First, the Board rested on improper hindsight. This Court has repeatedly emphasized the importance of "avoid[ing] even a hint of hindsight": "Obviousness cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention." *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1352 (Fed. Cir. 2013) (quotation marks omitted). In other words, the obviousness analysis must start with the prior art and ask whether a person of ordinary skill would have worked *forward* to the claimed invention; a factfinder may not start with the claimed invention and work *backward* by identifying scattered instances of the claim limitations in the prior art.

The Board flouted these principles. It treated the variations in Stopper C's force profile as immaterial because, the panel said, "Stopper C's forces after aging are within the claimed range" ("less than 11 N").

32

Appx57; *see* Appx59.  But that reasoning is entirely backward-looking.

In taking that hindsight-based approach and assuming that anywhere in

the claimed range will do, the Board missed the key point: a person of

ordinary skill would not have been motivated to select a stopper with un-

predictable forces *regardless* of whether all of those force figures hap-

pened to fall within the claimed range, because the variation itself would

have been viewed as a problem.  *See* Appx21686-21689 (¶¶67-73).[7]

Relatedly, the Board relied on the challenged patent to establish

that Stopper C's forces after aging were "acceptable for intravitreal injec-

tion"—a context Boulange did not even consider—but it did not tie that

assertion to anything in the prior art.  According to the Board, even

though Stopper C is "inferior to" Stopper B1, "the values for Stopper C

are still . . . well under the 20 N that the '631 patent acknowledges was

---

[7] The Board cited Dr. Andrew Calman's testimony that he administers one prefilled syringe with forces up to 10 N.  Appx57 (citing Appx10929 (17:1-7), Appx10939 (27:10-17)).  But Dr. Calman was not discussing a syringe whose forces change unpredictably *over time*—that is, during storage—like Stopper C does.  *See* Appx10939 (27:10-17).  Indeed, Dr. Calman was not even clearly talking about the break-loose force at all: he clarified that the "higher forces" occurred only "with higher injection speeds and/or *towards the end of plunger travel*."  Appx10939 (27:15-17) (emphasis added).  Moreover, the data he was discussing (relating to the Eylea syringe) was not prior art.  *See infra*, pp. 35-36.

'known in the art' to be acceptable for intravitreal injection." Appx59 (quoting Appx269 (5:31-38)); *see* Appx57. But what the specification actually says is that stoppers with forces under 20 N are known in the art *generally*—not that they are known *to be acceptable for intravitreal injection*. Appx269 (5:31-38). The Board made that further leap all on its own. And the evidence does not support the Board's extrapolation from all known syringes to syringes for intravitreal injection: again, the force appropriate for an injection into a patient's eyeball is different (and lower) than the forces appropriate for, say, an injection into the arm. *See supra*, pp. 9-10. Nothing in the specification or elsewhere in the record supports the Board's inference that a skilled artisan would have viewed a break-loose force of up to 20 N as acceptable for an intravitreal injection device.

Second, the Board attempted to support its conclusion that a skilled artisan would have selected Stopper C despite the teaching away by impermissibly relying on documents outside the prior art. In contrast to a factfinder in district-court litigation, the Board may find obviousness "*only* on the basis of prior art consisting of patents or printed publications." 35 U.S.C. §311(b) (emphasis added); *see, e.g., Arctic Cat Inc. v.*

*GEP Power Prod., Inc.*, 919 F.3d 1320, 1332 (Fed. Cir. 2019) (reversing or vacating obviousness determinations that depended in whole or in part on a non-prior-art reference). Despite this rule, the Board concluded that "a force increase of less than 4 N after aging would have been expected and acceptable" because non-prior-art "data from Regeneron demonstrat[ed] that the break loose force for Eylea PFS can vary from approximately ▇ N (*i.e.*, 4 N)." Appx58; Appx9215 (underlying data).

The Eylea data is plainly not prior art. The document containing the data is dated 2018—years after the priority date. Appx9201. Nor is it public. Regeneron has insisted—to this day—that the data is confidential business information that has not been made public. *See* Appx9215 (designated "Controlled REGENERON document" with "CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER"); Appx1121. Indeed, Regeneron even convinced the Board to redact the supposedly motivating data from its final written decision. Data that the Board cannot even make public *in 2023* was plainly not publicly accessible in a printed publication *in 2012*. *See Cordis Corp. v. Bos. Sci.*

*Corp.*, 561 F.3d 1319, 1333 (Fed. Cir. 2009) ("[A] binding agreement of confidentiality may defeat a finding of public accessibility.").[8]

### 3. The Board wrongly disregarded half the basis for Boulange's teaching away.

In addition to the Board's reliance on hindsight and non-prior art, the Board's analysis of the teaching-away question is fatally flawed for an independent reason: it rests on a misreading of Boulange. To downplay the reference's disparagement of Stopper C, the Board suggested that "Boulange only states that Stopper C *in Table 7* 'does not appear to be acceptable for a medical device.'" Appx58 (quoting Appx3945). Observing that only the syringes were lubricated with silicone oil in the Table 7 experiment, whereas both the syringes *and* stoppers were lubricated in the Table 5 experiment, the Board surmised that Boulange's disparagement of Stopper C rested on that difference. Appx58. The Board's reading has no support in the reference whatsoever.

---

[8] Even on its own terms, the Eylea data does not show that "a force increase of less than 4 N after aging would have been expected." Appx58. There, 75% of tested syringes were clustered in a range from ▮#▮ to ▮#▮ N. *See* Appx9215 fig.1. Tolerating syringes that generally display the same forces, albeit with some outliers, is not the same thing as tolerating forces that are unpredictably inconsistent over time.

Boulange's statement about Stopper C not being "acceptable" appears in a paragraph discussing the initial, pre-aging break-loose forces in Table 7. Appx3945. And if the initial break-loose force for Stopper C in Table 7 (3.9 N) was unacceptably high, so were the initial break-loose forces for Stopper C in the other experiment (4.7 N, 4.2 N, and 3.9 N). *See* Appx3943 tbl.5, Appx3945 tbl.7. There is absolutely no basis for reading Boulange to teach that Stopper C was "not . . . acceptable" *unless lubricated*. As explained, the point of Boulange was to encourage the use of "the invention"—stoppers that, unlike Stopper C, were coated in Parylene C—precisely because they reduced the need for silicone oil.[9]

Thus, Boulange regarded Stopper C as "not . . . acceptable for a medical device" in addition to being "markedly inferior." The Board's refusal to recognize that disparagement was not only erroneous but unsupported.

---

[9] According to the Board, "Boulange discloses a pre-filled syringe with decreased silicone oil to limit the risk of interaction between the silicone oil and any drug stored in the syringe." Appx18. But Boulange makes clear that decreasing silicone oil is possible only with the syringe of "the invention"—that is, the invention *of Boulange*, which uses Parylene C. Appx3947-3950. And Stopper C does not use Parylene C. *See supra*, pp. 15-16. Only by misunderstanding this critical point was the Board able to conclude that a skilled artisan would have used Stopper C with reduced silicone oil.

### 4. Boulange does not motivate a skilled artisan to use Stopper C for eye injections specifically.

Even if Boulange did not *teach away* from the use of Stopper C, it certainly does not affirmatively *motivate* the use of that device in the eye-injection context. A reference that Regeneron's own expert called "[n]ot very motivat[ing]" is not substantial evidence of motivation. Appx20670 (147:13-148:4).

To establish motivation, Regeneron had to prove by a preponderance of the evidence not only that skilled artisans "*could* combine [the asserted] references," but "that they *would have been* motivated to do so." *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014). That means Regeneron had to show, at the very least, that its asserted combination was "a *suitable* option from which the prior art did not teach away." *Par Pharm., Inc. v. TWi Pharms., Inc.*, 773 F.3d 1186, 1198 (Fed. Cir. 2014). After all, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR Int'l v. Teleflex, Inc.*, 550 U.S. 398, 418 (2007).

Regeneron's asserted combination flunks this test. The record offers no reason to believe that a skilled artisan would have turned to

Boulange—a publication that does not even discuss intravitreal injections. A skilled artisan in 2012 would have known that an intravitreal injection is a unique procedure that requires a much more carefully calibrated syringe. *See, e.g.*, Appx3487 (¶53) (Regeneron's expert conceding that, in the context of intravitreal injections, it is "even more important" for a syringe to have a smooth force profile); *see also supra*, pp. 9-10. Yet nowhere does Boulange discuss that unique context. Indeed, a representative of Becton Dickinson, the assignee of the Boulange invention, conceded that its prefilled syringes were "not validated for intraocular use." Appx24355. Against that backdrop, Regeneron offers no reason why a skilled artisan would have turned to Boulange to solve a problem relating to injection devices for intravitreal injections.

And even if Regeneron could show that a skilled artisan would have picked up Boulange, that does not support selecting Boulange's disfavored Stopper C for this purpose. Again, the central teaching of Boulange is that a stopper must either use large amounts of silicone oil or be coated in Parylene C to be suitable for a medical device—after all, Boulange's invention is a syringe with a Parylene C-coated stopper. *See supra*, p. 15. No skilled artisan would read that reference and come away encouraged

39

to use the *uncoated* Stopper C in a medical device where large amounts of silicone oil are problematic. *See supra*, pp. 26-32. In the end, even Regeneron's own expert conceded the point: Boulange's statements about Stopper C, he agreed, are "[n]ot very motivat[ing]." Appx20670 (147:13-148:4). Thus, even if Boulange does not affirmatively teach away from the use of Stopper C, it certainly cannot sustain a finding that a skilled artisan would have been motivated to use that element in this context. And that lack of motivation evidence is fatal to the obviousness combination that the Board adopted.

### 5.    Regeneron's expert declaration cannot sustain the Board's motivation analysis.

The Board also relied on the unsubstantiated opinion of Regeneron's expert, Horst Koller, that a person of ordinary skill "would have understood that most pre-filled syringes are expected to experience some level of force increase over the shelf-life of the syringe." Appx57-58 (quoting Appx6620 (¶39)) (emphasis added). But that opinion cannot support the Board's motivation analysis because the very evidence on which Mr. Koller relied refutes his opinion.

Mr. Koller based his opinion on Figure 1 from Regeneron's Exhibit 1013:

 

**Figures 1a and 1b: the break loose effect**

Appx6621; *see* Appx3986.  As an initial matter, it is hard to glean any-thing from these stylized, hypothetical graphs, which contain no units quantifying the graphs' axes.  And even taking the figure at face value, it decidedly does *not* show that "most pre-filled syringes" experience some level of force increase.  Instead, *some* prefilled syringes—"oily" syringes shown in the figure's left panel—see "higher break-out forces" over time, but others—"baked-on"[10] syringes shown in the right panel—have

---

[10] The process of "baked-on" siliconization involves "application of a silicone oil emulsion and 'heating the silicone-coated syringe to a specific temperature for an appropriate time.'"  Appx3493-3494 (¶63) (quoting Appx3986).  In contrast, the process of "oily" or "spray-on" siliconization involves "spraying silicone oil directly onto the inside of the syringe

41

"[b]reak-out forces [that] stay low during storage." Appx6621. Indeed, according to Regeneron's expert, a skilled artisan never would have considered the oily syringes in the left panel, because baked-on siliconization (which is disclosed in Boulange) is far superior. *See* Appx3493-3500 (¶¶63-71); Appx3944; Appx6611 (¶15). In short, there is no actual evidence for the Board's conclusion that a skilled artisan would have expected "*most* pre-filled syringes" to experience an increase in break-loose forces over the shelf-life of the product. Appx57-58 (emphasis added).

## B. A skilled artisan would not have reasonably expected success in combining Boulange's Stopper C with Sigg's terminal sterilization method.

The second step of the obviousness inquiry asks whether a person of ordinary skill in the art would have had a "reasonable expectation of success in" combining the challenger's asserted references. *Samsung Elecs. Co. v. Elm 3DS Innovations, LLC*, 925 F.3d 1373, 1380 (Fed. Cir. 2019). That expectation cannot exist where a person of ordinary skill would have believed the elements of one asserted reference "incompatible" with the elements of another. *Id.* at 1381 (affirming no-reasonable-expectation finding where expert testimony showed that the chemical

---

barrel to form a lubricant coating." Appx3490 (¶58).

process disclosed in one reference was "incompatible with" the integrated circuit disclosed in another reference).  That kind of incompatibility exists here: the prior art offered no reason to believe that Sigg's terminal sterilization method would work with Boulange's syringes, and the Board erred in finding otherwise.

### 1. A person of ordinary skill would not have known how to design a syringe to withstand Sigg's terminal sterilization.

A person of ordinary skill in the art on the priority date would have known it was extremely challenging to terminally sterilize a prefilled syringe without damaging a VEGF antagonist inside.  *See supra*, p. 11.  Regeneron's own expert, James Agalloco, underscored these difficulties: as of 2012, he explained, "[t]he manufacture[] of sterile products [was] universally acknowledged to be the most difficult of all pharmaceutical production activities to execute."  Appx23947 (55:6-20).  Indeed, even as late as 2017—several years *after* the priority date—Regeneron executives lamented that "[t]erminal sterilization has been a humbling engineering problem."  Appx24213; *see* Appx24147-24148 (60:16-63:3).

In light of these difficulties, Sigg itself taught that "there are only very few packaging material combinations that provide the required

43

tightness of the system such as to avoid ingress of sterilizing gasses into the pharmaceutical liquid enclosed by the prefilled container." Appx3891. Even the Board acknowledged the basic point: "terminally sterilizing a [prefilled syringe] with [vaporized hydrogen peroxide]," the Board explained, "was technically challenging at the time of invention." Appx67.

Crucially, however, Sigg never teaches a skilled artisan *how* to overcome these known technical challenges. "Sigg is entirely focused on the sterilization *process*, i.e., the steps involved in performing the sterilization method on a filled container such as a syringe, but provides essentially no information about the container (e.g., the syringe) itself." Appx21246-21247 (¶55). The lack of any instruction on how to achieve terminal sterilization of a prefilled syringe for intravitreal injection of a VEGF antagonist would have been a significant obstacle to skilled artisan. *See, e.g.*, Appx21247-21248 (¶56) ("[Sigg's] process information . . . would not have been sufficient for a POSA to practice the VHP sterilization method on a [syringe] filled with a VEGF-antagonist for intravitreal injection."); Appx21249-21250 (¶58) ("Sigg . . . makes clear that most syringe designs are not suitable for use with the described VHP methods,

44

but Sigg does not identify any examples of suitable syringes or even features of syringes that are suitable.").

> ###     2.     The Board's reasonable-expectation analysis relies on non-prior art.

As it did in its motivation analysis, *see supra*, pp. 34-36, the Board supported its reasonable-expectation analysis with confidential information that was not found in any prior-art printed publication.  In particular, the Board concluded that a person of ordinary skill would have "known that siliconized Stopper C was suitable for a terminally sterilized [prefilled syringe] comprising a VEGF-antagonist because siliconized rubber stoppers had already been used for that purpose in the Macugen [prefilled syringe]."  Appx56.  But the only written support for that proposition comes from confidential FDA filings produced by Bausch, subject to a protective order, that Regeneron certified "have not been published or otherwise made public."  Appx1134, Appx1136-1137.  The Board's final decision even redacts a short parenthetical describing the document in the most general terms.  Appx56 (parenthetical following citation to Ex. 1220).  It goes without saying that the confidential information in this document is not prior art.

Seeking to fill this hole in its reasoning, the Board's opinion notes that "the terminally sterilized Macugen [prefilled syringe]" was "FDA approved and on-sale in the United States before the filing date of the '631 patent," and concludes that "the evidence surrounding its development and launch is still relevant to the knowledge base of" a person of ordinary skill. Appx71-72 (citing *Yeda Research v. Mylan Pharm. Inc.*, 906 F.3d 1031, 1041 (Fed. Cir. 2018)). But *confidential* aspects of Macugen's FDA file, which the agency would not make public, 21 C.F.R. §20.61(c), are not part of the general "knowledge base." In any event, the Board's reliance on non-prior-art information about the Macugen syringe goes well beyond allowing that information to play a permissible "supporting role[]." *Yeda*, 906 F.3d at 1041. In *Yeda*, for example, the Court concluded that the Board erred to the extent it used a non-prior-art reference "in deciding whether a [person of ordinary skill] would have had a reasonable expectation of success." *Id.* at 1042. That is exactly what the Board did here: it relied on the nonpublic Macugen information to show that a person of ordinary skill would have "known that siliconized Stopper C was suitable for a terminally sterilized [prefilled syringe] comprising a VEGF-

46

antagonist"—*i.e.*, would have had a reasonable expectation of success in combining Boulange and Sigg.

Without that improper reliance on non-prior art, the Board lacks sufficient grounds to find a reasonable expectation of success, and its decision should be set aside.

### 3. The remaining evidence does not support the Board's reasonable-expectation finding.

Even if the Court could overlook the Board's reliance on non-prior art, the remainder of the Board's reasonable-expectation analysis is flawed, too.

a. Most notably, the Board ignores an entire category of probative evidence: testimony from Regeneron's expert, Mr. Agalloco, that cuts *against* Regeneron's argument that persons of ordinary skill would have thought they could terminally sterilize Boulange's syringes without degrading the biologic drug inside. As discussed above, Mr. Agalloco testified that in 2012 "[t]he manufacture[] of sterile products [was] universally acknowledged to be the most difficult of all pharmaceutical production activities to execute." Appx23947 (55:6-20). Novartis cited this key admission to the Board. Appx1652. The Board failed to acknowledge it

at all—much less explain how it was consistent with the Board's reasonable-expectation finding.

b.  While it ignored Mr. Agalloco's testimony, the Board did point to Mr. Koller's testimony to support its reasonable-expectation analysis.  In particular, the Board relied on Mr. Koller's opinion "that it was standard in the art to design pre-filled syringes like those in Boulange to be gastight to protect the drug from degradation during shelf life."  Appx63 (citing Appx3563-3565 (¶172)).  But there are several problems with the Board's reliance on this evidence.

First, the Board's analysis (and the testimony from Mr. Koller on which it relies) simply points back to Boulange—and Boulange, like Sigg, would not have given a person of ordinary skill in the art a reasonable expectation of achieving sufficient gas-tightness in a syringe containing Stopper C.  That is because the cited passages of Boulange, a reference that focuses on the Parylene C coating, do not even pertain to the uncoated Stopper C.  According to the Board, Boulange "explain[s] that *the disclosed coating* ensures tightness" and "describes that *the invention* . . . preserv[es] the tightness" between the piston and syringe.  Appx63 (citing Appx3927-3928 (3:20-27, 4:21-32); Appx3930 (6:10-14)) (emphasis

added and omitted) (quotation marks omitted). But Stopper C does not bear the "disclosed coating" and is not "the invention" of Boulange (Stopper B1). *See* Appx3938 tbl.1.

Thus, the teachings that form the backbone of the Board's reasonable-expectation analysis do not even relate to Stopper C—the only stopper the Board considered in its motivation analysis. And even putting aside that fundamental error, the relevant passages of Boulange simply express a general preference for gas-tightness—they never explain *how* to design a stopper that gets the job done. *See* Appx3563 (¶172) (contending that "Boulange . . . acknowledges the need for a stopper design to maintain sufficient tightness" without offering any information about how to meet that need); *cf.* Appx24383 (276:3-10) (Mr. Koller acknowledging that Boulange contains "no specific gas ingress testing data").

Second, the Board's analysis fails to grapple with an independent hurdle that rubber stoppers posed. As Regeneron's expert conceded, ethylene oxide and vaporized hydrogen peroxide can absorb into the rubber stopper of a prefilled syringe and leach into the drug over time. Appx23937 (14:18-15:16). Nothing in Boulange addresses how to prevent sterilizing gas from reaching and degrading a VEGF antagonist through

that mechanism, and the Board offered no answer of its own—it simply ignored the point when Novartis raised it. Appx783-784.

Third, the Board incorrectly dismissed the fact that Boulange teaches aseptic filling—an alternative to terminal sterilization in which syringe components are sterilized *before* filling. *See* Appx21254 (¶65); Appx3928 (4:10-11). In light of that that teaching, a skilled artisan would not have been motivated to combine Boulange with a reference, like Sigg, that teaches terminal sterilization. The Board disagreed, but the two justifications it offered for its conclusion were both wrong. According to the Board, "Boulange makes no reference to aseptic filling." Appx64. But Boulange plainly describes aseptic filling, even if it does not do so *by name*. *See* Appx3928 (4:1-11) (discussing sterilization by means of "ionizing radiation" that occurs *before* "the medical device has been filled with the medical product"). The Board also reasoned that "*all* [prefilled syringes] are designed to be gas-tight during normal storage to prevent air from negatively interacting with the drug product." Appx64. But even if that statement were correct, it is irrelevant: terminal sterilization is *not* normal storage. Rather, the terminal sterilization methods discussed in Sigg are performed under pressure extremes that heighten the risk that

50

sterilizing gas will contaminate the drug product—which is particularly problematic when dealing with VEGF antagonists uniquely susceptible to degradation. *See, e.g.*, Appx21244-21245 (¶51); Appx21273 (¶93); *see also supra*, pp. 10-11.

c. The Board also found that a person of ordinary skill would have had a reasonable expectation of success in combining Sigg and Boulange because, the Board said, Sigg's sterilization method "can be done at ambient pressure." Appx65. But the evidence does not bear out that conclusion.

As Regeneron's expert, Mr. Agalloco, testified, the only vaporized-hydrogen-peroxide method that a person of ordinary skill would have known on the priority date was performed with a vacuum. Appx23941-23942 (32:2-33:3). Moreover, and at the very least, a vacuum is used at the end of the sterilization process to remove any residual gasses. Appx3891; Appx3902; Appx3912; *see* Appx23944 (41:10-18). Thus, the Board's "ambient pressure" hypothesis does not salvage its reasonable-expectation analysis.

***

For all these reasons, the Board erred in determining that a person of ordinary skill in the art would have been motivated to use Boulange's Stopper C or would have had a reasonable expectation of successfully combining Stopper C with Sigg's terminal-sterilization method. Accordingly, the Board erred in finding claim 1 obvious. That is a sufficient basis to reverse as to all claims. *See, e.g.*, Appx126 (all the Board's reasoning relies on Boulange and Sigg).

## II. The Board erred in holding that dependent claim 21 is obvious based on Sigg and Boulange.

Even if the Board's analysis of the independent claim were sustainable, its treatment of dependent claim 21 is independently flawed. That claim calls for a blister pack comprising a prefilled syringe according to claim 1, "wherein the syringe has been sterilized using EtO or $H_2O_2$ with a Sterility Assurance Level of at least $10^{-6}$." Appx276 (20:21:23). The Board misread Sigg as providing motivation to use vaporized hydrogen peroxide to achieve the specific sterility assurance level of $10^{-6}$ or greater for a prefilled syringe containing a VEGF antagonist. And the prior art provided no reasonable expectation that a skilled artisan would succeed in producing what was—even according to Regeneron's own expert—

52

"universally acknowledged to be the most difficult of all pharmaceutical production activities to execute." Appx23947 (55:6-20).

### A. A skilled artisan would not have been motivated to achieve a sterility assurance level of $10^{-6}$ or greater using ethylene oxide or hydrogen peroxide.

Claim 21 requires achieving a specific sterility assurance level—$10^{-6}$—using a particular method: treatment with ethylene oxide or hydrogen peroxide. Appx276 (20:21:23). Yet Sigg never teaches that a sterility assurance level of $10^{-6}$ or greater can be achieved, without damage to a sensitive VEGF antagonist inside the syringe, *using ethylene oxide or hydrogen peroxide*.

Sigg discloses and claims two methods of terminal sterilization: vaporized hydrogen peroxide and beta irradiation. *See* Appx3891-3922; *see* Appx3890 (contrasting "[r]adiation techniques" with techniques using "oxidizing gases"). As Mr. Koller agreed at his deposition, however, the only time Sigg discloses achieving a sterility assurance level of $10^{-6}$ is in connection with its claim 15, which recites achieving a $10^{-6}$ sterility assurance level *using beta irradiation*. Appx3914; Appx20649-20650 (64:15-65:1); *see* Appx23957-23958 (94:21-97:19). There is no similar disclosure for vaporized hydrogen peroxide.

53

To compensate for the complete absence of the essential disclosure, the Board relied on a dubious syllogism. The Board observed (1) that Sigg "defines 'sterility' for a health care product as $10^{-6}$" and (2) that Sigg "describes VHP as a 'sterilization' treatment." Appx110 (citing Appx3895 (7:6-13); Appx3908 (20:11-16)). Combining these points, the Board concluded that vaporized hydrogen peroxide ensures a sterility level of $10^{-6}$. Appx110.

The Board's premises do not support its conclusion. The Board's reasoning hinges on the fact that Sigg occasionally calls vaporized hydrogen peroxide a "sterilization treatment." Appx3908 (20:11-16). But Sigg's definitions make clear that "sterilization" and "sterility" are separate terms. "Sterility" is a more specific term referring to "complete absence of microbial life as defined by a probability of nonsterility or a sterility assurance level (SAL)" (*e.g.*, at least $10^{-6}$ "for health care products"). Appx3895. "Sterilization," meanwhile, is a more general descriptor—it is "interchangeabl[e]" with other terms like "decontamination," "sanitization," "antimicrobial treatment." Appx3895. According to the Board, at least one of those interchangeable terms—"sanitization"—can refer to a sterility assurance level of only $10^{-3}$. Appx110-111. Thus, the Board's

analysis fails on its own terms: even accepting the Board's logic, Sigg's reference to vaporized hydrogen peroxide as a "sterilization treatment" suggests only that it achieves a lower sterility assurance level than claimed.

To support its alternative conclusion, the Board cites Mr. Koller's declaration for the proposition that "sterilization" refers to "an SAL of $10^{-6}$," while "sanitization" refers to "an SAL of $10^{-3}$." Appx110. "[B]y using the term 'sterilization,'" the Board reasons, "Dr. Sigg intended to communicate that the method he developed was able to achieve an SAL of $10^{-6}$." Appx110 (quoting Appx6642 (¶82)) (quotation marks omitted). But that assertion directly conflicts with the *express definition* in Sigg itself—which says that "sterilization" and "sanitization" are "inter-changeabl[e]." Appx3895. The Board cannot use declaration testimony about a term's everyday meaning to alter the way that term is *specifically defined* in the specification of a prior-art patent application. *Cf. 3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003) ("[A] definition of a claim term in the specification will prevail over a term's ordinary meaning if the patentee has acted as his own lexicographer and clearly set forth a different definition.").

The Board also cited what it called "the prosecution history of the Sigg '380 application." Appx111. In particular, the Board observed that, in 2014 (well after the priority date), "Novartis submitted claims . . . directed to an SAL of $10^{-6}$ using VHP." Appx111. According to the Board, even though no such claims ever issued, this submission constituted a "represent[ation] to the USPTO that Sigg includes such a disclosure to enable VHP to achieve a sterility assurance level of at least $10^{-6}$." Appx111. But the prosecution history of the Sigg '380 application (*i.e.*, the U.S. counterpart of the international Sigg application) is not prior art. The published Sigg *reference* (*i.e.*, the PCT publication that forms part of Regeneron's obviousness combination) is dated January 20, 2011. Appx3888. And the priority date of the '631 patent is no later than October 23, 2012. Appx4 n.6. Yet the claim amendments that the Board cites come from March 13, 2014. Appx13121-13128. In other words, the Board is once again relying on non-prior-art. The question is what the 2011 Sigg PCT publication taught a person of ordinary skill in the art in

56

2012—not what claims or arguments Novartis introduced during prosecution in 2014.[11]

Applying Sigg's defined terms, a skilled artisan would have understood the general description of vaporized hydrogen peroxide as a sterilization treatment as just that—a general description, not a specific cross-reference to a demanding sterility assurance level.  The Board erred in concluding otherwise.

### B.    A skilled artisan would not have reasonably expected to succeed in achieving a sterility assurance level of $10^{-6}$ or greater using ethylene oxide or hydrogen peroxide.

Even if the Court were to discern sufficient motivating disclosures in Sigg, a skilled artisan would not have had a reasonable expectation of success.  That fact was confirmed by Regeneron's own expert—whose testimony the Board simply ignored.

---

[11] Moreover, the claim amendments that Novartis submitted in March 2014 are irrelevant because the examiner rejected them (and then issued a notice of abandonment several months later).  *See* Appx13132-13148.  No claims ever issued on the Sigg '380 application.  Appx111.  Even if the Board were correct that Novartis's position in this action is inconsistent with its claim amendments, "[a]bsent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations."  *New Hampshire v. Maine*, 532 U.S. 742, 750-751 (2001) (emphasis added) (quotation marks omitted).

As Mr. Agalloco testified, as of 2012, sterilization was "universally acknowledged" to be "the most difficult of all pharmaceutical production activities to execute." Appx23947 (55:6-20). And achieving a sterility assurance level of $10^{-6}$ without unacceptably degrading a sensitive biologic medication required even more effort. Mr. Agalloco conceded that it can sometimes take "extensive experimentation to try to make a particular method work to give you a [$10^{-6}$] SAL." Appx23962 (113:11-114:9). And he agreed that sometimes a sterility assurance level of $10^{-6}$ cannot be achieved at all, in which case a less stringent sterility assurance level must be used. Appx23951 (71:20-72:3). As Mr. Agalloco explained, various factors "alone or in combination could result in your inability to achieve the [$10^{-6}$] and allow you to defer to something less." Appx23951 (72:10-16). Indeed, industry guidelines recognize that sometimes a terminal sterilization process cannot be designed that will "achieve an SAL of $10^{-6}$ without adversely affecting the essential safety and function" of the product. Appx20577 ("If, based on its intended use, a product would be required to possess a $10^{-6}$ SAL, but the product is incapable of withstanding the sterilization process, the selection of an SAL other than $10^{-6}$ may be necessary.").

58

The Board's response to this evidence: nothing. Novartis cited the foregoing testimony, *see* Appx1658-1661, but the Board failed to even address it—let alone explain how it can be squared with the Board's analysis of claim 21. That is because it cannot. Regeneron's own expert conceded that a skilled artisan would not have expected to succeed in achieving the limitations of claim 21 based on the teachings of Sigg and Boulange, and nothing in the record suggests otherwise.

## III. Objective indicia refute the Board's obviousness determination.

Where objective indicia of nonobviousness are present, they also "must be considered," as they "help[] inform the ultimate obviousness determination." *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048-1049 (Fed. Cir. 2016) (en banc). Here, the Board improperly discounted several objective indicia because of its erroneous view of nexus. And it erred in its ultimate weighing of the objective indicia.

### A. The Board improperly discounted evidence of licensing and commercial success.

#### 1. Genentech's licensing and the success of the Lucentis prefilled syringe provide strong evidence that the claims of the '631 patent are not obvious.

Commercial success and licensing can be powerful signs that a claimed invention is not obvious. "When a product attains a high degree

of commercial success, there is a basis for inferring that attempts to a solution have been made and have failed." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016) (brackets and quotation marks omitted). Likewise, "evidence that competitors or customers had licensed" a disputed patent can "provide probative and cogent evidence of non-obviousness of the claims at issue." *Institut Pasteur & Université Pierre & Marie Curie v. Focarino*, 738 F.3d 1337, 1347 (Fed. Cir. 2013) (quotation marks omitted).

Both of those objective indicia of nonobviousness are present here. As discussed above, Genentech tried and failed to develop a prefilled syringe for its Lucentis (ranibizumab) VEGF antagonist. *See supra*, pp. 11-13. It then took a license to the '631 patent—and achieved substantial commercial success. *See supra*, p. 13. Genentech's sales of Lucentis vials had begun to decline in 2015 due to market competition. Appx23061; Appx18693; Appx18701. The launch of the prefilled syringe presentation according to the patent claims here not only reversed the Lucentis sales decline, but caused sales to climb higher than they had been at any previous time. Appx21805-21806 (¶20).

60



Appx21819-21822 (¶¶39-40). In the end, even the Board acknowledged that "[t]here is little dispute that . . . [the] Lucentis PFS was commercially successful." Appx83.

Both Genentech's licensing decision and the commercial success of its product had a nexus to the claims of the '631 patent. With respect to the license, the timeline tells a clear story: Genentech spent years developing its own prefilled syringe; it failed; and then it opted to take a license from Novartis to the '631 patent and to sell its Lucentis product using Novartis's prefilled syringe. *See supra*, pp. 11-13; *see also* Appx16863-16885. That license is specific to the prefilled syringe, and it covers only two families of patents, both related to the prefilled syringe. Appx16882-16885 (listing the '631 patent family at PAT055157 in Exhibit D).

The nexus to Genentech's commercial success is equally apparent. The Lucentis prefilled syringe is an embodiment of—and is coextensive with—a number of claims of the '631 patent, including claims 1 and 21. *See* Appx21317 (¶166); Appx21669 (¶31). Indeed, Novartis submitted a detailed claim chart explaining how each claim limitation of claims 1, 3, 7, 8, 14, 17, 21, 22, and 24 is practiced in the Lucentis syringe. *See* Appx830-832. Consider just claims 1 and 21:

| '631 PATENT LIMITATIONS | FEATURES OF THE LUCENTIS PFS |
|---|---|
| **Claim 1** | |
| *A pre-filled, terminally sterilized syringe for intravitreal injection,* | Lucentis PFS is a "pre-filled syringe" for "intravitreal injections" (Appx17153) that is sterilized using [chem] after it is [activity] in its [material] (Appx16281) |
| *the syringe comprising a glass body forming a barrel, a stopper and a plunger and* | Lucentis PFS comprises a glass body forming a barrel, a stopper and a plunger rod (Appx14657) |
| *containing an ophthalmic solution which comprises a VEGF-antagonist, wherein:* | Lucentis PFS contains ranibizumab, a VEGF antagonist and anti-VEGF antibody, in an ophthalmic solution (Appx17167; Appx269 (6:32-36); Appx21324-21325 (¶181); Appx21338 (¶222)) |
| *(a) the syringe has a nominal maximum fill volume of between about 0.5 ml and about 1 ml,* | nominal maximum fill volume of Lucentis PFS is [#] ml (Appx16358) |
| *(b) the syringe barrel comprises from about 1 µg to 100 µg silicone oil,* | Lucentis PFS barrels contain [#-#] µg of silicone oil, with an acceptance criterion of less than [#] µg of silicone oil (Appx16479) |



| | |
|---|---|
| *(c) the VEGF antagonist solution comprises no more than 2 particles >50 μm in diameter per ml* | the VEGF antagonist solution of Lucentis PFS comprises no more than ▓ particles >▓ μm per ml (Appx16468) |
| *and wherein the syringe has a stopper break loose force of less than about 11N.* | Lucentis PFS has stopper break-loose force of ▓ N (Appx16469) |
| **Claim 21** | |
| *A blister pack comprising a prefilled syringe according to claim 1, wherein the syringe has been sterilized using $H_2O_2$ or EtO with a Sterility Assurance Level of at least $10^{-6}$.* | Lucentis PFS is "[action] using [chem] to achieve a minimum [result] of [#]" (Appx16397) |

For all these reasons, the Board should have recognized a nexus between the patent claims and the Lucentis prefilled syringe, and that Genentech's licensing and the commercial success of the Lucentis pre-filled syringe provide strong indications that Novartis's claimed invention is not obvious.

## 2. The Board discounted licensing and commercial success based on a flawed view of nexus.

The Board concluded that there was no nexus between the claims of the '631 patent and either the commercial success of the Lucentis pre-filled syringe or Genentech's decision to license the '631 patent. But the Board's analysis was fundamentally flawed on both counts.

MATERIAL SUBJECT TO PROTECTIVE ORDER REDACTED

a. The Board was wrong that the commercial success of the Lucentis prefilled syringe stemmed from "significant unclaimed features" of that product. Appx75-80. The Board pointed in particular to (1) the design of the Lucentis syringe's stopper and plunger rod, (2) the inclusion of a particular tip cap, and (3) the use of a "baked-on" silicone-application technique. Appx75-80. But the Board missed the forest for the trees. These specific design choices are not meaningful *in themselves*—instead, they are relevant because they allow for terminal sterilization of the prefilled syringe without damage to the sensitive VEGF antagonist inside. *See* Appx78 (acknowledging that these design features are "significant for terminal sterilization"). And that is exactly what the '631 patent claims: a barrel-stopper-plunger combination that allows a prefilled syringe to be terminally sterilized without damaging a VEGF antagonist inside. Appx276.[12]

---

[12] Notably, the unique stopper and plunger rod of the Lucentis syringe—which are described and depicted in the '631 patent's specification—were developed before the priority date of the '631 patent by the same Novartis scientists who pioneered the patent. *See* Appx266 (figs. 2, 3, 5); Appx267-268 (2:57-3:62); Appx272 (11:14-36, 12:15, 12:27-29); Appx18087; Appx21279 (¶104). Novartis scientists also selected the tip cap: they simply compared different caps and selected one that allows the Lucentis syringe to maintain an adequate [result] during [process].

By citing these three features as significant unclaimed features, the Board essentially demanded perfect correspondence between the claims and the Lucentis prefilled syringe—in conflict with this Court's case law. As the Court explained in *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366 (Fed. Cir. 2019):

> [T]he degree of correspondence between a product and a patent claim falls along a spectrum. At one end of the spectrum lies perfect or near perfect correspondence. At the other end lies no or very little correspondence, such as where the patented invention is only a component of a commercially successful machine or process. Although we do not require the patentee to prove perfect correspondence . . . , what we do require is that the patentee demonstrate that the product is essentially the claimed invention.

*Id.* at 1374 (citation and quotation marks omitted). Here, the claim limitations are plainly more than a "component" of the Lucentis prefilled syringe—they essentially *are* the Lucentis product. The Board erred by demanding a one-to-one matchup.

In the end, the Board's analysis lost sight of the blockbuster nature of the Lucentis syringe. As the chart above shows, the Lucentis prefilled syringe quickly replaced the Lucentis vial and pushed sales of the drug

[process]. Appx18150; *see* Appx6652 (¶105). And baked-on siliconization, for its part, is simply the prior art method of applying lower amounts of silicone oil. *See supra*, pp. 41-42 & n.10.

higher than ever before. *See supra*, p. 61. The idea that *no part* of that commercial success is due to features claimed in the '631 patent is fanciful. And that is fatal to the Board's conclusion. Where the commercial success of a product is due to "two factors," one "undisputedly covered by the claims" and the other "undisputedly *not* covered by the claims," the burden is on the challenger—not the patentee—to "disprov[e] that the [claimed factor] contributed to the success of the invention." *Ecolochem, Inc. v. S. California Edison Co.*, 227 F.3d 1361, 1378 (Fed. Cir. 2000). Regeneron never made that showing, and nothing in the record allows the Board to conclude that the claims of the '631 patent—which Genentech licensed—played *no role* in the commercial success of its blockbuster product.

b. The Board also erred in concluding that "Genentech's license has a weak nexus to the '631 patent claims, because it is directed to data and know-how for FDA approval that are not disclosed in the '631 patent." Appx98. This Court has previously criticized the Board for "too finely pars[ing] [a third party's] licensing activities." *Pasteur*, 738 F.3d at 1347. In *Pasteur*, the Board had rejected evidence of licensing on the view that the patentee "did not establish that the third parties specifically licensed

the patent family to gain access to the subject matter *claimed* in the [relevant] patent, rather than other technology *described* in the patent but not claimed or claimed in related patents." *Id.* This Court explained that "that theoretical possibility does not undermine the strong probative value of the licensing of the [relevant] patent" because "[t]he central success described in the patent [was] the one prior art hoped for and [was] captured in the claims at issue." *Id.*

So, too, here: the theoretical possibility that Genentech had other reasons for taking a license does not undermine the fact that the "central success described in" the '631 patent—a terminally sterilized prefilled syringe for intravitreal injection of a VEGF antagonist—was one that the "prior art hoped for," and that Genentech itself tried and failed to achieve. As in *Pasteur*, therefore, Genentech's "licensing activities provide probative and cogent evidence of non-obviousness of the claims at issue." *Id.* (quotation marks omitted).

For all these reasons, the Board erred in discounting Novartis's evidence of commercial success and licensing.

### B.    The Board erred in its ultimate weighing of the objective indicia.

The weighing of objective indicia and the ultimate obviousness determination are questions of law that this Court reviews de novo.  *See, e.g.*, *Leo Pharm. Prod., Ltd. v. Rea*, 726 F.3d 1346, 1353 (Fed. Cir. 2013). Here, the objective indicia that the Board found in Novartis's favor—with or without the additional indicia that the Board should have found for Novartis (*see supra*, pp. 59-67)—support the patentability of all the claims of the '631 patent.

Most notably, this case involves a clear example of a long-felt need and failure of others.  *See, e.g.*, *Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1369 (Fed. Cir. 2017) (holding that "[e]vidence of long-felt need is particularly probative of obviousness when it demonstrates both that a demand existed for the patented invention, and that others tried but failed to satisfy that demand" (quotation marks omitted)).  Genentech had every incentive to succeed in developing a terminally sterilized pre-filled syringe for intravitreal injection of a VEGF antagonist, but it was unable to do so.  *See supra*, pp. 11-13.  Indeed, this is the rare case in which there is *direct* evidence of a prominent trying to make the claimed invention, and failing.  *See supra*, pp. 11-13.

68

The Board agreed that the evidence of long-felt need and failure of others cut in Novartis's favor.  Appx96; *see also* Appx93 (acknowledging "a need to reduce silicone oil contamination that was not necessarily met by Macugen PFS").  But the Board deemed those objective indicia "not significant" because, it said, "producing a syringe that avoided silicone oil contamination was achieved . . . by the baked-on application process." Appx97.  That makes no sense.  Baked-on siliconization was disclosed in the prior art: Boulange teaches it, for example.  *See supra*, p. 42.  Yet the long-felt need persisted—Genentech did not succeed in developing a pre-filled syringe until it licensed Novartis's invention.

Properly considered, this evidence of long-felt need and Genentech's failure weighs heavily against obviousness.  And that is even before adding to the scale the evidence of licensing and commercial success that the Board improperly disregarded.  *See supra*, pp. 59-67.  Together, these indicia paint a consistent picture: no one had managed to satisfy the long-felt need for a terminally sterilized prefilled syringe for intravitreal injection of VEGF antagonists—much less managed to bring such a syringe to market—until Novartis's invention.

# CONCLUSION

The Court should reverse the Board's final written decision finding

claims 1 through 26 of the '631 unpatentable as obvious.


July 3, 2023                                    Respectfully submitted.

                                                /s/ *William M. Jay*

Elizabeth Holland                               William M. Jay
ALLEN & OVERY LLP                               GOODWIN PROCTER LLP
1221 Avenue of the Americas                     1900 N Street, N.W.
New York, NY 10020                              Washington, DC 20036
(212) 610-6365                                  (202) 346-4190

William G. James II                             Joshua Weinger
ALLEN & OVERY LLP                               Gerard J. Cedrone
1101 New York Avenue, N.W.                      GOODWIN PROCTER LLP
Washington, DC 20005                            100 Northern Avenue
(202) 683-3895                                  Boston, MA 02210
                                                (617) 570-1000

                                                *Counsel for Appellants*

# ADDENDUM TABLE OF CONTENTS

**Agency Order:**

Final Written Decision,
  Paper No. 113 (October 25, 2022)........................................ Appx1-128

**Patent:**

U.S. Patent No. 9,220,631 ................................................... Appx264-276

████████████████████

Trials@uspto.gov
571-272-7822

Paper 113
Entered: October 25, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

REGENERON PHARMACEUTICALS, INC.,
Petitioner,

v.

NOVARTIS PHARMA AG,
NOVARTIS TECHNOLOGY LLC,
NOVARTIS PHARMACEUTICALS CORPORATION,
Patent Owner.

_____

IPR2021-00816
Patent 9,220,631 B2

_____

Before ERICA A. FRANKLIN, ROBERT L. KINDER, and
JAMIE T. WISZ, *Administrative Patent Judges*.

KINDER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

████████████████████

**Regeneron Exhibit 1257.001
Regeneron v. Novartis
IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

## I.    INTRODUCTION

On April 16, 2021, Regeneron Pharmaceuticals, Inc. ("Petitioner" or
"Regeneron")[1] filed a Petition to institute *inter partes* review of claims 1–26
(all claims) of U.S. Patent No. 9,220,631 B2 (Ex. 1001, "the '631 patent").
Paper 1 ("Petition" or "Pet.").  On October 26, 2021, we instituted the
petitioned review (Paper 13, "Institution Decision" or "Inst. Dec.").

Novartis Pharma, AG, et al., ("Patent Owner" or "Novartis")[2] filed a
Patent Owner Response (Papers 35, 40[3] "PO Resp.") to oppose the Petition.
Regeneron filed a Reply (Papers 72, 73 "Pet. Reply") to the Patent Owner
Response.  Patent Owner filed a Sur-reply (Papers 92, 93 "Sur-reply") to the
Reply.  We conducted an oral hearing on July 21, 2022.  A transcript has
been entered into the record (Paper 112, "Tr.").

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a).  This
Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R.
§ 42.73 as to the patentability of claims 1–26 of the '631 patent.  We
determine Petitioner has shown by a preponderance of the evidence that
those claims are unpatentable.

---

[1] Petitioner identifies Regeneron Pharmaceuticals, Inc. as the real party in
interest.  Pet. 1.
[2] Patent Owner identifies the named parties (Novartis Pharma AG, Novartis
Technology LLC, and Novartis Pharmaceuticals Corporation) as the real
parties in interest.  Paper 4, 2.
[3] Two papers listed include both the public, redacted, version and the sealed
confidential version.

**Regeneron Exhibit 1257.002**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

## II.    BACKGROUND

### A. Related Cases and Proceedings

The '631 patent is involved in two district court cases.  Pet. 1–2.  On June 19, 2020, Patent Owner filed a complaint[4] in the United States District Court for the Northern District of New York (NDNY) alleging that Petitioner infringes at least claim 1 of the '631 patent.  Pet. 2 ("parallel district court litigation").  On July 17, 2020, Regeneron filed a complaint[5] in the Southern District of New York (SDNY) against Novartis and Vetter Pharma International GmbH seeking judgment that (i) Novartis's and Vetter's conduct violates Section 1 of the Sherman Act, (ii) Novartis's conduct violates Section 2 of the Sherman Act, and (iii) the '631 patent be declared unenforceable.  Pet. 2–3 ("antitrust litigation").

On June 19, 2020, Novartis filed a complaint at the International Trade Commission ("ITC") alleging that Regeneron infringes claims 1–6 and 11–26 of the '631 patent.  Pet. 1–2 ("ITC Investigation").  On April 8, 2021, Novartis filed a motion to terminate the ITC Investigation on the basis of withdrawal of the complaint.  Pet. 2; Ex. 1006.  On April 8, 2021, the Administrative Law Judge issued an initial determination terminating the ITC Investigation.  Ex. 1010.

On July 16, 2020, Petitioner filed petitions in IPR2020-01317 (IPR'1317) and IPR2020-01318 (IPR'1318) challenging claims 1–26 of

---

[4] Novartis Pharma AG et al. v. Regeneron Pharms., Inc., No. 20-cv-690 (N.D.N.Y.) (filed Jun. 19, 2020).
[5] Regeneron Pharms., Inc. v. Novartis Pharma AG et al., No. 20-cv-5502 (S.D.N.Y.) (filed July 17, 2020).

**Regeneron Exhibit 1257.003**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

the '631 patent.  Pet. 2.  On December 2, 2020, Petitioner filed a motion to

terminate IPR'1318 and the Board issued an order terminating the

proceeding on December 7, 2020.  On January 15, 2021, the Board exercised

its discretion under 35 U.S.C. § 314(a) and denied institution of IPR'1317

based on the ITC Investigation that was co-pending at that time.

*B.  The '631 Patent*

The '631 patent is titled "Syringe."  Ex. 1001, code (54).  The '631

patent "relates to a syringe, particularly to a small volume syringe such as a

syringe suitable for ophthalmic injections."  *Id.* at code (57).  The U.S.

application resulting in the '631 patent was filed on January 25, 2013 (*id.*

at code (22)), and identifies multiple purported foreign priority applications,

the earliest of which was filed in July 2012[6] (*id.* at code (30)).

The Specification notes that for small volume syringes intended for

eye injections, sterilization can present issues that are not necessarily

associated with larger syringes.  *Id.* at 1:22–30.  Further, certain therapeutics

are particularly sensitive to sterilization techniques, thus it is important for

the syringe to remain robustly sealed but also easy to use in that the force

required to depress the plunger to administer the medicament must not be

too high.  *Id.* at 1:31–40.

---

[6] Patent Owner contends that the claims are entitled to a priority date of July
3, 2012.  PO Resp. 7.  Whether the claims are entitled to the July 3, 2012
priority date, or to the date of October 23, 2012 (Ex. 1003 ¶ 20) alleged by
Petitioner, makes no difference in our ultimate patentability determination.

Regeneron Exhibit 1257.004
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Figure 2 of the '631 patent, reproduced below, illustrates a cross section through the syringe. *Id.* at 10:60–67.



Figure 2 (above) depicts a cross section of a top down view of a syringe. *Id.* at 10:48–49.

As described, syringe 1 comprises body 2, stopper 10 and plunger 4. *Id.* at 10:61–67. Syringe 1 extends along first axis A, and body 2 comprises outlet 12 at outlet end 14. *Id.* Stopper 10 is arranged within body 2 such that front surface 16 of stopper 10 and body 2 define variable volume chamber 18. *Id.* Variable volume chamber 18 contains injectable medicament 20 comprising an ophthalmic solution comprising a VEGF antagonist. *Id.* at 10:67–11:2. Injectable fluid 20 can be expelled though outlet 12 by movement of stopper 10 towards outlet end 14 thereby reducing the volume of variable volume chamber 18. *Id.* at 11:3–5.

## C. Challenged Claims

The '631 patent includes twenty-six claims, and Petitioner challenges each claim. Claim 1 is illustrative and reads as follows:

5

**Regeneron Exhibit 1257.005**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

> 1. A pre-filled, terminally sterilized syringe for intravitreal injection, the syringe comprising a glass body forming a barrel, a stopper and a plunger and containing an ophthalmic solution which comprises a VEGF-antagonist, wherein:
>
> a) the syringe has a nominal maximum fill volume of between about 0.5 ml and about 1 ml,
>
> (b) the syringe barrel comprises from about 1 µg to 100 µg silicone oil,
>
> (c) the VEGF-antagonist solution comprises no more than 2 particles >50 µm in diameter per ml and wherein the syringe has a stopper break loose force of less than about 11N.

Ex. 1001, 19:2–13. Claim 24 is "[a] method of treating a patient . . . using a pre-filled syringe according to claim 1." *Id.* at 20:29–38.

### D.  *Asserted Grounds of Unpatentability*

Petitioner asserts several grounds of unpatentability (Pet. 21–23), which are provided in the table below:

**Regeneron Exhibit 1257.006**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

| Claim(s) Challenged | 35 U.S.C. §[7] | Reference(s)/Basis |
|---|---|---|
| 1–3, 5–9, 14–22, 24 | 103(a) | Sigg,[8] Boulange,[9] "and if necessary USP789"[10] |
| 1–3, 5–9, 14–22, 24 | 103(a) | Lam[11] and Boulange |
| 4, 10, 23 | 103(a) | Sigg, Boulange, Fries[12] |
| 4, 10, 23 | 103(a) | Lam, Boulange, Fries |
| 11–13 | 103(a) | Sigg, Boulange, Furfine[13] |
| 11–13 | 103(a) | Lam, Boulange, Furfine |

---

[7] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103. Because the challenged claims of the '631 patent have an effective filing date before the effective date of the applicable AIA amendments, we refer to the pre-AIA version of 35 U.S.C. § 103 in this Decision.

[8] PCT Patent Publication No. WO 2011/006877 (Ex. 1007).

[9] PCT Patent Publication No. WO 2009/030976 (Ex. 1008).

[10] U.S. Pharmacopeia, USP 789, Particulate Matter in Ophthalmic Solutions, USP 34 NF 29 (2011) ("USP789") (Ex. 1019). Petitioner contends that "USP789 demonstrates a POSITA would have known that Sigg and Lam were required to meet the claimed particle amounts. . . . Petitioner's obviousness arguments remain the same if USP789 should be explicitly listed in Grounds 1-10." Pet. 21 n.7.

[11] PCT Patent Publication No. WO 2008/077155 (Ex. 1029).

[12] Arno Fries, Drug Delivery of Sensitive Biopharmaceuticals With *Prefilled Syringes*, 9(5) DRUG DELIVERY TECH. 22 (2009) (Ex. 1012).

[13] PCT Patent Publication No. WO 2007/149334 (Ex. 1021).

7

**Regeneron Exhibit 1257.007**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

| Claim(s) Challenged | 35 U.S.C. §[7] | Reference(s)/Basis |
|---|---|---|
| 25 | 103(a) | Sigg, Boulange, 2008 Macugen Label[14] |
| 25 | 103(a) | Lam, Boulange, 2008 Macugen Label |
| 26 | 103(a) | Sigg, Boulange, Dixon[15] |
| 26 | 103(a) | Lam, Boulange, Dixon |

The parties rely on numerous declarations and exhibits relevant to our determination as we examine below.

III.    ANALYSIS

*A. Legal Standards of Obviousness*

Section 103(a) forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).

The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art;

---

[14] Internet Archive WayBack Machine, March 7, 2011 Record of Drugs.com, Macugen Prescribing Information, available at https://web.archive.org/web/20110307065238/http://www.drugs.com: 80/pro/macugen.html (Ex. 1009).
[15] James A. Dixon, et al. "VEGF Trap-Eye for the treatment of neovascular age-related macular degeneration." *Expert opinion on investigational drugs* 18.10 (2009): 1573–1580 (Ex. 1030).

8

Regeneron Exhibit 1257.008
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

(2) any differences between the claimed subject matter and the prior art;
(3) the level of ordinary skill in the art; and (4) when available, evidence
such as commercial success, long-felt but unsolved needs, and failure of
others. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18
(1966); *see KSR*, 550 U.S. at 407 ("While the sequence of these questions
might be reordered in any particular case, the [*Graham*] factors continue to
define the inquiry that controls."). The Court in *Graham* explained that
these factual inquiries promote "uniformity and definiteness," for "[w]hat is
obvious is not a question upon which there is likely to be uniformity of
thought in every given factual context." *Graham*, 383 U.S. at 18.

The Supreme Court made clear that we apply "an expansive and
flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415.
Whether a patent claiming the combination of prior art elements would have
been obvious is determined by whether the improvement is more than the
predictable use of prior art elements according to their established functions.
*Id*. at 417. To reach this conclusion, however, it is not enough to show
merely that the prior art includes separate references covering each separate
limitation in a challenged claim. *Unigene Labs., Inc. v. Apotex, Inc*., 655
F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness additionally requires
that a person of ordinary skill at the time of the invention "would have
selected and combined those prior art elements in the normal course of
research and development to yield the claimed invention." *Id*.

A claimed invention may be obvious even when the prior art does not
teach each claim limitation, so long as the record shows why one of skill in
the art would have modified the prior art to obtain the claimed invention.

9

**Regeneron Exhibit 1257.009**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

*See Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1307 (Fed. Cir. 2006).
As a factfinder, we also must be aware "of the distortion caused by hindsight
bias and must be cautious of arguments reliant upon *ex post* reasoning."
*KSR*, 550 U.S. at 421.  This does not deny us, however, "recourse to
common sense" or to that which the prior art teaches.  *Id.*

### B.  Level of Ordinary Skill in the Art

We are faced with the unusual situation where Petitioner advocates for
two different standards for the person of ordinary skill in the art:  one level
of skill for the apparatus claims (1–23), and another unique level of skill for
"the method of treating a patient" claims (24–26) of the '631 patent.

Petitioner first contends, with respect to claims 1–23, that

> A person having ordinary skill in the art ("POSITA")
> relevant to the '631 Patent as of July 3, 2012 would have had at
> least an advanced degree (Dipl.Ing, M.S., or Ph.D.), with
> research experience in mechanical engineering, biomedical
> engineering, materials science, chemistry, or a related field, or at
> least 2-3 years of professional experience in one or more of those
> fields.

Pet. 24 (citing Ex. 1003 ¶¶ 30–32).  Petitioner also contends that "a POSITA
would have had experience with (i) the design of pre-filled syringes; and (ii)
sterilization of drug delivery devices, including those containing sterilization
sensitive therapeutics."  *Id.*

With respect to "method claims 24–26, a POSITA would have an
M.D. with a specialty in ophthalmology."  *Id.* (citing Ex. 1003 ¶¶ 30–32;
Ex. 1031 ¶¶ 22–23).  Petitioner's declarant, Mr. Horst Koller, explains:

> Claims 24-26 relate to methods of treating a patient
> suffering from eye disease, by administering an ophthalmic

10

Regeneron Exhibit 1257.010
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

> solution using the pre-filled syringe described in claim 1.  Because
> such intravitreal administration must be performed by an
> ophthalmologist, it is my opinion that a POSITA with respect to
> claims 24-26 would be an ophthalmologist with experience
> administering VEGF-antagonist drugs to patients via the
> intravitreal route.

Ex. 1003 ¶ 32.  Petitioner also provides the declaration of Dr. Szilard Kiss,
an ophthalmologist, in support of its contentions with respect to claims 24–
26.  Ex. 1031 ¶¶ 4–6.

"Patent Owner disagrees with the split definition of POSA proposed
by Petitioner, which presumes that a POSA would have had sufficient
expertise to single-handedly develop a PFS,[16] or a method of treatment using
a PFS, as claimed in the '631 patent."  PO Resp. 6.  Patent Owner proposes
that "a POSA designing a PFS or method of treatment using a PFS would
have worked *in collaboration with others* having complementary skills and
experience."  *Id.* (emphasis added).  Similar to Petitioner, Patent Owner
further proposes that the person of ordinary skill in the art would have had
an advanced degree and at least 2–3 years of professional experience.  *Id.*
Patent Owner further advocates that "[s]uch a person would have been a
member of a product development team and would have drawn upon not
only his or her own skills, but also the specialized skills of team members in
complementary fields including ophthalmology, microbiology and
toxicology."  *Id.*

---

[16] PFS stands for pre-filled syringe and it "is a syringe that is packaged and
sold with a drug formulation already loaded into the syringe."  Ex. 1003
¶ 36.

Regeneron Exhibit 1257.011
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

In reply, Petitioner disagrees that a person of ordinary skill in the art would "consult someone with 'specialized skills' in toxicology." Pet. Reply 1. Petitioner further notes that "Novartis previously acknowledged that toxicology was immaterial, as its definition in the ITC investigation included no such requirement." *Id.* (citing Ex. 1253, 18–19).

As both parties recognize, the disagreement in the level of ordinary skill in the art has no bearing on the ultimate determination of obviousness. *See* PO Resp. 7 ("Under either party's proposed POSA definition, however, the challenged claims of the '631 patent would not have been obvious."); Pet. Reply 1 ("the claims would have been obvious under either definition").

Based on the final record, we adopt Petitioner's unique approach for identifying the person of ordinary skill in the art. Specifically, for claims 1–23, the person of ordinary skill in the art would have had at least an advanced degree with research experience in mechanical engineering, biomedical engineering, materials science, chemistry, or a related field, or at least 2–3 years of professional experience. Further, the person of ordinary skill in the art would have had experience with the design of pre-filled syringes and sterilization of drug delivery devices. We recognize that claims 24–26 require administering an ophthalmic solution using the pre-filled syringe described in claim 1, and agree with Petitioner that that a person of ordinary skill in the art for these claims would be an ophthalmologist with experience administering VEGF-antagonist drugs to patients via the intravitreal route.

12

**Regeneron Exhibit 1257.012**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

### C. Claim Construction

Petitioner proposes claim interpretations for several claim terms or phrases. Pet. 24–26. Patent Owner does not object to Petitioner's proposed constructions, or to our preliminary constructions set forth in the Institution Decision. *See* Inst. Dec. 31–34. We address those claim terms in the following discussion.

"Stopper Break Loose Force"

Claim 1 requires "the syringe has a stopper break loose force of less than about 11N." In the Petition, Petitioner proposes construing the term "stopper break loose force" to mean "the force required to make the plunger/stopper move from its resting position in the syringe barrel." Pet. 24 (citing Ex. 1003 ¶¶ 47–52, 121). As for timing, Petitioner further argues that "[t]he '631 Patent does not specify when the break loose force is measured (*i.e.*, storage time prior to testing)." *Id.*

Having reviewed the evidence of record, including the Specification of the '631 patent, we find Petitioner's proposed construction persuasive. *See* Ex. 1001, 5:15–21. Mr. Koller also persuasively shows that the term "stopper break loose force," would have been known in the art. Ex. 1003 ¶¶ 47–52; Ex. 1001, 5:34–45. Thus, based on the final record, we are persuaded by Petitioner's proposed construction. We do not find cause to limit the break loose force measurement to any specific time.

"Stopper Slide Force"

Claims 14–16 recite "a stopper slide force of less than" a specified amount. Petitioner also proposes construing the related term "stopper slide force" to mean "the force required to sustain movement of the stopper after

13

Regeneron Exhibit 1257.013
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

movement has already begun." Pet. 25 (citing Ex. 1003 ¶¶ 47–52, 121). As for timing, Petitioner further argues that "the '631 Patent does not specify when the stopper slide force is measured (*i.e.*, storage time prior to testing)." *Id.*

Mr. Koller has also persuasively shown that the term "stopper slide force," would have been known in the art. Ex. 1003 ¶¶ 47–52; Ex. 1001, 5:34–45. Based on the final record, we are persuaded by Petitioner's proposed construction. We do not find cause to limit the stopper slide force measurement to any specific time.

## "Terminally Sterilized"

Petitioner proposes construing "terminally sterilized." Pet. 25. We agree with Petitioner that the term "terminally sterilized" should be construed because one issue in contention is whether or not the asserted prior art fully enables terminally sterilizing a VEGF antagonist-filled syringe for purposes of an obviousness analysis.

Petitioner first notes that "'[t]erminal sterilization' can refer to sterilizing both the drug product in the container and the surface of the container in a single process." *Id.* (citing Ex. 1003 ¶ 81). Petitioner contends that the '631 patent discloses that in its specific "terminal sterilisation" methods, "[t]he package is exposed to the sterilising gas until the outside of the syringe is sterile," but that "significant amounts of the sterilising gas should not enter the variable volume chamber of the syringe." *Id.* (quoting Ex. 1001 at 9:49–56; 10:2–4) (alteration in original). Petitioner, and Mr. Koller, conclude that "in the '631 Patent 'terminally sterilized' refers to a process whereby the outside of a pre-filled syringe is sterilized,

14

Regeneron Exhibit 1257.014
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

while contact between the sterilizing agent and the drug product within the syringe is minimized." *Id.* (citing Ex. 1003 ¶ 120).

The Specification explains that traditional "[s]terilisation can be achieved by terminal sterilisation in which the assembled product, typically already in its associated packaging, is sterilised using heat or a sterilising gas." Ex. 1001, 1:17–21. The Background section of the Specification also describes a goal "to ensure that while a suitable level of sterilisation is carried out, the syringe remains suitably sealed, such that the therapeutic is not compromised." *Id.* at 1:33–36. In the section of the Specification labeled "Sterilisation," it describes that "a terminal sterilisation process may be used to sterilise the syringe and such a process may use a known process such as an ethylene oxide (EtO) or a hydrogen peroxide ($H_2O_2$) sterilisation process," and "[t]he package is exposed to the sterilising gas until the outside of the syringe is sterile." *Id.* at 9:48–56. Further, the Specification notes that significant amounts of the sterilizing gas should not enter the chamber and then defines what significant amounts encompass. *Id.* at 10:2–7.

Based on the final record, we are persuaded that a person of ordinary skill in the art would understand that the term "terminally sterilized," as used in the '631 patent, includes the sterilization of the outside of a pre-filled syringe (*i.e.*, primary packaging component) while minimizing contact between the drug product within the pre-filled syringe and the sterilizing agent being applied. *See* Ex. 1003 ¶ 120. Notably, the '631 patent recognizes that some amounts of the sterilizing gas may interact with the ophthalmic solution so long as the amount does not "cause unacceptable

15

Regeneron Exhibit 1257.015
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

modification of the ophthalmic solution within the variable volume chamber." Ex. 1001, 10:5–7.

<u>"About"</u>

The claimed silicone oil ranges (claims 1, 3, 22), break loose force (claims 1, 14), stopper slide force (claims 14–16), and silicone oil thickness (claim 2) use the modifier "about." Petitioner notes that the '631 patent has provided its own definition for the term "about." Pet. 25 (quoting Ex. 1001, 10:24–29). Petitioner argues that for the term "about," it is unnecessary to determine "the outer boundaries of the claimed ranges (e.g., whether 'about 1 µg to 100 µg' encompasses 110 µg, 150 µg, etc.)." Pet. 25–26.

We disagree with Petitioner that it is unnecessary to determine the boundaries of the term "about," because the issue is before us for at least claim 14's requirement of "a stopper slide force of less than about 5N." We, however, agree with Petitioner's remaining argument that the term "about" in relation to a numerical value x is defined by the '631 patent to mean "for example, x±10%." Ex. 1001, 10:24–29.

### D. Obviousness over Sigg, Boulange, and USP789

Petitioner asserts that claims 1–3, 5–9, 14–22, and 24 would have been obvious over Sigg, Boulange, and USP789. Pet. 26–54, 71–74; Pet. Reply 1–17, 21–27. Patent Owner disagrees. PO Resp. 8–39, 46–60; Sur-reply 1–27.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a

16

Regeneron Exhibit 1257.016
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

preponderance of the evidence that claims 1–3, 5–9, 14–22, and 24 are
unpatentable.

### 1.    Sigg

Sigg is titled, "Surface Decontamination of Prefilled Containers in
Secondary Packaging." Ex. 1007, code (54). Sigg is directed to "terminal-
sterilization methods suitable for prefilled containers containing sensitive
products, such as biotech (biological) drug solutions." *Id.* at 7:29–8:2. Sigg
explains that the "invention relates to a method and system for terminal
sterilization of the outer surface and/or surface decontamination of prefilled
containers in secondary packaging, wherein the prefilled container contains
a pharmaceutical or biological drug product." *Id.* at 1:5–7.

Sigg notes that prior art sterilization techniques like high temperature
steam and gamma irradiation risked denaturing or chemically modifying
biologic drug solutions. *Id.* at 2:20–29. To solve this problem, Sigg
proposes "treatment of prefilled containers in secondary packaging by an
application of vaporized-hydrogen peroxide, in which vapors are
controllable by certain post-treatment measures." *Id.* at 8:8–13.

Sigg discloses two post-application methods for removing or
inactivating the hydrogen peroxide residue and thereby preventing the
hydrogen peroxide from leaching into the pre-filled syringe: application of a
vacuum to reverse the direction of vapor flow, and inactivation of the
hydrogen peroxide vapors. *Id.* at 3:19–30, 14:9–23. Sigg provides
Example 1, which discloses vaporized $H_2O_2$ (VHP) sterilization of 0.5 mL
syringes filled with a protein solution such as the anti-VEGF antibody
ranibizumab intended for intravitreal injection. *Id.* at 20:10–21:11, 9:11–14;

17

Regeneron Exhibit 1257.017
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Ex. 1003 ¶ 123. The results showed that with respect to byproducts and degradation products "there were no differences between the results of the untreated syringes and with hydrogen-peroxide treated syringes." Ex. 1007, 21:2–3.

> ### 2.  *Boulange*

Boulange is titled "Medical Device and Smooth Coating Therefor." Ex. 1008, code (54). Boulange discloses several syringes, including pre-filled syringes. *Id.* at code (71), 14:19–21. Boulange also discloses a series of examples in which the break loose and glide forces of syringes internally coated with silicone oil are compared to un-siliconized syringes. *Id.* at 18:15–19:10.

Boulange relates "to a medical device, for example a syringe, comprising at least one smooth coated part, [] for example a container and/or a piston, said parts being able to move one relative to the other, for example translationally and/or rotationally, when the medical device is operated." *Id.* at 1:3–7. Boulange discloses a pre-filled syringe with decreased silicone oil to limit the risk of interaction between the silicone oil and any drug stored in the syringe. *Id.* at 6:10–32 ("with the medical device of the invention, it is possible to decrease the total amount of lubricant, for example silicone oil, that is necessary in such a medical device"). Boulange further discloses that the pre-filled syringe has decreased break loose (activation) and slide (sustainable) forces while preserving a tight seal between the piston and barrel. *Id.*

Boulange describes tests conducted to evaluate break loose and slide forces on 1 mL pre-filled glass syringes with different piston (stopper)

Regeneron Exhibit 1257.018
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

configurations—labeled as A, B1, B2, and C, in Table 1 ("configurations of pistons"). *Id.* at 14 ("Table 1"), 13:11–12 ("[C]ontainer 2 is a glass syringe body accommodating a piston 3"), 14:19–21 ("tests were applied on containers filled with 1 mL of demineralised water"). "Regarding the coated pistons, several surface finishes or roughnesses of the outer surface of coating were tested, as summarized in Table 1 below." *Id.* at 13:19–21.

**Table 1 : configurations of pistons A, B1 and C**

| Piston reference | Viscoelastic substrate | Coating | Coating thickness | Surface finish |
|---|---|---|---|---|
| A (comparative) | Bromobutyl rubber | No | --- | Smooth Ra = 0.7 µm Rt = 11.4 µm |
| B1 (invention) | Bromobutyl rubber | Yes | 3 µm | Smooth Ra = 0.9 µm Rt =12.0 µm |
| B2 (comparative) | Bromobutyl rubber | Yes | 3 µm | Rough Ra = 3.1 µm Rt = 24.0 µm |
| C (comparative) | Chlorobutyl rubber | No | --- | Smooth Ra = 0.7 µm Rt = 11.0 µm |

Table 1 from Boulange shows configurations of pistons A, B1, and C, with column headings of "Viscoelastic substrate," "Coating," "Coating thickness," and "Surface finish." Ex. 1008, 14.

Boulange discloses measurements of "friction force B," which corresponds to the claimed break loose force. *Id.* at 15:6–8 ("the force required, under static conditions, to break the contact . . . between the piston 3 and the container 2"). Boulange also discloses forces S and F, which are slide forces measured at different stopper positions. *Id.* at 15:9–11 ("S is the force . . .

19

Regeneron Exhibit 1257.019
Regeneron v. Novartis
IPR2021-00816

Appx19

IPR2021-00816
Patent 9,220,631 B2

for moving the piston 3 . . . measured half way of the piston travel."), 15:13–16 ("F is the force . . . to move the piston 3 when it reaches the end of its travel").

Boulange provides "Example 5," wherein the forces with silicone oil either baked on ("Scenario 1") or sprayed on ("Scenario 2") to the syringe barrel are measured.  Ex. 1008, 20:13–21.  Boulange discloses baked-on silicone oil was applied to the barrel at "a rate of 40 μg for a surface area of 10 cm$^2$," while spray-on silicone was applied "at a rate of 500 μg for a surface area of 10 cm$^2$."  *Id.* at 20:15–21.  Boulange's Table 7 discloses that Pistons A and C had certain break loose and slide forces with the baked-on syringes when tested unaged (T=0), while Piston B1 had break loose and slide forces less than 5 N for both the unaged (T=0) and aged (T=1) syringe.  *Id.* at 21.

Boulange tested syringes with baked-on silicone oil, where the pistons (A, B1, and C) were also coated with silicone oil.  For those syringes, Table 5 discloses break loose and slide forces for Pistons B1 and C for both unaged (T=0) and aged (T=1) syringes.

20

**Regeneron Exhibit 1257.020**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

**Table 5 : Activation Gliding Forces, Pistons A, B1 and C**

| Silicone/internal surface of container | | 4 μg/cm² | | | 4 μg/cm² | | | 4 μcm² | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Silicone/piston | | 5 μg/cm² | | | 15 μg/cm² | | | 50 μg/cm² | | |
| Force (N) | | B | S | F | B | S | F | B | S | F |
| Piston | A T=0 | 6.6 (0.6) | 5.8 (1.0) | 4.7 (1.0) | 7.2 (0.5) | 6.9 (1.9) | 4.7 (1.9) | 6.6 (0.8) | 6.5 (1.5) | 4.0 (1.5) |
| | A T=1 | 12.0 (2.3) | 8.4 (2.0) | 3.2 (1.3) | 11.0 (0.8) | 8.0 (1.9) | 3.3 (1.0) | 10.7 (1.2) | 6.7 (1.5) | 3.6 (1.7) |
| | B1 T=0 | 2.2 (0.2) | 2.7 (0.4) | 2.7 (0.4) | 2.2 (0.2) | 3.0 (0.6) | 3.0 (0.6) | 2.1 (0.1) | 2.6 (0.5) | 2.6 (0.5) |
| | B1 T=1 | 2.8 (0.3) | 4.3 (1.2) | 4.3 (1.2) | 2.6 (0.6) | 3.3 (0.3) | 3.3 (0.3) | 2.5 (0.2) | 3.4 (0.3) | 3.4 (0.3) |
| | C T=0 | 4.7 (0.4) | 6.5 (0.6) | 4.6 (0.6) | 4.2 (0.3) | 6.0 (0.7) | 4.2 (0.7) | 3.9 (0.5) | 5.2 (0.7) | 4.0 (0.7) |
| | C T=1 | 8.4 (0.6) | 8.3 (1.9) | 4.1 (1.6) | 7.5 (0.6) | 8.3 (1.4) | 4.8 (2.2) | 7.8 (1.1) | 6.2 (1.0) | 3.7 (1.5) |

Petitioner's highlighted Table 5 of Boulange depicts activation and gliding
forces for pistons A, B1, and C.  Pet. 31; Ex. 1008, Table 5.

       *3.*    *USP789*

USP789 is a monograph in United States Pharmacopeia.  Ex. 1019.

USP789 is a well-known standard in the art for ophthalmic solutions.

Pet. 36, 45, 59.  Mr. Koller testifies that "[t]he applicable limits on

particulate content are set forth in USP789."  Ex. 1003 ¶ 90 & n.10 ("USP is

a nonprofit scientific organization founded in 1820 that develops and

disseminates public compendial standards for drug products.").  According

to Mr. Koller, although "the USP is not legally binding, it was well known

in the art that USP specifications are de facto requirements for regulatory

approval of a drug product."  *Id.* ¶ 92 (citing Ex. 1057, 1).  Further,

Mr. Koller opines that "a POSITA would have understood that it is

effectively a requirement for all ophthalmic products to meet the USP789

guidelines, including VEGF-antagonists for intravitreal administration."  *Id.*

USP789 is also mentioned in the '631 patent, "[i]n one embodiment, the

21

**Regeneron Exhibit 1257.021**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

syringe has low levels of silicone oil sufficient to meet USP789." Ex. 1001, 2:1–4, 6:15–30.

According to USP789, ophthalmic solutions are required to contain fewer than 50 particles per mL ≥ 10 μm, fewer than 5 particles per mL ≥ 25 μm, and fewer than 2 particles per mL ≥ 50 μm. Ex. 1019, 6 (citations to added pagination). "Every ophthalmic solution . . . is subject to the particulate matter limits set forth . . . unless otherwise specified." *Id.* at 5.

Petitioner relies on USP789 to demonstrate that a POSITA would have known that Sigg and Lam were required to meet the claimed particle amounts. Pet. 21 n.7. "Petitioner does not believe that USP789 needs to be listed in Grounds 1-10," but nonetheless includes this reference in each ground, "if necessary." *Id.* For example, Petitioner alleges that "[a] POSITA would understand that ranibizumab solution disclosed in Sigg is an ophthalmic solution," and as such, "when making a pre-filled syringe as disclosed in Sigg, a POSITA would have been motivated to comply with the prior art particulate requirements for ophthalmic solutions set forth in USP789." Pet. 36.

Patent Owner notes that it "accepts Petitioner's position that it did not need to list USP 789 in its Grounds because Sigg discloses an 'ophthalmic solution' and a POSA would have understood that USP 789 is a 'de facto requirement for regulatory approval' of an ophthalmic solution." PO Resp. 19 n.3 (quoting Ex. 1003 ¶ 92).

We include USP789 in each asserted ground for clarity and because at least one argument made by Patent Owner relates to USP789.

22

**Regeneron Exhibit 1257.022**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

### 4.     *Independent Claim 1*

Below, we first set forth Petitioner's arguments and evidence.  Next, we examine Patent Owner's arguments and evidence.  In the following section, we examine each parties' evidence and argument related to the objective indicia of nonobviousness.  Finally, we provide our analysis by examining the totality of the evidence and argument before us.  As explained more below, Petitioner has shown by a preponderance of the evidence that claim 1 would have been obvious over Sigg, Boulange, and USP789.

#### a)     *Petitioner's Arguments*

[1.a] A pre-filled, terminally sterilized syringe for intravitreal injection

Petitioner contends Sigg discloses terminal sterilization of pre-filled syringes for intravitreal injection. Pet. 40–41 (citing Ex. 1007, 2:15–19 ("[T]here is a strong market need for terminally antimicrobially-treated [*i.e.* sterilized] medical devices, such as prefilled syringes used for intravitreal injections."), 3:8–19, 9:4–14, 12:15–16:21, 20:10–21:11; Ex. 1003 ¶¶ 188–189).

[1.b] the syringe comprising a glass body forming a barrel, a stopper and a plunger

Petitioner relies on Figure 1 of Sigg as evidence of the claimed structure, whereas Figure 1 shows a barrel, stopper, and plunger. Pet. 41 (citing Ex. 1003 ¶ 190).

23

**Regeneron Exhibit 1257.023**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2



Petitioner's annotated and highlighted Figure 1 of Sigg, with the barrel
labeled in green, the plunger labeled in yellow, and the stopper labeled in
red.  Pet. 41.

For the "glass body" limitation, Petitioner argues that it would have been
obvious to use a glass barrel in Sigg because it was a known design option
for ranibizumab and was known to be impermeable to sterilizing gasses.
Pet. 41 (citing Ex. 1003 ¶¶ 124, 191; Ex. 1002, 1274–75 (Patent Owner
explaining during prosecution that "syringes which are prefilled with
biologics are comprised of glass barrels.")).

Alternatively, Petitioner argues that "Boulange discloses a syringe
comprising a glass barrel and a piston (*i.e.*, stopper)."  Pet. 41–42 (citing
Ex. 1008, 9:21–35, 13:11–12; Ex. 1003 ¶ 192).  Petitioner contends that "a
POSITA would understand that the stopper would be coupled to a plunger to
enable the user to advance the stopper during use."  Pet. 42 (citing Ex. 1003
¶ 193).  Mr. Koller provides an annotated Figure 2 of Boulange showing
where the plunger would be coupled to the stopper.  Ex. 1003 ¶ 193.

[1.c] and containing an ophthalmic solution which comprises a VEGF-
antagonist, wherein:

Sigg discloses a pre-filled syringe containing an ophthalmic solution

24

Regeneron Exhibit 1257.024
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

comprising ranibizumab, which is one of the three VEGF-antagonists
identified in the '631 patent. Pet. 43 (citing Ex. 1007, 9:11–14 ("[T]he drug
product is a protein solution, such as ranibizumab."); *see also id.* at 20:17–
21, 24:21–22, 26:10–11; Ex. 1003 ¶¶ 194–195).

[1.d] (a) the syringe has a nominal maximum fill volume of between about
0.5 ml and about 1 ml

 Petitioner relies on teachings from both Sigg and Boulange for this
limitation. Pet. 43–44. Petitioner notes that Sigg discloses a syringe with a
nominal maximum fill volume of 0.5 mL. Pet. 43 (citing Ex. 1007, 20:20–
21 ("Filling of 0.5 mL syringes was performed in a sterile lab.")). Relying
on the testimony of Mr. Koller, Petitioner contends that "[i]t also would
have been obvious to use a 0.5 to 1 mL syringe for ranibizumab because
only a small volume of fluid can be injected intravitreally." *Id.* (citing
Ex. 1003 ¶¶ 196; Ex. 1031 ¶ 27; Ex. 1027, 1 (2010 Lucentis Label
describing injection of 0.05 mL of solution)).

 Petitioner additionally argues that "Boulange discloses a syringe with
a nominal maximum fill volume of 1 mL." Pet. 43 (citing Ex. 1008, 14:19–
21 ("Activation Gliding Force (AGF) tests were applied on containers filled
with 1 mL of demineralised water."); Ex. 1003 ¶ 197). According to
Petitioner, and Mr. Koller, "[a] POSITA would also understand that 'a
surface area of 10 cm$^2$, disclosed in Boulange is the approximate inner
surface area of a 1 mL syringe." *Id.* at 43–44 (citing Ex. 1008, 20:15–17;
Ex. 1003 ¶¶ 197–198).

25

Regeneron Exhibit 1257.025
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

[1.e] (b) the syringe barrel comprises from about 1 μg to 100 μg silicone oil

Petitioner relies on the teachings of Boulange for this limitation. Pet. 44. According to Petitioner, "Boulange discloses that for the syringes with baked-on silicone oil, 40 μg was deposited (*i.e.*, applied) to an internal surface area of 10 cm$^2$ (*i.e.*, 4 μg/cm2)." *Id.* (citing Ex. 1008, 20:15–17 ("[S]ilicone lubricant was deposited and baked onto the internal surface of the syringe body 2, at a rate of 40 μg for a surface area of 10 cm$^2$."), 21:1–3 (Table 7 disclosing "4 μg/cm$^2$" for Scenario 1); Ex. 1003 ¶¶ 199–202. Petitioner relies on Mr. Koller's calculations and concludes that "[a] POSITA would understand that the rate of application disclosed in Boulange (4 μg/cm$^2$) would apply to other syringe sizes, and would result in approximately 28 μg of silicone oil for a 0.5 mL syringe." Pet. 44 (citing Ex. 1003 ¶ 200 ("Thus, at a rate of 4 μg/cm$^2$, a total of 27.8, or ~28, μg of silicone oil, would be applied for a 0.5 mL standard syringe as disclosed in Sigg using the method of Boulange.")).

[1.f] (c) the VEGF-antagonist solution comprises no more than 2 particles >50 μm in diameter per ml

As noted above, this particulate content limitation relies on the industry standard set forth in USP789. Ex. 1003 ¶¶ 90–92. Petitioner contends that "[a] POSITA would understand that an ophthalmic solution, as disclosed in Sigg, should meet USP789, including comprising no more than 2 particles >50 μm in diameter per ml." Pet. 44–45 (citing Ex. 1003 ¶¶ 60–61, 66, 161, 165, 195, 203–205). Petitioner further contends that

a POSITA would have had a reasonable expectation that

26

Regeneron Exhibit 1257.026
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

combining Sigg and Boulange would satisfy USP789 given that Boulange discloses a pre-filled syringe with less than 50 μg of silicone oil and is designed to "limit the risk of interaction between a lubricant, for example silicone oil, and the therapeutic molecules potentially stored in the container."

Pet. 45 (citing Ex. 1008, 6:26–29; Ex. 1003 ¶ 206).

[1.g] and wherein the syringe has a stopper break loose force of less than about 11N.

Petitioner contends that "Boulange discloses a stopper break loose force less than 11 N." Pet. 45 (citing Ex. 1003 ¶¶ 207–209). Petitioner relies on two unique stoppers, either of which would allegedly be acceptable for the combination – stopper B1 (Parylene-C)[17] and stopper C. Pet. 37 ("Boulange discloses multiple stopper configurations that a POSITA would have been motivated to combine with Sigg."), 38–39 (examining stopper C), 45–47; *See* Tr. 10:1–19 ("Either stopper would be considered acceptable for this combination.")

Relying on the testimony of Mr. Koller, Petitioner argues that a person of ordinary skill in the art would have been motivated to utilize stopper C in Table 5 of Boulange. Pet. 38. Petitioner recognizes that "Boulange states that stopper C in Table 7 'does not appear to be acceptable for a medical device,'" but Petitioner explains that person of ordinary skill in the art "would have understood that is because stopper C in Table 7 did not

---

[17] Because we determine Petitioner's arguments and evidence related to stopper C of Boulange are sufficient to ultimately prove by a preponderance of the evidence that claim 1 is unpatentable, we focus on each party's arguments and evidence related to stopper C, and not stopper B1.

27

Regeneron Exhibit 1257.027
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

include any coating." *Id.* at 38–39 (citing Ex. 1003 ¶ 181). Mr. Koller relies on Table 5 of Boulange, set forth below, which "discloses break loose forces (B) of less than about 11N for stoppers that were coated with silicone oil[] and tested with baked-on syringes having 40 μg of silicone oil (*i.e.*, 4 μg/cm²):" Ex. 1003 ¶ 208.

Table 5 : Activation Gliding Forces, Pistons A, B1 and C

| Silicone/internal surface of container | 4 μg/cm² | | | 4 μg/cm² | | | 4 μcm² | | |
|---|---|---|---|---|---|---|---|---|---|
| Silicone/piston | 5 μg/cm² | | | 15 μg/cm² | | | 50 μg/cm² | | |
| Force (N) | B | S | F | B | S | F | B | S | F |
| Piston   A T=2 | 6.6 (0.6) | 5.8 (1.0) | 4.7 (1.0) | 7.2 (0.5) | 6.9 (1.9) | 4.7 (1.9) | 6.6 (0.8) | 6.5 (1.5) | 4.0 (1.5) |
| A T=1 | 12.0 (2.3) | 8.4 (2.0) | 3.2 (1.3) | 11.0 (0.8) | 8.0 (1.9) | 3.3 (1.0) | 10.7 (1.2) | 8.7 (1.5) | 3.6 (1.7) |
| B1 T=0 | 2.2 (0.2) | 2.7 (0.4) | 2.7 (0.4) | 2.2 (0.2) | 3.0 (0.6) | 3.0 (0.6) | 2.1 (0.1) | 2.6 (0.5) | 2.6 (0.5) |
| B1 T=1 | 2.8 (0.3) | 4.3 (1.2) | 4.3 (1.2) | 2.6 (0.6) | 3.3 (0.3) | 3.3 (0.3) | 2.5 (0.2) | 3.4 (0.3) | 3.4 (0.3) |
| C T=0 | 4.7 (0.4) | 6.5 (0.6) | 4.6 (0.6) | 4.2 (0.3) | 6.0 (0.7) | 4.2 (0.7) | 3.9 (0.5) | 5.2 (0.7) | 4.0 (0.7) |
| C T=1 | 8.4 (0.8) | 8.3 (1.9) | 4.1 (1.6) | 7.5 (0.8) | 8.3 (1.4) | 4.8 (2.2) | 7.8 (1.1) | 6.2 (1.0) | 3.7 (1.5) |

Mr. Koller provides annotated Table 5 depicting activation gliding forces for pistons A, B1, and C with added yellow highlights for certain break loose forces (B) in the 4 μg/cm² column. *Id.*

Mr. Koller explains that "Table 5 of Boulange discloses stoppers siliconized with 5 μg/cm2 of silicone oil." *Id.* ¶ 208 n.23. Petitioner argues that "Table 5 likewise discloses break loose forces less than 11N for the baked-on syringes with 40 μg of silicone oil (4 μg/cm2) for stoppers B1 and C at T=0 and T=1." Pet. 46.

Petitioner concludes that "[a] POSITA would understand that the break loose forces disclosed in Table 5 and 7 of Boulange would remain the same even with a ranibizumab solution contained in the syringe instead of water because the break loose force is independent of the viscosity of the

28

Regeneron Exhibit 1257.028
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

fluid." Pet. 47 (citing Ex. 1003 ¶ 209).

<u>Reasons for Combining</u>

Petitioner contends that

[a] POSITA would have been motivated to combine Sigg with Boulange to minimize the amount of silicone oil in Sigg's terminally sterilized pre-filled syringe, which would reduce the risk of interaction between the silicone oil and drug product, and minimize the amount of silicone oil that could be transferred to the patient's eye upon administration.

Pet. 31 (citing Ex. 1003 ¶¶ 128, 145–147, 159–167). According to Petitioner and Mr. Koller, "[a] POSITA would have understood that a lubricant is required on the syringe barrel to enable movement of the stopper, and that baked-on and spray-on siliconization were the two known application options." *Id.* (citing Ex. 1003 ¶¶ 54–71). Petitioner reasons that "the combination of Sigg with Boulange also would have been obvious as the use of a known technique (baked-on siliconization) to a known device (pre-filled syringe) that yields a predictable result (reduced amount of silicone oil)." Pet. 31–32 (citing Ex. 1003 ¶ 163).

Petitioner also relies on substantial testimony and evidence showing the known risks of silicone oil for drug products in general, and specifically for intravitreal injections. Pet. 32 (citing Ex. 1003 ¶¶ 159–162; Ex. 1015, 330; Ex. 1013, 4; Ex. 1012, 6). Petitioner contends that "it was well-known that injecting silicone oil into a patients' eye can cause complications," including persistent elevations in intraocular pressure. *Id.* (citing Ex. 1003 ¶¶ 61, 66, 161; Ex. 1025, 11). Petitioner alleges that "by 2010 that it was desirable to minimize the amount of silicone oil in syringes used for

Regeneron Exhibit 1257.029
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

intravitreal injection." Pet. 32–33 (citing Ex. 1067, 5; Ex. 1080, 2; Ex. 1003 ¶¶ 159–167).

Based on this evidence and reasons for minimizing the risks of silicone oil for intravitreal injections, Petitioner contends

> a POSITA would have looked to Boulange because it discloses that "it is possible to decrease the total amount of lubricant, for example silicone oil, that is necessary" and limits "the risk of interaction between . . . silicone oil, and the therapeutic molecules potentially stored in the container of the medical device."

Pet. 33 (quoting Ex. 1008, 6:23–29). For these reasons, Petitioner contends that "a POSITA would have been motivated to use the baked-on syringes in Boulange, which utilized approximately one-tenth the silicone oil quantity of sprayed-on syringes, while retaining low break loose and slide forces and a tight seal between the stopper and the barrel." *Id.* at 33–34 (citing Ex. 1003 ¶¶ 163, 185–186).

Petitioner further contends that "[a] POSITA would have had a reasonable expectation of success that the combination of Sigg and Boulange would result in a terminally sterilized pre-filled syringe having silicone oil and forces within the claimed ranges." Pet. 34 (citing Ex. 1003 ¶¶ 182–187). Petitioner provides several reasons, including "Boulange explicitly discloses a 1 mL glass syringe with 40 μg silicone oil (*i.e.*, 4 μg/cm$^2$) and resulting break loose and slide forces of less than 11N and 5N." *Id.* (citing Ex. 1008, 20:15–21:14). Petitioner notes that "[i]t was known that baked-on siliconization applies one-tenth the amount of silicone oil relative to spray-on siliconization (*e.g.*, 40 μg versus 500 μg for a 1.0 mL

30

**Regeneron Exhibit 1257.030**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

syringe) with comparable break loose and slide forces," and as such "the claimed forces are nothing more than the quantification of the results of a known process and cannot be used to argue non-obviousness." *Id.* (citing Ex. 1003 ¶¶ 63–71, 182–183). Petitioner also argues "a POSITA would not expect incompatibility between the VHP[18] terminal sterilization disclosed in Sigg and the baked-on syringe disclosed in Boulange," because "Sigg discloses that its VHP process is broadly applicable to pre-filled syringes, and does not affect the contents of the container." *Id.* (citing Ex. 1003 ¶¶ 184–186; Ex. 1007, 9:16–17, 14:27–15:20). "Thus," Petitioner concludes that "a POSITA would have understood that Sigg's terminal sterilization would not impact the siliconization levels or the forces of Boulange because Sigg's VHP method prevents the sterilizing gas from ingressing into the syringe." Pet. 34–35 (citing Ex. 1003 ¶ 184).

Petitioner reasons that "Boulange clearly discloses a pre-filled syringe suitable for Sigg's terminal sterilization method." Pet. 35. Mr. Koller testifies that it was standard in the art to design pre-filled syringes to be gas-tight to protect the drug product from degradation during its shelf life. Ex. 1003 ¶ 172. Petitioner also relies on the teachings of Boulange to show that "a POSITA would have readily understood that Boulange's syringe is designed to be gas-tight, which would prevent any sterilizing gas from entering the syringe," because "Boulange describes that the 'invention allows to have decreased activation, sustainable and final forces . . . without having to add lubricant and ***while preserving the tightness*** of the contact

---

[18] VHP stands for vaporized hydrogen peroxide ($H_2O_2$).

31

**Regeneron Exhibit 1257.031**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

region between said two parts.'"  Pet. 35 (quoting Ex. 1008, 6:10–14) (citing
Ex. 1003 ¶¶ 172, 184–186).  Petitioner also notes that "Boulange explicitly
discloses that its syringe can accommodate a drug product in a gaseous
phase," thus demonstrating "that Boulange's syringe was sufficiently tight to
prevent gas from exiting or entering the syringe." *Id.* (citing Ex. 1008, 1:14–
16; Ex. 1003 ¶¶ 172, 184–186).

    As for the motivation to combine Sigg and Boulange with USP789 to
arrive at the claimed particulate content, Petitioner contends "[a] POSITA
would understand that ranibizumab solution disclosed in Sigg is an
ophthalmic solution," and as such, "when making a pre-filled syringe as
disclosed in Sigg, a POSITA would have been motivated to comply with the
prior art particulate requirements for ophthalmic solutions set forth in
USP789."  Pet. 36 (citing Ex. 1003 ¶¶ 90–92, 122–123, 168).

    Petitioner also alleges that the person of ordinary skill in the art
"would have expected to succeed in combining Sigg and Boulange to meet
USP789 requirements."  *Id.*  Petitioner states that "Boulange discloses a pre-
filled syringe with silicone oil amounts within the claimed ranges," and "a
POSITA would have reasonably expected that the combination of Sigg and
Boulange would result in a terminally sterilized pre-filled glass syringe
having the claimed silicone oil content and operational forces in conjunction
with a VEGF antagonist (*i.e.*, ranibizumab) solution that meets USP789."
*Id.* (citing Ex. 1003 ¶¶ 168–170).

    Petitioner next argues that although "[t]he '631 Patent includes no
limitations regarding the lubrication or coating for the stopper, Boulange
discloses multiple stopper configurations that a POSITA would have been

32

**Regeneron Exhibit 1257.032**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

motivated to combine with Sigg." Pet. 37. These include stopper C in
Table 5 of Boulange. Pet. 38. Petitioner contends that "a POSITA would
have been motivated to utilize stopper C in Table 5 of Boulange." Pet. 38.
Petitioner acknowledges that "[a]lthough Boulange states that stopper C in
Table 7 'does not appear to be acceptable for a medical device,' a POSITA
would have understood that is because stopper C in Table 7 did not include
any coating." Pet. 38–39 (quoting Ex. 1008, 21:4–5) (citing Ex. 1003
¶ 181). Mr. Koller testifies that "[a] POSITA would recognize that
Boulange only tested configurations A and C in Table 7 (no coating at all) to
provide a baseline for assessing the improvements that can be attributed to
the use of a Parylene C coating." Ex. 1003 ¶ 181 n.20 (citing Ex. 1008,
21:4–14). Petitioner notes that "[i]n contrast, Table 5 discloses stopper C
with a coating of silicone oil (5 μg/cm$^2$), which was conventional in the art."
Pet. 39 (citing Ex. 1003 ¶¶ 178–180). Petitioner further recognizes that
"Boulange describes that stopper C in Table 5 was 'markedly inferior' to
stopper B1 (Ex. 1008 at 19:6–7)," but Petitioner contends "a POSITA would
have understood that the resulting break loose and slide forces for stopper C
would have been suitable for intravitreal injection." Pet. 39 (citing Ex. 1003
¶¶ 178–180; Ex. 1001, 5:31–36 (acknowledging that known pre-filled
syringes used for intravitreal injection had forces less than 20 N)).
Mr. Koller testifies that "the results for Configuration C in Table 5 are
consistent with typical industry expectations," and "[t]he results for
Stopper C in Table 5 are substantially less than 20 N." Ex. 1003 ¶ 180.

 Based on this evidence and testimony, Petitioner argues that
"Boulange's statement that stopper C in Table 5 is inferior cannot constitute

33

Regeneron Exhibit 1257.033
Regeneron v. Novartis
IPR2021-00816

teaching away of the *claimed invention* because the forces for stopper C are well within the ranges claimed." Pet. 40 (citing *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) ("A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use.").

>     *b)   Patent Owner's Arguments*

Patent Owner does not necessarily challenge whether the individual references in the combination teach each element of claim 1. *See* PO Resp. 8–25. Instead, Patent Owner makes several arguments directed to the combination of references. *See id.* First, Patent Owner argues a person of ordinary skill in the art (POSITA) would not have been motivated to combine Sigg and Boulange to arrive at the claimed invention because of the force profile of Boulange syringe (stopper) C and because Boulange teaches away from Syringe C. *Id.* at 13–18. Further, Patent Owner contends a POSITA would not have been motivated to use a solution having no more than two particles greater than 50 μm in diameter per mL. *Id.* at 18–20. Patent Owner argues a POSITA would not have had a reasonable expectation of success because they would not have reasonably expected Boulange's syringes to be compatible with VHP. *Id.* at 20–25. Patent Owner also argues that Petitioner has failed to show that Sigg enables a sterilization method for a PFS. *Id.* at 25–32. Patent Owner relies heavily on several declarants as discussed below. We highlight each of Patent Owner's

Regeneron Exhibit 1257.034
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

contentions in turn.[19]

Patent Owner notes that a POSITA would have balanced the need to minimize silicone oil "with more pressing concerns, such as ensuring that (1) the PFS had sufficiently low break loose forces that remained consistent over time; (2) the VEGF-antagonist did not degrade; and (3) potentially toxic substances were not introduced into the patient's eye." PO Resp. 9; *see also* Tr. 50:1–3 ("For intravitreal injection a person of skill in the art would want a syringe where the forces were low and consistent over time." (citing Ex. 2204 ¶¶ 67, 70, 99) (Declaration of Andrew F. Calman, M.D., Ph.D)).

     i.    Force Profile of Syringe (Stopper) C

Patent Owner contends that a POSITA "would not have been motivated to use Boulange Syringe C in a PFS for intravitreal administration of a VEG-F antagonist because Syringe C has inconsistent forces that increase over time." PO Resp. 8. Patent Owner notes that Boulange makes disparaging statements about stopper C and the data shows that its forces are inconsistent and increasing with time. *Id.* at 13–14. Patent Owner argues that a POSITA "would have known that a PFS for intravitreal injection must maintain consistent, low break loose forces over time to avoid injuring a patient's eye," and Boulange emphasizes the importance of maintaining forces over time, even after storage. *Id.* at 14 (citing Ex. 2204 ¶¶ 67, 70, 99; Ex. 1008, 6).

_____

[19] As noted above, because we do not rely on Petitioner's arguments related to Boulange stopper (syringe) B1 (containing Parylene-C), we do not address Patent Owner's arguments related to the same.

Regeneron Exhibit 1257.035
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Examining Boulange Table 5, Patent Owner argues that "while the
break loose force for Syringe C was initially 4.7 N, it nearly doubled to 8.4
N within just one month of accelerated storage, which simulated three
months of actual storage time." PO Resp. 14 (citing Ex. 1008, 21). Patent
Owner alleges that because of this force profile (4.7 to 8.4 N), "Boulange
characterizes Syringe C as 'markedly inferior' and not 'acceptable for a
medical device.'" *Id.* (quoting Ex. 1008, 19:7, 21:4–5).

Patent Owner contends "that the break loose forces for Syringe C in
Table 7 and Table 5 were essentially identical, showing that that the
statement of discouragement logically applied to both." PO Resp. 15 (citing
Ex. 2001 ¶ 89–90) (Declaration of Karl Leinsing). Patent Owner argues that
"[g]iven the data in Table 5 and Boulange's explicit statements, a POSA
would not have been motivated to use Syringe C in combination with Sigg."
*Id.* Further, Patent Owner notes "that even if the forces were 'acceptable' at
$T_0$ and $T_1$, as Mr. Koller argues (Ex. 1003 ¶179), Syringe C could not be
used for a PFS for intravitreal injections because the forces are inconsistent
over time and may continue to rise over the shelf life of the PFS." *Id.* (citing
Ex. 2204 ¶ 72; Ex. 2201 ¶¶ 43–44) (Supplemental Declaration of Karl
Leinsing); *see also* Tr. 48:19–49:25 ("[T]he question about the change from
4.7 to 8.4, . . . it's not acceptable because of the one-month aging change.
So the magnitude, it's not the magnitude of the numbers, it's the fact that
they jump up over one month that Boulange . . . says it's markedly
inferior."). For these reasons, Patent Owner argues "[c]onsidered as a
whole, Boulange teaches away from Syringe C," and "Boulange would have
discouraged a POSA from using Syringe C in a PFS," thus, "Petitioner's

36

**Regeneron Exhibit 1257.036**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

argument that a POSA would have been motivated to combine Syringe C
with Sigg must fail."  PO Resp. 16, 18 (citing Ex. 2201 ¶ 38–46).

     ii.    2 particles > 50 μm in diameter per ml

As noted above, Petitioner relies on the industry standard set forth in
USP789 to teach the claim requirement of "2 particles > 50 μm in diameter
per ml" (particulate content limitation).  *See* Pet. 44–45 ("POSITA would
understand that an ophthalmic solution, as disclosed in Sigg, should meet
USP789, including comprising no more than 2 particles >50 μm in diameter
per ml.").  Patent Owner disagrees with this conclusion and argues that
"even if a POSA would have been motivated to comply with USP 789, that
does not mean the POSA would have been motivated to meet this claim
limitation," because USP789 does not require an ophthalmic solution to
meet this particulate content limitation.  PO Resp. 19 (citing Ex. 2189,
205:17–20; 208:15–209:6; Ex. 1003 ¶ 205).

Patent Owner contends that "USP 789 provides a two-stage test
approach," and only ophthalmic solutions that fail the first test (no more than
50 particles greater than or equal to 10 μm in diameter per mL) are required
to pass the microscopic method test (the requirement of having no more than
2 particles greater than or equal to 50 μm in diameter per mL).  *Id.* (citing
Ex. 1019, 5–6; Ex. 2189, 204:1–205:20).  Patent Owner relies on the
statement in USP789 that "[i]t is expected that most articles will meet the
requirements on the basis of the light obscuration test alone."  *Id.* (quoting
Ex. 1019, 5).  Patent Owner further argues "Petitioner has provided no
motivation for a POSA to have met this claim element," because Petitioner
has not explained "why a POSA would have anticipated that the VEGF-

37

**Regeneron Exhibit 1257.037**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

antagonist solution of Sigg would be among the minority of solutions that
fail the first test and are thus subject to the second test with its additional
requirement." PO Resp. 20 (citing Ex. 2201 ¶¶ 82–84). Mr. Leinsing
similarly testifies that "having fewer than 2 particles greater than 50 μm in
diameter per milliliter is not a requirement," and "USP789 only has a
specific limit on particles greater than 50 μm in diameter for solutions that
fail to satisfy the light obscuration test." Ex. 2201 ¶¶ 82–84.

    iii.    Reasonable Expectation of Success – Compatibility of
           Boulange's Syringes with VHP

      Patent Owner questions whether Boulange's syringe could withstand
terminal sterilization with VHP when filled with a VEGF-antagonist solution
and contends Petitioner failed to establish a reasonable expectation of
success. PO Resp. 20. Patent Owner relies on Mr. Koller's cross
examination testimony and argues that "not every combination of barrel and
stopper would work to protect a sensitive drug product." *Id.* (citing
Ex. 2189, 92:4–93:8). Mr. Leinsing testifies that terminal sterilization with
VHP is conducted under vacuum and extreme pressure, which can permit
gas to pass between the syringe barrel and stopper in a way that does not
occur under standard pressure conditions. *See* Ex. 2201 ¶ 49. He further
notes that "Boulange mentions nothing about using VHP to sterilize its
syringes," and "[n]othing in Boulange suggests that the authors had
considered terminal sterilization of any of the syringes they used, or that the
syringes would be suitable for terminal sterilization." *Id.* ¶ 65. Mr. Leinsing
concludes that "[a] POSA would not assume that any syringe was
compatible with VHP sterilization unless specifically designed for that

38

**Regeneron Exhibit 1257.038**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

purpose." *Id.*

Patent Owner examines and challenges evidence relied on by Mr.
Koller from Boulange that relates to whether a POSITA would have
sterilized the syringe by a VHP method.  PO Resp. 21–23.  Patent Owner
first argues that the statement in Boulange that "possible degradation is
sometimes initiated by the processes used to sterilize the medical devices
containing them," refers only to degradation of the piston, or the stopper,
and not the drug product stored in the syringe.  *Id.* at 22 (citing Ex. 2189,
182:8–15; Ex. 2201 ¶ 131; Ex. 1008, 4:3–5).  Next, Patent Owner addresses
Mr. Koller's testimony related to a statement in Boulange that "tightness in
the region of contact between the piston and the container can be guaranteed
to be maintained." *Id.* (quoting Ex. 1003 ¶ 172 (citing Ex. 1008, 3:20–27)).
Patent Owner contends that this statement "has nothing to do with ingress of
gases, but rather refers to the ability to ensure that liquid drug product
'escapes only via the distal end of the container' and does not leak out of the
back during injection." *Id.* (quoting Ex. 1008, 3:20–27, 6:10–22).  Thus,
according to Patent Owner, "[a] POSA would have understood that a syringe
must be significantly tighter to prevent gaseous ingress during terminal
sterilization by VHP than merely to prevent liquid drug product from leaking
out." *Id.* (citing Ex. 2201 ¶ 54).  Patent Owner argues that other similar
statements in Boulange convey "nothing about the syringe's ability to
preserve the medical product if sterilized with VHP or other sterilizing
gases." *Id.* at 23–24.  Patent Owner concludes that "without any indication
that Boulange's syringe was designed to permit terminal sterilization by
sterilizing gases, a POSA would have had no reason to expect that it would

**Regeneron Exhibit 1257.039
Regeneron v. Novartis
IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

be among the 'very few' syringes tight enough to be amenable to such a process." *Id.* at 24–25 (citing Ex. 2201 ¶ 129).

iv.   Enablement of Sigg's VHP Method

Patent Owner contends that Sigg is not self-enabled because it fails to identify any syringe designs that can withstand its VHP method, and, neither Mr. Koller's opinions nor the prior art cited by Petitioner supports enablement. PO Resp. 25. Patent Owner, and its declarant, both contend that because "VHP sterilization is performed under vacuum and subjects the PFS to extreme pressure," an enabling disclosure must teach a person of ordinary skill in the art "how to design a syringe for these circumstances." *Id.* at 26 (citing Ex. 2201 ¶¶ 51, 93; Ex. 2189, 51:14–51:13).

Patent Owner dismisses Mr. Koller's opinion that "it was conventional that a pre-filled syringe should be gas-tight to protect certain drug products from exposure to oxygen and degradation," because "[t]he issue facing the POSA was not how to prevent ingress of oxygen during *normal storage conditions*; it was how to prevent ingress of sterilizing gas under the *extreme conditions* of VHP." *Id.* Patent Owner presents additional evidence alleging ███████████████████

███████████████████████████████████████

███████████████████████ *Id.* (citing Ex. 2140, 2; Ex. 2206 ¶¶ 33, 40 (Declaration of Juergen Sigg, Ph.D)). Patent Owner makes a similar argument with respect to ███████████████

███████████████████████████████████████

██████ *Id.* at 27 (citing Ex. 2140, 2; Ex. 2206 ¶¶ 33, 40). According to Patent Owner, the "evidence demonstrates that a POSA would have had to

40

Regeneron Exhibit 1257.040
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

engage in undue experimentation to identify a PFS that could be terminally sterilized using Sigg's VHP method without unacceptably modifying the VEGF-antagonist solution in the syringe." *Id.*

Patent Owner questions Mr. Koller's testimony related to enablement based on the 2008 Macugen Label because "that label does not show the Macugen PFS design, does not state that the product was terminally sterilized, and does not disclose the sterilization technique used." *Id.* at 28 (citing Ex. 2189, 186:18–187:3; 196:12–21; Ex. 2001 ¶ 99); *see also* Tr. 52:19–53:2. Patent Owner argues that the description of a "sterile foil pouch" does not necessarily suggest to a POSITA that Macugen PFS was terminally sterilized because a product does not have to be terminally sterilized to receive the label "sterile." PO Resp. 28 (quoting Ex. 2189, 186:18–186:22) (citing Ex. 2203 ¶ 102 (Declaration of Michael Miller, Ph.D); Ex. 2201 ¶ 115). Thus, Patent Owner concludes that "[t]he Macugen 2008 label therefore would have offered no guidance to a POSA who wanted to practice Sigg's VHP method." *Id.* at 29.

Patent Owner further notes that its syringe described in the '631 patent provides an enabling disclosure for terminal sterilization, but "[t]he fact the '631 patent does not claim the details of its syringe design that provide an enabling disclosure is not legally relevant." PO Resp. 30 n.7. Patent Owner argues that "the possibility that prior-art syringe components could have been cobbled together to permit terminal sterilization of a PFS for intravitreal injection containing a VEGF-antagonist does not satisfy Petitioner's burden." *Id.* at 31.

41

Regeneron Exhibit 1257.041
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

> c) *Arguments Related to Objective Evidence of Nonobviousness*[20]

Patent Owner's Arguments

Patent Owner contends that "[s]everal objective indicia strongly support the nonobviousness of the challenged claims." PO Resp. 46. According to Patent Owner, "there was a need for a terminally sterilized PFS for intravitreal injection of VEGF-antagonists containing low silicone oil levels and operable with acceptable break loose forces," yet Patent Owner contends "no pharmaceutical company could put such a PFS on the market before the inventions of the '631 patent." *Id.* at 47–48. Patent Owner examines PFS products made by Genentech, Pfizer, and Becton Dickinson and argues that these products used high levels of silicone oil despite the long felt need for low silicone oil syringes. *Id.* at 49. Patent Owner alleges another company, Vetter, ███████████████████████████████ █████████████████████████████████████████ *Id.* (citing Ex. 2206 ¶ 24).

> Nexus

Patent Owner contends it "is entitled to a presumption of nexus because Lucentis PFS, marketed in the United States by Genentech, is an embodiment of at least Claims 1, 3, 7, 8, 14, 17, 21, 22, and 24 of the '631 patent, and is co-extensive with them." *Id.* at 50 (citing Ex. 2201

---

[20] We examine secondary considerations under the heading for claim 1 because the parties largely argue secondary considerations together for the claims. To the extent that unique arguments are made for other claims (*e.g.*, claims 8, 22), we note those arguments and address them.

42

Regeneron Exhibit 1257.042
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

¶ 166; Ex. 2204 ¶ 31).  Patent Owner provides a claim chart and argues that claims 1, 3, 7, 8, 14, 17, 21, 22, and 24 of the '631 patent are co-extensive with the Lucentis PFS.  *Id.* at 50–52 (citing Ex. 2201 ¶¶ 170–285, as well as various exhibits related to Lucentis PFS).  Lucentis PFS contains ranibizumab in an ophthalmic solution, which Patent Owner equates to the claimed "VEGF-antagonist" of claim 1.  *Id.* at 51.  Patent Owner alleges that "the claims above cover the entirety of the Lucentis PFS, and the Lucentis PFS does not contain any unclaimed features," because "the Lucentis PFS is not a component of a larger product," and "[i]t consists only of the claimed syringe body filled with a VEGF-antagonist."  *Id.* at 53 (citing Ex. 2201 ¶ 287).

Patent Owner relies on the claimed combination as a whole and contends that "[a] nexus may be presumed even if the individual limitations of a claimed invention are all in the prior art."  *Id.*  Patent Owner believes that "Petitioner is mistaken when it suggests that the commercial success of Lucentis 'could only plausibly be relevant to claims 8–10, which are the only claims that are limited to ranibizumab (*i.e.*, Lucentis).' (Pet. 72 n.20[])," because not every embodiment of the claims must be sold in order to rely upon evidence of commercial success.  *Id.* at 54 (quoting *In re Huai-Hung Kao*, 639 F.3d 1057, 1069 (2011) ("there would never be commercial success evidence for a claim that covers more than one embodiment")).  Patent Owner also contends that the evidence shows the existence of a nexus between the objective evidence and the challenged claims.  *Id.*

Commercial Success

Relying on the testimony of James E. Malackowski (Ex. 2205), Patent

43

Regeneron Exhibit 1257.043
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Owner contends that the Lucentis PFS has achieved significant commercial success since its launch in 2017. PO Resp. 55 (citing Ex. 2205 ¶¶ 36–44). Patent Owner notes that in ████████████████████████████████████████ ████████████████████████████████████████████. *Id.* Patent Owner contends that "the commercial success of Lucentis PFS is due to the inventions claimed in the '631 patent." *Id.* Patent Owner alleges that "Genentech's ability to sell Lucentis in a PFS presentation, under a license to the '631 patent, substantially increased both the absolute sales and the market share Lucentis achieved." *Id.* Patent Owner notes that a Lucentis product was launched by Genentech in 2006 as a vial presentation. *Id.* Patent Owner notes that "Lucentis vial sales generally increased through 2014, but began to decline in 2015 due to market competition," but when the PFS presentation was launched in 2017, Lucentis PFS reversed the prior sales decline and caused sales to climb higher than they had been at any previous time. *Id.* (citing Exs. 2266, 2275, 2161, 2099, 2205 ¶ 20). Patent Owner claims that "the PFS launch turned around Lucentis's market share trajectory . . . leading to sustained share increases against other VEGF-antagonist competitors." *Id.* at 56 (citing Ex. 2205 ¶¶ 36–43, Figs. 6–9).

Long-Felt Need

Patent Owner alleges there was a long-felt need for the claimed invention, specifically "a terminally sterilized PFS for intravitreal injection of a VEGF-antagonist containing the claimed amounts of silicone oil." *Id.* at 56–57. Patent Owner contends that this "need had not been met in the marketplace prior to the launch of the Lucentis PFS." *Id.* at 57. Patent Owner argues that "as of the priority date, the only PFS for intravitreal

44

Regeneron Exhibit 1257.044
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

injection of a VEGF-antagonist on the market (Macugen) had ███ of silicone oil and was known to cause 'intravitreal contamination by silicone oil droplets.'" *Id.* (quoting Ex. 1003 ¶ 66) (citing Ex. 2001 ¶¶ 41, 182; Ex. 2257, 51:20–52:4). Patent Owner contends that "Pfizer, the developer and marketer of Macugen, had every incentive to meet the market need by offering Macugen with the silicone oil levels described in *Boulange*, but did not do so." *Id.* Patent Owner alleges that "[i]f it were obvious that a syringe with silicone oil amounts within the ranges claimed by the '631 patent could function properly, Genentech would likewise have been motivated to develop it," yet, Patent Owner points to evidence suggesting that "Genentech still believed that the preferred silicone oil amount for a PFS containing a biologic like a VEGF-antagonist was between 200–500 μg." *Id.* (citing Ex. 2022, 11).

Patent Owner also notes that "Becton Dickinson, the assignee of the Boulange application . . . never pursued a patent based on the Boulange application, while its Hypak for Biotech SCF syringe, which it marketed to Novartis and others as its low silicone oil prefillable syringe for sensitive biological products, had ███ of silicone oil." *Id.* at 58 (citing Ex. 2206 ¶ 21; Ex. 2141, 30).

### Failure of Others

Patent Owner contends, "[t]he evidence shows that others had attempted, but failed, to develop a terminally sterilized PFS for intravitreal injection of a VEGF-antagonist within the claims of the '631 patent." PO Resp. 58. Patent Owner relies on the "██████████████████████████ ████████████████████████████████████████████

45

**Regeneron Exhibit 1257.045**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

████████████████████.” *Id.* ("[T]he current record contains substantial additional support, including internal Genentech documents, the testimony of Genentech witness Mr. Overcashier, and the first-hand knowledge and contemporaneous documents of Dr. Juergen Sigg." *Id.* (citing Ex. 2206 ¶¶ 5–18; Exs. 2099–2115, Ex. 2194, 37:1–13).

Skepticism

Patent Owner relies on evidence related to communications between ████ and Novartis. PO Resp. 59. Specifically, "████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████

████████████████'" *Id.* (citing Ex. 2206 ¶¶ 24–26, 28; Exs. 2142, 2143). Patent Owner asserts that "██████ skepticism is particularly relevant to claim 22, which requires 'from about 1 to 50 µg silicone oil.'" *Id.*

Licensing

Patent Owner contends that "Genentech's licensing of the '631 patent is likewise strong evidence of nonobviousness." PO Resp. 60. According to Patent Owner, "████████████████████████████████████████," and ████████████████████████████████████████████████ ████████████████████████████████ *Id.* (citing Ex. 2121). Patent Owner notes that "████████████████████████████████████ ████████████████████████████" *Id.* Further, "Genentech used the license to the '631 patent by commercializing Lucentis PFS in the U.S. with a syringe that practices the '631 patent." *Id.*

Regeneron Exhibit 1257.046
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Petitioner's Arguments

In its Petition, "Petitioner provides a preliminary statement explaining

why there is no evidence of secondary considerations that could overcome

the clear evidence of obviousness set forth herein." Pet. 71.

> Petitioner first notes that

> the unsupported assertion of unexpected results in the '631
> Patent (Ex. 1001 at 5:15-25) with respect to reducing silicone oil
> amounts while maintaining acceptable break loose and slide
> forces is clearly contradicted by Boulange, which discloses the
> claimed silicone oil amounts in conjunction with the claimed
> break loose and slide forces.

Pet. 71–72 (citing Ex. 1003 ¶¶ 305–314).

Petitioner next argues that "long-felt need cannot demonstrate

non-obviousness because all claim elements were already described in the

prior art (e.g., Sigg, Lam, Boulange)," and "Macugen® PFS was a VEGF

antagonist sold in a 1 mL glass pre-filled syringe and sold in a sterile blister

pack by August 2008." Pet. 72 (Ex. 1003 ¶¶ 295–304, 148–153).

As for the commercial success of Lucentis PFS,[21] Petitioner alleges

that Novartis cannot demonstrate non-obviousness because it cannot

demonstrate that Lucentis PFS is co-extensive with the challenged claims.

*Id.* Additionally, Petitioner contends that "because all the claimed features

were already known in the art, any success of Lucentis PFS is not relevant."

Pet. 72–73. Petitioner also alleges that "Patent Owner's licenses for the

'631 Patent cannot demonstrate nonobviousness," because "Patent Owner

---

[21] Genentech brought Lucentis PFS to market in 2016 (Ex. 2015) and
licensed the '631 patent from Patent Owner as discussed more below.

**Regeneron Exhibit 1257.047
Regeneron v. Novartis
IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

will be unable to show that there is a nexus between its license agreement
with Genentech and the '631 Patent." Pet. 73.

Petitioner contends that Patent Owner will not be able to show failure
of others "because the evidence will show that others succeeded before
Patent Owner." *Id.* For example, "[b]y June 2010, Petitioner had reduced to
practice a 1 mL Eylea pre-filled syringe that was (i) terminally sterilized,
(ii) used a baked-on syringe with less than 100 µg of silicone oil on the
syringe barrel, and (iii) met the requirements of the USP789." *Id.* (citing
Ex. 1005, 109–110, 114–125). Petitioner notes that its "Eylea PFS was
subsequently used in clinical studies and approved by regulatory authorities
in Australia in 2012." *Id.* (citing Ex. 1066).

In its Reply, Petitioner addresses Patent Owner's evidence of
objective indicia of nonobviousness as follows and argues "Novartis's
secondary considerations evidence, which lack nexus and is otherwise
irrelevant, cannot overcome the compelling evidence of obviousness." Pet.
Reply 21.

Nexus and Commercial Success

Petitioner first argues that there is no nexus between any commercial
success of Lucentis PFS and the '631 patent because "non-patented features
and features known in the prior art underlay the commercial success." Pet.
Reply 21 (quoting *Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d
1023, 1034 (Fed. Cir. 2016)). Petitioner relies on Patent Owner's evidence
and testimony to support its position "that numerous unclaimed features
contribute to the success of Lucentis PFS:"

- ███████████████████████████████████ critical to

48

Regeneron Exhibit 1257.048
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

> terminal sterilization and commercialization. Ex. 2206
> ¶¶ 46–48; Ex. 2201 ¶¶ 105–106.

- A "baked silicone" application process critical to
  preventing silicone oil being injected into the eye.
  Ex. 2209 ¶ 36 (Declaration of Jeremy Wolfe, M.D.).

- A ██████ critical to terminal sterilization. Ex. 2141, 51.

- ██████████████████████████████ critical to
  achieving low break loose and slide forces. Ex. 2141, 33;
  Ex. 2064, 30.

Pet. Reply 22 (also citing Ex. 1105 ¶¶ 100–106 (Reply Declaration of Mr.

Koller)).

Petitioner next relies on admissions of Patent Owner and its witnesses

to argue "that the success of Lucentis PFS is due to features that were known

in the art." Pet. Reply 22. For example, "Dr. Wolfe and ████████

████████████████████████—testified that physicians use

Lucentis PFS due to its convenience, which was a known PFS feature and

not attributable to the '631 Patent claims." *Id.* (citing Ex. 2209 ¶ 31;

Ex. 1161, 115:8–14, 115:22–116:18; Ex. 1106 ¶¶ 30–34)

Petitioner next contends that "[t]here is also no nexus because

Lucentis PFS is not coextensive with the claims," and "there must be some

evidence that other embodiments within the claim would produce the same

results." *Id.* at 23 (citations omitted). Petitioner first notes that "Lucentis

PFS contains a single VEGF-antagonist—ranibizumab—but the '631 Patent

functionally claims any VEGF-antagonist." *Id.* (citing Ex. 1105 ¶ 99).

Petitioner alleges that "there is no evidence that a PFS comprising

other VEGF-antagonists within the claim scope would be successful," but

"there is evidence that the Beovu PFS, which Novartis contends practices

49

IPR2021-00816
Patent 9,220,631 B2

multiple claims, ***would not*** be successful." *Id.* at 23–24 (citing Ex. 1005, 42; Ex. 1106 ¶ 35; Ex. 1208, 58:5–15).

Petitioner next argues that because Lucentis PFS contains between ██████████████████████ but the claims cover up to about 100 μg (claims 1–21, 23–26) or about 50 μg (claim 22), the claims actually cover embodiments that would not be suitable for a commercial product. *Id.* at 24. Petitioner relies on the cross-examination testimony of Dr. Sigg, "██ ████████████████████████████████████ (Ex. 1158, 110:2–17), meaning the claims cover embodiments unsuitable for a commercial product." *Id.*

As for commercial success regardless of presumed nexus, Petitioner argues that "Novartis has not set forth evidence linking any commercial success to the specific claimed features, and instead has only shown a correlation between increased sales and introduction of Lucentis PFS." *Id.* at 24 (Ex. 1107 ¶¶ 39–51). Petitioner contends that "Novartis ignores that Lucentis was also approved for new indications when the PFS launched," and "Novartis's Global Head of Ophthalmology did not believe '███████████ ████████████'" Ex. 1161, 100:22–101:11; Ex. 1107 ¶ 48.

<u>Long-Felt Need</u>

Petitioner first responds that the need for a terminally sterilized PFS for intravitreal injection of a VEGF-antagonist containing the claimed amounts of silicone oil was a need that was met by the prior art. Pet. Reply 24–25. Petitioner contends that "Macugen PFS was a terminally sterilized PFS containing a VEGF-antagonist with sufficiently low operational forces by 2008," and "Becton Dickinson had disclosed in

50

Regeneron Exhibit 1257.050
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Boulange ████████ 1 mL glass syringes comprising less than 50 μg silicone oil by May 2011." *Id.* (citing Ex. 1105 ¶¶ 107–109, 113; Ex. 1106 ¶¶ 19–20; Ex. 1215 ¶¶ 3–5; Ex. 1162, 1–6).

Petitioner next alleges that the claims do not satisfy the need identified by Novartis. *Id.* at 25. Petitioner notes that "Novartis characterized the need as including a 'syringe with low levels of silicone oil' to prevent silicone oil injection into the eye." *Id.* (citing Ex. 2204 ¶¶ 80, 91). According to Petitioner, however, the '631 patent only claims silicone oil applied to the syringe barrel, yet, silicone oil also can be introduced into a PFS via the stopper and filling process, neither of which are claimed. *Id.* (citing Ex. 1105 ¶ 111; Ex. 1207, 35:20–36:6). Petitioner also contends the process used to apply the oil is important as to whether the silicone oil migrates from the syringe barrel and into the patient's eye, but yet again, the process is not claimed. *Id.* (citing Ex. 1105 ¶ 111; Ex. 1207, 35:20–36:6). "Thus," according to Petitioner, "the claims do not satisfy the need for a 'syringe with low levels of silicone oil' that avoids silicone oil injection into the eye," and "[t]o the extent Lucentis PFS does, it is due to unclaimed features." *Id.* (citing Ex. 1105 ¶¶ 110–112).

Petitioner next argues that "there is no evidence that others actually made efforts to meet the need as characterized by Novartis," because "Macugen PFS already met every need expressed by Novartis, except for the claimed silicone oil amount." *Id.* at 26 (citing Ex. 1105 ¶¶ 108–116). Petitioner further asserts that "the silicone oil amounts were met by [Becton Dickinson's (BD's)] baked-on syringes," yet, "while it was clearly obvious as of 2011 to use a baked-on syringe for a VEGF-antagonist PFS, sales of

51

Regeneron Exhibit 1257.051
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Macugen PFS had declined by that time due to more effective drug products (e.g., Lucentis, EYLEA)." *Id.* (citing Ex. 1105 ¶¶ 113–116). "Thus," according to Petitioner, "there is no evidence that the makers of Macugen PFS made efforts to incorporate BD's baked-on syringe." *Id.*

<u>Failure of Others</u>

Petitioner addresses each of Patent Owner's alleged failures by others. Pet. Reply 26. Petitioner contends "████████████████████
████████████████████████████████████████████
████████████████████████████████████████████"

*Id.* (citing Ex. 1100 ¶¶ 58–59) (Declaration of James Agalloco). Petitioner next argues that "Macugen PFS successfully terminally sterilized a PFS by 2008," and "Regeneron successfully manufactured commercial-scale batches of a terminally sterilized Eylea PFS in 2010, which were used in clinical trials from 2011–2014 and approved in Europe and Australia in 2012." *Id.* at 26–27 (Ex. 1102 ¶¶ 14–29, 36, 40–41).

<u>Skepticism</u>

Petitioner contends that "Novartis's argument that Vetter was allegedly skeptical about applying less than 100 µg of silicone oil is unsupported," because "[t]he challenged claims cover up to 'about 100µg,' meaning ████████████████████████████████████████████"

Pet. Reply 27 (citing Ex. 1105 ¶¶ 117–120). Petitioner further relies on correspondence between Novartis and Vetter to contradict Novartis's position that Vetter was ████████████████████████████.

*Id.* (citing Ex. 1213, 101:9–103:3; Ex. 1168, 2–4; Ex. 2143, 2 (████████
████████████████████████████████)).

52

Regeneron Exhibit 1257.052
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Licensing

Petitioner contends that "Genentech's license has no nexus to the '631 Patent," because it "is clearly directed to ███████████ ██████ that are not disclosed in the '631 Patent." Pet. Reply 27 (citing Ex. 2121, 1; Ex. 1105 ¶¶ 124–132; Ex. 1107 ¶¶ 54–58). Petitioner argues "[t]hat the license also provided rights to the '631 Patent is insufficient to demonstrate a nexus." *Id.*

    *d) Analysis*

Having now considered the evidence in the complete record established during trial, we are persuaded that, based on this record, Petitioner has demonstrated by a preponderance of the evidence that claim 1 of the '631 patent would have been obvious to the person of ordinary skill in the art based on the combination of Sigg, Boulange, and USP789. Petitioner persuasively shows how each element of claim 1 is taught by the combination of references and provides sound reasoning for the combination of references. Pet. 31–47; Pet. Reply 21–27. Patent Owner has not shown that the combined evidence of secondary considerations of nonobviousness is persuasive enough to overcome Petitioner's strong case of obviousness.

The combination of Sigg and Boulange teaches that pre-filled syringes may be made of glass because Boulange discloses a syringe comprising a glass barrel and a piston (*i.e.*, stopper) that would work in Sigg's device. *See* Pet. 41–42 (citing Ex. 1008, 9:21–35, 13:11–12; Ex. 1003 ¶ 192). Sigg also teaches a pre-filled terminally sterilized syringe containing a VEGF-antagonist for intravitreal injection with a nominal maximum fill volume of between 0.5 mL and 1 mL. Ex. 1003 ¶ 159. The current record establishes

53

Regeneron Exhibit 1257.053
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

that the claim limitation "2 particles >50 μm" comes from the USP-789 standard, which is an accepted standard for ophthalmic drugs such a VEGF-antagonist solution intended for intravitreal use. Ex. 1019; Ex. 1003 ¶¶ 90–92. We are persuaded by Mr. Koller that, because Sigg discloses a PFS with ranibizumab, a known VEGF-antagonist solution intended for intravitreal use, Petitioner has established that it would have obvious to a POSITA that the VEGF-antagonist solution in Sigg must comply with the USP-789 standard. Ex. 1003 ¶ 92.

As for the limitation requiring about 1 μg to 100 ug silicone oil and a specific break loose force (less than about 11 N), Sigg does not disclose any particular break loose force, but Boulange discloses several tests of "friction force B" of various syringes. Ex. 1008, 15:6–8. We find persuasive Petitioner's evidence that Table 5 of Boulange discloses break loose forces (B) of less than about 11 N for stoppers that were coated with silicone oil[] and tested with baked-on syringes having 40 μg of silicone oil (*i.e.*, 4 μg/cm2). Ex. 1003 ¶ 208; Pet. 46 ("Table 5 likewise discloses break loose forces less than 11 N for the baked-on syringes with 40 μg of silicone oil (4 μg/cm2) for stoppers B1 and C at T=0 and T=1.").

Based on the final record, we also find Petitioner's reasoning and evidentiary underpinnings show by a preponderance of the evidence that a POSITA would have been motivated to combine Sigg's terminally sterilized PFS comprising a VEGF-antagonist with Boulange's low-silicone and low break loose/gliding force syringe and the combination would have had a reasonable expectation of success. *See* Ex. 1003 ¶¶ 159–187. Because Sigg discloses that the pre-filled syringe can contain a sensitive protein or

54

**Regeneron Exhibit 1257.054**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

biologic drug product, such as a VEGF-antagonist solution, a POSITA
would have been motivated to minimize the amount of silicone oil used in
the syringe barrel in order to reduce or avoid the negative interactions that
were known to occur between silicone oil and protein or biologic
formulation. *Id.* ¶ 159. We determine that it was known in the art that pre-
filled syringes are typically siliconized to achieve desired break loose and
gliding forces. *See, e.g.*, Ex. 1001, 4:48–50. The evidence of record
establishes that the person of ordinary skill in the art was aware that
reducing the amount of silicone oil in intravitreal injections was desirable to
avoid potential "incompatibilities includ[ing] aggregation, deformation, and
inactivation of native protein structures of the delivered drug." *See* Ex. 1003
¶¶ 159–160 (quoting Ex. 1012, 6).

Further, the advantages of using baked-on siliconization as disclosed
in Boulange would help reduce the amount of "residual" or "free" silicone
oil that can enter the protein formulation and cause negative effects because
the baking attaches the silicone oil to the inner surface of the syringe barrel.
*Id.* ¶ 165. Accordingly, and based on the final record, we determine that
Petitioner has provided sufficient articulated reasons and evidentiary
underpinnings for its reasons for combining Sigg's terminally sterilized PFS
comprising a VEGF-antagonist with Boulange's low-silicone and low break
loose/gliding force syringe.

We address each of Patent Owner's arguments in more detail below.

i.    Force Profile of Syringe (Stopper) C

As noted above, Patent Owner contends that a POSITA "would not
have been motivated to use Boulange Syringe C in a PFS for intravitreal

55

**Regeneron Exhibit 1257.055**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

administration of a VEG-F antagonist because Syringe C has inconsistent forces that increase over time." PO Resp. 8; Sur-reply 5 ("Even though the forces remain under 11N, they almost double over that period. A POSA would be concerned those inconsistent forces would continue to rise, making the syringe unsuitable for intravitreal use.").

We first note that claim 1 does not require any particular break loose force at a particular time. *See* Tr. 15:17–16:5. Patent Owner's contentions are not challenging whether the prior art teaches any particular limitation, but instead whether the POSITA would have been motivated to use Boulange Stopper C in a PFS for intravitreal administration of a VEGF-antagonist. We determine that the combined evidence demonstrates the POSITA would have been motivated to use Boulange Stopper C as proposed by Petitioner.

Stopper C is lubricated with silicone oil, which was a typical stopper configuration and used in a prior art terminally sterilized PFS comprising a VEGF-antagonist. *See* Ex. 1105 ¶¶ 30–33; Ex. 1207, 41:9–12, 46:4–10 (Deposition of Karl Leinsing). More specifically, a POSITA would have known that siliconized Stopper C was suitable for a terminally sterilized PFS comprising a VEGF-antagonist because siliconized rubber stoppers had already been used for that purpose in the Macugen PFS. *See* Pet. Reply 3; Ex. 1008, 13:11–15, Table 1 and 5; Ex. 1220, 97, 229 (███████████ ███████████████████████); Ex. 1105 ¶¶ 30–33.

The final record establishes that stopper C in Boulange has acceptable break loose forces and side forces both at time zero and after accelerated aging. Ex. 1008, 13:11–15, Tables 1, 5. As seen in Table 5 of Boulange

56

IPR2021-00816
Patent 9,220,631 B2

below, the siliconized Stopper C maintained break loose forces less than

11 N (8.4 N, 7.5 N, 7.8 N) after accelerated aging. *Id.*

Table 5 : Activation Gliding Forces, Pistons A, B1 and C

| Silicone/internal surface of container | | 4 µg/cm² | | | 4 µg/cm² | | | 4 µcm² | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Silicone/piston | | 5 µg/cm² | | | 15 µg/cm² | | | 50 µg/cm² | | |
| Force (N) | | B | S | F | B | S | F | B | S | F |
| Piston | A T=0 | 6.6 (0.6) | 5.9 (1.0) | 4.7 (1.0) | 7.2 (0.5) | 6.9 (1.9) | 4.7 (1.9) | 6.6 (0.8) | 6.5 (1.5) | 4.0 (1.5) |
| | A T=1 | 12.0 (2.3) | 8.4 (2.0) | 3.2 (1.3) | 11.0 (0.8) | 8.0 (1.9) | 3.3 (1.0) | 10.7 (1.2) | 6.7 (1.5) | 3.6 (1.7) |
| | B1 T=0 | 2.2 (0.2) | 2.7 (0.4) | 2.7 (0.4) | 2.2 (0.2) | 3.0 (0.6) | 3.0 (0.6) | 2.1 (0.1) | 2.6 (0.5) | 2.6 (0.5) |
| | B1 T=1 | 2.8 (0.3) | 4.3 (1.2) | 4.3 (1.2) | 2.6 (0.6) | 3.3 (0.3) | 3.3 (0.3) | 2.5 (0.2) | 3.4 (0.3) | 3.4 (0.3) |
| | C T=0 | 4.7 (0.4) | 6.5 (0.6) | 4.6 (0.6) | 4.2 (0.3) | 6.0 (0.7) | 4.2 (0.7) | 3.9 (0.5) | 5.2 (0.7) | 4.0 (0.7) |
| | C T=1 | 8.4 (0.6) | 8.3 (1.9) | 4.1 (1.6) | 7.5 (0.6) | 8.3 (1.4) | 4.8 (2.2) | 7.8 (1.1) | 6.2 (1.0) | 3.7 (1.5) |

Petitioner's highlighted Table 5 of Boulange depicts activation and gliding
forces for pistons A, B1, and C.  Pet. 31; Ex. 1008, Table 5.

We have considered the testimony from Patent Owner's experts but

determine that a POSITA would not have been deterred from using Stopper

C because the break loose force increases from 4.7 N to 8.4 N (Δ 3.7 N)

after accelerated aging. *See* PO Resp. 14–15; Ex. 2201 ¶ 88; Ex. 2204 ¶¶

67–73; Sur-reply 5–6.  We find Petitioner's position more persuasive—

because Stopper C's forces after aging are within the claimed range and

suitable for intravitreal injection, the POSITA would not be deterred from

using Stopper C.  Pet. Reply 4; Ex. 1105 ¶¶ 38–42; Ex. 1208, 17:1–7, 27:10–

17 (Dr. Calman acknowledging his preferred PFS for intravitreal injection

requires up to 10 N force).  As Mr. Koller explains, "[a] POSITA would

have understood that most pre-filled syringes are expected to experience

57

Regeneron Exhibit 1257.057
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

some level of force increase over the shelf-life of the syringe," and such an entirely expected increase would not deter the POSITA. Ex. 1105 ¶ 39.

We also agree with Mr. Koller that Stopper C's increase in force from 4.7 N to 8.4 N would not be an inconsistent "force profile" that would affect an ophthalmologist's use of the syringe. *Id.* ¶ 41. Mr. Koller persuasively shows how a force increase of less than 4 N after aging would have been expected and acceptable "based on tolerances and variations in manufacturing processes," as evidenced by data from Regeneron demonstrating that the break loose force for Eylea PFS can vary from approximately ████████. *Id.* ¶ 42 (citing Ex. 1154, 15). Further, even Patent Owner's declarants agreed that they found the Eylea PFS to have consistent forces from syringe to syringe despite this stated variance. Ex. 1105 ¶ 42 (citing Ex. 1212 (Wolfe Dep. Tr.), 28:7–9; Ex. 1208 (Calman Dep. Tr.), 22:3–9).

Patent Owner contends that Boulange describes all configurations of Stopper C as "unacceptable," however, based on the final record, we disagree. *See* PO Resp. 14; Sur-reply 5–6; Ex. 2001 ¶¶ 89–90. Boulange only states that Stopper C *in Table 7* "does not appear to be acceptable for a medical device." Ex. 1008, 21:5. As Mr. Koller explains, Stopper C in Table 7 is distinct from other embodiments because it is not siliconized. Ex. 1105 ¶¶ 34–37. In contrast, Stopper C in Table 5 is siliconized and had much lower break loose forces after accelerated aging (8.4 N, 7.5 N, 7.8 N) than Stopper C in Table 7 (14.4 N). *Id.* ¶ 35 ("the statement in Boulange . . . comes directly after Table 7 of Boulange and is clearly referring to the configuration of Stopper C that has no lubrication on it at all"). We agree

58

Regeneron Exhibit 1257.058
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

with Mr. Koller that this "statement would not be understood to apply to the results in Table 5 of Boulange because that is an entirely different configuration of Stopper C (*i.e.*, it includes a silicone oil lubricant)." *Id.*; *see also* Tr. 18:4–14, 41:18–42:8.

Even though Boulange describes siliconized Stopper C as "markedly inferior" to Stopper B1 (coated with Parylene C), we do not see this as a teaching away as argued by Patent Owner. *See* Sur-reply 5. Although Stopper C's 8 N (after accelerated aging) is inferior to the values for Stopper B1 (less than 3 N), the values for Stopper C are still within the claimed "about 11N," but more importantly, well under the 20 N that the '631 patent acknowledges was "known in the art" to be acceptable for intravitreal injection. Ex. 1105 ¶ 37; Ex. 1001, 5:31–38 ("Break loose and slide forces for prefilled syringes *known in the art* are typically in the region of less than 20N.") (emphasis added).

We find persuasive Mr. Koller's testimony that a POSITA would recognize Boulange's aging conditions correspond to the intended storage life for a VEGF-antagonist. Further, because the results from Stopper C are low even after 12 months of shelf life, a POSITA would understand Stopper C is an acceptable alternative to Stopper B1 (Parylene C), even though it is categorized as "markedly inferior" to Stopper B1. *Id.* A POSITA would have understood that Stopper C's low force profile would indeed work, but also that Stopper B1 has an extremely low force profile making it the superior alternative for that one condition. Further, as Mr. Koller explains, a POSITA would have been motivated to use Stopper C as opposed to Stopper B1, because Stopper C was "comprised of rubber and coated with silicone

59

**Regeneron Exhibit 1257.059**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

oil, which was a common stopper design in the prior art." Ex. 1105 ¶ 33
("[A] POSITA would have known that rubber stoppers coated with silicone
oil had been used in a PFS comprising a VEGF-antagonist for intravitreal
injection before the '631 Patent.").

Thus, we determine the descriptions in Boulange are distinct from
those set forth in *AstraZeneca AB v. Mylan Pharm. Inc.*, 19 F.4th 1325, 1337
(Fed. Cir. 2021), relied on by Patent Owner.  *See* PO Resp. 16.  In
*AstraZeneca*, the Federal Circuit determined that a reference teaches away
when a POSITA "would be discouraged from following the path set out in
the reference." *AstraZeneca AB*, 19 F.4th at 1337 (Fed. Cir. 2021)
("reference that properly teaches away can preclude a determination that the
reference renders a claim obvious").

The prior art in *AstraZeneca* taught a control formulation and a novel
formulation (similar to Boulange Stoppers C and B1 (novel Parylene C)) and
the Federal Circuit affirmed that the prior art taught away from the control
formulation (Rogueda).  *Id.*  The district court, and Federal Circuit, relied on
"AstraZeneca's expert . . . testify[ing] that a skilled artisan looking at the
adhesion test results in Rogueda would conclude that the control
formulations 'were not suitable' and 'clearly don't work,'" and the "control
formulations" had "poor adhesion." *Id.* at 1336.  Further, "the particle size
reported by Rogueda was significantly larger, indicating that there were
'huge agglomerates . . . floating around' in the formulations, rendering them
'completely unsuitable.'"  *Id.* at 1337.

The force profiles set forth in Boulange for Stopper C would not have
discouraged the skilled artisan from following the path set out in Boulange

60

**Regeneron Exhibit 1257.060**
**Regeneron v. Novartis**
**IPR2021-00816**

because Stopper C's force profiles were markedly low, even though Stopper B1 was superior in comparison. *See* Ex. 1105 ¶ 37 ("Although 8N is inferior to the values for Stopper B1 (less than 3N), the values for Stopper C are within the claimed 'about 11N' and" below those "known to be acceptable for intravitreal injection."). The control formulation examined in *AstraZeneca* is distinct from Stopper C in Boulange because a skilled artisan at the time of invention would have viewed Stopper C as having acceptable break loose forces and slide forces both at time zero and after accelerated aging. Further, a variance of 4.7 N to 8.4 N (Δ 3.7 N) after accelerated aging is within accepted industry standards and would have been a viable option for the POSITA. *See* Ex. 1154, 15 (break loose force for Eylea PFS varying from approximately ████ ); Tr. 16:7–20; Ex. 1212, 28:7–9; Ex. 1208, 22:3–9.

ii.    2 particles > 50 μm in diameter per ml

The parties agree that Sigg discloses an ophthalmic solution and a POSITA would have understood that USP789 is a de facto requirement for regulatory approval of an ophthalmic solution. *See* PO Resp. 19 n.3; Ex. 1003 ¶ 92. As noted above, however, Patent Owner contends that USP789 does not require an ophthalmic solution to meet the particulate content limitation (2 particles > 50 μm in diameter per ml). PO Resp. 19.

Even accepting Patent Owner's contention as true – that USP789 does not dictate that the particulate content limitation be met in every situation – USP789 nonetheless teaches use of the particulate content limitation. The limitation comes directly from the microscopic test of USP789, which explains that it "may be necessary to test . . . by the light obscuration test

61

Regeneron Exhibit 1257.061
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

followed by the microscopic test."  Ex. 1019, 5; *see also id.* ("[M]icroscopic testing may be used exclusively" where "the ophthalmic solution cannot be tested by light obscuration.").  Accordingly, USP789 provides clear motivation for a POSITA to design an ophthalmic solution to pass the light obscuration *and* microscopic tests to ensure compliance, including having no more than 2 particles > 50 μm.  Ex. 1105 ¶¶ 43–45; Ex. 2002, 10 (Declaration of Marie Picci asserting that "USP<789> standard requires no more than 2 particles > 50 μm").

    iii.    Reasonable Expectation of Success

As noted above, Patent Owner questions whether Boulange's syringe could withstand terminal sterilization with VHP when filled with a VEGF-antagonist solution and Patent Owner contends that not every combination of barrel and stopper would work to protect a sensitive drug product.  PO Resp. 20–25; Ex. 2201 ¶ 135.  Based on the final record, Petitioner has persuasively shown that Boulange's pre-filled syringe would have been compatible with Sigg's terminal sterilization method (VHP) and a POSITA would have reasonably expected the combination to work as proposed by Petitioner.

First, it is important to reiterate our claim construction for "terminally sterilized," as the sterilization of the outside of a pre-filled syringe (*i.e.*, primary packaging component) while *minimizing contact* between the drug product within the pre-filled syringe and the sterilizing agent being applied. *See* Ex. 1003 ¶ 120.  As we previously emphasized, the '631 patent recognizes that some amounts of the sterilizing gas may interact with the ophthalmic solution so long as the amount does not "cause unacceptable

62

**Regeneron Exhibit 1257.062**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

modification of the ophthalmic solution within the variable volume
chamber." Ex. 1001, 10:5–7. Thus, some amount of contact between the
drug product within the pre-filled syringe and the sterilizing agent is
contemplated within the scope of the claims.

We find persuasive Mr. Koller's testimony that it was standard in the
art to design pre-filled syringes like those in Boulange to be gas-tight to
protect the drug product from degradation during its shelf life. Ex. 1003
¶ 172 (quoting Ex. 1008, 1:18–21 ("The piston is preferably made at least
partially from a viscoelastic material so as to ensure tightness in the region
of contact between the container and the piston."), 3:20–27, 4:21-32
(explaining that the disclosed coating ensures tightness and enables "gliding
between the two parts intended to cooperate together and also tightness
between these two parts at the contact region")). Petitioner's position that a
POSITA would have readily understood that Boulange's syringe to be gas-
tight, preventing sterilizing gas from entering the syringe, is more persuasive
because "Boulange describes that the 'invention allows to have decreased
activation, sustainable and final forces . . . without having to add lubricant
and *while preserving the tightness* of the contact region between said two
parts.'" Pet. 35 (quoting Ex. 1008, 6:10–14) (citing Ex. 1003 ¶¶ 172, 184–
186); *see also* Ex. 1008, 1:14–16 (Boulange describing that its syringe can
accommodate a drug product in a gaseous phase).

Patent Owner posits that a syringe would not be able to withstand
sterilization conditions unless specially designed to do so. PO Resp. 21;
Ex. 2201 ¶ 65 (explaining also that Boulange does not discuss terminal
sterilization). Regardless of Boulange's lack of discussion of terminal

63

Regeneron Exhibit 1257.063
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

sterilization, a POSITA would have still had an expectation of success. Boulange discloses use of structure for achieving gas tightness, similar to the '631 patent, and notes that it preserves the tightness, such that a POSITA would reasonably expect compatibility with VHP sterilization. *See* Pet. Reply 8; Pet. 34–35. The evidence does not support Patent Owner's contention that Boulange's discussion of gas tightness was just "aspirational." Sur-reply 8. Boulange instead describes a functional siliconized rubber stopper (Stopper C), similar to that which had already been used in the ████ terminally sterilized Macugen PFS approved by the FDA. Ex. 1105 ¶¶ 48–52, 264.

Patent Owner contends that Boulange discloses that the syringe components are sterilized before the syringe is filled with the active (aseptic filling), whereas terminal sterilization takes place after the syringe is filled. Sur-reply 6–7. Thus, according to Patent Owner, a POSITA would not have been motivated to combine Boulange with a reference that teaches terminal sterilization (Sigg). *Id.* First, Boulange makes no reference to aseptic filling and the evidence cited by Patent Owner does not support such a conclusion. Regardless, we are not persuaded that a POSITA would have been dissuaded from combining the syringe structure taught by Boulange with the terminal sterilization technique taught by Sigg because all PFSs are designed to be gas-tight during normal storage to prevent air from negatively interacting with the drug product – Boulange's relied upon structure remains consistent. Ex. 1105 ¶ 48; Ex. 1003 ¶ 172; Ex. 1008, 4:21–32.

Patent Owner further argues that terminal sterilization requires special tightness beyond the tightness described in Boulange because of pressure

64

Regeneron Exhibit 1257.064
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

variations that may cause stopper movement. PO Resp. 22–23; Ex. 2201
¶ 54. Petitioner demonstrates, however, that "[t]his argument is not
applicable to the VHP method disclosed in Sigg, which can be done at
ambient pressure." Pet. Reply 9 (citing Ex. 1213, 71:3–8; Ex. 1252, 222
(¶ 9); Ex. 1105 ¶¶ 59–61); *see also* Ex. 1207, 120:17–22 ("Q. Now, with
respect to terminal sterilization using ethylene oxide or vaporized hydrogen
peroxide, is your understanding that the pressure changes associated with
those sterilization cycles would cause the stopper to move? A. Not
necessarily, no."). As Mr. Koller persuasively explains, "a POSITA would
understand that Sigg teaches a VHP method that attempts to minimize the
use of pressure changes" during the VHP process such that terminal
sterilization process could be achieved without causing the stopper to move.
Ex. 1105 ¶ 61 (citing Ex. 1007, 14:3–6, 14:9–11, 14:18–20). The evidence
in the final record does not demonstrate that any special tightness or specific
stopper material, coating, or dimensions, would have been required to
achieve terminal sterilization within the scope of the claims of the '631
patent. *See* Ex. 1207, 109:1–13, 113:10–17; Ex. 1105 ¶ 49. Further, the
'631 patent does not claim any specific structure for achieving the same
result. Accordingly, we determine that a POSITA would have determined
that the stoppers disclosed in Boulange would result in an acceptably tight
seal for terminal sterilization (even with pressure changes), and thus,
Boulange discloses a stopper compatible with VHP sterilization.

    iv.    Enablement of Sigg's VHP Method

    For the reasons previously examined, and as set forth below, we
determine that Petitioner demonstrates that Sigg is enabled for the portions

65

**Regeneron Exhibit 1257.065**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

of its disclosure that are cited. Further, we determine that evidence in the final record establishes that a skilled artisan would have been able to make and use the claimed invention as set forth in Petitioner's proposed combination of reference without undue experimentation.

In a § 103 analysis, we need not consider a prior art reference in a vacuum. Instead, as the Federal Circuit stated in *Raytheon*:

> We have explained that there is no absolute requirement for a relied-upon reference to be self-enabling in the § 103 context, so long as the overall evidence of what was known at the time of invention establishes that a skilled artisan could have made and used the claimed invention. We have also previously expounded the principle that if an obviousness case is based on a non-self-enabled reference, and no other prior art reference or evidence would have enabled a skilled artisan to make the claimed invention, then the invention cannot be said to have been obvious.

*Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1376–77 (Fed. Cir. 2021). Based on the final record, we do not find this to be a case where no other prior art reference or evidence would have enabled a skilled artisan to make the claimed invention. The final record, including Sigg, contains persuasive teachings demonstrating that a POSITA would have known how to use a VHP method to terminally sterilize a PFS containing sensitive biological solutions. *See* Ex. 1003 ¶¶ 78–89.

We again note our claim construction for "terminally sterilized," which Patent Owner has not challenged. The '631 patent recognizes that some amounts of the sterilizing gas may interact with the ophthalmic solution. Ex. 1001, 10:5–7.

66

**Regeneron Exhibit 1257.066**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

Next, we consider that the '631 patent discloses, but does not claim, any specific structure that enables terminal sterilization of a PFS. The claims of the '631 patent are not directed to a particular stopper or plunger rod design, and instead appear to encompass any stopper and plunger rod that allow terminal sterilization in the manner claimed. *See* Ex. 1003 ¶ 108. Typically, unclaimed features cannot be used to distinguish a patent over the prior art.

Patent Owner contends that Sigg is not self-enabled because it fails to identify any syringe designs that can withstand its VHP method, and, neither Mr. Koller's opinions nor the prior art cited by Petitioner supports enablement. PO Resp. 25–26. Many of Patent Owner's arguments are similar to those we have already considered, but found unpersuasive. Our reasoning carries over to the issue here and we add the following analysis.

Weighing the testimony in the final record, and examining all of the evidence before us, we recognize that terminally sterilizing a PFS with VHP was technically challenging at the time of invention. Even still, we are more persuaded by Mr. Koller's testimony that conducting terminal sterilization of a PFS with VHP in light of the prior art of record would not require undue experimentation. *See* Ex. 1003 ¶¶ 83–88; Ex. 1105 ¶¶ 66–71. Mr. Koller provides persuasive testimony as to how Sigg's disclosure of "the VHP sterilization methods would be applied to pre-filled syringes containing sensitive protein formulations such as VEGF-antagonists in order to sterilize the outside surface of the syringe (and not the drug formulation itself)." Ex. 1003 ¶ 83. Mr. Koller relies on a quotation from Sigg that describes its VHP sterilization method of

67

**Regeneron Exhibit 1257.067**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

> treating prefilled containers within secondary packaging with
> controllable vaporized-hydrogen peroxide (VHP). The principle
> is the formation of a vapor of hydrogen peroxide in containment
> and a subsequent removal or inactivation of vapors in a
> controlled manner. Prior to removal or inactivation, VHP
> condenses on all surfaces, creating a microbiocidal film that
> decontaminates the container surface.

*Id.* ¶ 84 (quoting Ex. 1007, 3:11–16). Mr. Koller then provides testimony

about cold sterilization using EtO (*id.* ¶¶ 85–87) but then notes that:

> While VHP works by a different mechanism than EtO, it still has
> the potential to damage biologic drug products. Thus, for pre-
> filled syringes, the syringe itself would have to be sufficiently
> closed off to prevent substantial amounts of the sterilizing gas
> from coming into contact with the drug formulation within. Sigg,
> for example, describes that removal of VHP vapors "ensures that
> the long-term stability of the protein is not compromised." Sigg
> (Ex. 1007) at 3:24-27.

*Id.* ¶ 87.

Mr. Koller further testifies that the POSITA would be aware of certain

regulations that seek to minimize the amount of sterilizing agent residue that

is permissible for exposure. *Id.* ¶ 88. With that awareness, the person of

ordinary skill in the art would understand that "the gas or vapor must be

allowed to sufficiently exit the secondary packaging of pre-filled syringe

after the sterilization process is over" and would thus be able to effectively

carry out Sigg's step in the VHP sterilization process "to remove VHP by

'applying post-treatment measures, within a decontamination chamber.'" *Id.*

(citing Ex. 1007, 10:5–6).

Patent Owner bases many of its arguments on the disclosure in Sigg

that "very few" (Ex. 1007, 4) syringe components are capable of making the

68

**Regeneron Exhibit 1257.068**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

tight seal required for terminal sterilization. *See* Ex. 1007, 3:27–30
("[T]here are only very few packaging material combinations that provide
the required tightness of the system such as to avoid ingress of sterilizing
gasses"); PO Resp. 25–26, 28. The final record, including Sigg, contains
persuasive evidence showing that a POSITA would have been capable of
making and using the invention without undue experimentation, and would
have understood which of the "very few" components described by Sigg
would have worked in a PFS that was terminally sterilized with VHP.

Patent Owner's contentions that Sigg is not enabling are also
contradicted by its prior representations to the USPTO. *See* Pet. Reply 11.
As Petitioner points out, "Sigg is a Novartis patent publication, which it
prosecuted extensively as Application No. 13/382,380 ('380 Application').
Ex. 1252." *Id.* As explained by Petitioner, "[f]rom January 2012 to April
2014, across six office actions and five responses, Novartis repeatedly
attempted to obtain claims directed to a PFS terminally sterilized with VHP
comprising a VEGF-antagonist—the ***exact*** subject matter that Novartis
presently alleges that Sigg does not enable," but the claims were rejected as
obvious. Pet. Reply 11–12 (citing Ex. 1252, 170–177, 192–201, 223–230,
249–255, 277–284, 302–310).

Thus, even if "very few" syringe components are capable of making
the tight seal and development of the Lucentis PFS with VHP was
"technically very challenging" (PO Resp. 26), the Sigg '380 Application
provides further evidence that a POSITA would have read Sigg as providing
sufficient support to enable VHP sterilization as claimed. For example,
Dr. Sigg submitted a declaration with the '380 Application testifying, "[t]he

69

**Regeneron Exhibit 1257.069**
**Regeneron v. Novartis**
**IPR2021-00816**

present application disclosed for the first time, and contrary to conventional thinking, that it is possible to obtain sufficient sterilization of the outer surface of a syringe in secondary packaging at ambient pressure." Ex. 1252, 222 (declaration dated May 2, 2013); *see also* Tr. 22:21–23:17. This statement, filed as a declaration, provides further evidence demonstrating that a POSITA would not have had to engage in undue experimentation to make and use a PFS that could be terminally sterilized using Sigg's VHP method. We have considered Dr. Sigg's new testimony that he knew by 2011 that the VHP sterilization method in Sigg did not work. Ex. 2206; Ex. 1213, 79:15–80:17; PO Resp. 26. In light of his prior declaration and the totality of the evidence, we find that the inventor's new testimony is not credible.

Patent Owner contends that Sigg is not enabled because VHP sterilization is "performed under vacuum and subjects the PFS to extreme pressure." PO Resp. 26. We do not find this position persuasive. First, Dr. Sigg previously represented to the USPTO that Sigg's VHP method does not require a vacuum, contradicting Patent Owner's current position. *See* Ex. 1252, 222 (¶ 9) ("[I]t is possible to obtain sufficient sterilization . . . *at ambient pressure*." (emphasis added)). Next, as previously examined, even if Sigg's VHP sterilization does require a vacuum, Mr. Leinsing admitted that a vacuum may not cause the stopper to move at all (Ex. 1207, 120:17–22, 145:17–20); *see also* Ex. 1105 ¶¶ 59–60 ("Mr. Leinsing's assertion that pressure changes could cause movement of the stopper during Sigg's terminal sterilization process is unsupported," because "[a] POSITA would understand that Sigg's VHP process would not necessarily cause a stopper to

70

Regeneron Exhibit 1257.070
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

move, and Mr. Leinsing has not demonstrated why using Sigg's VHP
method on the Boulange syringe specifically would cause such
movement."). Finally, even if stopper movement would occur due to
pressure variations, Mr. Koller presents persuasive testimony explaining
prior art mechanisms that can be used to prevent stopper movement due to
these pressure changes. Ex. 1105 ¶¶ 65–71. We examine this testimony
more below.

Mr. Koller persuasively explains that "[a] POSITA would have thus
readily understood that stopper movement could occur during terminal
sterilization, and would have known how to incorporate one of many
features known in the art to prevent such movement." *Id.* ¶ 55. Mr. Koller
relies on one such feature found in the Macugen PFS, and explains that the
device uses "a clip that locked the plunger rod and stopper in place to inhibit
stopper movement during terminal sterilization." *Id.* The Macugen PFS was
a sterilized PFS containing a VEGF-antagonist with sufficiently low
operational forces that was known by 2008. Ex. 1105 ¶¶ 107–109; Ex. 1106
¶¶ 19–20 (Reply Declaration of Dr. Kiss). The parties dispute whether the
Macugen PFS is prior art and whether it was terminally sterilized. PO
Resp. 28; Ex. 2201 ¶¶ 113–117; Pet. Reply 14. Regardless of its status as
prior art, the evidence surrounding its development and launch is still
relevant to the knowledge base of the POSITA. *See Yeda Research v. Mylan
Pharm. Inc.*, 906 F.3d 1031, 1041 (Fed. Cir. 2018) ("[N]on-prior art
evidence of what was known . . . can be relied on for their proper supporting
roles, e.g., indicating the level of ordinary skill in the art."). Accordingly,
the          terminally sterilized Macugen PFS, which was FDA approved and

71

**Regeneron Exhibit 1257.071**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

on-sale in the United States before the filing date of the '631 patent, further supports that ████ terminal sterilization was within the level of ordinary skill in the art upon based on the teachings of Sigg.  Pet. Reply 14; Ex. 1254, 9.

The evidence in the final record before us also suggests that the inventors of the '631 patent pursued VHP sterilization at least in part because they knew it was ████████████████████ *Id.* (quoting Ex. 1254, 9 ("████████████████████")) (citing Ex. 2063, 92).  Petitioner also relies on the Eylea PFS, and Mr. Koller persuasively explains how this device was terminally sterilized with VHP and approved in Australia by February 2012.  Ex. 1003 ¶ 124 n.15.

Based on the totality of the evidence presented, we find persuasive Mr. Koller's testimony that "Sigg teaches a VHP method that attempts to minimize the use of pressure changes," and "features for minimizing stopper movement during a terminal sterilization process . . . were likewise well-known in the art." *Id.* ¶ 61 (citing Ex. 1007, 14:3–6, 14:9–11, 14:18–20); Ex. 1105 ¶ 66.  Further, we agree with Mr. Koller that "prior art pre-filled syringe designs were known in the art for preventing gas from ingressing into the drug product, as reflected in Boulange." Ex. 1105 ¶ 66.  Based on the background knowledge examined above, and Mr. Koller's testimony, we determine a POSITA would have found Sigg's VHP method enabled.

Patent Owner submits additional evidence and testimony related to ████████████████████████████, and relies on the statement that VHP was "████████████." PO Resp. 27 (quoting Ex. 2206 ¶ 17).  Petitioner presents contradictory evidence showing that

72

Regeneron Exhibit 1257.072
Regeneron v. Novartis
IPR2021-00816

[REDACTED] Pet. Reply 13 (citing Ex. 2148, 2 [REDACTED] ); Ex. 1100 ¶ 51. We have considered both parties' arguments and evidence related to [REDACTED] work and find it unpersuasive for either party.

The evidence in the final record demonstrates persuasively how a POSITA would know to use the teachings of Sigg and Boulange to achieve the tight seal required for terminal sterilization using a VHP method. A POSITA would need only perform routine optimization to perform the VHP terminal sterilization process described in Sigg in the manner claimed by the '631 patent.

> v.   Objective Indicia of Nonobviousness

Before any final obviousness determination, we must consider the evidence of obviousness in light of any objective evidence of nonobviousness presented by Patent Owner. *See Graham*, 383 U.S. at 17–18 ("Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented."); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012) ("This objective evidence must be 'considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.'" (quoting

Regeneron Exhibit 1257.073
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

*Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed. Cir. 1983))).

Objective evidence of nonobviousness is relevant only if there is a nexus between the evidence and the claimed invention. *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019). A presumption of nexus applies if the asserted objective evidence "is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Artic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). To the extent that a presumption of nexus does not apply, Patent Owner may still prove nexus "by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996). The stronger the showing of nexus, the greater the weight accorded the objective evidence of nonobviousness. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 (Fed. Cir. 1985).

As set forth above, Patent Owner presents arguments and evidence directed to objective indicia of non-obviousness, including nexus, commercial success, satisfaction of a long-felt but unmet need, failure of others, skepticism, and licensing. PO Resp. 46–60. Petitioner challenges each indicium. Pet. Reply 21–27. We address each of these below.

Nexus

As noted above, Patent Owner contends that the Lucentis PFS, marketed in the United States by Genentech (licensee of the '631 patent), is an embodiment of certain claims of the '631 patent, and is co-extensive with them. PO Resp. 50 (citing Ex. 2201 ¶ 166; Ex. 2204 ¶ 31). Patent Owner

74

Regeneron Exhibit 1257.074
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

provides a claim chart showing how Lucentis PFS meets all the limitations of these claims. *Id.* at 50–52. Patent Owner argues that the Federal Circuit has "never held that the existence of one or more unclaimed features, standing alone, means nexus may not be presumed." *Id.* at 53 (quoting *Fox Factory,* 944 F.3d at 1374). All that is required for a presumption of nexus is that "the patentee demonstrate that the product is essentially the claimed invention." *Id.* Patent Owner alleges that Lucentis PFS does not contain any unclaimed features and it is not a component of a larger product. Ex. 2201 ¶ 287.

Based on the final record before us, Patent Owner has not established that the Lucentis PFS is coextensive with the claims and essentially the claimed invention. The claims of the '631 patent are broader than the Lucentis PFS, and cover embodiments well beyond Lucentis PFS that may not be successful. Ex. 1105 ¶ 98. Petitioner has presented persuasive evidence demonstrating that several unclaimed features are significant to the structure and function of the Lucentis PFS and these unclaimed features also contribute to the success of the Lucentis PFS. *See* Pet. Reply 22. We find Petitioner's reasoning persuasive and address these features below.

Significant Unclaimed Features

The Lucentis PFS utilizes ███████████████ ████████████████████████████ that Patent Owner, and its declarants, have touted ████████████████████ ██████████████████████. Ex. 2206 ¶¶ 42, 46–48; Ex. 2201 ¶¶ 104 (████████████████████████████

75

Regeneron Exhibit 1257.075
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

█████████████████████████████████████████████

████████████████████████ ), 105–106.

In his declaration, Dr. Sigg discusses a report submitted to a regulatory authority describing "████████████████████████████████ ███████████████████████████████" Ex. 2206 ¶ 46. In a section of the report related to "████████████████████████████████ ██████████████████████████████" Dr. Sigg discusses "██████████ ████████████████████████████" and explains that these "██████ █████████████████████████████████████████████ █████████████████████████████████████████████████ ██████████████████████████████" *Id.* (quoting Ex. 2141, 49). Dr. Sigg testifies that "█████████████████████ ████████████████████████████" was addressed by "████████████████████████████████████" *Id.* ¶ 47. Further, the ██████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ *Id.* ¶ 48.

Patent Owner's expert, Mr. Leinsing, testifies that "the inventors of the '631 patent also redesigned the stopper to increase the distance between the first and last circumferential ribs of the stopper," which addressed the risk of sterility breach during sterilization of the outer surface of the syringe." Ex. 2201 ¶ 104; *see also* Ex. 2064, 4 ("Change of plunger stopper design to reduce risk of sterility breach."). "This modification increased the size of the 'sterility zone,' which improved the syringe's tolerance for stopper movement during sterilization without breaching the sterility (and

76

IPR2021-00816
Patent 9,220,631 B2

thus the integrity of the drug product)." Ex. 2201 ¶ 104 (quoting Ex. 2141, 54–55). According to Mr. Leinsing, "[t]hese new design elements work together to reduce the risk of sterility breach and enable sterilization to acceptable sterility assurance levels by ensuring that any stopper movement that occurs during sterilization (or at other times) does not result in a sterility breach." *Id.* ¶ 105 ("The inventors' syringe design thus allowed them to develop ███████████████████████████████████████████ ████████████████████████████████████████ ████"). As explained by Mr. Leinsing, "[t]he '631 patent also describes these innovations and their significance for terminal sterilization." Ex. 2201 ¶ 106.

Mr. Koller testifies that "the Lucentis PFS includes a stopper coated with silicone oil, which Novartis documents describe as ███████ ██████████████████████████████████████ Ex. 1105 ¶ 104 (quoting Ex. 2064, 30 (███████████████████████████████████████ ████████████████████████████") (citing Ex. 2141, 33 ██████████████████████████████████████████████ ██████████████████████████████████████████. Mr. Koller further explains that "the stopper used in the Lucentis PFS is coated with ████████ on the product contacting side," and "Mr. Leinsing opined that polymer coatings are critical to a PFS because they can 'reduc[e] the degree to which leachables from the rubber closure may enter into the drug formulation.'" *Id.* at 102 (citing Ex. 2224, 9; Ex. 2001 ¶ 52).

Although these new design features to the plunger rod and stopper may be described, in part, in the '631 patent (Ex. 2201 ¶ 106), none of these

77

Regeneron Exhibit 1257.077
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

features were claimed. *See* Tr. 31:13–34:21. The claims require a "stopper

and plunger," but as Mr. Leinsing recognizes, the important design

innovations for the Lucentis PFS plunger and stopper, █████████████

████████████████████████████████████████████████████████████████

███, are not claimed. *See* Ex. 2201 ¶ 104; *see also* Ex. 1105 ¶¶ 102, 104.

Based on the final record, each of these plunger rod and stopper features

contribute to the commercial success of Lucentis PFS, but these features are

not captured in the claims of the '631 patent. For example, according to

Dr. Sigg, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████. Ex. 2206 ¶ 48. Indeed, the ██████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████." Ex. 2201 ¶ 105.

Next, although the claims recite a specific amount of silicone oil as

part of the syringe barrel, the claims are not limited to syringes using the

baked silicone process used in the Lucentis PFS. *See* '631 patent, claim 1

("about 1 μg to 100 ug silicone oil"). Each party agrees that two features of

the Lucentis PFS were critical to reducing residual silicone oil that could be

injected into the eye: a reduction in the amount of silicone oil used (claimed)

and the "baked silicone" application technique (not claimed). Ex. 1105

¶ 103; Ex. 2209 ¶ 36 (Declaration of Jeremy Wolfe, M.D.).

Dr. Wolfe (Patent Owner's declarant) explains the dangers of silicone

oil mixing with medication, and further details that the Lucentis PFS carries

"a very low risk of silicone oil being injected into the eye," because of "the

78

Regeneron Exhibit 1257.078
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

use of an optimized application process of the silicone oil to the syringe wall in pre-filled syringes, and to a reduction in the amount of silicone oil used in this new application process." Ex. 2209 ¶ 36 (citing Ex. 2018, 3) (describing the baked silicone process as reducing the incidence of silicone-related complications). Dr. Wolfe opines that "[t]his is an important consideration in light of the large number of repeating anti VEGF intravitreal injections performed on a particular patient, and given that treatment of retinal pathologies can require years of repeated injections." *Id.* (citing Ex. 2215, 1, 8).

Mr. Koller, testifying for Petitioner, agrees. Ex. 1105 ¶ 103. He testifies that "the method of siliconization (spray-on or baked-on) impacts the way silicone oil interact with drug products," and "baked-on siliconization creates a thin layer of silicone oil to the inner surface of glass syringe barrels, thereby reducing the amount of 'residue' or 'free' silicone oil." *Id.*; Ex. 1003 ¶¶ 65, 66. Mr. Koller opines that "[u]sing baked-on siliconization is therefore important for a PFS containing a protein drug formulation because excessive silicone oil can cause protein aggregation and drug degradation." Ex. 1105 ¶ 103. Even though this optimized application process is an important feature of the Lucentis PFS, the '631 patent claims do not require a specific siliconization process, and thus cover both baked-on and spray-on siliconization. *Id.*

Another product feature important to the Lucentis PFS, but unclaimed, is the ███████ *Id.* ¶ 105. Mr. Koller persuasively explains that "███████████████████████████████████████████████████████ ████████████████████," because ████████████████████████████

79

**Regeneron Exhibit 1257.079**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

███████████████████████████████████████████.” *Id.*
(citing Ex. 2194 (Overcashier Dep. Tr.)), 142:17–143:2.  Mr. Koller relies
on ██████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████           *Id.* (quoting Ex. 2141, 51).  As Mr. Koller
notes, "the '631 Patent does not claim a tip cap."  *Id.*

> The Claims of the '631 Patent Are Broader than the Lucentis PFS

Petitioner has also produced persuasive evidence showing that other
embodiments within the claim scope would not necessarily produce the
same results as Lucentis PFS and be commercially successful.  *See* Pet.
Reply at 23.  We find persuasive Mr. Koller's testimony that nearly all of the
claims (except claims 8–10) do not require the PFS to contain an ophthalmic
solution comprising the drug Lucentis, but encompass a PFS that contains an
ophthalmic solution that comprises any VEGF-antagonist, regardless of the
effectiveness of such drug product.  Ex. 1105 ¶¶ 98–99.  Specifically,
Lucentis PFS[22] contains a single VEGF-antagonist—ranibizumab—but
claim 1, for example, recites that the ophthalmic solution comprises "a
VEGF-antagonist," without limiting it to any particular VEGF-antagonist.
Yet, Patent Owner offers no evidence that a PFS comprising other VEGF-
antagonists within the claim scope would be commercially successful.  *Id.*

---

[22] "The Lucentis® drug formulation and the Lucentis® active ingredient
molecule (ranibizumab) are the same in the vial presentation as in the PFS
presentation.  In the PFS presentation, the Lucentis® drug formulation is
stored in the PFS for the entirety of its shelf life."  Ex. 2204 ¶ 57.

Regeneron Exhibit 1257.080
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Mr. Koller also testifies persuasively that the Lucentis PFS contains only ▮▮▮ of silicone oil on the syringe barrel, but the claims broadly cover silicone oil amounts as high as 100 μg (claims 1–21, 23–26) or about 50 μg (claim 22).  Ex. 1105 ¶ 98.  There is evidence showing that Novartis deemed that a syringe comprising ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮.  *Id.* (citing Ex. 1158, 112:13–113-4; Ex. 1159, 81:1–82:8). For example, as explained by Juergen Roettele, Ph.D (a Novartis technical project lead for Lucentis PFS), a process using 100 micrograms of silicone oil for a prefilled syringe, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮"  Ex. 1159, 81:1–82:8, 18:21–19:5.  Because the upper bounds of the claimed silicone oil range were purportedly not commercially feasible, the nexus and coextensiveness become more of a challenge for Patent Owner to establish.

Summary

Considering the totality of the unclaimed features and components of the Lucentis PFS, and the evidence that demonstrates these features and components were deemed important to the function and success of the product, Patent Owner has not met its burden to establish that the Lucentis PFS embodies the claimed features and is coextensive with them.  We are cognizant of *Fox Factory*'s caution that the existence of one or more unclaimed features, standing alone, does not necessarily mean that nexus cannot be presumed.  *Fox Factory, Inc.*, *944 F.*3d at 1374.  Considering the evidence as a whole, including Patent Owner's lack of persuasive rebuttal as to the importance of each feature examined above, we cannot reach a

Regeneron Exhibit 1257.081
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

determination that the Lucentis PFS "is the invention disclosed and claimed." *Id.*

The features of the Lucentis PFS examined above, even according to Patent Owner's own declarants, are not "additional insignificant features," or merely "standard components of any PFS." *Id.*; Sur-reply 21. To the contrary, these features are described by Patent Owner's own documents and witnesses as:

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] *See supra.*

<u>Commercial Success</u>

"When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention." *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997); *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016). "Demonstrating that an invention has commercial value, that it is commercially successful, weighs in favor of its non-obviousness." *WBIP*, 829 F.3d at 1337. Further, "non-patented features and features known in the prior art underlay the commercial success." *Ethicon Endo-Surgery, Inc.*, 812 F.3d at 1034.

82

Regeneron Exhibit 1257.082
Regeneron v. Novartis
IPR2021-00816

There is little dispute that Lucentis PFS practices certain claims of the '631 patent and that Lucentis PFS was commercially successful. For reasons set forth below, however, Patent Owner has not persuasively shown that the commercial success of Lucentis PFS was due to a claimed feature that was not already known in the art prior to the '631 patent. Based on the full record developed during trial, we determine that the success of Lucentis PFS was driven by a number of unclaimed product design features and the efficacy of the Lucentis drug (ranibizumab).[23] Further, we find that there is no persuasive evidence in the final record that Lucentis PFS was commercially successful primarily because of the claimed features, *i.e.*, a terminal sterilization and 1–100 µg of silicone oil with break loose forces less than 11 N.



Patent Owner claims that "Lucentis PFS is a ▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮ product that enjoys '▮▮▮▮▮▮▮▮' which doctors ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮" Sur-reply 20 (emphasis added) (citing Ex. 2348, 24:6–8, 37:21–38:6, 40:10–18). As examined above, however, many of the features that make the Lucentis PFS "▮▮▮ are not claimed in the '631 patent. Some of the reasons that it was ▮▮▮ are due to unclaimed features such as the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮. Ex. 2201 ¶¶ 104–105; Ex. 2206 ¶¶ 46–48.

_____

[23] These arguments related to the efficacy of the drug (ranibizumab) are relevant to claim 1 and to all claims that do not require ranibizumab.

83

Regeneron Exhibit 1257.083
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Petitioner persuasively argues, "Dr. Wolfe and ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ testified that physicians use Lucentis PFS due to its convenience, which was a known PFS feature and not attributable to the '631 Patent claims." Pet. Reply 22 (citing Ex. 2209 ¶ 31; Ex. 1161, 115:8–14, 115:22–116:18; Ex. 1106 ¶¶ 30–34). As for convenience, this is also a feature not directly attributable to the claims of the '631 patent as we examine below.

As Petitioner's testifying ophthalmologist, Dr. Kiss, persuasively explains, "physicians overwhelmingly prefer a PFS over vial," and they do

> so for reasons that were already known in the prior art (e.g., Macugen PFS). A PFS requires fewer steps and less time to administer. For example, using a vial requires two needles while using a PFS requires only one. *See* Ex. 2209, ¶ 32. Because administering a PFS requires fewer steps and less time than a vial and syringe, using a PFS allows an ophthalmologist to treat more patients. Moreover, fewer steps with PFS translates to a clinically meaningful reduction in the rate of endophthalmitis. *See* Ex. 2215.003; *see also* Ex. 2209, ¶ 35 . . . . Therefore, ophthalmologists strongly prefer using the Lucentis PFS over the vial presentation of Lucentis because the PFS provides efficiency, convenience, and reduced risk of infection due to fewer administration steps.

Ex. 1106 ¶ 30.

Dr. Kiss and Dr. Wolfe (Patent Owner's testifying ophthalmologist) seem to agree that certain factors make a PFS much more preferable to use over a vial. Ex. 1106 ¶ 31; Ex. 2209 ¶ 31. These factors include that "PFS are 'significantly more convenient, save physician time, minimize risk of physician error, and decrease the risk of infection,'" and, a "reduced risk of infection from using a PFS" due "to the elimination of several steps in the

84

Regeneron Exhibit 1257.084
Regeneron v. Novartis
IPR2021-00816

process required to transfer the medication from the vial to the syringe."
Ex. 1106 ¶ 31 (citing Ex. 2209 ¶ 35).  Dr. Kiss relies on



*Id.* ¶ 32 (citing Ex. 2171, 2).  Dr. Kiss testifies, and we find
persuasive, that "

." *Id.*

Thus, many of the attributes identified above that drive
ophthalmologists' use of the Lucentis PFS existed in prior art PFSs for
intravitreal injection. *See id.*  "For example," Dr. Kiss points to the
"Macugen PFS and Trivaris PFS, both commercially available as pre-filled
syringes prior to 2012," as "provid[ing] ophthalmologists with efficiency,
convenience, reduced risk of infection due to fewer administration steps, and
more accurate dosing." *Id.* ¶ 33.  For these reasons, Dr. Kiss testifies
persuasively that "an ophthalmologist would very much prefer to use the
Lucentis PFS over a Lucentis vial format." *Id.* ¶ 34.

Testimony and evidence produced by both parties attributes a
significant portion of the success of the Lucent PFS to the drug used in the
product—ranibizumab.  For example, a Novartis employee overseeing all of
Novartis's development activities in ophthalmology testified that

. Ex. 1161,

Regeneron Exhibit 1257.085
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

17:19–20, 115:22–116:18 ██████████████████████
████████████████████████████████████). As
Petitioner shows, however, "Lucentis PFS contains a single VEGF-
antagonist—ranibizumab—but the '631 Patent functionally claims any
VEGF-antagonist." Pet. Reply 23 (citing Ex. 1105 ¶ 99) (also noting claims
8–10 are limited to ranibizumab). Patent Owner has not persuasively shown
that a PFS comprising other VEGF-antagonists within the claim scope of
claim 1 would be successful.[24] For instance, Petitioner produces persuasive
evidence showing that Beovu PFS, also developed by Novartis, and
allegedly within the scope of the claims, would not be successful. *See*
Ex. 1005, 42; Ex. 1106 ¶ 35 (noting "reports of Beovu causing 'severe
vision loss, retinal artery occlusion and/or vasculitis' (Ex. 1250)"; Ex. 1208,
58:5–15. Even though the PFS version of this drug has apparently "not yet
been launched" (Sur-reply 23) we find this presents additional evidence
showing the importance of ranibizumab to the success of the Lucentis PFS.
Because claim 1 encompasses any PFS that comprises any VEGF-
antagonist, regardless of how effective the drug product is, this presents

---

[24] As noted above, claim 8 specifically requires "ranibizumab." The burden
is on Patent Owner to establish the significance of ranibizumab to the
secondary considerations asserted. Although a Novartis witnesses testifies
that the ████████████████████████████████████████████████
██████████████████████" Patent Owner has not persuasively
argued or explained how embodiments of the invention requiring
ranibizumab (claims 8–10) would have been uniquely commercially
successful or how the drug relates to other secondary considerations.
Ex. 1161, 17:19–20.

86

Regeneron Exhibit 1257.086
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

further evidence that a nexus is lacking between the alleged commercial
success of the Lucentis PFS and claim 1. Ex. 1105 ¶ 99; Ex. 1106 ¶ 34.

The low silicone oil content of Lucentis PFS presents a safer delivery
system (as examined above) and this is achieved because Lucentis PFS
" ██████████████████████████████ " (PO Resp. 51). The
claims, however, cover up to about 100 µg of silicone oil (claims 1–21, 23–
26) or about 50 µg (claim 22). Pet. Reply 24 (citing Ex. 1105 ¶ 98). There
is evidence in the final record which suggests that 100 µg would have been
unsuitable for Lucentis PFS. For example, "Dr. Sigg testified ████████
████████████████████████████ (Ex. 1158, 110:2–17),
meaning the claims cover embodiments unsuitable for a commercial
product." Pet. Reply 24. In essence, the breadth of claim scope up to about
100 µg of silicone oil encompasses successful ranges (Lucentis PFS) as well
as the upper bounds that may be ████████████████████████████
████ We do not give this 100 µg testimony considerable weight, however,
because other evidence suggests that a "silicone oil level (*i.e.*, 100 µg) was
low enough to avoid unwanted interactions with sensitive drugs." Ex. 1105
¶ 119. Regardless, the upper bounds of claim 1 (up to 100 µg of silicone
oil), would most likely " ████████████████████████████████
████████████████████████████████████ ," as testified
by Dr. Sigg. Ex. 1158, 110:2–17.

We have considered Patent Owner's evidence related to the
significant commercial success of the Lucentis PFS, including the
declaration of Mr. Malackowski. PO Resp. 55–56; Ex. 2205. The data
presented by Patent Owner shows that the launch of the Lucentis PFS

87

Regeneron Exhibit 1257.087
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

presentation in January 2017 helped to slow declining sales of the vial
presentation and sales eventually climbed higher than they had been at any
previous time.  PO Resp. 55 (citing Ex. 2099).  We disagree, however, with
Patent Owner's conclusion that "these data confirm nexus because they
show that it was the PFS presentation, embodying the '631 patent, that
enabled Genentech to reverse the downward trend for Lucentis and to
capture incremental sales and market share." *Id.* at 56.  Patent Owner and
Mr. Malackowski wrongly focus on the purported nexus between
commercial success and the Lucentis PFS, instead of the nexus between
commercial success and the claimed inventions of the '631 patent.  *See*
Ex. 1107 ¶¶ 32–38 (Declaration of Lisa J. Cameron, Ph.D).  We agree with
Dr. Cameron that "Mr. Malackowski assumes that the Lucentis PFS is
coextensive with the claimed inventions of the '631 Patent," and thus,
"makes no attempt to establish a nexus between the claimed inventions of
the '631 Patent and the alleged commercial success of the PFS form of
Lucentis." *Id.* ¶ 34 (emphasis omitted).

Although the Lucentis PFS earned significant sales,
"Mr. Malackowski fails to provide a systematic analysis of Lucentis PFS
revenues relative to those of other anti-VEGF treatments." *Id.* ¶ 33.  As one
example, Eylea, a leading FDA-approved, anti-VEGF treatment, was used to
treat more eyes than Lucentis both before and after the launch of the
Lucentis PFS and appears to have gained considerable market share over
Lucentis both before and after launch of the Lucentis PFS.  Ex. 1107 ¶ 23;
Ex. 2205 ¶ 42.

88

**Regeneron Exhibit 1257.088**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

Further, we agree with Dr. Cameron that "Mr. Malackowski never addresses the critical issue of whether the PFS form of Lucentis has generated substantial incremental profits over and above those associated with the vial form of Lucentis." *Id.* For example, Mr. Malackowski relies on data showing that "Lucentis vial sales had generally increased from 2010 through 2014," and the sales of the Lucentis vial in the 12-month period before launch of the Lucentis PFS ███████████. Ex. 2205 ¶¶ 38–39. For the 12-month period after the launch of Lucentis PFS in 2017, however, sales remained fairly flat at ████████ showing almost no growth due to the PFS launch. *Id.* Mr. Malackowski presents evidence showing how Lucentis was losing market share to Eylea, but with the launch of Lucentis PFS the market ████████████████████████████. *Id.* ¶¶ 39–42 ("Beginning in 2015 Lucentis vial sales began to decline," but "in 2017, Lucentis sales 'increased by 1% in the US, mainly driven by the launch of prefilled syringes' and growth in new indications."). Thus, although market share data is not required to show commercial success, Patent Owner's analysis of Lucentis PFS revenues relative to those of other anti-VEGF treatments is not persuasive to demonstrate the patented invention was a noticeable driver of commercial success. As a result, we find Mr. Malackowski's testimony less persuasive as to commercial success.

Based on the final record, the commercial success of Lucentis PFS was inadequately linked to the claimed invention. We determine that there is no nexus between any commercial success of Lucentis PFS and the '631 patent because "non-patented features and features known in the prior art underlay the commercial success." *Ethicon Endo-Surgery, Inc.*, 812 F.3d at

89

Regeneron Exhibit 1257.089
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

1034. As set forth in our analysis above, all the claimed features were already known in the art as demonstrated by Boulange and Sigg, and Patent Owner has not persuasively established how claim 1 as a whole would have driven the commercial success of Lucentis PFS apart from the non-patented features. Finally, although Patent Owner need not produce evidence of commercial success for every potential embodiment of the claims, in this instance, Novartis has not provided an adequate basis to support the conclusion that other embodiments falling within the claims will behave in the same manner.

Claim 8 of the '631 patent recites "the anti-VEGF antibody is ranibizumab." Apart from pointing out that Lucentis PFS contains ranibizumab, Patent Owner has not persuasively explained why the subject matter of this claim, apart from other claims, would have been commercially successful. *See* PO Resp. 51, 54 ("Claim 1 includes, but is not limited to, ranibizumab."). Similarly, claim 22 requires up to about 50 μg of silicone oil, yet the Lucentis PFS uses " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ " *Id.* Patent Owner has not shown whether a product with more than ▮▮▮ of silicone oil would have been viable, no less commercially successful.

Long-felt Need, Failure of Others

Because the evidence between long-felt need and failure of others is so intertwined, we examine these indicia together. "The existence of a long-felt but unsolved need that is met by the claimed invention is further objective evidence of non-obviousness." *Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1369 (Fed. Cir. 2017). Establishing long-felt need first requires objective evidence that a recognized problem existed in

90

Regeneron Exhibit 1257.090
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

the art for a long period without solution. *See Orthopedic Equip. Co., Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376 (Fed. Cir. 1983). Second, another must not have satisfied the long-felt need before the invention of the challenged patent. *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988). Third, the invention of the challenged patent must satisfy the long-felt need. *In re Cavanagh*, 436 F.2d 491, 496 (CCPA 1971); *see also Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332–33 (Fed. Cir. 2009) (articulating all three factors).

As noted above, Patent Owner makes arguments related to others attempting to solve the problem of high levels of silicone oil known to cause intravitreal contamination but ultimately failing. The evidence in the final record establishes that others had PFS products that were terminally sterilized with VHP by at least 2010. Ex. 1102 ¶¶ 14–21; Ex. 1105 ¶¶ 63–64. Patent Owner has, however, shown how certain of these products had shortcomings as compared to the claimed invention. Below, we consider each of these products, and how their development and commercialization impact long-felt need, failure of others, and skepticism.

Macugen PFS

Patent Owner alleges there was a long-felt need for the claimed invention, specifically "a terminally sterilized PFS for intravitreal injection of a VEGF-antagonist containing the claimed amounts of silicone oil," and "the only PFS for intravitreal injection of a VEGF-antagonist on the market (Macugen) had ███ of silicone oil and was known to cause 'intravitreal contamination by silicone oil droplets.'" PO Resp. 56–57. Petitioner counters that Macugen PFS successfully terminally sterilized a PFS by 2008.

91

Regeneron Exhibit 1257.091
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Pet. Reply 26.  Further, Becton Dickson had already made public syringes with less than 100 μg of silicone oil and break loose force less than 11 N, i.e., Boulange.  Ex. 1003 ¶¶ 163–164.

Based upon our review of the final record, Becton Dickinson successfully manufactured Macugen PFS, a terminally sterilized 1 mL syringe.  Ex. 1105 ¶ 62.  This product, however, never integrated the teachings set forth in Becton Dickinson's Boulange application of reducing the amount of silicone oil used in the pre-filled syringe.  *Id.*  As such, Patent Owner has shown that the problems solved by reduced silicone oil in the claimed invention were encountered by Macugen PFS and not solved.  Specifically, because Macugen PFS had up to ███████ of silicone oil, the excessive silicone oil caused some degree of intravitreal contamination.  PO Resp. 56–57; Ex. 2189, 44:19–21; Ex. 2001 ¶ 42 ("known to be associated with accumulation of silicone oil droplets in patients' eyes") (citing Ex. 1080, 1; Ex. 2023, 11–12).  Patent Owner's evidence of problems attributable to silicone oil causing intravitreal contamination in Macugen PFS is scant, thus, it does not appear to be a substantial recognized problem.  Although Becton Dickinson had disclosed (Boulange) ████████████ 1 mL glass "█████████" syringes comprising less than 50 μg silicone oil by May 2011 (Ex. 1105 ¶ 138), Becton Dickinson never integrated its low silicone oil know-how into the commercialized Macugen PFS to address any issues with silicone oil causing intravitreal contamination.  Ex. 1105 ¶ 113; Ex. 1215 ¶¶ 3–5; Ex. 1162, 1–6.

The evidence and argument related to Macugen PFS is mixed, but slightly in favor of Patent Owner.  The development of Macugen PFS does

92

**Regeneron Exhibit 1257.092**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

not necessarily evince a failure of others because the problems purportedly
addressed by the claims of the '631 patent were either already met by
Macugen PFS, or not a concern based on the evidence before us.  We agree
with Petitioner that "Macugen PFS already met every need expressed by
Novartis, except for the claimed silicone oil amount."  Pet. Reply 26 (citing
Ex. 1105 ¶¶ 108–116).  Where we diverge from Petitioner's position is the
argument that "[i]n turn, the silicone oil amounts were met by BD's baked-
on syringes."  *Id.*  The evidence shows that Macugen PFS never integrated
the teachings related to low silicone oil in a commercialized product.  Thus,
there was a need to reduce silicone oil contamination that was not
necessarily met by Macugen PFS.

Eylea PFS (2010)

As noted above, in an attempt to demonstrate that others succeeded
before Patent Owner, Petitioner relies on the Eylea PFS, and alleges that
"[b]y June 2010, Petitioner had reduced to practice a 1 mL Eylea pre-filled
syringe that (i) was terminally sterilized, (ii) used a baked-on syringe with
less than 100 μg of silicone oil on the syringe barrel, and (iii) met the
requirements of the USP789," and thereafter "used in clinical studies and
approved by regulatory authorities in Australia in 2012."  Pet. 73 (citing 14
pages of an ITC Brief – Ex. 1005, 109–110, 114–125; Ex. 1066); Pet. Reply
26–27 (citing 19 paragraphs of Dr. Graham's expert report – Ex. 1102
¶¶ 14–29, 36, 40–41).

Petitioner's attempt to rely on Eylea PFS by making three bullet
points with no supporting explanation as to how the arguments relate to the
claims, and then incorporating dozens of pages of supporting material, is a

93

**Regeneron Exhibit 1257.093**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

classic example of improper incorporation by reference, which we forbid. 37 CFR § 42.6(a)(3) ("Arguments must not be incorporated by reference from one document into another document."). Further, significant portions of Ex. 1005 are redacted. We decline to dig through excess, redacted, material to discovery Petitioner's case. Accordingly, Petitioner has not shown that Eylea PFS is a proper example of others succeeding before Patent Owner.

Patent Owner does not persuasively argue or point to evidence showing that the Eylea PFS is an example of others striving to satisfy a long-felt need, or that the Eylea PFS otherwise evinces a failure of others. Instead, Patent Owner points out that "there is no evidence that the Australian syringe that Mr. Koller points to was ever launched or that the makers were actually successful in making a syringe that could be marketed to physicians to treat patients." Ex. 2201 ¶ 122. Accordingly, the evidence related to Eylea PFS does not support either party for this indicium.

Lucentis PFS – Genentech

Petitioner contends that "Novartis has not established that others failed at developing a terminally sterilized PFS," because "██████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████." Pet. Reply 26 (citing Ex. 1100 ¶¶ 58–59); *see* Ex. 1100 ¶ 59 ("████████████████████████████████████████████ ████████████████████████████████████████████████ ████████").

94

Regeneron Exhibit 1257.094
Regeneron v. Novartis
IPR2021-00816

MATERIAL SUBJECT TO PROTECTIVE ORDER REDACTED

IPR2021-00816
Patent 9,220,631 B2

Patent Owner contends that "[t]he evidence does not support Petitioner's claim that Genentech ███████████████████████████████ ████████████████████████████████████████████ ███████'" Sur-reply 18. Patent Owner argues, and we agree, that "███████████ ██████████████████████████████████████████████ ████████████████" *Id.* (citing Ex. 2203 ¶¶ 51–55, 83–88, 94). Petitioner's claim that ████████████████████████████████████████ █████████████████████ is not supported. ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ Sur-reply 18 (citing Ex. 2339, 18:18–20:11). Thus, Patent Owner's position that ████ ████████████████████████████████████████████████ ████████████████████████████████████████████ is supported. *Id.*

We find persuasive Patent Owner's explanation as to how ████████████ ████████████████████████████████████████████████ ██████████████████████████ *Id.* at 19 (citing Ex. 1210, 132:16–135:3, 150:6–154:2; Ex. 2115, 8). Further, we agree with Patent Owner's conclusion that ████████████████████████████████ █████ ███████████████████████████████████████ ████████████████████████████████████████ ████ Ex. 2100, 164. Patent Owner persuasively shows that "[e]ven as of 2012, Genentech still believed that the preferred silicone oil amount for a

95

Regeneron Exhibit 1257.095
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

PFS containing a biologic like a VEGF-antagonist was between 200–500 µg." PO Resp. 57 (citing Ex. 2022, 11). However, the fact that ██ ████████████████████████████████████████████████ does not necessarily translate to a failure to reduce silicone oil levels, as Patent Owner recognizes it was not a concern. The evidence related to ██████ ██████████████████████████████████████████ ████████████████████ weighs slightly favorable to Patent Owner. Ex. 2206 ¶¶ 5–18; Ex. 2194, 37:1–13.

Overall, we give Patent's Owner's evidence of long-felt need and failure of others some weight in favor of patentability, but for the reasons set forth below the weight is not significant when evaluating all evidence of obviousness and non-obviousness. Novartis characterizes the need that was not met as including a "syringe with low levels of silicone oil" to prevent silicone oil injection into the eye. Ex. 2204 ¶¶ 80, 91 ("the problem of silicone oil in the eye"). As Petitioner persuasively argues, "[t]he '631 Patent, however, only claims silicone oil applied to the syringe barrel," whereas "[s]ilicone oil can also be introduced into a PFS via the stopper and filling process, neither of which are claimed." Pet. Reply 25 (citing Ex. 1105 ¶¶ 110–112; Ex. 1207, 22:2–23:14; Ex. 1211, 32:18–35:16). Further, "whether the silicone oil migrates from the syringe barrel and into the patient's eye depends on the process used to apply the oil, which also is not claimed." *Id.* (citing Ex. 1105 ¶ 111; Ex. 1207, 35:20–36:6). As we have previously determined, the application of silicone oil through a baked-on process is more precise and more homogenous, using approximately one-tenth the silicone oil quantity of sprayed-on syringes. *See* Ex. 1003 ¶¶ 63–

96

Regeneron Exhibit 1257.096
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

65, 165 ("baking attaches the silicone oil to the inner surface of the syringe barrel, which reduces the amount of 'residual' or 'free' silicone oil that can enter the protein formulation and cause negative effects").

This evidence shows that producing a syringe that avoided silicone oil contamination was achieved not just by reducing the volume of oil coating the syringe, but also by the baked-on application process. Thus, for these reasons, the claims do not necessarily satisfy the need for a "syringe with low levels of silicone oil" that avoids silicone oil release into the eye. These other factors, including the oil on the stopper and filling process, are also important to satisfying that need, yet they are not claimed. As noted above, the invention of the challenged patent must satisfy the long-felt need.

Skepticism

As far as skepticism, we have considered both parties' contentions and find the evidence does not persuasively support either position, except for claim 22. Patent Owner's position is focused on communications between Vetter and Novartis. PO Resp. 59. Specifically, Patent Owner cites a statement that a syringe with ████████████████████████████████ ████████████████████████████████████████████ " Ex. 2206 ¶¶ 24–26, 28; Exs. 2142, 2143.

We find no skepticism because the challenged claims cover up to about 100 µg, meaning ████████████████████████████████ ████████████████████████████████████████████ ██████████. Ex. 1105 ¶¶ 117–120. Other evidence cited by Petitioner suggests that Vetter was ████████████████████████████████. *See*

97

Regeneron Exhibit 1257.097
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Ex. 1213, 101:9–103:3; Ex. 1168, 2–4; Ex. 2143, 2 (██████████████████
██████████████████████████).

For claim 22, however, Patent Owner separately asserts that "██████
skepticism is particularly relevant to claim 22, which requires 'from about 1
to 50 µg silicone oil.'" PO Resp. 59. With regard to claim 22, we find the
████ communications show some skepticism by industry experts in
achieving the invention claimed, which requires a maximum of 50 µg
silicone oil. However, Petitioner has produced evidence showing that
Becton Dickinson was offering 1 mL syringes (but not PFS) with as low as
████████ of silicone oil on the barrel, consistent with Boulange, which
likewise discloses less than 50 µg of silicone oil for a 1 mL syringe barrel.
Ex. 1105 ¶ 120. Accordingly, the evidence in favor of patentability for
claim 22 is only slightly in Patent Owner's favor related to skepticism.

<u>Licensing</u>

Novartis asserts that licenses show the non-obviousness of the
'631 patent claims, specifically noting its license with Genentech ████████
████████████████████████. Sur-reply 26 (citing Ex. 2346,
54:1–13). Patent Owner does not, however, provide details as to how the
patent license shows a nexus to the claims at issue in the '631 patent.

Petitioner contends, and we agree, that Genentech's license has a
weak nexus to the '631 patent claims, because it is directed to ████████
████████████████████ that are not disclosed in the '631 patent. Pet.
Reply 27 (citing Ex. 2121, 1; Ex. 1105 ¶¶ 124–132; Ex. 1107 ¶¶ 54–58).
The conveyed rights encompassed the ████████████████████████████
████████████████████ related to a pre-filled syringe. Ex. 1105

98

Regeneron Exhibit 1257.098
Regeneron v. Novartis
IPR2021-00816

¶ 125 (citing Ex. 2121, 10–14).  Notably, the '631 patent was licensed ▮



▮ *Id.* (citing Ex. 2121, 22); Ex. 2206, 19–20 ▮

In considering the Genentech license, "the relevant inquiry is whether there is a nexus between the patent and the licensing activity itself, such that the factfinder can infer that the licensing 'arose out of recognition and acceptance of the subject matter claimed' in the patent."  *GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995)).  Novartis does not persuasively establish that the licensing arose out of recognition and acceptance of the subject matter claimed in the '631 patent claims.

Yet, these things do not demonstrate a nexus between the '631 patent and the licensing activity itself.  Novartis has not cited to evidence showing that the value of the license was driven by the '631 patent specifically, as opposed to the value of the other

.  The licensing evidence provides, at most, a scant basis for assessing the value of the '631 patent.  The Genentech license provides little or no evidence of non-obviousness.

vi.    Overall Determination of Obviousness Based on all *Graham* Factors

In sum, having considered the complete record developed during trial, we conclude that Petitioner has demonstrated by a preponderance of the

99

Regeneron Exhibit 1257.099
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

evidence that the subject matter of claim 1 would have been obvious over the combined disclosures of Boulange, Sigg, and USP789.

Petitioner presents a strong case of obviousness and provides articulated reasons with sound support in the record for combining the references. Patent Owner's reasons why the person of skill in the art would not have made the combination run contrary to the teachings of the references and to the knowledge base of the skilled artisan at the time of invention. Patent Owner has not established a nexus between the commercial success of the Lucentis PFS and the subject matter of claim 1, in part because of "patentee's own assertions about the significance of the unclaimed features," and also because each claimed element was already known in the art and commercialized. *Fox Factory, Inc.*, 944 F.3d at 1375. The stronger evidence of obviousness cannot be overcome with the weaker evidence of long-felt need and failure of others tending to show nonobviousness. The evidence of licensing is weak at best because the '631 patent is but a minor piece of a larger agreement and the license provides a scant basis for assessing the value of the '631 patent.

Considering the totality of the evidence before us, Petitioner has established by a preponderance of the evidence that claim 1 would have been obvious for the reasons set forth above.

### 5. *Claim 14*

We next consider five dependent claims that Patent Owner alleges are separately patentable over the combination of Sigg, Boulange, and USP789. *See* PO Resp. 32–41. We address each claim in turn.

100

**Regeneron Exhibit 1257.100**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

Claim 14 recites, "[a] pre-filled syringe according to claim 1, wherein the syringe has a stopper break loose force of less than about 5N, and wherein the syringe has a stopper slide force of less than about 5N."

Petitioner persuasively shows that the Table 5 of Boulange teaches a break loose force of 4.7 N for Stopper C, meeting claim 14's requirement of a stopper break loose force of less than about 5 N.  Pet. 49–50.

Next, we examine the limitation requiring that "the syringe has a stopper slide force of less than about 5N."  According to Mr. Koller, Boulange "discloses measurements of glide forces, labeled in Boulange as 'friction force S' and 'friction force F,' both of which are types of slide forces, measured at different points along the syringe barrel."  Ex. 1003 ¶ 142.  The disclosed slide force "F" for Stopper C in Table 5 of Boulange is less than 5 N (4.6 N), while the slide force "S" is 6.5 N.  Mr. Koller testifies that "[b]ecause the '631 patent is silent as to when the stopper break loose force and glide forces are measured, or where along the syringe barrel the glide force is measured, a POSITA would understand that these forces could be measured at any time and glide force can be measured at any place along the syringe barrel."  Ex. 1003 ¶ 146.

Mr. Koller also testifies that "it would have been a matter of routine optimization to achieve a force of less than 5 N for Force S for Stopper C in Table 5," because "a POSITA would have understood that the stopper slide force is proportional to the speed at which the stopper is tested."  *Id.* Mr. Koller notes that "Boulange, for example, discloses that the tests were performed at 380 mm/min," and then testifies that "a POSITA would have known that the slide force of 6.5 N for Stopper C could be reduced to less

101

Regeneron Exhibit 1257.101
Regeneron v. Novartis
IPR2021-00816

than 5 N by reducing the stopper speed, which a POSITA would have been motivated to do to assess the forces at different speeds at which the user could operate the syringe." *Id.* (citing Ex. 1008, 16:13–15; Ex. 1076, 5) (describing testing at 4 mm/sec (*i.e.*, 240 mm/min), which is "representative of manual syringe delivery").

Patent Owner contends that Petitioner's assertion of "routine optimization" to achieve a slide force less than 5 N is a conclusory assertion that is insufficient for Petitioner to meet its burden. PO Resp. 32. Patent Owner argues that Petitioner failed to set forth some rational underpinning for a routine optimization argument. *Id.* Patent Owner also believes that Petitioner improperly incorporated by reference arguments from Mr. Koller's declaration. *Id.*

According to Patent Owner and its expert, Mr. Leinsing, "Mr. Koller's 'routine optimization' opinion is flawed," because "completely changing the test used to assess a syringe's slide force in order to get a more favorable result is not 'optimization,' particularly since the most obvious way for a POSA to optimize a syringe to achieve lower forces would have been to add more silicone oil." *Id.* at 33 (citing Ex. 2201 ¶ 144). Mr. Leinsing directs us to a test in Boulange using 500 μg of silicone and testifies that "the most straightforward way for a POSA to optimize the syringe to address excessive slide force would have been to increase the lubrication of the syringe by increasing the amount of silicone oil." Ex. 2201 ¶ 144. Without doing so, Mr. Leinsing explains, a POSITA would not have expected to be able to achieve lower slide forces. *Id.*

102

Regeneron Exhibit 1257.102
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

We first consider that the break loose and slide forces are a measure of the force that would in practice be asserted by a clinician to depress the plunger. Ex. 1001, 1:36–39. Such a force, as pointed out by Mr. Koller, will be dependent on several factors, including the speed of depression, and also upon the type and volume of syringe coating, as discussed above and examined by Mr. Leinsing. *See* Ex. 2201 ¶ 144. Despite the fact that the speed of depressing the plunger will alter the force required to slide the plunger, it is unclear on the current record if there is an industry standard of the appropriate speed to conduct such tests. For example, the '631 patent states that "[t]he forces are typically measured at a stopper travelling speed of 190 mm/min." Ex. 1001, 5:44–45.

With that background in mind, Mr. Koller suggests that the speed of pressing the plunger is a variable that impacts force and testifies that changing the speed would have been routine optimization. Specifically, changing Boulange's "380 mm/min" speed to "240 mm/min" as taught in an article from "Pharmaceutical Review – Technical Considerations in the Development of Pre-filled Syringes for Protein Products" (Ex. 1076) would have been simple optimization. The speed (240 mm/min) is described in the article as "representative of manual syringe delivery." Ex. 1076, 5.

Mr. Leinsing does not contest that the "240 mm/min" speed is an accurate "representative of manual syringe delivery," but instead he suggests that the most straightforward way to optimize slide forces would have been to increase the lubrication. Even if true, we find Mr. Koller's optimization approach and explanations credible and more persuasive because the impetus for combining Sigg with Boulange was to minimize the volume of

103

**Regeneron Exhibit 1257.103**
**Regeneron v. Novartis**
**IPR2021-00816**

silicone oil on the syringe body, which would be defeated by Mr. Leinsing's optimization approach. *See* Ex. 1003 ¶ 159.

Next, we also are cognizant that the claim limitation requires "less than *about* 5N," which creates a degree of variance. The '631 patent states that "[t]he term 'about' in relation to a numerical value x means, *for example*, x±10%." Ex. 1001, 10:28–29 (emphasis added). Further, when the term "about" is used, it avoids a strict numerical boundary to the specified parameter. *See Cohesive Techs. v. Water Corp.*, 543 F.3d 1351 (Fed. Cir. 2008).

Within this context, we determine that Petitioner has persuasively established that it would have been a matter of routine optimization for a POSITA to achieve a slide force of "less than about 5N," for Force S for Stopper C in Table 5 (disclosed as 6.5 N with a speed of 380 mm/min). A POSITA would have understood that the stopper slide force is proportional to the speed at which the stopper is tested and that a speed of "240 mm/min" would have been representative of manual syringe delivery[25] such that the slide force of Stopper C in Table 5 of Boulange would have been less than about 5 N in optimized conditions that were more representative of manual syringe delivery. Ex. 1003 ¶¶ 183, 222. As persuasively explained by Mr. Koller, physicians typically inject at lower speeds. *Id.*

_____

[25] Although we do not rely on the teachings of the '631 patent, had Boulange's tests been conducted at the testing speed disclosed in the '631 patent, the resulting forces in Table 5 of Boulange would have been much less because of the decrease from 380 mm/min to 190 mm/min. *See* Ex. 1003 ¶¶ 183, 222 (explaining relationship of speed to force).

Regeneron Exhibit 1257.104
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

In addition, we credit Mr. Koller's testimony that the friction force S and friction force F disclosed in Boulange represent slide forces. Ex. 1003 ¶ 142. Based on that testimony, we agree with Mr. Koller that friction force "F"[26] for Stopper C in Table 5 of Boulange, which is less than 5 N (4.6 N), satisfies the slide force limitation in claim 14. Ex. 1003 ¶ 222. As Mr. Koller explained, claim 14 does not limit when or where along the syringe barrel the glide force is measured, thus, slide force "F" (4.6 N) alone would also satisfy claim 14. *Id.* ¶ 144.

Because the POSITA was already attempting to minimize the silicone content in the Boulange and Sigg combination (as detailed above) we disagree that a POSITA would have been more inclined to just add more silicone oil as proposed by Mr. Leinsing. Finally, we do not see Petitioner's citation to one supporting paragraph in Mr. Koller's declaration as improper incorporation by reference.

Having now considered the evidence in the complete record established during trial, we are persuaded that, based on this record, Petitioner has demonstrated by a preponderance of the evidence that claim 14 would have been obvious over Sigg, Boulange, and USP789.

---

[26] "[T]he friction force F is the force required, again in dynamic mode, to move the piston 3 when it reaches the end of its travel in the container 2." Ex. 1008, 15:13–15.

Regeneron Exhibit 1257.105
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

###### 6.    *Claim 17*

Claims 17 depends from claim 1 and further requires "[a] blister pack comprising a pre-filled syringe according to claim 1, wherein the syringe has been sterilized using $H_2O_2$ or EtO."

Petitioner asserts that "Sigg discloses a pre-filled syringe in a blister pack that is terminally sterilized by vaporized hydrogen peroxide ($H_2O_2$)." Pet. 51 (citing Ex. 1007, 6:26–28, 9:1–4; Ex. 1003 ¶¶ 228–229). Petitioner relies on Sigg's disclosure that "a prefilled container 100 previously filled . . . is decontaminated on surfaces 102 following encasement or packaging in a secondary package 104 by vaporized-hydrogen peroxide. Ex. 1007, 8:21–24.

Patent Owner challenges Petitioner's assertion as lacking both motivation and reasonable expectation of success. PO Resp. 33–34. Patent Owner asserts that a POSITA would have preferred Sigg's beta irradiation method, which is outside the scope of claim 17. Novartis examines "Example 1 of Sigg, which uses VHP," but allegedly "provides no information about experiment conditions and no data demonstrating whether, or how well, the method worked to sterilize the syringes." *Id.* at 34 (citing Ex. 2021 ¶ 64; Ex. 1007, 20:10–21:11). Patent Owner argues that "there is no indication that sterility testing was even done." *Id.* (citing Ex. 2001 ¶ 64; Ex. 1007, 20:10–21:11); Ex. 2203 ¶ 59. Patent Owner contends that "Example 2, which uses beta irradiation, contains far more useful information" about specific performance "under the test conditions." *Id.* Novartis reasons that picking "Sigg's VHP method while ignoring its beta irradiation method is based purely on the hindsight knowledge." *Id.*

106

**Regeneron Exhibit 1257.106
Regeneron v. Novartis
IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

Further, Patent Owner alleges that a POSITA "would not have reasonably expected to combine Boulange with Sigg's VHP method," because "[t]here is no example in Sigg of successful use of VHP to terminally sterilize a PFS." *Id.*

We have already considered, and found unpersuasive, Patent Owner's related arguments – Sigg's enablement and reasonable expectation of success of a VHP method to terminally sterilize a PFS. We incorporate that analysis from above. Further, we add that a disclosed motivation does not necessarily have to be the best option, only that it be a suitable option. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800 (Fed. Cir. 2021) ("It's not necessary to show that a combination is 'the best option, only that it be a suitable option.'" (quoting *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1197–98 (Fed. Cir. 2014)). Sigg encourages the use of VHP as "ideal for surface decontamination of prefilled containers," and, as such, it is a suitable option. Pet. Reply 15 (quoting Ex. 1007, 8:8–13). As examined above, we find the disclosures in Sigg persuasive.

Further, a POSITA would have had a reasonable expectation of success with Sigg's VHP method, even in light of Example 1, which Patent Owner alleges contains insufficient details. Sigg discloses that syringes were "treated with a vaporized hydrogen peroxide sterilization treatment" without affecting protein stability. Ex. 1007, 20:11–21:3. Further, Sigg describes that VHP is "*ideal* for surface decontamination of prefilled containers, yet not harmful to the stability or integrity of the contents of the prefilled container." *Id.* at 8:8–13 (emphasis added). As Mr. Koller persuasively testifies, "Sigg teaches using VHP to sterilize prefilled syringes

107

**Regeneron Exhibit 1257.107**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

without impacting the drug product, which provides further motivation for its use." Ex. 1105 ¶ 78; *see also* Ex. 1100 ¶¶ 40–42.

Having now considered the evidence in the complete record established during trial, we are persuaded that, based on this record, Petitioner has demonstrated by a preponderance of the evidence that claim 17 would have been obvious over Sigg, Boulange, and USP789.

>    7.    *Claim 21*

Claim 21, depending from Claim 17, further requires "a pre-filled syringe . . . wherein the syringe has been sterilized using EtO or $H_2O_2$ with a Sterility Assurance Level of at least $10^{-6}$."

Petitioner relies on Sigg and its disclosure of sterilizing the syringe with $H_2O_2$. Pet. 53. According to Petitioner, "Sigg defines sterile to mean the complete absence of microbial life, and discloses that the desired sterility assurance level (SAL) is at least $10^{-6}$." *Id.* (citing Ex. 1007, 7:8–13 ("'Sterility' as used herein is meant to refer to complete absence of microbial life as defined by . . . a sterility assurance level (SAL) . . . . SALs for health care products are defined to be at least $10^{-6}$.")). Petitioner relies on the testimony of Mr. Koller, who reasons that because Sigg discloses a SAL of at least $10^{-6}$, "[i]t would also be routine optimization for a POSITA to achieve a sterility assurance level of $10^{-6}$ for the syringe." Ex. 1003 ¶¶ 236–238. Petitioner further contends that "Novartis's assertion that Sigg's disclosure of an SAL of $10^{-6}$ does not apply to VHP is contradicted by Sigg, and also by Novartis's prior representations to the USPTO." Pet. Reply 15–16.

108

Regeneron Exhibit 1257.108
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Patent Owner argues that "Mr. Koller's opinions contain fundamental mistakes about sterility assurance levels." PO Resp. 35. Specifically, "Mr. Koller[] opines that a log reduction and an SAL are the same thing, and that a 6-log reduction equates to an SAL of $10^{-6}$," is "incorrect, as is confirmed by Patent Owner's expert, Dr. Miller, who, unlike Mr. Koller, is a microbiologist and expert in sterilization." *Id.* at 36 (citing Ex. 2209 ¶ 90) (Declaration of Michael J. Miller, Ph.D). As counsel for Patent Owner elaborated at oral hearing, "an SAL of $10^{-6}$, as is explained by our expert Dr. Miller, is a stringent sterility requirement," and "[i]t requires longer treatment often, harsher treatment conditions, and it can lead to additional exposure of the drug to the sterilizing gases and to damage to the drug and it would lower the reasonable expectation of success." Tr. 52:12–16.

Patent Owner contends that "Petitioner's general statement that 'Sigg discloses a SAL of at least $10^{-6}$' (Pet. 53) is insufficient to meet its burden on claim 21, as the claim specifically requires an SAL of at least $10^{-6}$ *using VHP or ETO.*" PO Resp. 37. Patent Owner argues that because Sigg identifies two methods of terminal sterilization, beta irradiation and VHP, but only links its beta irradiation method with achieving a SAL of $10^{-6}$, Petitioner has failed to meet its burden. *Id.* (citing Ex. 2189, 64:15–65:1, 58:9–13, 59:11–14). Patent Owner notes that "claim 15 of Sigg recites achieving an SAL of $10^{-6}$ using beta irradiation," yet, "[t]here is no similar claim for VHP." *Id.* Patent Owner argues that Example 1, which uses VHP, provides no information on SAL. *Id.* at 34. Patent Owner contends that "Petitioner has not even attempted to provide a specific motivation for a POSA to use Sigg's VHP method to achieve an SAL of $10^{-6}$," and "Mr.

109

Regeneron Exhibit 1257.109
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Koller fails to explain how this 'routine optimization' would have been achieved." *Id.* at 38. Patent Owner relies on the real-world example of the difficulty using sterilizing gases to terminally sterilize the Lucentis PFS to an SAL of $10^{-6}$. *Id.*

We find Petitioner's contentions more persuasive. Sigg defines "sterility" for a health care product as $10^{-6}$ and describes VHP as a "sterilization" treatment. Ex. 1007, 7:6–13, 20:11–16; Ex. 1003 ¶ 237. Mr. Koller and Dr. Agalloco persuasively explain that Sigg discloses that VHP achieves an SAL of $10^{-6}$, because Sigg describes that the "*required SALs* for health care products are defined to be at least $10^{-6}$," which includes syringes. Ex. 1007, 7:8–13 (emphasis added); Ex. 1105 ¶ 81; Ex. 1100 ¶¶ 43–48. Establishing an SAL of $10^{-6}$ is based on regulatory requirements and a requirement for all PFS syringes. Ex. 1100 ¶ 43 ("a person knowledgeable in microbiology and sterilization techniques would understand that Sigg's VHP method is expected to achieve an SAL of $10^{-6}$ for the disclosed syringes because that was the required SAL for syringes"). Mr. Koller testifies that "Sigg repeatedly refers to VHP as a terminal sterilization method," and "a POSITA would interpret Sigg as disclosing that VHP is a method of achieving sterility for syringes, which Sigg defines as an SAL of $10^{-6}$." Ex. 1105 ¶ 81.

We find persuasive Mr. Koller's explanation of the difference between the terms "sterilization" and "sanitization." *Id.* ¶ 82. As explained by Mr. Koller, "Dr. Sigg explained that an SAL of $10^{-6}$ is understood to mean 'sterilization,' while an SAL of $10^{-3}$ is understood to mean 'sanitization,'" and thus, "[b]y using the term 'sterilization' in the Sigg

110

Regeneron Exhibit 1257.110
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

application, Dr. Sigg intended to communicate that the method he developed was able to achieve an SAL of $10^{-6}$." *Id.* (citing Ex. 2206 ¶ 14; Ex. 1213, 63:8–64:5).

Our analysis is further confirmed by examining the prosecution history of the Sigg '380 Application (previously discussed above). Ex. 1252. In the '380 Application, Novartis submitted claims during prosecution directed to an SAL of $10^{-6}$ using VHP. Specifically, Novartis represented to the Office that the following was encompassed within the scope of the Sigg '380 Application:

> applying vaporized-hydrogen peroxide to the surface of the prefilled syringe in secondary packaging;

> allowing vaporized-hydrogen peroxide to remain in contact with the prefilled syringe surface for a sufficient time to decontaminate the prefilled syringe <u>to a sterility assurance level of at least $10^{-6}$</u>;

*Id.* at 292. Thus, Novartis previously represented to the USPTO that Sigg includes such a disclosure to enable VHP to achieve a sterility assurance level of at least $10^{-6}$. *See* Tr. 28:21–24 ("That's an admission that the Sigg references discloses VHP sterilization to an SAL of $10^{-6}$."). We find the about-face in this proceeding unpersuasive.

Having now considered the evidence in the complete record established during trial, we are persuaded that, based on this record, Petitioner has demonstrated by a preponderance of the evidence that claim 21 would have been obvious over Sigg, Boulange, and USP789.

111

Regeneron Exhibit 1257.111
Regeneron v. Novartis
IPR2021-00816

8.    *Claim 22*

Claim 22 depends from claim 1 and further requires, "wherein the syringe barrel has an internal coating of from about 1-50 µg silicone oil."

Petitioner argues "Boulange discloses an internal coating of silicone oil on the syringe barrel of 40 µg." Pet. 48 (citing Ex. 1008, 20:15–17 ("a silicone lubricant was deposited . . . onto the internal surface of the syringe body 2, at a rate of 40 µg for a surface area of 10 cm$^2$"); Ex. 1003 ¶¶ 214–216).

Patent Owner contends that "Claim 22 further limits the amount of silicone oil on the syringe barrel to 'from about 1-50 µg,'" and "Petitioner's arguments fail for the same reasons discussed above for claim 1, and based on the objective indicia of nonobviousness discussed below." PO Resp. 39. As we previously mentioned, the commercial Lucentis PFS uses ███████ ████████████████████, yet, Patent Owner has not shown whether a product with more than █████ of silicone oil would have been viable, no less commercially successful. Further, Patent Owner argues "█████ skepticism is particularly relevant to claim 22." *Id.* at 59.

We previously determined that the evidence in favor of patentability for claim 22 is only slightly in Patent Owner's favor related to skepticism. Similarly, although claim 22 is closer to being coextensive with the Lucentis PFS than claim 1, claim 22 still covers a larger range of silicone oil. Weighing all the evidence of record before us, including Boulange's disclosure of an internal coating of silicone oil on the syringe barrel of 40 µg, the evidence of nonobviousness does not overcome Petitioner's stronger case of obviousness for claim 22.

Regeneron Exhibit 1257.112
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Having now considered the evidence in the complete record established during trial, we are persuaded that, based on this record, Petitioner has demonstrated by a preponderance of the evidence that claim 22 would have been obvious over Sigg, Boulange, and USP789.

> 9.    *Claim 24*

Claim 24 is "[a] method treating a patient suffering from of an ocular disease," requiring, *inter alia*, "administering an ophthalmic solution to the patient using a pre-filled syringe according to claim 1."

Petitioner relies on Sigg's disclosure of "ranibizumab (e.g. 6mg/ml or 10 mg/ml) solution for intravitreal injection," as teaching the requirement of claim 24 of treating wet AMD or macular edema.  Pet. 54 (quoting Ex. 1007, 9:11–14).  Petitioner notes that "[b]y 2010, ranibizumab was approved for at least the treatment of wet AMD and macular edema following RVO." *Id.* (citing Ex. 1031 ¶¶ 33–37; Ex. 1027, 1 (Lucentis Label)).

Petitioner further relies on the testimony of Dr. Kiss as to how "ophthalmologists were well aware that the listed diseases were caused by or related to abnormal VEGF expression and therefore could be treated by a VEGF-antagonist." Ex. 1031 ¶ 34.  Dr. Kiss testifies that based on Sigg disclosing a sterilized, pre-filled syringe including Lucentis, an ophthalmologist would have understood that the very purpose of a pre-filled syringe including Lucentis is to treat a patient suffering from ocular diseases listed in claim 24.  *Id.* ¶ 36.  Dr. Kiss opines that if "the pre-filled syringe of claim 1 is obvious, then the step of using an ophthalmic solution in a prefilled syringe to treat the recited list of diseases would also have been

113

**Regeneron Exhibit 1257.113**
**Regeneron v. Novartis**
**IPR2021-00816**

**Appx113**

IPR2021-00816
Patent 9,220,631 B2

obvious and well within the ordinary skill and routine practice of an ophthalmologist." *Id.* ¶ 37.

Patent Owner contends that Petitioner's showing how ranibizumab was approved for treatment of two of the specified ocular diseases is "insufficient for Petitioner to meet its burden of proving motivation and reasonable expectation of success for Claims 24–26." PO Resp. 39–40. Patent Owner argues the appropriate "questions are whether a POSA would have been motivated to combine Sigg and Boulange to make a PFS within claim 1 that could be used by a doctor to treat a patient with those ocular diseases, and whether the POSA would have reasonably expected success in doing so." *Id.* at 40. Patent Owner contends that a POSITA would need a reasonable expectation of success of using a PFS up until its expiration date. *Id.* at 41.

Patent Owner further argues "[a]n ophthalmologist would similarly not be motivated to use a PFS that had inconsistent forces because it could damage a patient's eye." Sur-reply 17.

We begin by addressing Patent Owner's last contention – an ophthalmologist would be dissuaded from using the proposed combination if it had an inconsistent or high force profile. *See* Ex. 2204 ¶¶ 67–73. We have fully examined this argument above and found it unpersuasive. Stopper C was tested at a speed of 380 mm/min (Ex. 1008, 16:13–15) and it displayed an increase in force from 4.7 N to 8.4 N (after accelerated aging), which we determine would not be an inconsistent "force profile" that would affect an ophthalmologist's use of the syringe. *Id.*; Ex. 1105 ¶¶ 37, 41. The values for Stopper C are within the claimed "about 11N," but more importantly,

114

**Regeneron Exhibit 1257.114**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

well under the 20 N that the '631 patent acknowledges was known to be acceptable for intravitreal injection. *Id.* Mr. Koller persuasively shows how a force increase of less than 4 N after aging would have been expected and acceptable "based on tolerances and variations in manufacturing processes," as evidenced by data from Regeneron demonstrating that the break loose force for Eylea PFS can vary from approximately ███████. *Id.* Ex. 1105 ¶ 41 (citing Ex. 1154, 15). Further, Dr. Calman, on behalf of Patent Owner, fails to identify what constitutes a "high" force, or what amount of variation would make the forces "unpredictable" for an ophthalmologist. *See* Ex. 2204 ¶¶ 67–73; Ex. 1106 ¶ 13.

Next, Patent Owner improperly injects FDA expiration dates into the scope of the claimed subject matter. The '631 patent does not claim any efficacy over any time period. Petitioner must prove only that a POSITA would have had a motivation to combine accompanied by a reasonable expectation of achieving what is actually claimed. Petitioner has met its burden of showing a reasonable expectation of achieving what is claimed. Petitioner demonstrated that combining Sigg, Boulange and USP789 would result in a sterile syringe comprising reduced silicone oil and forces suitable for intravitreal injection. Pet. 32 (silicone oil), 35 (USP789 compliance), 38–39 (break loose and slide forces). Petitioner further demonstrated that an ophthalmologist would have administered the resulting syringe, as required by claims 24–26, because ranibizumab was a known treatment for wet-AMD. *Id.* at 54, 68–71; *see also* Ex. 1105 ¶¶ 89–94.

Having now considered the evidence in the complete record established during trial, we are persuaded that, based on this record,

115

**Regeneron Exhibit 1257.115**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

Petitioner has demonstrated by a preponderance of the evidence that claim 24 would have been obvious over Sigg, Boulange, and USP789.

> 10.    *Remaining Claims Not Separately Challenged*

Petitioner asserts that Claims 2, 3, 5–9, 15, 16, and 18–20 would have been obviousness based on the combination of Sigg, Boulange, and USP789. Pet. 31–40, 47–53. Petitioner identifies disclosures in the prior art references that teach the limitations of these claims, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in the art. *Id.* Petitioner also supports its contentions for these claims with expert testimony, including from Mr. Koller. Ex. 1003 ¶¶ 211–235. For the same reasons discussed above, and for the additional reasons set forth by Petitioner, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 2, 3, 5–9, 15, 16, and 18–20 are unpatentable. *See id.*

Patent Owner does not present any arguments for these claims other than those we have already considered and, more specifically, Patent Owner has not made any argument that these remaining dependent claims are separately patentable. Accordingly, we determine that Patent Owner has waived that right. *See* Paper 14, 8 (Scheduling Order) ("Patent Owner is cautioned that any arguments not raised in the response may be deemed waived.").

Having now considered the evidence in the complete record established during trial, we are persuaded that, based on this record, Petitioner has demonstrated by a preponderance of the evidence that claims

116

**Regeneron Exhibit 1257.116**
**Regeneron v. Novartis**
**IPR2021-00816**

2, 3, 5–9, 15, 16, and 18–20 would have been obvious over Sigg, Boulange, and USP789.

### E.  Obviousness over Sigg, Boulange, USP789, and Fries

Petitioner contends that claims 4, 10, and 23 of the '631 patent would have been obvious over the combined teachings of Sigg, Boulange, USP789, and Fries.  Pet. 65–66.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claims 4, 10, and 23 are unpatentable.

### 1.    Fries

Fries is a 2009 article titled "Drug Delivery of Sensitive Biopharmaceuticals With Prefilled Syringes."  Ex. 1012.  Fries details that silicone oil has displayed incompatibilities with "sensitive biopharmaceuticals" including "aggregation, deformation, and inactivation of native protein structures," and likewise recommends baked-on siliconization as a preferred method.  *Id.* at 6.  Fries further describes the benefits of baked-on siliconization for pre-filled syringes.  *Id.* ("[I]interactions with sensitive biopharmaceuticals have been Observed . . . . Advanced siliconization technology has been developed to lower the level of free (non-bound) silicone oil in prefilled syringes.").  Fries discloses that Dow Corning 365 (*i.e.*, DC365) is used for baked-on siliconization in pre-filled syringes.  *Id.*

117

Regeneron Exhibit 1257.117
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

> 2.    *Claims 4, 10, and 23*

Dependent claims 4, 10, and 23 require that the silicone oil is DC365 and has a viscosity of about 350 cP and claim 10 further recites particulate content requirements from USP789.  Petitioner contends, and we agree, that these limitations would have been obvious based on Sigg, Boulange, USP789, and Fries.  Pet. 65–66; Ex. 1003 ¶¶ 239–242.

We find persuasive Mr. Koller's testimony that "it was well known in the art prior to 2012 that DC365 was used as a silicone oil emulsion in the baked-on process, and was a preferred commercially-available emulsion for baking silicone onto syringe barrels."  Ex. 1003 ¶ 240.  Further, Mr. Koller persuasively testifies that Fries teaches that DC365 is used for baked-on siliconization in pre-filled syringes and that DC365, which contains DC360 oil, was typically used for syringe siliconization.  *Id.* (citing Ex. 1012, 6).  Finally, we also agree with Mr. Koller that "[a] POSITA would [] have been motivated to combine the design option disclosed in Fries regarding the type of silicone oil with the siliconized syringe disclosed in Boulange given that both publications pertain to lowering the amount of silicone oil and using baked-on siliconization."  *Id.* ¶ 241.

Patent Owner does not present any arguments for these claims other than those we have already considered and, more specifically, Patent Owner has not made any argument that these dependent claims are separately patentable.  Accordingly, we determine that Patent Owner has waived that right.

We have considered the evidence and arguments of record, including those directed to claim 1 addressed above, and we determine that Petitioner

118

Regeneron Exhibit 1257.118
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

has demonstrated by a preponderance of the evidence that claims 4, 10, and 23 would have been obvious over the combined teachings of Sigg, Boulange, USP789, and Fries for the reasons discussed in the Petition and as supported by the testimony of Mr. Koller. *See, e.g.*, Pet. 65–66; Ex. 1003 ¶¶ 239–242.

### F. *Obviousness over Sigg, Boulange, USP789, and Furfine*

Petitioner contends that claims 11–13 of the '631 patent would have been obvious over the combined teachings of Sigg, Boulange, USP789, and Furfine. Pet. 67–68.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claims 11–13 are unpatentable.

### 1. *Furfine*

Furfine is a patent publication titled "VEFG Antagonist Formulations Suitable for Intravitreal Administration," and assigned to Regeneron Pharmaceuticals, Inc. (Petitioner). Ex. 1021, codes (54), (71). Furfine "is directed to pharmaceutical formulations suitable for intravitreal administration comprising agents capable of inhibiting vascular endothelial growth factor (VEGF), and to methods for making and using such formulations." *Id.* ¶ 1. Further, "[t]he invention includes liquid pharmaceutical formulations having increased stability, as well as formulations that may be lyophilize and reconstituted for intravitreal administration." *Id.* According to Mr. Koller, "Furfine discloses aflibercept,

119

**Regeneron Exhibit 1257.119**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

which is a non-antibody VEGF-antagonist for intravitreal injection."
Ex. 1003 ¶¶ 156–157, 243–246, 293.

>    2.    *Claims 11–13*

Dependent claims 11–13 require that the VEGF-antagonist is a non-antibody VEGF antagonist, which can be aflibercept at a concentration of 40 mg/ml.

Petitioner persuasively shows how "Furfine discloses the non-antibody VEGF-antagonist aflibercept in a 1 ml pre-filled glass syringe." Pet. 68 (citing Ex. 1021 ¶¶ 5, 6, 36, 45, 59, 61; Ex. 1003 ¶¶ 239–242. Specifically, Furfine discloses "VEGF Trap," which the '631 patent acknowledges is aflibercept. Ex. 1021 ¶ 59; Ex. 1001, 6:37–41. Petitioner argues, and we agree, that "[a] POSITA would have been motivated to use aflibercept in a terminally sterilized pre-filled syringe, as disclosed in Sigg," because of the advantages of prefilled containers described by Sigg and because "Sigg further discloses that its terminal sterilization method is applicable to 'all drug products' and 'provide[s] the device to an end user with a low bioburden and low risk of contaminants.'" Pet. 67; Ex. 1003 ¶¶ 243–246, 293. "Thus," Petitioner persuasively shows that "a POSITA would have recognized that it would be desirable to administer aflibercept . . . via a terminally sterilized pre-filled syringe (Sigg []) using a baked-on syringe (Boulange) to achieve the resulting benefits described above." Pet. 67; Ex. 1003 ¶¶ 243–246, 293.

Patent Owner does not present any arguments for these claims other than those we have already considered and, more specifically, Patent Owner has not made any argument that these dependent claims are separately

Regeneron Exhibit 1257.120
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

patentable.  Accordingly, we determine that Patent Owner has waived that right.

We have considered the evidence and arguments of record, including those directed to claim 1 addressed above, and we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 11–13 would have been obvious over the combined teachings of Sigg, Boulange, USP789, and Furfine for the reasons discussed in the Petition and as supported by the testimony of Mr. Koller.  *See, e.g.*, Pet. 67–68; Ex. 1003 ¶¶ 243–246, 293.

### G. Obviousness over Sigg, Boulange, USP789, and 2008 Macugen Label

Petitioner contends that claim 25 of the '631 patent would have been obvious over the combined teachings of Sigg, Boulange, USP789, and 2008 Macugen Label.  Pet. 68–70.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claim 25 is unpatentable.

### 1.    2008 Macugen Label

We have previously discussed Macugen and its delivery system as a PFS.  *See* Ex. 1009, 11.  The 2008 Macugen Label is the prescribing information from the "Drugs.com" website (available March 7, 2011), which "presents product monographs approved by the US Food and Drug Administration (FDA) and compiled by drug manufacturers."  Ex. 1039, 1; Ex. 1009.

**Regeneron Exhibit 1257.121**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

The 2008 Macugen Label describes using a pre-filled syringe to treat wet AMD with the VEGF-antagonist Macugen. Ex. 1009, 7–8. The 2008 Macugen Label describes a priming step in which the physician depresses the plunger "to eliminate all the bubbles and to expel the excess drug so that the top edge of the 3rd rib on the plunger stopper aligns with the preprinted black dosing line." *Id.* at 7.

　　　2.　　*Claim 25*

Dependent claim 25, which depends from claim 24, comprises an initial priming step in which a physician depresses the plunger of the pre-filled syringe to align the predetermined part of the stopper with the priming mark. Petitioner contends, and we agree, that these limitations would have been obvious based on Sigg, Boulange, USP789, and 2008 Macugen Label as explained by the testimony of Dr. Kiss. Pet. 68–70; Ex. 1031 ¶¶ 32, 38–39.

We find persuasive Petitioner's contention that "[a] priming step to align a plunger with a dosing line (*i.e.*, priming mark) was a known design that is broadly applicable to pre-filled syringes containing a drug product." Pet. 69–70 (citing Ex. 1031 ¶¶ 32, 38–39). The '631 patent describes the priming mark as "allow[ing] the physician to align a pre-determined part of the stopper . . . with the mark, thus expelling excess ophthalmic solution and any air bubbles from the syringe." Ex. 1001, 2:25–32. "Thus," as Petitioner contends, "the 'priming mark' of the '631 Patent is synonymous with the 'dosing line' of the 2008 Macugen Label." *Id.* at 69. Dr. Kiss persuasively explains that this priming step was a known technique, and a POSITA would have been motivated to include this feature in the pre-filled syringe disclosed

122

**Regeneron Exhibit 1257.122**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

in Sigg to remove air bubbles and expel excess drug product to ensure accurate dosing, as described in the 2008 Macugen Label. Ex. 1031 ¶¶ 32, 38–39.

Patent Owner does not present any arguments for this claim other than those we have already considered and, more specifically, Patent Owner has not made any argument that this dependent claim is separately patentable. Accordingly, we determine that Patent Owner has waived that right.

We have considered the evidence and arguments of record, including those directed to claim 1 addressed above, and we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 25 would have been obvious over the combined teachings of Sigg, Boulange, USP789, and 2008 Macugen Label for the reasons discussed in the Petition and as supported by the testimony of Dr. Kiss. *See, e.g.*, Pet. 68–70; Ex. 1031 ¶¶ 32, 38–39.

### H. Obviousness over Sigg, Boulange, USP789, and Dixon

Petitioner contends that claim 26 of the '631 patent would have been obvious over the combined teachings of Sigg, Boulange, USP789, and Dixon. Pet. 70–71.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claim 26 is unpatentable.

123

**Regeneron Exhibit 1257.123**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

### 1.    *Dixon*

Dixon is an article from *Expert Opinion on Investigational Drugs* (Volume 18, October 2009), which is a recurring publication. Ex. 1030, 1. Dixon describes advantages associated with using aflibercept, including less frequent injections that would provide "the opportunity to significantly reduce treatment burden on patients and physicians." Ex. 1030, 8. Dixon further describes that "[i]n contrast to current anti-VEGF antibodies, which are rapidly cleared, [aflibercept] is relatively inert, and is degraded more slowly." *Id.* Before aflibercept was approved, "[b]y far the most commonly used anti-VEGF drugs currently in use for neovascular AMD are ranibizumab and bevacizumab," which are both antibody VEGF-antagonists. *Id.* at 5.

### 2.    *Claim 26*

Dependent claim 26 further requires that the VEGF-antagonist to be administered is a non-antibody VEGF-antagonist where the patient has previously received treatment with an antibody VEGF-antagonist.

Petitioner, supported by the testimony of Dr. Kiss, persuasively argues that because "[a]flibercept was ultimately approved by the FDA in 2011 and viewed as a superior option for the treatment of neovascular AMD . . . it would have been obvious to treat a patient with aflibercept (a non-antibody VEGF-antagonist), wherein the patient has previously received treatment with ranibizumab (an antibody VEGFantagonist)." Pet. 70–71; Ex. 1031 ¶¶ 40–42.

Patent Owner does not present any arguments for this claim other than those we have already considered and, more specifically, Patent Owner has

124

**Regeneron Exhibit 1257.124**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

not made any argument that claim 26 is separately patentable.  Accordingly, we determine that Patent Owner has waived that right.

We have considered the evidence and arguments of record, including those directed to claim 1 addressed above, and we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 26 would have been obvious over the combined teachings of Sigg, Boulange, USP789, and Dixon for the reasons discussed in the Petition and as supported by the testimony of Dr. Kiss.  *See, e.g.*, Pet. 70–71; Ex. 1031 ¶¶ 40–42.

## I.  *Obviousness Grounds with Lam*

Petitioner relies upon Lam as being interchangeable with Sigg in each ground.  *See* Pet. 1, 21, 55 ("For the reasons set forth above with respect to Sigg, a POSITA would have been motivated to combine the terminally sterilized pre-filled syringe comprising ranibizumab disclosed in Lam."), 65, 67, 68, 70.

As discussed in detail above, Petitioner has demonstrated by a preponderance of the evidence that each challenged claim would have been obvious over Sigg, Boulange, USP789, and an additional reference for certain dependent claims.  Because we have already determined that each challenged claim is unpatentable based on the Sigg, Boulange and USP789 combinations, we need not reach these additional grounds where Lam is substituted for Sigg in each ground.  *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) ("[T]he Board need not address issues that are not necessary to the resolution of the proceeding.").

125

**Regeneron Exhibit 1257.125**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

IV.    CONCLUSION

In summary:[27]

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 5–9, 14–22, 24 | 103 | Sigg, Boulange, USP789 | 1–3, 5–9, 14–22, 24 | |
| 4, 10, 23 | 103 | Sigg, Boulange, USP789, Fries | 4, 10, 23 | |
| 11–13 | 103 | Sigg, Boulange, USP789, Furfine | 11–13 | |
| 25 | 103 | Sigg, Boulange, USP789, 2008 Macugen Label | 25 | |
| 26 | 103 | Sigg, Boulange, USP789, Dixon | 26 | |
| 1–3, 5–9, 14–22, 24 | | Lam,[28] Boulange, USP789 | | |
| 4, 10, 23 | | Lam, Boulange, USP789, Fries | | |
| 11–13 | | Lam, Boulange, USP789, Furfine | | |

---

[27] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[28] As noted above, because we have already determined that each challenged claim is unpatentable based on the combinations containing Sigg, we need not reach grounds where Lam is substituted for Sigg.

126

**Regeneron Exhibit 1257.126**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

| | | | | |
|---|---|---|---|---|
| 25 | | Lam, Boulange, USP789, 2008 Macugen Label | | |
| 26 | | Lam, Boulange, USP789, Dixon | | |
| **Overall Outcome** | | | 1–26 | |

## V.     ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 1–26 of the '631 patent have been shown to be unpatentable; and,

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

127

**Regeneron Exhibit 1257.127**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

FOR PETITIONER:

Anish Desai
Christopher Pepe
Elizabeth Weiswasser
WEIL GOTSHAL & MANGES, LLP
anish.desai@weil.com
christopher.pepe@weil.com
elizabeth.weiswasser@weil.com

FOR PATENT OWNER:

Elizabeth Holland
William James
Nicholas Mitrokostas
ALLEN & OVERY LLP
elizabeth.holland@allenovery.com
william.james@allenovery.com
nicholas.mitrokostas@allenovery.com

Linnea Cipriano
Joshua Weinger
Duncan Greenhalgh
GOODWIN PROCTER LLP
lcipriano@goodwinlaw.com
jweinger@goodwinprocter.com
dgreenhalgh@goodwinlaw.com

**Regeneron Exhibit 1257.128**
**Regeneron v. Novartis**
**IPR2021-00816**



US009220631B2

(12) **United States Patent**
    Sigg et al.

(10) **Patent No.:**    **US 9,220,631 B2**
(45) **Date of Patent:**    **Dec. 29, 2015**

(54) **SYRINGE**

(71) Applicant: **Novartis AG**, Basel (CH)

(72) Inventors: **Juergen Sigg**, Loerrach (DE);
    **Christophe Royer**, Munich (DE);
    **Andrew Mark Bryant**, Basel Land
    (CH); **Heinrich Martin Buettgen**,
    Rheinfelden (CH); **Marie Picci**,
    Ranspack-le-bas (FR)

(73) Assignee: **Novartis AG**, Basel (CH)

( * ) Notice: Subject to any disclaimer, the term of this
    patent is extended or adjusted under 35
    U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/750,352**

(22) Filed: **Jan. 25, 2013**

(65) **Prior Publication Data**
    US 2014/0012227 A1    Jan. 9, 2014

(30) **Foreign Application Priority Data**

| | | |
|---|---|---|
| Jul. 30, 2012 | (EP) | ................................. 12174860 |
| Oct. 23, 2012 | (EP) | ................................. 12189649 |
| Nov. 16, 2012 | (AU) | ................................. 2012101677 |
| Nov. 16, 2012 | (AU) | ................................. 2012101678 |
| Nov. 23, 2012 | (DE) | ................ 20 2012 011 016 U |
| Nov. 23, 2012 | (DE) | ................ 20 2012 011 259 U |
| Nov. 23, 2012 | (DE) | ................ 20 2012 011 260 U |
| Dec. 3, 2012 | (EP) | ................................. 12195360 |
| Jan. 23, 2013 | (AU) | ................................. 2013100070 |
| Jan. 23, 2013 | (AU) | ................................. 2013100071 |
| Jan. 23, 2013 | (DE) | ................ 20 2013 000 688 U |

(51) **Int. Cl.**
    *A61M 5/00*    (2006.01)
    *A61F 9/00*    (2006.01)
    *A61M 5/178*    (2006.01)
    (Continued)

(52) **U.S. Cl.**
    CPC ............. *A61F 9/0008* (2013.01); *A61K 9/0019*
    (2013.01); *A61K 9/0048* (2013.01); *A61K
    38/179* (2013.01); *A61M 5/002* (2013.01);
    *A61M 5/178* (2013.01); *A61M 5/28* (2013.01);
    *A61M 5/31* (2013.01); *A61M 5/315* (2013.01);
    *A61M 5/31505* (2013.01); *A61M 5/31513*
    (2013.01);
    (Continued)

(58) **Field of Classification Search**
    CPC ........ A61K 9/0048; A61F 9/008; A61M 5/31
    USPC ................................................. 604/218, 294
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,090,081 A * 7/2000 Sudo et al. .................... 604/230
7,141,042 B2 * 11/2006 Lubrecht ....................... 604/230
(Continued)

FOREIGN PATENT DOCUMENTS

AU    2012101677 A4    12/2012
AU    2012101678 A4    12/2012
(Continued)

OTHER PUBLICATIONS

Badkar et al., "Development of biotechnology products in pre-filled
syringes: technical considerations and approaches", AAPS
PharmaSciTech, vol. 12, No. 2, pp. 564-572, (Jun. 2011).
(Continued)

*Primary Examiner* — Aarti B Berdichevsky
(74) *Attorney, Agent, or Firm* — Michael Mazza

(57) **ABSTRACT**

The present invention relates to a syringe, particularly to a
small volume syringe such as a syringe suitable for oph-
thalmic injections.

**26 Claims, 1 Drawing Sheet**



Fig 2

**Regeneron Exhibit 1001.001**

# US 9,220,631 B2
Page 2

(51) **Int. Cl.**

| | |
|---|---|
| *A61M 5/315* | (2006.01) |
| *A61K 9/00* | (2006.01) |
| *A61K 38/17* | (2006.01) |
| *A61M 5/28* | (2006.01) |
| *A61M 5/31* | (2006.01) |

(52) **U.S. Cl.**
CPC ................. *A61M 2005/3104* (2013.01); *A61M 2005/3139* (2013.01)

(56)                    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,303,748 B2 * | 12/2007 | Wiegand et al. | ........... 424/134.1 |
| 2006/0172944 A1 * | 8/2006 | Wiegand et al. | ................ 514/12 |
| 2006/0293270 A1 | 12/2006 | Adamis et al. | |
| 2007/0190058 A1 * | 8/2007 | Shams | ....................... 424/145.1 |
| 2008/0312607 A1 * | 12/2008 | Delmotte et al. | ............ 604/230 |
| 2010/0310309 A1 | 12/2010 | Abendroth et al. | |
| 2011/0257601 A1 | 10/2011 | Furfine et al. | |
| 2011/0276005 A1 * | 11/2011 | Hioki et al. | ................... 604/187 |
| 2012/0078224 A1 | 3/2012 | Lerner et al. | |
| 2013/0012918 A1 | 1/2013 | Foster | |
| 2014/0249484 A1 * | 9/2014 | Jones et al. | ................... 604/230 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 201578690 U | 9/2010 |
| DE | 10 2008 005938 A1 | 7/2009 |
| EP | 0264273 A2 | 4/1988 |
| EP | 0879611 A2 | 11/1998 |
| EP | 2371406 | 10/2011 |
| JP | 2001-104480 | 4/2001 |
| JP | 2002241264 A2 | 8/2002 |
| WO | 97/44068 A1 | 11/1997 |
| WO | 2006047325 A1 | 5/2006 |
| WO | 2006128564 A1 | 12/2006 |
| WO | WO 2007/035621 A1 | 3/2007 |
| WO | 2007084765 A2 | 7/2007 |
| WO | WO 2007/149334 A2 | 12/2007 |
| WO | WO2010/060748 | 6/2010 |
| WO | 2010136492 | 12/2010 |
| WO | WO 2011/123722 A1 | 10/2011 |
| WO | WO2011/135067 | 11/2011 |
| WO | WO 2012/134528 A1 | 10/2012 |
| WO | WO 2012/149040 A2 | 11/2012 |
| WO | 2014/005728 A1 | 1/2014 |

### OTHER PUBLICATIONS

Ausubel et al., "Current Protocols in Molecular Biology", 7.7.18 of Current protocols in Molecular Biology, eds., supplement 30, (1987).
Badkar et al., Analysis of Two Commercially Available Bortezomib Products : Differences in Assay of Active Agent and Impurity Profile >> AAPS PharmaSciTech, vol. 12, No. 2, pp. 564-572, (Jun. 2011).

Schoenknecht, "Requirements on pre-fillable glass suringes", AAPS National Biotechnology Conference 2007—Abstract No. NBC07-000488, 2007.
Holash et al., "VEGF-Trap: A VEGF blocker with potent anitumor effects", PNAS USA, vol. 99, No. 17, pp. 11393-11398, (Aug. 20, 2002).
Riely & Miller, "Vascular Endothelial Growth Factor Trap in Non-Small Cell lung Cancer", Clin Cancer Res, 13:4623-7s, (Aug. 1, 2007).
Li et al., "KH906, a recombinant human VEGF receptor fusion protein, is a new effective topical treatment for corneal neovascularization", Molecular Vision, 17:797-803,(Mar. 25, 2011).
Smith & Waterman, "Comparison of Biosequences", Adv Appl. Math, 2:482-489, (1981).
Chan et al: "Syringe Siliconization Process Investigation and Optimization" Journal of Pharmaceutical Science and Technology, Issue 66, pp. 137, 147-148, Mar. 2012.
Lankers: "The Relationship Between Silicone Layer Thickness, Free Silicone Oil and Protein Aggregation in Prefilled Syringes" 2010 AAPS National Biotechnology Conference San Francisco, Slides 25, 39, 46, May 19, 2010.
Majumdar et al: "Evaluation of the Effect of Syringe Surfaces on Protein Formulations" Journal of Pharmaceutical Sciences, Issue 100, pp. 2563-2573, Jul. 2011.
Bakri and Ekdawi: "Intravitreal Silicone Oil Droplets after Intravitreal Drug Injections" Retina, Issue 28, pp. 996-1001, Jul. 2008.
Daikyo Ru Crystal Zenith Insert Needle Syringe System, West Delivering Innovative Solutions, 2010.
Meyer et al: "Steps for a Safe Intravitreal Injection Technique",Meyer et al. "Steps for a Safe Intravitreal Injection Technique"Retinal Physician, p. 3, Jul. 1, 2009.
"Biopharmaceuticals—SPE applications", RapID Particle Systems, Single Particle Explore, D6a, Sep. 28, 2015, http //www.particle-explorer.com/yourapplications/biopharaceuticals/index.html[Sep. 16, 2015 11:12:45].
Email dated Sep. 9, 2015 from Elizabeth Scuderl, Senior meeting Manager, AAPS to Teresa Homnch re Inquiry about publication of conference abstract.
Tibor Hlobik: "Reducing quality risks to drug products and meeting needs of patients with enhanced components for prefilled syringe systems". West Delivering Innovative Solutions, www.ondrugdelivery.com, 2012 No. 33, pp. 32-34.
Summary of Product Characteristics—Zaltrap (undated).
"Ranibizumab", Scientific Discussion, EMEA, 2007, pp. 1-54.
"Avastin", Scientific Discussion, EMEA, 2005, pp. 1-61.
Mehmet Selim Kocabora, et al. "Intreavitreal silicone oil droplets following pegaptanib injection", Acta Ophthalmologica, 2010 e44-345.
N. Clunas, et al: "Ranibizumab pre-filled syringe: recently approved innovation in the Eurpean Union with the potential to reduce infection risk, improve does accuracy, and enhance efficient treatment administration". Congress on Controversies in Ophthamology, Abstract, 2014.
"COPHy Poster List—Group A"(Poster 17), The 5th World congress on Controversies in Opthalmology (COPHy) Mar. 20-23, 2014, Lisbon, Portugal.

* cited by examiner

Regeneron Exhibit 1001.002



Fig 1

Fig 2

Fig 3

Fig 4

Fig 5

Regeneron Exhibit 1001.003

US 9,220,631 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# SYRINGE

## TECHNICAL FIELD

The present invention relates to a syringe, particularly to a small volume syringe such as a syringe suitable for ophthalmic injections.

## BACKGROUND ART

Many medicaments are delivered to a patient in a syringe from which the user can dispense the medicament. If medicament is delivered to a patient in a syringe it is often to enable the patient, or a caregiver, to inject the medicament. It is important for patient safety and medicament integrity that the syringe and the contents of that syringe are sufficiently sterile to avoid infection, or other, risks for patients. Sterilisation can be achieved by terminal sterilisation in which the assembled product, typically already in its associated packaging, is sterilised using heat or a sterilising gas.

For small volume syringes, for example those for injections into the eye in which it is intended that about 0.1 ml or less of liquid is to be injected the sterilisation can pose difficulties that are not necessarily associated with larger syringes. Changes in pressure, internal or external to the syringe, can cause parts of the syringe to move unpredictably, which may alter sealing characteristics and potentially compromise sterility. Incorrect handling of the syringe can also pose risks to product sterility.

Furthermore, certain therapeutics such as biologic molecules are particularly sensitive to sterilisation, be it cold gas sterilisation, thermal sterilisation, or irradiation. Thus, a careful balancing act is required to ensure that while a suitable level of sterilisation is carried out, the syringe remains suitably sealed, such that the therapeutic is not compromised. Of course, the syringe must also remain easy to use, in that the force required to depress the plunger to administer the medicament must not be too high.

There is therefore a need for a new syringe construct which provides a robust seal for its content, but which maintains ease of use.

## DISCLOSURE OF THE INVENTION

The present invention provides a pre-filled syringe, the syringe comprising a body, a stopper and a plunger, the body comprising an outlet at an outlet end and the stopper being arranged within the body such that a front surface of the stopper and the body define a variable volume chamber from which a fluid can be expelled though the outlet, the plunger comprising a plunger contact surface at a first end and a rod extending between the plunger contact surface and a rear portion, the plunger contact surface arranged to contact the stopper, such that the plunger can be used to force the stopper towards the outlet end of the body, reducing the volume of the variable volume chamber, characterised in that the fluid comprises an ophthalmic solution. In one embodiment, the ophthalmic solution comprises a VEGF-antagonist.

In one embodiment, the syringe is suitable for ophthalmic injections, more particularly intravitreal injections, and as such has a suitably small volume. The syringe may also be silicone oil free, or substantially silicone oil free, or may comprise a low level of silicone oil as lubricant. In one embodiment, despite the low silicone oil level, the stopper break loose and slide force is less than 20N.

For ophthalmic injections, it is particularly important for the ophthalmic solution to have particularly low particle content. In one embodiment, the syringe meets US Pharmacopeia standard 789 (USP789).

Syringe

The body of the syringe may be a substantially cylindrical shell, or may include a substantially cylindrical bore with a non circular outer shape. The outlet end of the body includes an outlet through which a fluid housed within the variable volume chamber can be expelled as the volume of said chamber is reduced. The outlet may comprise a projection from the outlet end through which extends a channel having a smaller diameter than that of the variable volume chamber. The outlet may be adapted, for example via a luer lock type connection, for connection to a needle or other accessory such as a sealing device which is able to seal the variable volume chamber, but can be operated, or removed, to unseal the variable volume chamber and allow connection of the syringe to another accessory, such as a needle. Such a connection may be made directly between the syringe and accessory, or via the sealing device. The body extends along a first axis from the outlet end to a rear end.

The body may be made from a plastic material (e.g. a cyclic olefin polymer) or from glass and may include indicia on a surface thereof to act as an injection guide. In one embodiment the body may comprise a priming mark. This allows the physician to align a pre-determined part of the stopper (such as the tip of the front surface or one of the circumferential ribs, discussed later) or plunger with the mark, thus expelling excess ophthalmic solution and any air bubbles from the syringe. The priming process ensures that an exact, pre-determined dosage is administered to the patient.

The stopper may be made from rubber, silicone or other suitable resiliently deformable material. The stopper may be substantially cylindrical and the stopper may include one or more circumferential ribs around an outer surface of the stopper, the stopper and ribs being dimensioned such that the ribs form a substantially fluid tight seal with an internal surface of the syringe body. The front surface of the stopper may be any suitable shape, for example substantially planar, substantially conical or of a domed shape. The rear surface of the stopper may include a substantially central recess. Such a central recess could be used to connect a plunger to the stopper using a snap fit feature or thread connection in a known manner. The stopper may be substantially rotationally symmetric about an axis through the stopper.

The plunger comprises a plunger contact surface and extending from that a rod extends from the plunger contact surface to a rear portion. The rear portion may include a user contact portion adapted to be contacted by a user during an injection event. The user contact portion may comprise a substantially disc shaped portion, the radius of the disc extending substantially perpendicular to the axis along which the rod extends. The user contact portion could be any suitable shape. The axis along which the rod extends may be the first axis, or may be substantially parallel with the first axis.

The syringe may include a backstop arranged at a rear portion of the body. The backstop may be removable from the syringe. If the syringe body includes terminal flanges at the end opposite the outlet end the backstop may be configured to substantially sandwich terminal flanges of the body as this prevent movement of the backstop in a direction parallel to the first axis.

The rod may comprise at least one rod shoulder directed away from the outlet end and the backstop may include a backstop shoulder directed towards the outlet end to cooperate with the rod shoulder to substantially prevent movement

Regeneron Exhibit 1001.004

US 9,220,631 B2

3

of the rod away from the outlet end when the backstop shoulder and rod shoulder are in contact. Restriction of the movement of the rod away from the outlet end can help to maintain sterility during terminal sterilisation operations, or other operations in which the pressure within the variable volume chamber or outside the chamber may change. During such operations any gas trapped within the variable volume chamber, or bubbles that may form in a liquid therein, may change in volume and thereby cause the stopper to move. Movement of the stopper away from the outlet could result in the breaching of a sterility zone created by the stopper. This is particularly important for low volume syringes where there are much lower tolerances in the component sizes and less flexibility in the stopper. The term sterility zone as used herein is used to refer to the area within the syringe that is sealed by the stopper from access from either end of the syringe. This may be the area between a seal of the stopper, for example a circumferential rib, closest to the outlet and a seal of the stopper, for example a circumferential rib, furthest from the outlet. The distance between these two seals defines the sterility zone of the stopper since the stopper is installed into the syringe barrel in a sterile environment.

To further assist in maintaining sterility during the operations noted above the stopper may comprise at a front circumferential rib and a rear circumferential rib and those ribs may be separated in a direction along the first axis by at least 3 mm, by at least 3.5 mm, by at least 3.75 mm or by 4 mm or more. One or more additional ribs (for example 2, 3, 4 or 5 additional ribs, or between 1-10, 2-8, 3-6 or 4-5 additional ribs) may be arranged between the front and rear ribs. In one embodiment there are a total of three circumferential ribs.

A stopper with such an enhanced sterility zone can also provide protection for the injectable medicament during a terminal sterilisation process. More ribs on the stopper, or a greater distance between the front and rear ribs can reduce the potential exposure of the medicament to the sterilising agent. However, increasing the number of ribs can increase the friction between the stopper and syringe body, reducing ease of use. While this may be overcome by increasing the siliconisation of the syringe, such an increase in silicone oil levels is particularly undesirable for syringes for ophthalmic use.

The rod shoulder may be arranged within the external diameter of the rod, or may be arranged outside the external diameter of the rod. By providing a shoulder that extends beyond the external diameter of the rod, but still fits within the body, the shoulder can help to stabilise the movement of the rod within the body by reducing movement of the rod perpendicular to the first axis. The rod shoulder may comprise any suitable shoulder forming elements on the rod, but in one embodiment the shoulder comprises a substantially disc shaped portion on the rod.

In one embodiment of the syringe, when arranged with the plunger contact surface in contact with the stopper and the variable volume chamber is at its intended maximum volume there is a clearance of no more than about 2 mm between the rod shoulder and backstop shoulder. In some embodiments there is a clearance of less than about 1.5 mm and in some less than about 1 mm. This distance is selected to substantially limit or prevent excessive rearward (away from the outlet end) movement of the stopper.

In one embodiment the variable volume chamber has an internal diameter greater than 5 mm or 6 mm, or less than 3 mm or 4 mm. The internal diameter may be between 3 mm and 6 mm, or between 4 mm and 5 mm.

In another embodiment the syringe is dimensioned so as to have a nominal maximum fill volume of between about 0.1 ml

4

and about 1.5 ml. In certain embodiments the nominal maximum fill volume is between about 0.5 ml and about 1 ml. In certain embodiments the nominal maximum fill volume is about 0.5 ml or about 1 ml, or about 1.5 ml.

The length of the body of the syringe may be less than 70 mm, less than 60 mm or less than 50 mm. In one embodiment the length of the syringe body is between 45 mm and 50 mm.

In one embodiment, the syringe is filled with between about 0.01 ml and about 1.5 ml (for example between about 0.05 ml and about 1 ml, between about 0.1 ml and about 0.5 ml, between about 0.15 ml and about 0.175 ml) of a VEGF antagonist solution. In one embodiment, the syringe is filled with 0.165 ml of a VEGF antagonist solution. Of course, typically a syringe is filled with more than the desired dose to be administered to the patient, to take into account wastage due to "dead space" within the syringe and needle. There may also be a certain amount of wastage when the syringe is primed by the physician, so that it is ready to inject the patient.

Thus, in one embodiment, the syringe is filled with a dosage volume (i.e. the volume of medicament intended for delivery to the patent) of between about 0.01 ml and about 1.5 ml (e.g. between about 0.05 ml and about 1 ml, between about 0.1 ml and about 0.5 ml) of a VEGF antagonist solution. In one embodiment, the dosage volume is between about 0.03 ml and about 0.05 ml. For Lucentis, the dosage volume is 0.05 ml or 0.03 ml (0.5 mg or 0.3 mg) of a 10 mg/ml injectable medicament solution; for Eylea, the dosage volume is 0.05 ml of a 40 mg/ml injectable medicament solution. Although unapproved for ophthalmic indications, bevacizumab is used off-label in such ophthalmic indications at a concentration of 25 mg/ml; typically at a dosage volume of 0.05 ml (1.25 mg). In one embodiment, the extractable volume from the syringe (that is the amount of product obtainable from the syringe following filling, taking into account loss due to dead space in the syringe and needle) is about 0.09 ml.

In one embodiment the length of the syringe body is between about 45 mm and about 50 mm, the internal diameter is between about 4 mm and about 5 mm, the fill volume is between about 0.12 and about 0.3 ml and the dosage volume is between about 0.03 ml and about 0.05 ml.

As the syringe contains a medicament solution, the outlet may be reversibly sealed to maintain sterility of the medicament. This sealing may be achieved through the use of a sealing device as is known in the art. For example the OVS™ system which is available from Vetter Pharma International GmbH.

It is typical to siliconise the syringe in order to allow ease of use, i.e. to apply silicone oil to the inside of the barrel, which decreases the force required to move the stopper. However, for ophthalmic use, it is desirable to decrease the likelihood of silicone oil droplets being injected into the eye. With multiple injections, the amount of silicone droplets can build up in the eye, causing potential adverse effects, including "floaters" and an increase in intra-ocular pressure. Furthermore, silicone oil can cause proteins to aggregate. A typical 1 ml syringe comprises 100-800 μg silicone oil in the barrel, though a survey of manufacturers reported that 500-1000 μg was typically used in pre-filled syringes (Badkar et al. 2011, AAPS PharmaSciTech, 12(2):564-572). Thus, in one embodiment, a syringe according to the invention comprises less than about 800 μg (i.e. about less than about 500 μg, less than about 300 μg, less than about 200 μg, less than about 100 μg, less than about 75 μg, less than about 50 μg, less than about 25 μg, less than about 10 μg) silicone oil in the barrel. If the syringe comprises a low level of silicone oil, this may be more than about 1 μg, more than

Regeneron Exhibit 1001.005

US 9,220,631 B2

**5**

about 3 μg, more than about 5 μg, more than about 7 μg or more than about 10 μg silicone oil in the barrel. Thus, in one embodiment, the syringe may comprise about 1 μg-about 500 μg, about 3 μg-about 200 μg, about 5 μg-about 10 μg or about 10 μg-about 50 μg silicone oil in the barrel. Methods for measuring the amount of silicone oil in such a syringe barrel are known in the art and include, for example, differential weighing methods and quantitation by infrared-spectroscopy of the oil diluted in a suitable solvent. Various types of silicone oil are available, but typically either DC360 (Dow Corning®; with a viscosity of 1000 cP) or DC365 emulsion (Dow Corning®; DC360 oil with a viscosity of 350 cP) are used for syringe siliconisation. In one embodiment, the pre-filled syringe of the invention comprises DC365 emulsion.

During testing it was surprisingly found that, for syringes having small dimensions, such as those discussed above, and particularly those described in conjunction with the Figures below, the break loose and sliding forces for the stopper within the syringe are substantially unaffected by reducing the siliconisation levels far below the current standard to the levels discussed here. This is in contrast to conventional thinking that would suggest that if you decrease the silicone oil level, the forces required would increase (see e.g. Schoenknecht. AAPS National Biotechnology Conference 2007—Abstract no. NBC07-000488, which indicates that while 400 μg silicone oil is acceptable, usability improves when increased to 800 μg). Having too great a force required to move the stopper can cause problems during use for some users, for example accurate dose setting or smooth dose delivery may be made more difficult if significant strength is required to move, and/or keep in motion, the stopper. Smooth administration is particularly important in sensitive tissues such as the eye, where movement of the syringe during administration could cause local tissue damage. Break loose and slide forces for pre-filled syringes known in the art are typically in the region of less than 20N, but where the pre-filled syringes contain about 100 μg-about 800 μg silicone oil. In one embodiment the glide/slide force for the stopper within the pro-filled syringe is less than about 11N or less than 9N, less than 7N, less than 5N or between about 3N to 5N. In one embodiment, the break loose force is less than about 11N or less than 9N, less than 7N, less than 5N or between about 2N to 5N. Note that such measurements are for a filled syringe, rather than an empty syringe. The forces are typically measured at a stopper travelling speed of 190 mm/min. In one embodiment, the forces are measured with a 30 G×0.5 inch needle attached to the syringe. In one embodiment, the syringe has a nominal maximal fill volume of between about 0.5 ml and 1 ml, contains less than about 100 μg silicone oil and has a break loose force between about 2N to 5N.

In one embodiment the syringe barrel has an internal coating of silicone oil that has an average thickness of about 450 nm or less (i.e. 400 nm or less, 350 nm or less, 300 nm or less,

**6**

200 nm or less, 10 nm or less, 50 nm or less, 20 nm or less). Methods to measure the thickness of silicone oil in a syringe are known in the art and include the rap.ID Layer Explorer® Application, which can also be used to measure the mass of silicone oil inside a syringe barrel.

In one embodiment, the syringe is silicone oil free, or substantially silicone oil free. Such low silicone oil levels can be achieved by using uncoated syringe barrels and/or by avoiding the use of silicone oil as a lubricant for product contacting machine parts, or pumps in the syringe assembly and fill line. A further way to reduce silicone oil and inorganic silica levels in a pre-filled syringe is to avoid the use of silicone tubing in filling lines, for example between storage tanks and pumps.

The syringe according to the invention may also meet certain requirements for particulate content. In one embodiment, the ophthalmic solution comprises no more than 2 particles ≥50 μm in diameter per ml. In one embodiment, the ophthalmic solution comprises no more than 5 particles ≥25 μm in diameter per ml. In one embodiment, the ophthalmic solution comprises no more than 50 particles ≥10 μm in diameter per ml. In one embodiment, the ophthalmic solution comprises no more than 2 particles ≥50 μm in diameter per ml, no more than 5 particles ≥25 μm in diameter per ml and no more than 50 particles ≥10 μm in diameter per ml. In one embodiment, a syringe according to the invention meets USP789 (United States Pharmacopoeia: Particulate Matter in Ophthalmic Solutions). In one embodiment the syringe has low levels of silicone oil sufficient for the syringe to meet USP789.

VEGF Antagonists

Antibody VEGF Antagonists

VEGF is a well-characterised signal protein which stimulates angiogenesis. Two antibody VEGF antagonists have been approved for human use, namely ranibizumab (Lucentis®) and bevacizumab (Avastin®).

Non-Antibody VEGF Antagonist

In one embodiment of the invention, the non-antibody VEGF antagonist is an immunoadhesin. One such immuoadhesin is aflibercept (Eylea®), which has recently been approved for human use and is also known as VEGF-trap (Holash et al. (2002) *PNAS USA* 99:11393-98; Riely & Miller (2007) *Clin Cancer Res* 13:4623-7s). Aflibercept is the preferred non-antibody VEGF antagonist for use with the invention. Aflibercept is a recombinant human soluble VEGF receptor fusion protein consisting of portions of human VEGF receptors 1 and 2 extracellular domains fused to the Fc portion of human IgG1. It is a dimeric glycoprotein with a protein molecular weight of 97 kilodaltons (kDa) and contains glycosylation, constituting an additional 15% of the total molecular mass, resulting in a total molecular weight of 115 kDa. It is conveniently produced as a glycoprotein by expression in recombinant CHO K1 cells. Each monomer can have the following amino acid sequence (SEQ ID NO: 1):

```
SDTGRPFVEMYSEIPEIIHMTEGRELVIPCRVTSPNITVTLKKFPLDTLIPDGKRIIWDSRKGFIISNATY

KEIGLLTCEATVNGHLYKTNYLTHRQTNTIIDVVLSPSHGIELSVGEKLVLNCTARTELNVGIDFNWEYPS

SKHQHKKLVNRDLKTQSGSEMKKFLSTLTIDGVTRSDQGLYTCAASSGLMTKKNSTFVRVHEKDKTHTCPP

CPAPELLGGPSVFLFPPKPKDTLMISRTPEVTCVVVDVSHEDPEVKFNWYVDGVEVHNAKTKPREEQYNST

YRVVSVLTVLHQDWLNGKEYKCKVSNKALPAPIEKTISKAKGQPREPQVYTLPPSRDELTKNQVSLTCLVK

GFYPSDIAVEWESNGQPENNYKTTPPVLDSDGSFFLYSKLTVDKSRWQQGNVFSCSVMHEALHNHYTQKSL

SLSPG
```

Regeneron Exhibit 1001.006

US 9,220,631 B2

7

and disulfide bridges can be formed between residues 30-79, 124-185, 246-306 and 352-410 within each monomer, and between residues 211-211 and 214-214 between the monomers.

Another non-antibody VEGF antagonist immunoadhesin currently in pre-clinical development is a recombinant human soluble VEGF receptor fusion protein similar to VEGF-trap containing extracellular ligand-binding domains 3 and 4 from VEGFR2/KDR, and domain 2 from VEGFR1/Flt-1; these domains are fused to a human IgG Fc protein fragment (Li et al., 2011 *Molecular Vision* 17:797-803). This antagonist binds to isoforms VEGF-A, VEGF-B and VEGF-C. The molecule is prepared using two different production processes resulting in different glycosylation patterns on the final proteins. The two glycoforms are referred to as KH902 (conbercept) and KH906. The fusion protein can have the following amino acid sequence (SEQ ID NO:2):

```
MVSYWDTGVLLCALLSCLLLTGSSSGGRPFVEMYSEIPEIIHMTEGRELVIPCRVTSPNITVTLKKFPLDT

LIPDGKRIIWDSRKGFIISNATYKEIGLLTCEATVNGHLYKTNYLTHRQTNTIIDVVLSPSHGIELSVGEK

LVLNCTARTELNVGIDFNWEYPSSKHQHKKLVNRDLKTQSGSEMKKFLSTLTIDGVTRSDQGLYTCAASSG

LMTKKNSTFVRVHEKPFVAPGSGMESLVEATVGERVRLPAKYLGYPPPEIKWYKNGIPLESNHTIKAGHVL

TIMEVSERDTGNYTVILTNPISKEKQSHVVSLVVYVPPGPGDKTHTCPLCPAPELLGGPSVFLFPPKPKDT

LMISRTPEVTCVVVDVSHEDPEVKFNWYVDGVEVHNAKTKPREEQYNSTYRVVSVLTVLHQDWLNGKEYKC

KVSNKALPAPIEKTISKAKGQPREPQVYTLPPSRDELTKNQVSLTCLVKGFYPSDIAVEWESNGQPENNYK

ATPPVLDSDGSFFLYSKLTVDKSRWQQGNVFSCSVMHEALHNHYTQKSLSLSPGK
```

and, like VEGF-trap, can be present as a dimer. This fusion protein and related molecules are further characterized in EP1767546.

Other non-antibody VEGF antagonists include antibody mimetics (e.g. Affibody® molecules, affilins, affitins, anticalins, avimers, Kunitz domain peptides, and monobodies) with VEGF antagonist activity. This includes recombinant binding proteins comprising an ankyrin repeat domain that binds VEGF-A and prevents it from binding to VEGFR-2. One example for such a molecule is DARPin® MP0112. The ankyrin binding domain may have the following amino acid sequence (SEQ ID NO: 3):

```
GSDLGKKLLEAARAGQDDEVRILMANGADVNTADSTGWTPLHLAVPWGHLEIVEVLLKYGADVNAKDFQGW

TPLHLAAAIGHQEIVEVLLKNGADVNAQDKFGKTAFDISIDNGNEDLAEILQKAA
```

Recombinant binding proteins comprising an ankyrin repeat domain that binds VEGF-A and prevents it from binding to VEGFR-2 are described in more detail in WO2010/060748 and WO2011/135067.

Further specific antibody mimetics with VEGF antagonist activity are the 40 kD pegylated anticalin PRS-050 and the monobody angiocept (CT-322).

The afore-mentioned non-antibody VEGF antagonist may be modified to further improve their pharmacokinetic properties or bioavailability. For example, a non-antibody VEGF antagonist may be chemically modified (e.g., pegylated) to extend its in vivo half-life. Alternatively or in addition, it may be modified by glycosylation or the addition of further glycosylation sites not present in the protein sequence of the natural protein from which the VEGF antagonist was derived.

Variants of the above-specified VEGF antagonists that have improved characteristics for the desired application may

8

be produced by the addition or deletion of amino acids. Ordinarily, these amino acid sequence variants will have an amino acid sequence having at least 60% amino acid sequence identity with the amino acid sequences of SEQ ID NO: 1, SEQ ID NO: 2 or SEQ ID NO: 3, preferably at least 80%, more preferably at least 85%, more preferably at least 90%, and most preferably at least 95%, including for example, 80%, 81%, 82%, 83%, 84%, 85%, 86%, 87%, 88%, 89%, 90%, 91%, 92%, 93%, 94%, 95%, 96%, 97%, 98%, 99%, and 100%. Identity or homology with respect to this sequence is defined herein as the percentage of amino acid residues in the candidate sequence that are identical with SEQ ID NO: 1, SEQ ID NO: 2 or SEQ ID NO: 3, after aligning the sequences and introducing gaps, if necessary, to achieve the maximum percent sequence identity, and not considering any conservative substitutions as part of the sequence identity.

Sequence identity can be determined by standard methods that are commonly used to compare the similarity in position of the amino acids of two polypeptides. Using a computer program such as BLAST or FASTA, two polypeptides are aligned for optimal matching of their respective amino acids (either along the full length of one or both sequences or along a pre-determined portion of one or both sequences). The programs provide a default opening penalty and a default gap penalty, and a scoring matrix such as PAM 250 [a standard scoring matrix; see Dayhoff et al., in Atlas of Protein Sequence and Structure, vol. 5, supp. 3 (1978)] can be used in conjunction with the computer program. For example, the percent identity can then be calculated as: the total number of identical matches multiplied by 100 and then divided by the sum of the length of the longer sequence within the matched span and the number of gaps introduced into the longer sequences in order to align the two sequences.

Preferably, the non-antibody VEGF antagonist of the invention binds to VEGF via one or more protein domain(s) that are not derived from the antigen-binding domain of an antibody. The non-antibody VEGF antagonist of the invention are preferably proteinaceous, but may include modifications that are non-proteinaceous (e.g., pegylation, glycosylation).

Therapy

The syringe of the invention may be used to treat an ocular disease, including but not limited to choroidal neovascularisation, age-related macular degeneration (both wet and dry forms), macular edema secondary to retinal vein occlusion

Regeneron Exhibit 1001.007

US 9,220,631 B2

9

(RVO) including both branch RVO (bRVO) and central RVO (cRVO), choroidal neovascularisation secondary to pathologic myopia (PM), diabetic macular edema (DME), diabetic retinopathy, and proliferative retinopathy.

Thus the invention provides a method of treating a patient suffering from of an ocular disease selected from choroidal neovascularisation, wet age-related macular degeneration, macular edema secondary to retinal vein occlusion (RVO) including both branch RVO (bRVO) and central RVO (cRVO), choroidal neovascularisation secondary to pathologic myopia (PM), diabetic macular edema (DME), diabetic retinopathy, and proliferative retinopathy, comprising the step of administering an initial priming step in which the physician depresses the plunger of the pre-filled syringe to align the pre-determined part of the stopper with the priming mark.

In one embodiment, the invention provides a method of treating an ocular disease selected from choroidal neovascularisation, wet age-related macular degeneration, macular edema secondary to retinal vein occlusion (RVO) including both branch RVO (bRVO) and central RVO (cRVO), choroidal neovascularisation secondary to pathologic myopia (PM), diabetic macular edema (DME), diabetic retinopathy, and proliferative retinopathy, comprising administering a non-antibody VEGF antagonist with a pre-filled syringe of the invention, wherein the patient has previously received treatment with an antibody VEGF antagonist.

Kits

Also provided are kits comprising the pre-filled syringes of the invention. In one embodiment, such a kit comprises a pre-filled syringe of the invention in a blister pack. The blister pack may itself be sterile on the inside. In one embodiment, syringes according to the invention may be placed inside such blister packs prior to undergoing sterilisation, for example terminal sterilisation.

Such a kit may further comprise a needle for administration of the VEGF antagonist. If the VEGF antagonist is to be administered intravitreally, it is typical to use a 30-gauge×½ inch needle, though 31-gauge and 32-gauge needles may be used. For intravitreal administration, 33-gauge or 34-gauge needles could alternatively be used. Such kits may further comprise instructions for use. In one embodiment, the invention provides a carton containing a pre-filled syringe according to the invention contained within a blister pack, a needle and optionally instructions for administration.

Sterilisation

As noted above, a terminal sterilisation process may be used to sterilise the syringe and such a process may use a known process such as an ethylene oxide (EtO) or a hydrogen peroxide ($H_2O_2$) sterilisation process. Needles to be used with the syringe may be sterilised by the same method, as may kits according to the invention.

The package is exposed to the sterilising gas until the outside of the syringe is sterile. Following such a process, the outer surface of the syringe may remain sterile (whilst in its blister pack) for up to 6 months, 9 months, 12 months, 15 months, 18 months, 24 months or longer. Thus, in one embodiment, a syringe according to the invention (whilst in its blister pack) may have a shelf life of up to 6 months, 9 months, 12 months, 15 months, 18 months, 24 months or longer. In one embodiment, less than one syringe in a million has detectable microbial presence on the outside of the syringe after 18 months of storage. In one embodiment, the pre-filled syringe has been sterilised using EtO with a Sterility Assurance Level of at least $10^{-6}$. In one embodiment, the

10

pre-filled syringe has been sterilised using hydrogen peroxide with a Sterility Assurance Level of at least $10^{-6}$. Of course, it is a requirement that significant amounts of the sterilising gas should not enter the variable volume chamber of the syringe. The term "significant amounts" as used herein refers to an amount of gas that would cause unacceptable modification of the ophthalmic solution within the variable volume chamber. In one embodiment, the sterilisation process causes ≤10% (preferably ≤5%, ≤3%, ≤1%) alkylation of the VEGF antagonist. In one embodiment, the pre-filled syringe has been sterilised using EtO, but the outer surface of the syringe has ≤1 ppm, preferably ≤0.2 ppm EtO residue. In one embodiment, the pre-filled syringe has been sterilised using hydrogen peroxide, but the outer surface of the syringe has ≤1 ppm, preferably ≤0.2 ppm hydrogen peroxide residue. In another embodiment, the pre-filled syringe has been sterilised using EtO, and the total EtO residue found on the outside of the syringe and inside of the blister pack is ≤0.1 mg. In another embodiment, the pre-filled syringe has been sterilised using hydrogen peroxide, and the total hydrogen peroxide residue found on the outside of the syringe and inside of the blister pack is ≤0.1 mg.

General

The term "comprising" means "including" as well as "consisting" e.g. a composition "comprising" X may consist exclusively of X or may include something additional e.g. X+Y.

The term "about" in relation to a numerical value x means, for example, x±10%.

References to a percentage sequence identity between two amino acid sequences means that, when aligned, that percentage of amino acids are the same in comparing the two sequences. This alignment and the percent homology or sequence identity can be determined using software programs known in the art, for example those described in section 7.7.18 of *Current Protocols in Molecular Biology* (F. M. Ausubel et al., eds., 1987) Supplement 30. A preferred alignment is determined by the Smith-Waterman homology search algorithm using an affine gap search with a gap open penalty of 12 and a gap extension penalty of 2, BLOSUM matrix of 62. The Smith-Waterman homology search algorithm is disclosed in Smith & Waterman (1981) *Adv. Appl. Math.* 2: 482-489

BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** shows a side view of a syringe

FIG. **2** shows a cross section of a top down view of a syringe

FIG. **3** shows a view of a plunger

FIG. **4** shows a cross section though a plunger

FIG. **5** shows a stopper

MODES FOR CARRYING OUT THE INVENTION

The invention will now be further described, by way of example only, with reference to the drawings.

FIG. **1** shows a view from a side of a syringe **1** comprising a body **2**, plunger **4**, backstop **6** and a sealing device **8**.

FIG. **2** shows a cross section through the syringe **1** of FIG. **1** from above. The syringe **1** is suitable for use in an ophthalmic injection. The syringe **1** comprises a body **2**, a stopper **10** and a plunger **4**. The syringe **1** extends along a first axis A. The body **2** comprises an outlet **12** at an outlet end **14** and the stopper **10** is arranged within the body **2** such that a front surface **16** of the stopper **10** and the body **2** define a variable volume chamber **18**. The variable volume chamber **18** con-

Regeneron Exhibit 1001.008

US 9,220,631 B2

11

12

tains an injectable medicament **20** comprising an ophthalmic solution comprising a VEGF antagonist such as ranibizumab. The injectable fluid **20** can be expelled though the outlet **12** by movement of the stopper **10** towards the outlet end **14** thereby reducing the volume of the variable volume chamber **18**. The plunger **4** comprises a plunger contact surface **22** at a first end **24** and a rod **26** extending between the plunger contact surface **22** and a rear portion **25**. The plunger contact surface **22** is arranged to contact the stopper **10**, such that the plunger **4** can be used to move the stopper **10** towards the outlet end **14** of the body **2**. Such movement reduces the volume of the variable volume chamber **18** and causes fluid therein to be expelled though the outlet.

The backstop **6** is attached to the body **2** by coupling to a terminal flange **28** of the body **2**. The backstop **6** includes a sandwich portion **30** which is adapted to substantially sandwich at least some of the terminal flange **28** of the body **2**. The backstop **6** is adapted to be coupled to the body **2** from the side by leaving one side of the backstop **6** open so that the backstop **6** can be fitted to the syringe **2**.

The body **2** defines a substantially cylindrical bore **36** which has a bore radius. The rod **26** comprises a rod shoulder **32** directed away from the outlet end **14**. The rod shoulder **32** extends from to a rod shoulder radius from the first axis A which is such that it is slightly less than the bore radius so that the shoulder fits within the bore **36**. The backstop **6** includes a backstop shoulder **34** directed towards the outlet end **14**. The shoulders **32, 34** are configured to cooperate to substantially prevent movement of the rod **26** away from the outlet end **14** when the backstop shoulder **34** and rod shoulder **32** are in contact. The backstop shoulder **34** extends from outside the bore radius to a radius less than the rod shoulder radius so that the rod shoulder **32** cannot pass the backstop shoulder **34** by moving along the first axis A. In this case the rod shoulder **32** is substantially disc, or ring, shaped and the backstop shoulder **34** includes an arc around a rear end **38** of the body **2**.

The backstop **6** also includes two finger projections **40** which extend in opposite directions away from the body **2** substantially perpendicular to the first axis A to facilitate manual handling of the syringe **1** during use.

In this example the syringe comprises a 0.5 ml body **2** filled with between about 0.1 and 0.3 ml of an injectable medicament **20** comprising a 10 mg/ml injectable solution comprising ranibizumab. The syringe body **2** has an internal diameter of about between about 4.5 mm and 4.8 mm, a length of between about 45 mm and 50 mm.

The plunger **4** and stopper **10** will be described in more detail with reference to later figures.

FIG. **3** shows a perspective view of the plunger **4** of FIG. **1** showing the plunger contact surface **22** at the first end **24** of the plunger **4**. The rod **26** extends from the first end **24** to the rear portion **25**. The rear portion **25** includes a disc shaped flange **42** to facilitate user handling of the syringe. The flange **42** provides a larger surface area for contact by the user than a bare end of the rod **26**.

FIG. **4** shows a cross section though a syringe body **2** and rod **26**. The rod **26** includes four longitudinal ribs **44** and the angle between the ribs is 90°.

FIG. **5** shows a detailed view of a stopper **10** showing a conical shaped front surface **16** and three circumferential ribs **52, 54, 56** around a substantially cylindrical body **58**. The axial gap between the first rib **52** and the last rib **56** is about 3 mm. The rear surface **60** of the stopper **10** includes a substantially central recess **62**. The central recess **62** includes an initial bore **64** having a first diameter. The initial bore **64** leading from the rear surface **60** into the stopper **10** to an inner recess **66** having a second diameter, the second diameter being larger than the first diameter.

Stopper Movement Forces

0.5 ml syringes siliconised with <100 µg silicone oil, filled with Lucentis, comprising one of two different stopper designs were tested for maximal and average break out and slide force. Prior to testing, 30 G×0.5″ needles were attached to the syringes. The testing was carried out at a stopper speed of 190 mm/min over a travel length of 10.9 mm. Stopper design 2 had a 45% increase in the distance between the front circumferential rib and rear circumferential rib.

|  |  | Stopper design 1 | | | Stopper design 2 | |
|---|---|---|---|---|---|---|
|  |  | Batch A | Batch B | Batch C | Batch D | Batch E |
| Break loose force of syringes | Average of 10 syringes | 2.2N | 2.3N | 1.9N | 2.1N | 2.5N |
|  | Max individual value | 2.5N | 2.5N | 2.3N | 2.6N | 2.7N |
| Sliding force | Average of 10 syringes | 3.1N | 3.2N | 3.1N | 4.1N | 4.6N |
|  | Max individual value | 3.5N | 3.5N | 3.6N | 4.7N | 4.8N |

For both stopper designs, average and maximum break out force remained below 3N. For both stopper designs, average and maximum sliding force remained below 5N.

It will be understood that the invention has been described by way of example only and modifications may be made whilst remaining within the scope and spirit of the invention.

SEQUENCE LISTING

```
<160> NUMBER OF SEQ ID NOS: 3

<210> SEQ ID NO 1
<211> LENGTH: 431
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: aflibercept

<400> SEQUENCE: 1

Ser Asp Thr Gly Arg Pro Phe Val Glu Met Tyr Ser Glu Ile Pro Glu
1               5                   10                  15

Ile Ile His Met Thr Glu Gly Arg Glu Leu Val Ile Pro Cys Arg Val
            20                  25                  30
```

Regeneron Exhibit 1001.009

US 9,220,631 B2

**13**          **14**

-continued

```
Thr Ser Pro Asn Ile Thr Val Thr Leu Lys Lys Phe Pro Leu Asp Thr
        35                  40                  45

Leu Ile Pro Asp Gly Lys Arg Ile Ile Trp Asp Ser Arg Lys Gly Phe
    50                  55                  60

Ile Ile Ser Asn Ala Thr Tyr Lys Glu Ile Gly Leu Leu Thr Cys Glu
65                  70                  75                  80

Ala Thr Val Asn Gly His Leu Tyr Lys Thr Asn Tyr Leu Thr His Arg
                85                  90                  95

Gln Thr Asn Thr Ile Ile Asp Val Val Leu Ser Pro Ser His Gly Ile
                100                 105                 110

Glu Leu Ser Val Gly Glu Lys Leu Val Leu Asn Cys Thr Ala Arg Thr
        115                 120                 125

Glu Leu Asn Val Gly Ile Asp Phe Asn Trp Glu Tyr Pro Ser Ser Lys
    130                 135                 140

His Gln His Lys Lys Leu Val Asn Arg Asp Leu Lys Thr Gln Ser Gly
145                 150                 155                 160

Ser Glu Met Lys Lys Phe Leu Ser Thr Leu Thr Ile Asp Gly Val Thr
                165                 170                 175

Arg Ser Asp Gln Gly Leu Tyr Thr Cys Ala Ala Ser Ser Gly Leu Met
                180                 185                 190

Thr Lys Lys Asn Ser Thr Phe Val Arg Val His Glu Lys Asp Lys Thr
        195                 200                 205

His Thr Cys Pro Pro Cys Pro Ala Pro Glu Leu Leu Gly Gly Pro Ser
    210                 215                 220

Val Phe Leu Phe Pro Pro Lys Pro Lys Asp Thr Leu Met Ile Ser Arg
225                 230                 235                 240

Thr Pro Glu Val Thr Cys Val Val Val Asp Val Ser His Glu Asp Pro
                245                 250                 255

Glu Val Lys Phe Asn Trp Tyr Val Asp Gly Val Glu Val His Asn Ala
                260                 265                 270

Lys Thr Lys Pro Arg Glu Glu Gln Tyr Asn Ser Thr Tyr Arg Val Val
        275                 280                 285

Ser Val Leu Thr Val Leu His Gln Asp Trp Leu Asn Gly Lys Glu Tyr
    290                 295                 300

Lys Cys Lys Val Ser Asn Lys Ala Leu Pro Ala Pro Ile Glu Lys Thr
305                 310                 315                 320

Ile Ser Lys Ala Lys Gly Gln Pro Arg Glu Pro Gln Val Tyr Thr Leu
                325                 330                 335

Pro Pro Ser Arg Asp Glu Leu Thr Lys Asn Gln Val Ser Leu Thr Cys
                340                 345                 350

Leu Val Lys Gly Phe Tyr Pro Ser Asp Ile Ala Val Glu Trp Glu Ser
        355                 360                 365

Asn Gly Gln Pro Glu Asn Asn Tyr Lys Thr Thr Pro Pro Val Leu Asp
    370                 375                 380

Ser Asp Gly Ser Phe Phe Leu Tyr Ser Lys Leu Thr Val Asp Lys Ser
385                 390                 395                 400

Arg Trp Gln Gln Gly Asn Val Phe Ser Cys Ser Val Met His Glu Ala
                405                 410                 415

Leu His Asn His Tyr Thr Gln Lys Ser Leu Ser Leu Ser Pro Gly
        420                 425                 430
```

```
<210> SEQ ID NO 2
<211> LENGTH: 552
<212> TYPE: PRT
```

**Regeneron Exhibit 1001.010**

US 9,220,631 B2

-continued

```
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: conbercept

<400> SEQUENCE: 2

Met Val Ser Tyr Trp Asp Thr Gly Val Leu Leu Cys Ala Leu Leu Ser
1               5                   10                  15

Cys Leu Leu Leu Thr Gly Ser Ser Ser Gly Gly Arg Pro Phe Val Glu
            20                  25                  30

Met Tyr Ser Glu Ile Pro Glu Ile Ile His Met Thr Glu Gly Arg Glu
        35                  40                  45

Leu Val Ile Pro Cys Arg Val Thr Ser Pro Asn Ile Thr Val Thr Leu
    50                  55                  60

Lys Lys Phe Pro Leu Asp Thr Leu Ile Pro Asp Gly Lys Arg Ile Ile
65                  70                  75                  80

Trp Asp Ser Arg Lys Gly Phe Ile Ile Ser Asn Ala Thr Tyr Lys Glu
                85                  90                  95

Ile Gly Leu Leu Thr Cys Glu Ala Thr Val Asn Gly His Leu Tyr Lys
            100                 105                 110

Thr Asn Tyr Leu Thr His Arg Gln Thr Asn Thr Ile Ile Asp Val Val
        115                 120                 125

Leu Ser Pro Ser His Gly Ile Glu Leu Ser Val Gly Glu Lys Leu Val
    130                 135                 140

Leu Asn Cys Thr Ala Arg Thr Glu Leu Asn Val Gly Ile Asp Phe Asn
145                 150                 155                 160

Trp Glu Tyr Pro Ser Ser Lys His Gln His Lys Lys Leu Val Asn Arg
                165                 170                 175

Asp Leu Lys Thr Gln Ser Gly Ser Glu Met Lys Lys Phe Leu Ser Thr
            180                 185                 190

Leu Thr Ile Asp Gly Val Thr Arg Ser Asp Gln Gly Leu Tyr Thr Cys
        195                 200                 205

Ala Ala Ser Ser Gly Leu Met Thr Lys Lys Asn Ser Thr Phe Val Arg
    210                 215                 220

Val His Glu Lys Pro Phe Val Ala Phe Gly Ser Gly Met Glu Ser Leu
225                 230                 235                 240

Val Glu Ala Thr Val Gly Glu Arg Val Arg Leu Pro Ala Lys Tyr Leu
                245                 250                 255

Gly Tyr Pro Pro Pro Glu Ile Lys Trp Tyr Lys Asn Gly Ile Pro Leu
            260                 265                 270

Glu Ser Asn His Thr Ile Lys Ala Gly His Val Leu Thr Ile Met Glu
        275                 280                 285

Val Ser Glu Arg Asp Thr Gly Asn Tyr Thr Val Ile Leu Thr Asn Pro
    290                 295                 300

Ile Ser Lys Glu Lys Gln Ser His Val Val Ser Leu Val Val Tyr Val
305                 310                 315                 320

Pro Pro Gly Pro Gly Asp Lys Thr His Thr Cys Pro Leu Cys Pro Ala
                325                 330                 335

Pro Glu Leu Leu Gly Gly Pro Ser Val Phe Leu Phe Pro Pro Lys Pro
            340                 345                 350

Lys Asp Thr Leu Met Ile Ser Arg Thr Pro Glu Val Thr Cys Val Val
        355                 360                 365

Val Asp Val Ser His Glu Asp Pro Glu Val Lys Phe Asn Trp Tyr Val
    370                 375                 380

Asp Gly Val Glu Val His Asn Ala Lys Thr Lys Pro Arg Glu Glu Gln
```

**Regeneron Exhibit 1001.011**

Appx274

US 9,220,631 B2

17

18

-continued

```
385                390                395                400

Tyr Asn Ser Thr Tyr Arg Val Val Ser Val Leu Thr Val Leu His Gln
                 405                410                415

Asp Trp Leu Asn Gly Lys Glu Tyr Lys Cys Lys Val Ser Asn Lys Ala
                 420                425                430

Leu Pro Ala Pro Ile Glu Lys Thr Ile Ser Lys Ala Lys Gly Gln Pro
             435                440                445

Arg Glu Pro Gln Val Tyr Thr Leu Pro Pro Ser Arg Asp Glu Leu Thr
    450                455                460

Lys Asn Gln Val Ser Leu Thr Cys Leu Val Lys Gly Phe Tyr Pro Ser
465                470                475                480

Asp Ile Ala Val Glu Trp Glu Ser Asn Gly Gln Pro Glu Asn Asn Tyr
                 485                490                495

Lys Ala Thr Pro Pro Val Leu Asp Ser Asp Gly Ser Phe Phe Leu Tyr
                 500                505                510

Ser Lys Leu Thr Val Asp Lys Ser Arg Trp Gln Gln Gly Asn Val Phe
             515                520                525

Ser Cys Ser Val Met His Glu Ala Leu His Asn His Tyr Thr Gln Lys
    530                535                540

Ser Leu Ser Leu Ser Pro Gly Lys
545                550


<210> SEQ ID NO 3
<211> LENGTH: 126
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: DARPin MP0112

<400> SEQUENCE: 3

Gly Ser Asp Leu Gly Lys Lys Leu Leu Glu Ala Ala Arg Ala Gly Gln
1                5                10                15

Asp Asp Glu Val Arg Ile Leu Met Ala Asn Gly Ala Asp Val Asn Thr
                 20                25                30

Ala Asp Ser Thr Gly Trp Thr Pro Leu His Leu Ala Val Pro Trp Gly
             35                40                45

His Leu Glu Ile Val Glu Val Leu Leu Lys Tyr Gly Ala Asp Val Asn
    50                55                60

Ala Lys Asp Phe Gln Gly Trp Thr Pro Leu His Leu Ala Ala Ala Ile
65                70                75                80

Gly His Gln Glu Ile Val Glu Val Leu Leu Lys Asn Gly Ala Asp Val
                 85                90                95

Asn Ala Gln Asp Lys Phe Gly Lys Thr Ala Phe Asp Ile Ser Ile Asp
                 100                105                110

Asn Gly Asn Glu Asp Leu Ala Glu Ile Leu Gln Lys Ala Ala
             115                120                125
```

Regeneron Exhibit 1001.012

US 9,220,631 B2

19                                                                 20

The invention claimed is:

**1**. A pre-filled, terminally sterilized syringe for intravitreal injection, the syringe comprising a glass body forming a barrel, a stopper and a plunger and containing an ophthalmic solution which comprises a VEGF-antagonist, wherein:

(a) the syringe has a nominal maximum fill volume of between about 0.5 ml and about 1 ml,

(b) the syringe barrel comprises from about 1 µg to 100 ug silicone oil,

(c) the VEGF antagonist solution comprises no more than 2 particles >50 µm in diameter per ml and wherein the syringe has a stopper break loose force of less than about 11N.

**2**. A pre-filled syringe according to claim **1**, wherein the syringe barrel has an internal coating of silicone oil that has an average thickness of about 450 nm or less.

**3**. A pre-filled syringe according to claim **1**, wherein the syringe barrel has an internal coating of from about 3 µg to about 100 ug silicone oil.

**4**. A pre-filled syringe according to claim **1**, wherein the silicone oil is DC365 emulsion.

**5**. A pre-filled syringe according to claim **1**, wherein the VEGF antagonist solution further comprises one or more of (i) no more than 5 particles ≥25 µm in diameter per ml, and (ii) no more than 50 particles ≥10 µm in diameter per ml.

**6**. A pre-filled syringe according to claim **1**, wherein the VEGF antagonist solution meets USP789.

**7**. A pre-filled syringe according to claim **1**, wherein the VEGF antagonist is an anti-VEGF antibody.

**8**. A pre-filled syringe according to claim **7**, wherein the anti-VEGF antibody is ranibizumab.

**9**. A pre-filled syringe according to claim **8**, wherein the ranibizumab is at a concentration of 10 mg/ml.

**10**. A pre-filled syringe according to claim **8**, wherein the silicone oil has a viscosity of about 350 cP, and the VEGF antagonist solution further comprises one or more of (i) no more than 5 particles ≥25 µm in diameter per ml, and (ii) no more than 50 particles ≥10 µm in diameter per ml.

**11**. A pre-filled syringe according to claim **1** wherein the VEGF antagonist is a non-antibody VEGF antagonist.

**12**. A pre-filled syringe according to claim **11**, wherein the non-antibody VEGF antagonist is aflibercept or conbercept.

**13**. A pre-filled syringe according to claim **12**, wherein the non-antibody VEGF antagonist is aflibercept at a concentration of 40 mg/ml.

**14**. A pre-filled syringe according to claim **1**, wherein the syringe has a stopper break loose force of less than about 5N, and wherein the syringe has a stopper slide force of less than about 5N.

**15**. A pre-filled syringe according to claim **14**, wherein the stopper break loose force or stopper slide force is measured using a filled syringe, at a stopper travelling speed of 190 mm/min, with a 30 G×0.5 inch needle attached to the syringe.

**16**. A pre-filled syringe according to claim **1**, wherein the syringe has a stopper slide force of less than about 11N.

**17**. A blister pack comprising a pre-filled syringe according to claim **1**, wherein the syringe has been sterilised using $H_2O_2$ or EtO.

**18**. A blister pack comprising a pre-filled syringe according to claim **17**, wherein the outer surface of the syringe has ≤1 ppm EtO or $H_2O_2$ residue.

**19**. A blister pack comprising a pre-filled syringe according to claim **17**, wherein the syringe has been sterilised using EtO or $H_2O_2$ and the total EtO or $H_2O_2$ residue found on the outside of the syringe and inside of the blister pack is ≤0.1 mg.

**20**. A blister pack comprising a pre-filled syringe according to claim **18**, wherein ≤5% of the VEGF antagonist is alkylated.

**21**. A blister pack comprising a pre-filled syringe according to claim **17**, wherein the syringe has been sterilised using EtO or $H_2O_2$ with a Sterility Assurance Level of at least $10^{-6}$.

**22**. A pre-filled syringe according to claim **1**, wherein the syringe barrel has an internal coating of from about 1-50 µg silicone oil.

**23**. A pre-filled syringe according to claim **1**, wherein the silicone oil has a viscosity of about 350 cP.

**24**. A method of treating a patient suffering from of an ocular disease selected from choroidal neovascularisation, wet age-related macular degeneration, macular edema secondary to retinal vein occlusion (RVO) including both branch RVO (bRVO) and central RVO (cRVO), choroidal neovascularisation secondary to pathologic myopia (PM), diabetic macular edema (DME), diabetic retinopathy, and proliferative retinopathy, comprising the step of administering an ophthalmic solution to the patient using a pre-filled syringe according to claim **1**.

**25**. The method of claim **24**, further comprising an initial priming step in which the physician depresses the plunger of the pre-filled syringe to align the pre-determined part of the stopper with the priming mark.

**26**. A method according to claim **24**, wherein the VEGF antagonist administered is a non-antibody VEGF antagonist and wherein the patient has previously received treatment with an antibody VEGF antagonist.

*     *     *     *     *

Regeneron Exhibit 1001.013

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the Court's CM/ECF system, and caused a copy to be served by email upon counsel of record for all parties at their registered CM/ECF email addresses.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rule 32(a) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b), it contains 13,331 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word for Office 365 in 14-point Century Schoolbook, a proportionally spaced typeface.

## CERTIFICATE OF CONFIDENTIAL MATERIAL

The foregoing document contains 33 unique words and 1 image marked as confidential. This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.


July 3, 2023                                    /s/ *William M. Jay*