**Appeal No. 2023-1334**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

NOVARTIS PHARMA AG, NOVARTIS TECHNOLOGY LLC, NOVARTIS
PHARMACEUTICALS CORPORATION,
*Appellants,*

v.

REGENERON PHARMACEUTICALS, INC.
*Appellee.*

---

**On Appeal from the Final Written Decision of the Patent Trial and Appeal
Board, No. IPR2021-00816**

---

### APPELLEE'S NONCONFIDENTIAL RESPONSE BRIEF

---

Anish R. Desai
Elizabeth S. Weiswasser
Adam B. Banks
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

Christopher M. Pepe
Priyata Y. Patel
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
(202) 682-7000

*Counsel for Appellee*
*Regeneron Pharmaceuticals, Inc.*

July 26, 2023

## REPRESENTATIVE PATENT CLAIMS AT ISSUE

**1.** A pre-filled, terminally sterilized syringe for intravitreal injection, the syringe comprising a glass body forming a barrel, a stopper and a plunger and containing an ophthalmic solution which comprises a VEGF-antagonist, wherein:

(a) the syringe has a nominal maximum fill volume of between about 0.5 ml and about 1 ml,

(b) the syringe barrel comprises from about 1 μg to 100 μg silicone oil,

(c) the VEGF antagonist solution comprises no more than 2 particles >50 μm in diameter per ml and wherein the syringe has a stopper break loose force of less than about 11 N.

Appx276, 19:2-13.

**21.** A blister pack comprising a pre-filled syringe according to claim 17, wherein the syringe has been sterilised using EtO or $H_2O_2$ with a Sterility Assurance Level of at least $10^{-6}$.

Appx276, 20:21-23.

## CERTIFICATE OF INTEREST

Counsel for the Appellee Regeneron certifies the following:

1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). Provide the full names of all entities represented by undersigned counsel in this case:

   **Regeneron Pharmaceuticals, Inc.**

2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   **None.**

3. **Patent Corporation and Stockholders.** Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

   **None.**

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   **Weil, Gotshal & Manges, LLP: Natalie Kennedy and Matthew D. Sieger;**

   **Weil, Gotshal & Manges, LLP (former) and Winston & Strawn LLP (current): Brian E. Ferguson and Robert T. Vlasis;**

   **Weil, Gotshal & Manges, LLP (former) and Regeneron Pharmaceuticals, Inc. (current): Andrew Gesior**

   **Regeneron Pharmaceuticals, Inc.: James T. Evans and Petra Scamborova.**

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

***Novartis Pharma AG, et al. v. Regeneron Pharmaceuticals, Inc.*, Case No. 1:20-cv-00690, (N.D.N.Y.);**

***Regeneron Pharmaceuticals, Inc. v. Novartis Pharma AG et al.*, Case No. 1:20-cv-01066, (N.D.N.Y.), appealed Case No. 22-247 (2d Cir.).**

6.  **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

    **None.**

Dated: July 26, 2023          */s/ Anish R. Desai*
                                Anish R. Desai

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

COUNTERSTATEMENT OF THE ISSUES..........................................3

COUNTERSTATEMENT OF THE CASE...............................................3

    I.      STATE OF THE ART BEFORE THE '631 PATENT.......................3

            A.    Prefilled Syringes for Intravitreal Injection ...............................3

            B.    Syringe Barrel Siliconization .....................................................5

            C.    Sterilization of PFSs .................................................................6

            D.    Particulate Content ...................................................................7

    II.     THE '631 PATENT ......................................................................8

            A.    The Challenged Claims ..............................................................8

            B.    The '631 Patent Specification ....................................................8

                  1.    Terminal Sterilization .....................................................8

                  2.    Particulate Content .........................................................9

                  3.    Siliconization Methods ....................................................9

    III.    PRIOR ART ................................................................................10

            A.    Sigg – PTC Patent Publication No. WO 2011/006877 .............10

                  1.    Sigg discloses a terminally sterilized PFS containing a VEGF-antagonist. ....................................10

                  2.    Prosecution History of Sigg...........................................11

             B.    Boulange – PCT Patent Publication No. WO 2009/030976.......................................................................12

    IV.    PROCEDURAL HISTORY .................................................15

            A.    The Board Concluded that Claim 1 Was Unpatentable Based on Sigg and Boulange ..................................................17

                  1.    Motivation to Combine...................................................17

                  2.    Reasonable Expectation of Success................................18

             B.    The Board Concluded that Claim 21 Was Unpatentable Based on Sigg and Boulange ..................................................18

             C.    The Board Concluded That Evidence of Secondary Considerations Did Not Overcome the Clear Evidence of Obviousness ............................................................................19

SUMMARY OF THE ARGUMENT .....................................................19

STANDARD OF REVIEW ...................................................................24

ARGUMENT .........................................................................................25

I.    THE BOARD CORRECTLY CONCLUDED THAT CLAIM 1 WAS UNPATENTABLE AS OBVIOUS BASED ON SIGG AND BOULANGE 25

   A.    Substantial Evidence Supports the Board's Motivation to Combine Determination ...................................................... 25

         1.    Substantial Evidence Supports the Board's Rejection of Novartis's Teaching Away Argument ....... 26

               a.    The force increase for Stopper C after storage does not teach away ................................. 27

               b.    Boulange's statement that Stopper C is "markedly inferior" does not teach away ............. 30

               c.    Boulange's statement that Stopper C "does not appear to be acceptable for a medical device" does not teach away ................................. 32

               d.    Novartis's cited cases are inapposite .................... 33

         2.    The Court Should Reject Novartis's Arguments that the Board Relied on Hindsight and Non-Prior Art ................................................................... 34

               a.    The Board did not rely on impermissible hindsight ............................................................. 35

               b.    The Board did not improperly rely on confidential information ...................................... 37

         3.    The Court Should Reject Novartis's Remaining Arguments ........................................................... 39

   B.    Substantial Evidence Supports the Board's Conclusion that a POSITA Would Have Had a Reasonable Expectation of Success in Combining Sigg and Boulange ....... 43

         1.    The Court Should Reject Novartis's Argument that a POSITA Would Not Have Known How to Design a Syringe to Withstand Terminal Sterilization ........................................................... 44

         2.    The Board Did Not Impermissibly Rely on Confidential Information Regarding Macugen PFS ....... 47

         3.    The Board Considered Mr. Agallaco's Testimony ........ 49

         4.    The Board Properly relied on Mr. Koller's Testimony ........................................................... 49

         5.    The Board Correctly Determined that Sigg Teaches Performing Terminal Sterilization at Ambient Pressure ........................................... 51

II. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S CONCLUSION THAT CLAIM 21 WAS OBVIOUS ................................53

    A. The Court Should Reject Novartis's Argument that Sigg Does Not Disclose Achieving an SAL of $10^{-6}$ or Greater ........55

    B. The Court Should Reject Novartis's Argument that a POSITA Would Have Lacked a Reasonable Expectation of Success in Achieving an SAL of $10^{-6}$ ..................................57

III. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S SECONDARY CONSIDERATIONS ANALYSIS ......................................58

    A. Substantial Evidence Supports the Board's Findings as to Each Factor ...............................................................58

    B. The Court Should Reject Novartis's Argument That Evidence of Licensing and Commercial Success Supports Patentability ............................................................62

    C. The Court Should Reject Novartis's Argument that the Board Improperly Weighed Secondary Considerations ..........64

CONCLUSION ..........................................................................66

## <u>STATEMENT REGARDING REDACTED MATERIAL</u>

Material redacted on p. 7 describes nonpublic, commercially sensitive information related to the design of Bausch Health Co. Inc.'s Macugen prefilled syringe.

Material redacted on p. 38 describes nonpublic, commercially sensitive information related to the design of Regeneron's Eylea prefilled syringe.

Material redacted on pp. 47 and 61 describes nonpublic, commercial sensitive information related to Novartis's product-development efforts.

Material redacted on p. 61 describes nonpublic, commercial sensitive information related to Novartis's business and commercial activities.

Material redacted on pp. 65-66 describes nonpublic, commercial sensitive information related to Genentech's product-development efforts.

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allergan, Inc. v. Sandoz Inc.*,
796 F.3d 1293 (Fed. Cir. 2015) ...................................................33, 34

*Alza Corp. v. Mylan Labs., Inc.*,
464 F.3d 1286 (Fed. Cir. 2006) .........................................................24

*Arctic Cat Inc. v. GEP Power Prod., Inc.*,
919 F.3d 1320 (Fed. Cir. 2019) .........................................................38

*AstraZeneca AB v. Mylan Pharms. Inc.*,
19 F.4th 1325 (Fed. Cir. 2021) ....................................................*passim*

*Bayer Pharma AG v. Watson Lab'y, Inc.*,
874 F.3d 1316 (Fed. Cir. 2017) ......................................26, 30, 31, 41

*Ethicon Endo-Surgery, Inc. v. Covidien LP*,
812 F.3d 1023 (Fed. Cir. 2016) ..........................................24, 62, 63

*Icon Health and Fitness, Inc. v. Strava, Inc.*,
849 F.3d 1034 (Fed. Cir. 2017) .........................................................36

*In re Inland Steel Co.*,
265 F.3d 1354 (Fed. Cir. 2001) .........................................................55

*Institut Pasteur & Université Pierre & Marie Curie v. Focarino*,
738 F.3d 1337 (Fed. Cir. 2013) .........................................................64

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) .........................................................35

*In re Jolley*,
308 F.3d 1317 (Fed. Cir. 2002) .........................................................45

*McCoy v. Heal Sys., LLC*,
850 F. App'x 785 (Fed. Cir. 2021) ....................................................36

ix

*Merck Sharp & Dohme Corp. v. Hospira, Inc.*,
    874 F.3d 724 (Fed. Cir. 2017) ..............................................................66

*In re Mettke*,
    570 F.3d 1356 (Fed. Cir. 2009) ..........................................................24

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)..............................................................................57

*Qualcomm Inc. v. Apple Inc.*,
    24 F.4th 1367 (Fed. Cir. 2022) ............................................................37

*Randall Mfg. v. Rea*,
    733 F.3d 1355 (Fed. Cir. 2013) ..........................................................24

*Santarus, Inc. v. Par Pharm., Inc.*,
    694 F.3d 1344 (Fed. Cir. 2012) ..........................................................33

*Spectralytics, Inc. v. Cordis Corp.*,
    649 F.3d 1336 (Fed. Cir. 2011) ..........................................................24

*Yeda Rsch. & Dev. Co. v. Mylan Pharms. Inc.*,
    906 F.3d 1031 (Fed. Cir. 2018) .................................................*passim*

## Statutes

35 U.S.C. §311(b) ......................................................................................37

## <u>STATEMENT OF RELATED CASES</u>

No other appeal from the same underlying proceeding was previously before this or any other appellate court. The following cases will directly affect or be directly affected by this Court's decision in the pending case:

*Novartis Pharma AG, et al. v. Regeneron Pharmaceuticals, Inc.*, Case No. 1:20-cv-00690, (N.D.N.Y.)

*Regeneron Pharmaceuticals, Inc. v. Novartis Pharma AG, et al.*, Case No. 1:20-cv-01066, (N.D.N.Y), appealed Case No. 22-247 (2d Cir.)

# **INTRODUCTION**

This appeal is the latest in a series of failed attempts by Novartis to defend the validity of U.S. Patent No. 9,220,631 ("the '631 Patent"). In June 2020, Novartis filed concurrent complaints before the U.S. International Trade Commission ("ITC") and the U.S. District Court for the Northern District of New York asserting that Regeneron's EYLEA PFS infringes the '631 Patent. The district court case was stayed pending the ITC investigation, which proceeded through fact and expert discovery. In March 2021, the ITC staff submitted its pretrial brief explaining, *inter alia*, why all 26 claims of the '631 Patent were invalid under the clear and convincing evidence standard in view of the obviousness combination at issue in this appeal. Appx507. In response to the Staff's position and just before the commencement of trial, Novartis terminated the ITC investigation. *Id*. Regeneron immediately filed the IPR that is the subject of this appeal.

After hearing 130 minutes of oral argument, reviewing twelve expert declarations, and considering tens of thousands of pages of record evidence, the Board reached the same conclusion as the ITC staff and invalidated all 26 claims of the '631 Patent as obvious. The Board's decision is supported by substantial evidence, and this Court should affirm.

1

*First*, substantial evidence supports the Board's conclusion that claim 1 was obvious over Sigg[1] and Boulange[2]. Novartis does not dispute that the combination discloses each limitation of claim 1. Instead, Novartis contends that Boulange teaches away from using Stopper C for intravitreal injection and that a POSITA would have lacked a reasonable expectation of success in designing a syringe compatible with Sigg's terminal sterilization method. The Board, however, soundly rejected these arguments. In particular, the Board relied on explicit disclosures in the prior art, expert testimony, and admissions in the '631 Patent specification to conclude that (1) Stopper C in Boulange would have been considered suitable for intravitreal injection and (2) Boulange's syringe design would have been sufficiently gas-tight to be compatible with Sigg's terminal sterilization method.

*Second*, substantial evidence supports the Board's finding that dependent claim 21 is obvious. The Board's conclusion that Sigg discloses achieving a sterility assurance level of $10^{-6}$ with a reasonable expectation of success was fully supported by explicit disclosures in Sigg, supporting expert testimony, and Novartis's prior representation to the USPTO during the prosecution of Sigg that it includes such a disclosure.

---

[1] PCT Publication No. WO2011/006877 (EX1007, Appx3888-3922).
[2] PCT Publication No. WO2009/030976 (EX1008, Appx3923-3954).

Finally, substantial evidence supports the Board's conclusion that Novartis's weak evidence of secondary considerations was insufficient to overcome the compelling case of obviousness set forth by Regeneron. After thoroughly evaluating all the evidence, the Board correctly determined that Novartis's evidence of commercial success and licensing failed to support non-obviousness because it lacked a sufficient nexus to the challenged claims.

This Court should affirm the Board's well-reasoned decision.

## COUNTERSTATEMENT OF THE ISSUES

1. Whether the Board's conclusion that claim 1 was unpatentable as obvious based on Sigg and Boulange is supported by substantial evidence.

2. Whether the Board's conclusion that Claim 21 was unpatentable as obvious based on Sigg and Boulange is supported by substantial evidence.

3. Whether the Board's conclusion that secondary considerations do not overcome the strong evidence of obviousness is supported by substantial evidence.

## COUNTERSTATEMENT OF THE CASE

### I.    State of the Art Before the '631 Patent

#### A.    Prefilled Syringes for Intravitreal Injection

Injectable drug products are generally provided to physicians in one of two formats—(1) a vial; or (2) a prefilled syringe ("PFS"). Drug products provided in a vial require the physician to transfer the drug into a syringe prior to injection. In contrast, a PFS is packaged with a drug formulation already filled, which provides advantages of less overfill, accurate dosing, and safer and quicker administration.

Appx3477-3480, ¶¶ 36-41.  A typical PFS includes several components: a glass or plastic barrel, a rubber stopper (*i.e.*, a plunger), a plunger rod, and a needle. Appx3478-3480, ¶¶ 38-40.



Figure 2: Components of pre-filled syringe

Appx3970

PFSs for intravitreal injection of a VEGF-antagonist were known before the '631 Patent.  Appx3955-3965.  A VEGF-antagonist is a substance capable of blocking or inhibiting the biological action of VEGF, which is a protein whose overexpression contributes to certain eye diseases.  Appx3476-3477, ¶¶ 34-35; Appx5128-5133, ¶¶ 24-32.  For example, VEGF-antagonists are administered to treat "the neovascular (wet) form of age-related macular degeneration (AMD), a leading cause of blindness."  Appx3956.  Several VEGF-antagonists were commercially available before the '631 Patent, including ranibizumab (Lucentis®), aflibercept (Eylea®) developed by Regeneron, and pegaptanib (Macugen®). Appx5128-5129, ¶ 25.  Macugen® was commercially available in a 1 mL glass PFS

by 2004. Appx5803-5804; Appx5128-5129, ¶ 25; Appx5130-5131, ¶¶ 28-30; Appx3549-3552, ¶¶ 148-153.

### B.    Syringe Barrel Siliconization

The stopper moves through the barrel of a PFS to inject a drug. This requires a force to start movement of the stopper (*i.e.*, break loose force), and a force to maintain movement of the stopper (*i.e.*, slide force). Appx3483-3488, ¶¶ 46-53. Commercially available syringes were commonly sold as "10 and 5," meaning that they have a maximum break loose force of 10N and a slide force of 5N. Appx3487, ¶ 52.

It was known that "[s]ilicone oil coating is commonly used on stoppers and on the inside of syringes…as a lubricant to enable movement of the plunger." Appx4058. Siliconization was accomplished using either a "spray-on" or "baked-on" method. With "spray-on" siliconization, silicone oil is sprayed onto the barrel without further processing. Appx3490-3493, ¶¶ 58-62. Although spray-on siliconization produces desirable break loose and slide forces, it requires a larger quantity of silicone oil, which was undesirable for at least two reasons. First, silicone oil was known to cause negative interactions with drug products. Appx3986. Second, silicone oil that migrates into the drug product is ultimately injected into the patient, which could result in silicone oil droplets in patients' eyes from intravitreal injection. Appx6071.

5

To address these concerns, syringe manufacturers developed "baked-on siliconization," which reduces the silicone oil applied to the barrel and minimizes the risk of interaction between silicone oil and the drug product. Baked-on siliconization involves spraying an emulsion including silicone oil onto the barrel and heating the syringe. Appx3981. Baked-on siliconization utilizes less silicone oil with better adherence to the barrel, which minimizes the amount of oil that can interact with the drug product without impacting break loose or slide force. Appx3493-3500, ¶¶ 63-71.

## C.    Sterilization of PFSs

FDA requires all ophthalmic products to be sterile. Appx3504, ¶ 78. The sterility of a medical product can be measured in terms of sterility assurance level ("SAL"). Appx6309, ¶ 27. For medical devices intended to breach skin or tissue (*e.g.*, a syringe), FDA generally requires an SAL of $10^{-6}$, meaning a probability that only 1 in 1,000,000 units would be non-sterile. *Id.*; Appx20577.

For sensitive biologic drugs such as VEGF-antagonists, it was well-known that the drug cannot withstand the heat and pressure of standard autoclaving sterilization. Appx3504-3505, ¶ 79. It was likewise known that the drug should minimize contact with any sterilizing agents such as vaporized hydrogen peroxide ("VHP"). *Id.* Thus, for PFSs containing VEGF-antagonists, it was known to: (i) separately sterilize the drug formulation; (ii) fill the sterile drug formulation into the

6

CONFIDENTIAL INFORMATION OMITTED

syringe in a sterile environment (*i.e.*, aseptic filling); and (iii) terminally sterilize the outer surface of the filled syringe using sterilizing gases such as VHP.  Appx3505-3511, ¶¶ 80-87.

The commercially available Macugen PFS was terminally sterilized with ███ by 2008.  Appx3524, ¶ 111; Appx6675, ¶¶ 146-147.  The 2008 Macugen PFS label, for example, states that Macugen is supplied in "a sterile foil pouch."  Appx3962.  Moreover, record evidence indicates that the named inventors on the '631 Patent knew that ███ PFS was terminally sterilized using ███, but did not disclose that information to the Patent Office during prosecution of the '631 Patent.  Appx11769; Appx13176.

### D.    Particulate Content

USP789 is a prior art standard for particulate matter limits in ophthalmic solutions.  USP789 requires that ophthalmic solutions tested according to the microscopic method (Method 2 below) contain fewer than 50 particles per mL $\geq 10$ μm, fewer than 5 particles per mL $\geq 25$ μm, and fewer than 2 particles per mL $\geq 50$ μm.  Appx4895-4896.

| Table 11   USP Chapter <789> Subvisible Particle Limits for Ophthalmic Solutions | | | | |
|---|---|---|---|---|
| Method 1   LO | | Method 2   microscope | | |
| $\geq$10 μm | $\geq$25 μm | $\geq$10 μm | $\geq$25 μm | $\geq$50 μm |
| 50/mL | 5/mL | 50/mL | 5/mL | 2/mL |

Appx4561

7

## II.    The '631 Patent

### A.    The Challenged Claims

Claims 1 and 21 are relevant to this appeal.  Claim 1 is directed to a terminally sterilized glass PFS for intravitreal injection, comprising a VEGF antagonist solution having no more than 2 particles > 50 μm in diameter per ml, wherein the syringe barrel has about 1-100 μg silicone oil, and a stopper break loose force of less than about 11N.[3]  Appx276.  Dependent claim 21 further specifies that the syringe has been sterilized using ethylene oxide (EtO) or hydrogen peroxide ($H_2O_2$) to achieve an SAL of at least $10^{-6}$.  *Id*.

### B.    The '631 Patent Specification

#### 1.    Terminal Sterilization

The specification describes terminal sterilization solely by way of desired results—certain SALs, alkylation, and residue.  Appx271, 9:55-10:22.  Indeed, the SAL of $10^{-6}$ required by claim 21 derives from regulatory requirements for certain medical devices, such as syringes.  Appx5512; Appx20577.

The specification does not describe any purportedly novel sterilization methods, stating only that terminal sterilization "may ***use a known process*** such as an ethylene oxide (EtO) or a hydrogen peroxide ($H_2O_2$) sterilisation process."  Appx271, 9:49-52 (emphasis added).  The specification also does not describe how

---

[3] Novartis does not dispute that the particulate content requirement in the challenged claims comes from USP789.  Appx22.

8

to use known sterilization processes to achieve the claimed results (*i.e.*, SAL of $10^{-6}$). Appx3521-3524, ¶¶ 107-111. Therefore, the specification presumes a POSITA would know how to terminally sterilize a PFS containing a VEGF-antagonist solution to meet an SAL of $10^{-6}$.

### 2.     Particulate Content

Regarding particulate count, the specification states that, "[i]n one embodiment, the syringe has low levels of silicone oil sufficient for the syringe to meet USP789." Appx269, 6:28-30. It otherwise includes no information and presumes a POSITA would know how to produce a PFS that meets USP789. Appx3562, ¶¶ 169-170; Appx3618, ¶¶ 253-254.

### 3.     Siliconization Methods

The only feature that the specification alleges to be novel is the claimed silicone oil amounts in combination with the claimed break loose and slide forces. Appx269, 5:15-27. The specification does not, however, describe any process for siliconizing a syringe barrel within the claimed range. Indeed, contrary to the statements in the '631 Patent specification, it was well-known that the baked-on method minimizes silicone oil on the barrel, while providing acceptable break loose and slide forces. *See supra* Section Counterstatement of the Case I.B.

III.    **Prior Art**

A.    **Sigg – PTC Patent Publication No. WO 2011/006877**

1.    **Sigg discloses a terminally sterilized PFS containing a VEGF-antagonist.**

Sigg is a Novartis patent publication directed to "terminal-sterilization methods suitable for prefilled containers containing sensitive products, such as biotech (biological) drug solutions…." Appx3895, 7:29-8:2. Sigg discloses "treatment of prefilled containers in secondary packaging by an application of vaporized-hydrogen peroxide, in which vapors are controllable by certain post-treatment measures…." Appx3896, 8:8-13.

Sigg discloses two post-treatment methods to minimize interaction between the VHP sterilizing gas and the drug product: (1) applying a vacuum to reverse the direction of vapor flow, and (2) inactivating the VHP at ambient pressure. Appx3891, 3:19-30; Appx3902, 14:9-23; Appx6632-6633, ¶¶ 59-61. In this way, Sigg discloses that VHP is able to fully sterilize the outer surface of the syringe, while minimizing contact between the drug product and the sterilizing gas. Appx3535, ¶ 127.

Example 1 of Sigg discloses VHP sterilization of 0.5 mL syringes filled with the VEGF-antagonist ranibizumab for intravitreal injection. *See* Appx3908-3909, 20:10-21:11; Appx3897, 9:11-14; Appx3531, ¶ 123. The results showed that with respect to byproducts and degradation products, "there were no differences between

10

the results of the untreated syringes and with hydrogen-peroxide treated syringes." Appx3909, 21:2-3.

### 2.    Prosecution History of Sigg

Novartis prosecuted Sigg in the U.S. as Application No. 13/382,380 ("'380 Sigg Application"). Appx12831-13148. From January 2012 to April 2014, across six office actions and five responses, Novartis submitted claims directed to a PFS comprising a VEGF-antagonist and terminally sterilized with VHP. Appx13000-13007; Appx13022-13031; Appx13053-13060; Appx13078-13085; Appx13107-13114; Appx13132-13140. In an attempt to overcome one of the examiner's rejections, named inventor Jüergen Sigg submitted a sworn declaration, stating that "[*t*]*he present application disclosed for the first time*, and contrary to conventional thinking, that *it is possible to obtain sufficient sterilization* of the outer surface of a syringe in secondary packaging *at ambient pressure*." Appx13052 (emphasis added).

In a subsequent office action, Novartis amended the '380 Sigg Application claims to require a syringe filled with the VEGF antagonist ranibizumab and sterilized using VHP to an SAL of $10^{-6}$. Appx13122. Novartis thus represented to the USPTO that Sigg discloses and enables a terminally sterilized PFS to an SAL of $10^{-6}$ using VHP. The examiner, however, recognized that an SAL of $10^{-6}$ was "a common standard for sterility", and rejected those claims as obvious. Appx13134.

11

Novartis ultimately abandoned the '380 Sigg Application, and subsequently amended the then-pending '631 Patent claims to include the "terminally sterilized" limitation.  Appx13148; Appx3305.

### B.    Boulange – PCT Patent Publication No. WO 2009/030976

Boulange discloses a PFS with small silicone oil amounts to minimize interaction with a drug stored therein.  Appx3930, 6:10-32.  Boulange further discloses that the PFS has low break loose and slide forces while preserving a tight seal between the piston and barrel.  *Id.*  Boulange describes tests conducted to evaluate stopper forces on 1 mL glass PFS with different piston (i.e., stopper) configurations—A, B1, B2, and C.  Appx3937, 13:11-12; Appx3938, 14:19-21; Appx3542-3543, ¶ 141.  Pistons B1 and B2 were conventional rubber stoppers coated with Parylene C.  Appx3542-3543, ¶ 141.  Stoppers A and C were conventional rubber stoppers that were not coated with Parylene C.

Table 1 : configurations of pistons A, B1 and C

| Piston reference | Viscoelastic substrate | Coating | Coating thickness | Surface finish |
|---|---|---|---|---|
| A (comparative) | Bromobutyl rubber | No | — | Smooth Ra = 0.7 µm Rt = 11.4 µm |
| B1 (invention) | Bromobutyl rubber | Yes | 3 µm | Smooth Ra = 0.9 µm Rt =12.0 µm |
| B2 (comparative) | Bromobutyl rubber | Yes | 3 µm | Rough Ra = 3.1 µm Rt = 24.0 µm |
| C (comparative) | Chlorobutyl rubber | No | — | Smooth Ra = 0.7 µm Rt = 11.0 µm |

12

Appx3938, 14:1-3

Boulange discloses measurements of "friction force B," which corresponds to break loose force. Appx3939, 15:6-8; Appx3543-3544, ¶ 142. Boulange also discloses forces S and F, which are slide forces measured at different stopper positions. Appx3939, 15:9-12, 15:13-16; Appx3543-3544, ¶ 142.

In Example 3, Boulange tested various stopper configurations in syringe barrels coated with 40 μg baked-on silicone oil. Stoppers A and C in Example 3 were rubber stoppers comprising a coating of silicone oil, which reflected the conventional stopper design used in the prior art.[4] Appx3545-3546, ¶ 144. Table 5 discloses break loose and slide force test results for the configurations in Example 3. As shown below, the break loose and slide forces were less than 11N for Piston C for both unaged (T=0) and aged (T=1 month)[5] syringes. *Id.* Table 5 also discloses that the break loose and slide forces for Piston B1 (Parylene C coated) were less than 11N, and were less than the forces for Stopper C. Appx3943. Boulange thus notes that the "results obtained with a piston having no coating (piston C) are markedly inferior" as compared to Piston B1. Appx3943, 19:6-7.

---

[4] In addition to being disclosed in prior art patents and printed publications, rubber stoppers coated with silicone oil were used in prior art products for intravitreal injection. Appx11938; Appx6618-6619, ¶ 33.

[5] The 1-month accelerated aging (T=1) reported in Boulange Table 5 corresponds to at least 9.2-13.9 months of normal storage. Appx6695, ¶ 179.

13

Table 5 : Activation Gliding Forces, Pistons A, B1 and C

| Silicone/internal surface of container | | 4 µg/cm² | | | 4 µg/cm² | | | 4 µcm² | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Silicone/piston | | 5 µg/cm² | | | 15 µg/cm² | | | 50 µg/cm² | | |
| Force (N) | | B | S | F | B | S | F | B | S | F |
| Piston | $A_{T=0}$ | 6.6 (0.6) | 5.8 (1.0) | 4.7 (1.0) | 7.2 (0.5) | 6.9 (1.9) | 4.7 (1.9) | 6.6 (0.8) | 6.5 (1.5) | 4.0 (1.5) |
| | $A_{T=1}$ | 12.0 (2.3) | 8.4 (2.0) | 3.2 (1.3) | 11.0 (0.8) | 8.0 (1.9) | 3.3 (1.0) | 10.7 (1.2) | 8.7 (1.5) | 3.6 (1.7) |
| | $B1_{T=0}$ | 2.2 (0.2) | 2.7 (0.4) | 2.7 (0.4) | 2.2 (0.2) | 3.0 (0.6) | 3.0 (0.6) | 2.1 (0.1) | 2.6 (0.5) | 2.6 (0.5) |
| | $B1_{T=1}$ | 2.8 (0.3) | 4.3 (1.2) | 4.3 (1.2) | 2.6 (0.6) | 3.3 (0.3) | 3.3 (0.3) | 2.5 (0.2) | 3.4 (0.3) | 3.4 (0.3) |
| | $C_{T=0}$ | 4.7 (0.4) | 6.5 (0.6) | 4.6 (0.6) | 4.2 (0.3) | 6.0 (0.7) | 4.2 (0.7) | 3.9 (0.5) | 5.2 (0.7) | 4.0 (0.7) |
| | $C_{T=1}$ | 8.4 (0.6) | 8.3 (1.9) | 4.1 (1.6) | 7.5 (0.6) | 8.3 (1.4) | 4.8 (2.2) | 7.8 (1.1) | 6.2 (1.0) | 3.7 (1.5) |

Appx3943, Table 5 (annotated)

The baked-on syringe barrel and Piston C in Table 5, in combination with Sigg, formed the basis of the obviousness combination that the Board determined invalidated the '631 Patent claims. Appx27, n.17.

Further, in Example 5, Boulange tested various stopper configurations used with syringe barrels having silicone oil either baked on ("Scenario 1") or sprayed on ("Scenario 2"). Appx3544-3546, ¶¶ 143-144. In contrast to Example 3 (*i.e.*, Table 5), Boulange discloses that the Stoppers in Example 5 were not coated with silicone oil. Appx3944, 14:14-21. The results of Example 5 are disclosed in Boulange Table 7, and show that Pistons A and C had break loose and slide forces less than 11N with baked-on syringes at T=0. *Id.*

| Table 7 | | Baked-On | | | | | |
|---|---|---|---|---|---|---|---|
| | | Scenario 1 | | | Scenario 2 | | |
| Silicone/internal surface of syringe | | 4 µg/cm² | 4 µg/cm² | 4 µg/cm² | 50 µg/cm² | 50 µg/cm² | 50 µg/cm² |
| Silicone/piston | | --- | --- | --- | --- | --- | --- |
| Force (N) | | B | S | F | B | S | F |
| Piston | A T=3 | 6.6 (0.3) | 6.9 (1.4) | 4.0 (1.4) | 5.5 (0.5) | 1.2 (0.3) | 4.0 (2.0) |
| | A T=1 | 15.7 (2.9) | 5.3 (2.6) | 6.1 (4.2) | 8.6 (1.1) | 1.6 (0.7) | 5.6 (4.1) |
| | B1 T=3 | 2.1 (0.1) | 2.5 (0.3) | 2.6 (0.3) | 1.9 (0.2) | 1.3 (0.3) | 2.1 (0.7) |
| | B1 T=1 | 3.0 (0.4) | 3.4 (0.5) | 2.8 (0.6) | 2.2 (0.2) | 1.4 (0.3) | 2.4 (0.6) |
| | C T=3 | 3.9 (0.6) | 6.6 (2.5) | 3.9 (2.5) | 4.2 (0.6) | 1.0 (0.4) | 4.7 (2.9) |
| | C T=1 | 14.4 (2.2) | 4.8 (2.1) | 3.6 (1.1) | 5.4 (1.2) | 1.3 (0.5) | 4.3 (2.8) |
| | A T=3 | 17.2 (6.1) | 4.3 (2.4) | 2.9 (1.2) | 10.0 (1.0) | 1.5 (0.3) | 4.0 (3.0) |
| | A T=6 | 20.5 (4.0) | 6.1 (3.0) | 3.0 (1.0) | 15.1 (1.4) | 2.5 (1.5) | 3.0 (2.0) |

Appx3945, Table 7 (annotated)

After ageing 1 month (T=1), however, Pistons A and C exhibited increased break loose and slide forces. *Id.* Due to force increases over time, Boulange describes that the ***unsiliconized*** Pistons A and C in Table 7 "do[] not appear to be acceptable for a medical device." Appx3945, 21:5.

Pistons A and C in Table 7 were not part of the obviousness combination at issue in this appeal.

## IV. Procedural History

On April 16, 2021, Regeneron filed a petition for *inter partes* review challenging all claims of the '631 Patent based on the following grounds:

1.    Claims 1-3, 5-9, 14-22, and 24 are rendered obvious by Sigg (or Lam), Boulange, and if necessary, USP789

2.    Claims 4, 10, and 23 are rendered obvious by Sigg (or Lam), Boulange, and Fries

15

3. Claims 11-13 are rendered obvious by Sigg (or Lam), Boulange, and Furfine

4. Claims 25 is rendered obvious by Sigg (or Lam), Boulange, and 2008 Macugen Label

5. Claims 26 is rendered obvious by Sigg (or Lam), Boulange, and Dixon

For Ground 1 and 2, Regeneron relied on two alternative stopper embodiments in Boulange. Specifically, Regeneron contended that Boulange's Stopper C coated with silicone oil (Table 5) or Stopper B1 coated with Parylene C (Table 5 or Table 7) rendered obvious the challenged claims when used with the baked-on syringe barrels in Boulange in combination with Sigg. Appx332-334. The Board instituted on all grounds on October 26, 2021. Appx499-574. With respect to Regeneron's obviousness ground based on Stopper C, Novartis argued in response that (1) Boulange teaches away from using Stopper C; (2) a POSITA would not have known how to design a syringe to withstand Sigg's terminal sterilization method because it is performed under a vacuum; (3) Sigg's terminal sterilization method was not enabled because Sigg does not disclose a syringe compatible with its sterilization method; and (4) secondary considerations rendered the challenged claims non-obvious.

After considering the parties' briefing, twelve expert declarations, and a 130-minute oral argument, the Board concluded in a 128-page opinion that all challenged claims were obvious. In relevant part, the Board concluded that independent claim

1 and dependent claim 21 were obvious based on Sigg in view of Boulange because Boulange's syringe barrel includes the claimed silicone oil amounts and Stopper C discloses the claimed forces, while Sigg discloses, *inter alia*, using VHP terminal sterilization to achieve an SAL of $10^{-6}$ for a PFS comprising a VEGF-antagonist solution.    Appx53-61; Appx110-111.    The Board did not reach Regeneron's arguments related to Stopper B1 of Boulange or the grounds based on Lam.  Appx35 n.19; Appx125.

### A.    The Board Concluded that Claim 1 Was Unpatentable Based on Sigg and Boulange

Novartis did not dispute before the Board that the combination of Sigg and Boulange discloses all limitations of claim 1.  Thus, the Board only needed to determine whether a POSITA would have been motivated to combine Sigg and Boulange with a reasonable expectation of success.

### 1.    Motivation to Combine

The Board found that a POSITA would have been motivated to combine Sigg and Boulange to minimize the silicone oil used in Sigg's syringe containing a sensitive protein formulation by using Boulange's baked-on siliconization method. Appx54-55 (citing Appx3554-3576, ¶¶ 159-187).  In contrast, the Board found unpersuasive Novartis's argument that Boulange teaches away from using Stopper C.  Appx55-61.  Specifically, the Board found that the force increase for Stopper C in Boulange is within the acceptable range for intravitreal injection (Appx56-58),

while Boulange's statements expressing preference for Stopper B1 do not teach away from Stopper C because it would have been suitable for intravitreal injection. Appx58-61.

### 2.    Reasonable Expectation of Success

The Board found that a POSITA would have had a reasonable expectation of success terminally sterilizing Boulange's syringe using Sigg's VHP method because PFSs like those in Boulange were designed to be gas-tight. Appx62-63. The Board rejected Novartis's argument that a "special tightness" would have been required for a syringe to withstand Sigg's sterilization method. Appx63-65. Specifically, the Board found that Sigg's sterilization method can be performed at ambient pressure—thus compatible with a normal gas-tight syringe such as Boulange's. Appx64-65. The Board also determined that the '631 Patent does not claim any specific structure to achieve special tightness for terminal sterilization. *Id*.

### B.    The Board Concluded that Claim 21 Was Unpatentable Based on Sigg and Boulange

The parties disputed whether Sigg discloses an SAL of $10^{-6}$ using VHP sterilization. The Board found that it does because Sigg defines "sterility" for a health care product as $10^{-6}$ and describes VHP as a sterilization method. Appx110-111. The Board further found that an SAL of $10^{-6}$ is a regulatory requirement, and because Sigg discloses terminally sterilizing a PFS, it discloses achieving an SAL of $10^{-6}$. Appx110 (citing Appx6320, ¶ 43). The Board also noted that during

prosecution of the '380 Sigg Application, Novartis represented that Sigg enables using VHP to achieve an SAL of $10^{-6}$.  Appx111 (citing Appx13122).

### C.    The Board Concluded That Evidence of Secondary Considerations Did Not Overcome the Clear Evidence of Obviousness

The Board considered all evidence of secondary considerations, and determined that only long-felt need and failure of others slightly supported non-obviousness.  As to other factors, the Board found that (1) Novartis failed to establish a nexus between the commercial success of Lucentis PFS and the challenged claims; (2) evidence of licensing is "weak at best because the '631 patent is but a minor piece of a larger agreement…," and (3) evidence of alleged skepticism by Vetter[6] did not apply to claim 1 or 21 because Vetter had already achieved a syringe with silicone oil within the claimed range.  Appx97; Appx100.  After considering the totality of the evidence, the Board concluded that "[t]he stronger evidence of obviousness cannot be overcome with the weaker evidence of long-felt need and failure of others."  Appx100.

## <u>SUMMARY OF THE ARGUMENT</u>

The Court should affirm the Board's determination that all claims of the '631 Patent were unpatentable as obvious.

---

[6] Vetter Pharma International GmbH.

19

I.A.    The Board correctly found that claim 1 was unpatentable.  Substantial evidence supports the Board's factual finding that a POSITA would have been motivated to combine Sigg and Boulange, and the Board correctly rejected Novartis's arguments to the contrary.  First, Novartis argues that Boulange "teaches away" because: (i) Stopper C's break loose force increases during storage; (ii) Boulange states that Stopper C is "markedly inferior" to Stopper B1; and (iii) Boulange allegedly describes Stopper C as "[un]acceptable for a medical device."  But substantial evidence supports the Board's findings that none of these points constitutes a teaching away.  Substantial evidence, such as testimony of both parties' expert witnesses, shows that an increase of 4N over time would have been acceptable and expected.  The record also shows that Boulange's "markedly inferior" statement does not constitute teaching away under this Court's precedent because a POSITA is not deterred from using a less preferred but still workable option.  And, the Board correctly found that Boulange's statement that Stopper C "does not appear to be acceptable" does not describe *siliconized* Stopper C which the Board used in concluding that claim 1 was obvious.

Second, Novartis argues that the Board's finding of no teaching away relies on legally impermissible evidence—hindsight and confidential information.  Not so.  It was proper (if not essential) for the Board to consider the claim language in its teaching away analysis because the correct inquiry asks whether the reference

20

teaches away "*from the claimed invention*."  *AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1337 (Fed. Cir. 2021).   The Board also properly relied on confidential evidence—not as prior art to supplement a missing claim element—but to demonstrate the knowledge of a POSITA with respect to whether an increase of 4N in break loose force would have been acceptable.   *Yeda Rsch. & Dev. Co. v. Mylan Pharms. Inc.*, 906 F.3d 1031, 1041 (Fed. Cir. 2018).  In any event, substantial other evidence supports the Board's conclusion.

I.B.   Substantial evidence supports the Board's finding that a POSITA would have had a reasonable expectation of success of combining Sigg and Boulange.  Novartis's arguments to the contrary are unavailing.  First, Novartis argues that a POSITA would not have known how to design a syringe to withstand Sigg's terminal sterilization.  But the Board considered all the evidence cited by Novartis and Regeneron, including evidence that Novartis had taken contrary positions before the USPTO, and found Regeneron's evidence more persuasive.  That is enough to warrant affirmance.  This Court's role is not to reweigh the evidence.

Second, Novartis argues that the Board impermissibly relied on confidential information concerning Macugen PFS to find a reasonable expectation of success.  But, again, the Board properly relied on Macugen PFS—not as a prior art ground— but as supporting evidence "relevant to the knowledge base of the POSITA."

21

Appx71.  In any event, substantial other evidence supports the Board's finding. Appx71.

Third, Novartis contends that "there are several problems" with the Board's reliance on Mr. Koller's testimony "that it was standard in the art to design pre-filled syringes like those in Boulange to be gas-tight to protect the drug from degradation during shelf life," but each of the alleged "problems" are improper requests to reweigh evidence the Board already considered.

Finally, Novartis argues that the Board's conclusion that all PFSs are designed to be gas-tight during normal storage is irrelevant because Sigg's terminal sterilization methods are performed under pressure extremes.  Once again, this argument reduces to a factual quibble with the Board's well-reasoned findings.  The Board concluded that Sigg's method can be performed under ambient pressure, a finding supported by substantial evidence.  Novartis offers no reason to disturb the Board's conclusion.

II.     The Court should affirm the Board's conclusion that claim 21 was unpatentable as obvious.  Substantial evidence supports the Board's finding that Sigg discloses achieving an SAL of $10^{-6}$ using VHP with a reasonable expectation of success.  The Court should reject Novartis's arguments to the contrary.  First, Novartis argues that the Board improperly relied on Mr. Koller's testimony that "sterilization" refers to an SAL of $10^{-6}$ and "sanitization" refers to an SAL of $10^{-3}$

because Sigg states that "sterilization" and "sanitization" are used interchangeably. This argument mischaracterizes the Board's decision, which principally relied on Sigg's explicit disclosure that "sterility" refers to an SAL of $10^{-6}$ and that VHP is a "sterilization treatment." Appx110. The Board further supported its conclusion with the testimony of Mr. Koller and Dr. Sigg, and Novartis's representations to the USPTO during the prosecution of the '380 Sigg Application, which directly contradict Novartis's arguments before the Board and on appeal. *Id.*

Second, Novartis argues that the Board ignored Mr. Agalloco's testimony that terminal sterilization was challenging as of 2012 in concluding that a POSITA would have had a reasonable expectation of success in achieving an SAL of $10^{-6}$. This is incorrect. The Board explicitly acknowledged the challenges of terminal sterilization, but found, after balancing all of the evidence, that a POSITA would have had a reasonable expectation of success in achieving an SAL of $10^{-6}$. Substantial evidence supports the Board's decision.

III. The Court should affirm the Board's findings on secondary considerations. Novartis argues that the Board improperly discounted evidence of licensing and commercial success, and applied a flawed nexus analysis. But the Board considered all relevant evidence, and reached its conclusion based on substantial evidence. Notably, the only claimed feature which Novartis contends to have contributed to Lucentis PFS's success is the PFS presentation, but a PFS

23

containing a VEGF antagonist had been on the market years before the '631 Patent. *Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023, 1034 (Fed. Cir. 2016) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent.") (citation omitted). The Board carefully considered evidence with respect to each factor, and found that the "stronger evidence of obviousness cannot be overcome with the weaker evidence of long-felt need and failure of others." Appx100. The Board's well-reasoned conclusion should not be disturbed.

## STANDARD OF REVIEW

This Court "review[s] the Board's compliance with governing legal standards de novo and its underlying factual determinations for substantial evidence." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (citation omitted). The presence or absence of a motivation to combine or reasonable expectation of success are factual determinations reviewed for substantial evidence. *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1289 (Fed. Cir. 2006). Whether a prior art reference teaches away from the claimed invention is a question of fact reviewed for substantial evidence. *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1343 (Fed. Cir. 2011). Weighing of secondary considerations is also a factual issue reviewed for substantial evidence. *In re Mettke*, 570 F.3d 1356, 1361 (Fed. Cir. 2009).

## **ARGUMENT**

### I.    The Board Correctly Concluded that Claim 1 Was Unpatentable as Obvious Based on Sigg and Boulange

The Court should affirm the Board's conclusion that claim 1 was unpatentable as obvious.  Substantial evidence supports the Board's factual findings that a POSITA would have been motivated to combine Sigg and Boulange with a reasonable expectation of success.  The Court should reject Novartis's arguments to the contrary.

#### A.    Substantial Evidence Supports the Board's Motivation to Combine Determination

Substantial evidence supports the Board's factual finding "that a POSITA would have been motivated to combine Sigg's terminally sterilized PFS comprising a VEGF-antagonist with Boulange's low-silicone and low break loose/gliding force syringe."  Appx54 (citing Appx3554-3576, ¶¶ 159-187).  The Board relied on the explicit teachings of Sigg and Boulange, as well as Regeneron's expert witness, Mr. Koller's supporting testimony.  Appx54-55 (citing Appx3554-3576, ¶¶ 159-187; Appx3981 (teaching that reducing silicone oil in intravitreal injections was desirable)).

Specifically, the Board credited Mr. Koller's testimony that Sigg's disclosure of a PFS containing a VEGF-antagonist would have motivated a POSITA to minimize silicone oil on the syringe barrel because negative interactions between silicone oil and a protein or biologic formulation were known to occur.  Appx3554-

3555, ¶ 159 (citing Appx3986); Appx55.  The Board further explained that "[t]he evidence of record establish[ed] that the [POSITA] was aware that reducing the amount of silicone oil in intravitreal injections was desirable to avoid potential 'incompatibilities includ[ing] aggregation, deformation, and inactivation of native protein structures.'"  Appx55 (quoting Appx3554-3555, ¶¶ 159-160); *see also* Appx3981.  The Board concluded that a POSITA would have looked to Boulange's disclosure of baked-on siliconization, which "would help reduce the amount of 'residual' and 'free' silicone oil that can enter the protein formulation and cause negative effects…."  Appx55 (citing Appx3558-3559, ¶ 165).

The Board's motivation to combine finding was clearly supported by substantial evidence.

### 1.    Substantial Evidence Supports the Board's Rejection of Novartis's Teaching Away Argument

Novartis did not dispute that a POSITA would have been motivated to use a syringe comprising reduced silicone oil (*i.e.*, Boulange) for a PFS for intravitreal injection (*i.e.*, Sigg).  Instead, Novartis asserted that Boulange teaches away from using Stopper C.  To demonstrate teaching away, Novartis needed to establish that Boulange "suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant."  *Bayer Pharma AG v. Watson Lab'y, Inc.*, 874 F.3d 1316, 1327 (Fed. Cir. 2017).  Novartis

26

failed to make that showing, and substantial evidence supports that Board's rejection of Novartis's argument.

### a. The force increase for Stopper C after storage does not teach away

Novartis argues that Boulange teaches away from Stopper C because its break loose force increases during storage from 4.7N to 8.4N ($\Delta$ 3.7N) and therefore is not "consistent and predictable." Opening Br. 27-29. As a threshold matter, the '631 Patent does not describe or claim a break loose force that does not change over time, and Novartis does not dispute that both the pre-storage and post-storage forces of Stopper C are within that claimed range (*i.e.*, 11N). Appx56. Moreover, the Board determined that Stopper C's increase of 3.7N in break loose force does not teach away from the claimed invention. *Id.* That finding is supported by substantial evidence for at least two reasons.

First, the Board explained that an increase of 3.7N would not have taught away when the overall value—8.4N—was an acceptable break loose force for intravitreal injection. Appx57. The Board relied on the testimony of Novartis's ophthalmology expert, Dr. Calman, who admitted that injection forces of up to 10N were acceptable to an ophthalmologist. *Id.* (citing Appx10929, 17:1-7 ("I would say...that I tend to administer [Avastin and EYLEA] more than the others"); Appx10939, 27:10-17 ("the ranges for the Eylea syringe tended to be higher, in the 3 to 10 Newton range")). The Board also relied on Mr. Koller's testimony that 8.4N

would have been acceptable because it is still under the claimed "about 11N." Appx59 (citing Appx6619-6620, ¶ 37). Finally, the Board relied on the specification's admission that less than 20N was "'known in the art' to be acceptable for intravitreal injection." Appx59 (quoting Appx269, 5:31-38).

Second, the Board found that an increase of less than 4N would not be an inconsistent force profile that would affect an ophthalmologist's use of the syringe. Rather, the Board found, a POSITA would have expected some increase in break loose force during the shelf life of a syringe. Appx57-58. Relying on Mr. Koller's testimony and his supporting evidence, the Board found that "'[a] POSITA would have understood that most pre-filled syringes are expected to experience some level of force increase over the shelf-life of the syringe', and such an entirely expected increase would not deter the POSITA." *Id.* (quoting Appx6620, ¶ 39 (citing Appx3986)); *see also* Appx57 (citing Appx6621-6622, ¶ 40). The Board also supported its conclusion with reference to Novartis's own expert testimony and EYLEA PFS data, which demonstrate that "a variance of 4.7 N to 8.4 N (Δ 3.7 N) after accelerated aging is within *accepted industry standards and would have been a viable option for the POSITA.*" Appx61 (citing Appx9215 (EYLEA PFS force data); Appx11447, 28:7-9 ("Q. And in your experience, does the Eylea PFS provide consistent forces from syringe to syringe? A. Yes."); Appx10934, 22:3-9 ("**Q** Okay. And with respect to Eylea PFS, do you find the forces to be consistent in terms of

break loose and slide force? **A** Generally speaking, yes -- **Q** Okay. **A** -- consistent from one Eylea syringe to another."); *see also* Appx58 (relying on Mr. Koller's testimony that "a force increase of 3.7 N would have been expected and acceptable" based on Eylea PFS data (citing Appx6622-6623, ¶¶ 41-42 (citing Appx9215)).

Indeed, Novartis failed to identify any record evidence suggesting that a force increase of 4N during storage would be considered unacceptable to a physician.[7] Accordingly, in an effort to support its argument that an "intravitreal injection device *must* have a break-loose force that is…consistent and predictable," Novartis misleadingly states that Mr. Koller "acknowledged that increases in a syringe's break-loose force during storage are 'undesirable, and potentially dangerous to the patient.'" Opening Br. 27. But the quoted testimony describes an undesirable break loose force increase associated with spray-on siliconization (Appx3491-3492, ¶ 59)—not the *baked-on* syringes of Boulange in the asserted obviousness combination with Sigg (Appx3498, ¶ 68).

In short, substantial evidence supports the Board's conclusion that a break loose force increase of 3.7N would not have deterred a POSITA from using Stopper

---

[7] The only purported support that Novartis cites in its brief is Dr. Calman's declaration. Appx21689, ¶ 72. But Dr. Calman never quantified an increase in force that would be unacceptable. *Id*. During his deposition, Dr. Calman testified that EYLEA PFS is his preferred syringe and that public test data showed its forces can range from 3-10 N (*i.e.*, Δ 7N). Appx10939, 27:10-17.

C. In contrast, no evidence supports Novartis's argument that such a force increase would teach away.

### b. Boulange's statement that Stopper C is "markedly inferior" does not teach away

Novartis also argues that the Board should have concluded that Boulange teaches away because Boulange states that Stopper C is "markedly inferior" to Stopper B1. Opening Br. 28-30. Novartis's argument is plainly inconsistent with this Court's precedent that just because "better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes." *Bayer*, 874 F.3d at 1327. Indeed, substantial evidence supports the Board's conclusion that this statement in Boulange does not teach away from Stopper C.

The Board considered the "markedly inferior" statement in the context of the entire disclosure of Boulange and the prior art. The Board appropriately concluded that a POSITA would have been motivated to use Stopper C because "Stopper C was 'comprised of rubber and coated with silicone oil, which was a common stopper design in the prior art.'" Appx59-60 (quoting Appx6618-6619, ¶ 33); Appx10793, 41:9-12 (Novartis expert admitting that siliconized rubber stopper was known before 2012). The Board further concluded that Boulange does not teach away from using Stopper C because the break loose force "values for Stopper C are still within the claimed 'about 11N,' but more importantly, well under the 20 N that the '631 patent acknowledges was 'known in the art' to be acceptable for intravitreal injection."

Appx59 (citing Appx269, 5:31-38; Appx6619-6620, ¶ 37).  Based on this evidence, the Board properly concluded that "Stopper C is an acceptable alternative to Stopper B1 (Parylene C), even though it is categorized as 'markedly inferior' to Stopper B1." *Id.*

Both parties agree that the "markedly inferior" statement ***compares*** Stopper C to Stopper B1.  Opening Br. 29 ("Boulange strongly discourages the use of Stopper C, calling it 'markedly inferior' to Stopper B1.").  That is, Boulange describes only that Stopper C is "markedly inferior" to Stopper B1; it does not deem Stopper C markedly inferior to *all* – or any – other stoppers in the art.  But to teach away, the reference must "discourage [a POSITA] from following the path set out in the reference, or would [lead a POSITA] in a direction divergent from the path that was taken in the claim."  *AstraZeneca*, 19 F.4th at 1337 (internal quotation marks omitted).  As this Court has emphasized, "the fact that there may be reasons a skilled artisan would prefer one over the other does not amount to a teaching away from the lesser preferred but still workable option."  *Bayer*, 874 F.3d at 1327.  Accordingly, this statement does not teach away, and substantial evidence supports the Board's conclusion that Stopper C would have been an acceptable, albeit less preferred, option.

c.     **Boulange's statement that Stopper C "does not appear to be acceptable for a medical device" does not teach away**

Novartis further argues that Boulange teaches away because Boulange allegedly describes that all configurations of Stopper C "do[] not appear to be acceptable for a medical device." Opening Br. 29. But the Board rejected Novartis's interpretation of Boulange, a conclusion well-supported by substantial evidence. Specifically, the Board concluded that this statement does not apply to ***siliconized*** Stopper C of Table 5—which is part of the obviousness combination—and instead applies only to Stopper C of Table 7, which is an ***unsiliconized*** stopper and not part of the obviousness combination. Appx58-59; *see also* Appx58 ("[T]he statement in Boulange...comes directly after Table 7…and is clearly referring to the configuration of Stopper C that has no lubrication…") (citing Appx6619, ¶ 35).

Substantial evidence supports the Board's interpretation of Boulange. The Board relied on Mr. Koller's testimony that Stopper C in Table 7 is distinct from other configurations of Stopper C because it is not siliconized, whereas Stopper C in Table 5 is siliconized and "had much lower break loose forces after accelerated aging (8.4 N, 7.5 N, 7.8 N) than Stopper C in Table 7 (14.4 N)." *Id.* (citing Appx6619-6620, ¶¶ 34-37; Appx1848, 18:4-14; Appx1871-1872, 41:18-42:8). The Board thus correctly concluded that this "statement would not be understood to apply to the

results in Table 5 of Boulange because that is an entirely different configuration of Stopper C." Appx58-59.

### d.    Novartis's cited cases are inapposite

Novartis argues that the statements in Boulange "are textbook examples of teaching away" under this Court's precedent. Opening Br. 30. Not so. The cases Novartis cites underscore that teaching away is a highly factual inquiry, and none warrants reversal in view of the substantial evidence that supports the Board's conclusion.

In *Santarus, Inc. v. Par Pharm., Inc.*, the Court reversed the district court's finding of no teaching away because the reference expressly stated that an embodiment relied on by the district court was "ruled out." 694 F.3d 1344, 1355 (Fed. Cir. 2012). Boulange, in contrast, does not state that siliconized Stopper C is "ruled out." As explained above, substantial evidence demonstrates that the force increase for Stopper C in Table 5 would have been acceptable; the "does not appear to be acceptable" statement in Boulange applies only to unsiliconized Stopper C; and Boulange's description of siliconized Stopper C being "markedly inferior" to Stopper B1 does not "rule out" Stopper C.

In both *AstraZeneca*, 19 F.4th at 1336 and *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1305 (Fed. Cir. 2015), the Court affirmed the district court's finding that a reference taught away based on substantial evidence. In *AstraZeneca*, the

substantial evidence was expert testimony that the control formulations "were not suitable" and "clearly don't work."[8]   19 F.4th at 1336.   And in *Allergan*, the substantial evidence included known side effects of using a specific compound that the defendant's expert described as "a natural born killer" that was "from Satan." 796 F.3d at 1305.

No such evidence exists here.  No testimony or other evidence suggests that Stopper C is "from Satan" or "clearly" would not work.  In fact, substantial evidence supports the opposite finding—siliconized Stopper C was commonly used in the prior art and had acceptable forces suitable for intravitreal injection.  *See supra* Section Argument I.A.1.a.

### 2.     The Court Should Reject Novartis's Arguments that the Board Relied on Hindsight and Non-Prior Art

Unable to show that the Board's decision lacks substantial evidence support, Novartis attempts to manufacture legal error.  But these efforts also fail.  Novartis argues that the Board's finding of no teaching away rests on two "legal errors"—the Board purportedly relied on: (1) hindsight; and (2) confidential, non-prior art information.  Opening Br. 32-36.  As explained below, the Board did not legally err.

---

[8] In *AstraZeneca*, the Court only concluded that the district court did not *clearly err* in finding a teaching away (19 F.4th at 1336); contrary to Novartis's contention, the Court did not "agree[] with the district court['s]" finding.  Opening Br. 31.

Moreover, substantial evidence supports the Board's conclusion even without the evidence that Novartis contends the Board improperly relied upon.

### a.     The Board did not rely on impermissible hindsight

Novartis argues that the Board took a "hindsight-based approach" when it found that an increase of 3.7N did not teach away based on the fact that "Stopper C's forces after aging are within the claimed ranged." Opening Br. 32-33 (quoting Appx57). Novartis argues that instead, the Board should have considered whether "a person of ordinary skill would [] have been motivated to select a stopper with unpredictable forces *regardless* of whether all of those force figures happened to fall within the claimed range…." Opening Br. 33. Novartis's argument fails for several reasons.

First, this Court's precedent required the Board to consider the scope of the claim in its teaching away analysis. That is, "a prior art reference is said to teach away **from the claimed invention** if a skilled artisan … would be discouraged from following the path set out in the reference, or … from **the path that was taken in the claim**." *AstraZeneca*, 19 F.4th at 1337 (emphasis added) (internal quotation marks omitted). This makes sense because one "must have a motivation to combine accompanied by a reasonable expectation of achieving **what is claimed in the patent-at-issue**." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016). The case law therefore demonstrates the opposite of

what Novartis argues—the Board would have erred had it not considered the claim language when assessing teaching away.  The Board thus properly considered whether Boulange teaches away from the claimed break loose force.

Second, Novartis's critique is beside the point in any event because the Board also considered (as Novartis contends it should have) whether "the variation itself would have been viewed as a problem" without reference to the claim language. Opening Br. 33.  In particular, the Board relied on Novartis's own expert testimony to conclude that the force variation would have been acceptable regardless of the claim language.  Appx57 (citing Appx10929, 17:1-7; Appx10939, 27:10-17).[9]  The Board also relied on Mr. Koller's testimony that a POSITA would have expected an increase in break-loose force over time.  *See supra* Section Argument I.A.1.

Finally, the Board supported its findings with the specification's own admission about the prior art—its statement that "[b]reak loose and slide forces for pre-filled syringes known in the art are typically in the region of less than 20N," (Appx59 (quoting Appx269, 5:31-38)).  Novartis does not (because it cannot) dispute that this statement comprises admitted prior art. *McCoy v. Heal Sys., LLC,*

---

[9] Novartis argues that the Board mischaracterized Dr. Calman's testimony.  Opening Br. 33 n.7.  Not so.  Dr. Calman clearly testified that a range of 3-10N was acceptable, which is substantial evidence supporting the Board's finding that there is no teaching away.   Novartis has set forth no basis for disregarding the Board's interpretation of Dr. Calman's testimony. *Icon Health and Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1041 (Fed. Cir. 2017) ("the PTAB is permitted to weigh expert testimony….").

850 F. App'x 785, 789 (Fed. Cir. 2021) ("The Board did not err by accepting the specification's own assertions of what is well known in the art."). Instead, Novartis argues that the statement does not support the Board's conclusion because the quoted text does not explicitly mention intravitreal injection. Opening Br. 33-34. The immediately surrounding sentences, however, discuss syringes for intravitreal injection. Appx269, 5:31-34 ("Smooth administration is particularly important in sensitive tissues such as the eye[.]"). Therefore, the Board reasonably interpreted the specification as disclosing that a break loose force of 20N was known to be acceptable for intravitreal injection. Appx59.

### b.    The Board did not improperly rely on confidential information

Novartis argues that the Board improperly relied on confidential information concerning the force characteristics of EYLEA PFS. Opening Br. 34-36. Specifically, Novartis argues that "the Board may find obviousness 'only on the basis of prior art consisting of patents or printed publications,'" and that "the Eylea data is plainly not prior art." *Id.* (quoting 35 U.S.C. §311(b)). This argument fails for two reasons.

First, Novartis's argument is contrary to the law. While non-prior art evidence "cannot be applied, independently, as teachings separately combinable," the Board may rely on non-prior art evidence for "their proper supporting roles, e.g., indicating the level of ordinary skill in the art." *Yeda*, 906 F.3d at 1041; *Qualcomm Inc. v.*

CONFIDENTIAL INFORMATION OMITTED

*Apple Inc.*, 24 F.4th 1367, 1375 (Fed. Cir. 2022) ("[A] petitioner may rely on evidence beyond prior art documents in an *inter partes* review."). This is exactly what the Board did here. It did not rely on EYLEA PFS information to supply a missing claim element, but to support its conclusion that a POSITA would not have considered a break loose force increase of 3.7N unacceptable. Appx58.

*Arctic Cat Inc. v. GEP Power Prod., Inc.*, 919 F.3d 1320, 1332 (Fed. Cir. 2019), on which Novartis relies, is inapposite. In *Arctic Cat*, the dispute was not whether the Board relied on non-prior art to supplement its obviousness analysis, but whether a reference was prior art at all. *Id*. Here, the Board only used EYLEA PFS test data in a manner consistent with this Court's precedent.

Second, other substantial evidence, which is not confidential, supports the Board's conclusion that Boulange does not teach away. The Board relied on testimony of both parties' experts, exhibits supporting that testimony, and the specification's admission that less than 20N was known to be acceptable for intravitreal injection. *See supra* Section Argument I.A.1.[10]

---

[10] Novartis argues that Eylea data does not show that a "force increase of less than 4N after aging would have been expected" because "75% of tested syringes were clustered in a range from ▉ to **num.**N." Opening Br. 36 n.8. Novartis, however, never made this argument before the Board. Regardless, substantial evidence supports the Board's finding that a 4N increase would have been expected and acceptable. Appx57-58 (citing Appx9215 (disclosing a force variation of 4 N)); Appx10939, 27:10-17.

### 3.    The Court Should Reject Novartis's Remaining Arguments

Novartis's remaining arguments are without merit.  First, Novartis argues that the Board wrongly disregarded the statement that Stopper C "does not appear to be acceptable for a medical device" as applying only to Table 7 because "if the initial break-loose force for Stopper C in Table 7 (3.9 N) was unacceptably high, so were the initial break loose forces for Stopper C in the other experiment (4.7 N, 4.2 N, and 3.9 N)."  Opening Br. 36-37.  The Board did not disregard this statement.  Rather, it concluded that the statement does not apply to Stopper C in Table 5.  Appx58-59.  As explained above, substantial evidence supports this conclusion.  Appx58-59 (citing Appx6619-6620, ¶¶ 34-37); *see supra* Section Argument I.A.1.  Moreover, there is no evidence that any of the initial break loose forces (T=0) for Stopper C were unacceptably high.  To the contrary, substantial evidence shows that a POSITA would consider the initial break loose forces acceptable. *See supra* Section Argument I.A.1.a.

Novartis also argues that "[t]here is absolutely no basis for reading Boulange to teach that Stopper C [of Table 7] was 'not . . . acceptable' *unless lubricated*."  Opening Br. 37.  The Board made no such finding.  Instead, the Board found that claim 1 was rendered obvious by, *inter alia*, siliconized Stopper C in Table 5, and that the "may not be acceptable" statement only applies to unsiliconized Stopper C

in Table 7.[11]  That finding is supported by the substantial evidence described above. *See supra* Section Argument I.A.1.c.

Second, Novartis argues that Boulange cannot motivate the use of its device in intravitreal injection because the record offers "no reason to believe that a skilled artisan would have turned to Boulange—a publication that does not even discuss intravitreal injections."  Opening Br. 38-40.  But the record is replete with such evidence.  For example, citing Mr. Koller's testimony, the Board explained that a POSITA would have turned to Boulange because Sigg discloses a PFS comprising a VEGF antagonist for intravitreal injection, and using Boulange's syringe "would help reduce the amount of 'residual' or 'free' silicone oil that can enter the protein formulation and cause negative effects."  Appx54-55 (citing Appx3554-3576, ¶¶ 159-187).

Novartis points to a Becton Dickinson (Boulange's applicant) representative's testimony that its PFSs were "not validated for intraocular use."  Opening Br. 39. But that testimony does not render Boulange's syringes unsuitable for intravitreal injection.  As the representative explained, not being validated for intraocular use

---

[11] Novartis also argues that the Board erred because "Boulange makes clear that decreasing silicone oil is possible only with the syringe . . . which uses Parylene C." Opening Br. 37 n.9.  This is incorrect.  Boulange discloses a syringe barrel with 40 µg silicone oil in combination with Stopper C to achieve forces within the claimed range.  Appx20 (citing Appx3944, 20:15-21).  Thus, substantial evidence supports the Board's finding that Boulange discloses decreasing silicone oil on a syringe barrel when used with Stopper C.

"doesn't mean it can't be. It just means that BD hasn't done the validation work." Appx24355, 104:19-20.

Third, Novartis argues that even if Boulange does not teach away, there is no motivation to use Stopper C for intravitreal injection because Mr. Koller's declaration could not sustain the Board's analysis. Opening Br. 39-42. Again, substantial evidence supports the Board's finding that there was a motivation to use Stopper C. *See supra* Section Argument I.A. Novartis points to Mr. Koller's deposition testimony that Boulange's "markedly inferior" statement is "[n]ot very motivat[ing]." Opening Br. 40 (quoting Appx20670, 147:13-148:4). But in his immediately preceding answer, Mr. Koller explained that "markedly inferior in table 5 is a clear expression. But I need to put in relation on what the results on piston C is. And if I see the results, yeah, it's not as good as B1, ***but suitable for my intended use if I want to use it***." Appx20670, 147:2-7 (emphasis added). Mr. Koller thus testified that, although Boulange discloses a more favorable option (Stopper B1), a POSITA would have understood that the other option (Stopper C) is still suitable for the intended purpose. That is enough to defeat Novartis's teaching away argument and motivate a POSITA to use Stopper C. As this Court has made clear, the fact that "better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes." *Bayer*, 874 F.3d at 1327.

41

Finally, Novartis argues that the Board erred in relying on Mr. Koller because evidence cited in his declaration purportedly refutes his opinion. Opening Br. 40-42. Specifically, Novartis argues, for the first time on appeal and without any supporting expert testimony, that Figure 1 of Schoenknecht does not support Mr. Koller's opinion that a POSITA would have expected the forces for a PFS to increase over time. *Id.* As shown below, however, the graphs in Figure 1b clearly show an increase in break-out (*i.e.*, break loose) force after storage, and supports Mr. Koller's testimony that most PFS "are expected to experience ***some level*** of force increase over the shelf-life…." Appx6620-6621, ¶ 39 (emphasis added).



Appx3986, Figs. 1a, 1b (annotated)

In any event, the Board did not rely solely on Mr. Koller's declaration to conclude that the increase in force would not have deterred a POSITA from using

Boulange's Stopper C. As explained above, the Board articulated three independent reasons, each sufficient to support its conclusion. *See supra* Section Argument I.A.1.a. Therefore, the Court should reject Novartis's argument.

### B. Substantial Evidence Supports the Board's Conclusion that a POSITA Would Have Had a Reasonable Expectation of Success in Combining Sigg and Boulange

Substantial evidence supports the Board's finding that a POSITA would have had a reasonable expectation of success in combining Sigg and Boulange. At the outset of its analysis, the Board reiterated its claim construction for "'terminally sterilized,' as the sterilization of the outside of a pre-filled syringe (*i.e.*, primary packaging component) while *minimizing contact* between the drug product within the pre-filled syringe and the sterilizing agent being applied." Appx62. The Board emphasized that the specification contemplates "some amount of contact between the drug product within the pre-filled syringe and the sterilizing agent" so long as it does not "cause unacceptable modification of the ophthalmic solution." Appx62-63. Under this construction, which Novartis did not dispute, the Board found that "Boulange's pre-filled syringe would have been compatible with Sigg's terminal sterilization method (VHP) and a POSITA would have reasonably expected the combination to work[.]" Appx62.

In reaching its conclusion, the Board credited "Mr. Koller's testimony that it was standard in the art to design pre-filled syringes like those in Boulange to be gas-

tight to protect the drug product from degradation during its shelf life" and to "prevent[] sterilizing gas from entering the syringe." Appx63 (citing Appx3563-3565, ¶ 172; Appx3925, 1:18-21; Appx3927, 3:20-27; Appx3928, 4:21-32). The Board found Mr. Koller's position persuasive because it was supported by explicit disclosures in the prior art, including that "Boulange describes that the 'invention allows to have decreased activation, sustainable and final forces…without having to add lubricant and *while preserving the tightness* of the contact region between said two parts.'" Appx63 (citing Appx3563-3565, ¶ 172; Appx3573-3576, ¶¶ 184-186; Appx3925, 1:14-16; Appx3930, 6:10-14).

The Board's reasonable expectation of success finding was clearly supported by substantial evidence.

### 1. The Court Should Reject Novartis's Argument that a POSITA Would Not Have Known How to Design a Syringe to Withstand Terminal Sterilization

Novartis argues that a POSITA would not have known how to design a syringe to withstand Sigg's terminal sterilization because "it was extremely challenging to terminally sterilize a prefilled syringe without damaging a VEGF antagonist inside," and "Sigg never teaches a skilled artisan *how* to overcome these known technical challenges." Opening Br. 43-45. But the Board considered all the evidence cited by Novartis and Regeneron, and found Regeneron's more persuasive.

44

Specifically, the Board found that a POSITA would have understood Boulange's syringe to be sufficiently gas-tight to withstand terminal sterilization, noting that record evidence "does not demonstrate that any special tightness or specific stopper material, coating, or dimensions, would have been required to achieve terminal sterilization."    Appx64-65 (citing Appx6626-6627, ¶ 49; Appx10861, 109:1-13; Appx10865, 113:10-17; Appx10872, 120:17-22; Appx6626-6627, ¶¶ 48-49, Appx6632-6633, ¶¶ 59-61; Appx3563-3565, ¶ 172; Appx3928, 4:21-32; Appx11537, 71:3-8; Appx13052, ¶ 9;).  Novartis's request that this Court reweigh the evidence the Board already considered is improper on substantial evidence review.  Indeed, even where "two different, inconsistent conclusions may reasonably be drawn from the evidence … an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002).

Additionally, to the extent that Novartis's argument that "Sigg never teaches a skilled artisan *how* to overcome these known technical challenges" is an attempt to revive its failed argument that Sigg is not enabling, substantial evidence supports the Board's finding that Sigg was in fact enabling.  Opening Br. 44-45.  The Board supported its conclusion with references to Mr. Koller's extensive analysis, and explicit disclosures in Sigg and other prior art.  *See e.g.*, Appx65-68 (citing

Appx271, 10:5-7; Appx3504-3513, ¶¶ 78-89, Appx3521-3522, ¶ 108; Appx6635-6638, ¶¶ 66-71; Appx1172-1173; Appx13052, ¶ 9).

In addition to relying on ample prior art and supporting testimony, the Board correctly found that Novartis's arguments were inconsistent with its representations to the USPTO during prosecution of the'380 Sigg Application. Appx69-70 (citing Appx13052). Specifically, Dr. Sigg submitted a sworn declaration during prosecution in 2013 that "the present application disclosed … that it is possible to obtain **sufficient sterilization** of the outer surface of a syringe in secondary packaging **at ambient pressure**." Appx13052, ¶ 9 (emphasis added). Faced with Sigg being used as prior art against the '631 Patent, Dr. Sigg swore the opposite before the Board in this proceeding—stating that he knew by 2011 that the VHP sterilization method in Sigg would not work. Appx22005-22006, ¶ 40. The Board did not overlook this blatant inconsistency, and concluded that Dr. Sigg's IPR testimony was "not credible." Appx70.

Yet, even in this appeal, Novartis continues to take a position that directly contradicts Dr. Sigg's sworn declaration to the USTPO—that Sigg does not disclose terminal sterilization performed at ambient pressure. Opening Br. 51. The Court should defer to the Board's credibility determination and reject Novartis's repeated attempts at doublespeak.

46

CONFIDENTIAL INFORMATION OMITTED

### 2.    The Board Did Not Impermissibly Rely on Confidential Information Regarding Macugen PFS

Novartis argues that the Board impermissibly relied on confidential information concerning Macugen PFS to find a reasonable expectation of success. Opening Br. 45-47.  But the Board properly relied on Macugen PFS—not as prior art—but as supporting evidence "relevant to the knowledge base of the POSITA." Appx71.  The Board's reliance on Macugen PFS was therefore proper because "non-prior art evidence of what was known … can be relied on for their proper supporting roles."  *Yeda*, 906 F.3d at 1041 (internal quotation marks omitted).

Novartis also contends that confidential aspects of Macugen PFS are not part of the general "knowledge base."  Opening Br. 46.  But the Board specifically rejected this argument because the evidence of record indicated that "the inventors of the '631 patent pursued VHP sterilization at least in part because they knew it was 'commercial information.'"  Appx72 (quoting Appx13176).  Moreover, other aspects of Macugen PFS were disclosed in prior art publications of record.  *See* Appx5802 (2004 Macugen Label disclosing a "rubber stopper"); Appx3962 (2008 Macugen label describing PFS supplied in "sterile foil pouch").  Macugen PFS had unquestionably been on sale and in use in the U.S. before the '631 Patent, and any POSITA would have had access to learn its characteristics.  Appx3549-3552, ¶¶ 148-

153; Appx5130-5131, ¶¶ 28-30.  It was therefore proper for the Board to rely on Macugen PFS as reflecting the knowledge base of a POSITA.

Novartis asserts that in *Yeda*, the "Court **concluded that the Board erred** to the extent it used a non-prior art reference 'in deciding whether a [POSITA] would have had a reasonable expectation of success.'"  Opening Br. 46 (emphasis added). This is false.  The Court in *Yeda* merely acknowledged that the Board had relied on confidential information to reach its conclusion regarding reasonable expectation of success, but did not find that doing so was error.  The Court stated only that "***[t]o the extent that this reliance was error***, we conclude that it was harmless error" because the confidential information "was the last piece of evidence in a lengthy analysis."  *Yeda*, 906 F.3d at 1042 (emphasis added).

As in *Yeda*, the Board here also relied on substantial other printed publication evidence and supporting testimony to find a reasonable expectation of success.  *See* Appx63 (citing Appx3563-3565,  ¶ 172; Appx3573-3576, ¶¶ 184-186; Appx3925, 1:14-21; Appx3927, 3:20-37; Appx3928, 4:21-32; Appx3930, 6:10-14).  Thus, at most the confidential Macugen information "was the last piece of evidence in a lengthy analysis," which was appropriate for the Board to consider.  *Yeda*, 906 F.3d at 1042.

### 3.    The Board Considered Mr. Agallaco's Testimony

Novartis argues that the Board ignored Mr. Agalloco's testimony that terminal sterilization was challenging.    Opening Br. 47.    To the contrary, the Board "recognize[d] that terminally sterilizing a PFS with VHP was technically challenging at the time of invention."    Appx67.    Yet it still concluded, after "[w]eighing the testimony in the final record, and examining all of the evidence," that it was "more persuaded by Mr. Koller's testimony that conducting terminal sterilization of a PFS with VHP in light of the prior art of record would not require undue experimentation."    *Id.* (citing Appx3509-3512, ¶¶ 83-88; Appx6635-6638, ¶¶ 66-71).

### 4.    The Board Properly relied on Mr. Koller's Testimony

Novartis contends that "there are several problems" with the Board's reliance on Mr. Koller's testimony "that it was standard in the art to design pre-filled syringes like those in Boulange to be gas-tight to protect the drug from degradation during shelf life."    Opening Br. 48-51.    But each of the alleged "problems" are improper requests to reweigh evidence the Board already considered.

First, Novartis argues that Boulange's disclosure of tightness pertains only to Stopper B coated with Parylene C, and not Stopper C.    Opening Br. 48-49.    But Novartis ignores key statements in Boulange that indicate otherwise.    For example, Boulange discloses that tightness is achieved by using a stopper made of viscoelastic

material (*i.e.*, rubber).  Appx3925, 1:18-20.  Boulange also discloses that prior to the '631 Patent, syringes for medical use were generally expected to be tight. Appx3930, 6:14-19 ("[I]n a medical device such as a syringe, the piston must be. . . ensuring the tightness with said container.").  Even Novartis admits that Boulange "express[es] a general preference for gas-tightness."  Opening Br. 49.  Therefore, Mr. Koller's testimony that Stopper C would be gas-tight is well-supported by statements in Boulange, and the Board properly relied on it.  Indeed, the Board considered and rejected Novartis's argument and found that Boulange "describes a functional siliconized rubber stopper (Stopper C)," and specifically cited Mr. Koller's explanation as to why a POSITA would have understood Stopper C to be sufficiently gas-tight for terminal sterilization.  Appx64 (citing Appx6626-6629, ¶¶ 48-52; Appx6742-6743, ¶ 264).

Second, Novartis argues that Boulange does not address how to prevent sterilizing gas from ingress through rubber stoppers.  Opening Br. 49-50.  But even if true, the Board determined that Sigg discloses measures to remove sterilizing gas residues.  Appx68 (citing Appx3511-3512, ¶ 88); *see also* Appx6755-6757, ¶¶ 290-292 (explaining that Sigg discloses methods to remove VHP residue).  Thus, any lack of disclosure in Boulange is irrelevant.

Third, Novartis argues that the Board incorrectly dismissed the fact that Boulange teaches aseptic filling because the Board wrongfully concluded that

Boulange makes no reference to aseptic filling.  Opening Br. 50.  To the contrary, the Board thoroughly evaluated and correctly rejected this argument.  Appx64. Indeed, Novartis admits that Boulange never uses the word "aseptic."[12]  Opening Br. 50.

### 5. The Board Correctly Determined that Sigg Teaches Performing Terminal Sterilization at Ambient Pressure

Finally, Novartis argues that the Board's conclusion that all PFSs are designed to be gas-tight during normal storage is irrelevant because Sigg's terminal sterilization methods are performed "under pressure extremes."  Opening Br. 50-51. Novartis's argument is misguided, however, because the Board concluded with substantial evidence support that Sigg's method can be performed under ambient pressure.  Appx64-65 (citing Appx11537, 71:3-8; Appx13052, ¶ 9; Appx10872, 120:17-22; Appx6632-6633, ¶¶ 59-61; Appx3902, 14:3-6, 9-11, 18-20).

Specifically, the Board relied on explicit disclosures in Sigg and testimony from several experts.  Appx65.  For example, the Board relied on testimony from Novartis's expert that Sigg's method would not necessarily result in pressure change causing the stopper to move.  *Id.* (citing Appx10872, 120:17-22).  The Board also concluded that Novartis's argument regarding pressure change was "not credible" given that Dr. Sigg swore that "[t]he present application disclosed . . . sterilization

---

[12] Even assuming Boulange implicitly refers to aseptic filling, there is no evidence that Boulange's syringe is incompatible with terminal sterilization.

of the outer surface of a syringe in secondary packaging *at ambient pressure*."
Appx69-70 (quoting Appx13052, ¶ 9) (emphasis added); Appx65 (citing the same).
The Board's finding is therefore supported by substantial evidence and should not
be disturbed.

The evidence Novartis points to does not mandate otherwise. Novartis argues
that "the only vaporized hydrogen-peroxide method that a person of ordinary skill
would have known on the priority date was performed with a vacuum," citing Mr.
Agalloco's deposition testimony. Opening Br. 51 (citing Appx23941-23942, 32:2-
33:3). Mr. Agalloco, however, did not state that *all* VHP methods required a
vacuum. Instead, Mr. Agalloco was discussing a specific VHP method, which
differed from the methods discussed in Sigg. Appx23941-23942, 31:11-33:15; *see
also* Appx11537, 71:3-8. Thus, Mr. Agalloco's testimony does not support
Novartis's argument.

Novartis next points to statements in Sigg that describe applying a vacuum.
Opening Br. 51 (citing Appx3891; Appx3902; Appx3912; Appx23944, 41:10-18
(discussing the relevant portions of Sigg)). But that is only one of several
embodiments in Sigg. Appx3902, 14:9-11 ("*In one embodiment*, leaching … is
prevented by application of a vacuum …."). Novartis ignores Sigg's other
embodiments, in which VHP may be inactivated by "application of ultraviolet rays
to the container." Appx3902, 14:18-20. Mr. Koller explained that other

52

embodiments in Sigg do not require a vacuum, which the Board considered in its decision.  Appx65 (citing Appx6632-6633, ¶ 61).

In sum, substantial evidence supports the Board's conclusion that claim 1 was obvious, and that Novartis's responsive arguments did not demonstrate otherwise.

## II.     Substantial Evidence Supports the Board's Conclusion that Claim 21 Was Obvious

Substantial evidence supports the Board's finding that Sigg discloses that VHP can achieve an SAL of $10^{-6}$.  *See* Appx108-111. On appeal, while Novartis frames its arguments for claim 21 as a lack of "motivat[ion] to achieve a sterility assurance level of $10^{-6}$" and a lack of "reasonabl[e] expect[ation] to succeed in" doing so, stripped of its rhetoric, Novartis in fact attacks the Board's finding that Sigg discloses an SAL of $10^{-6}$ using VHP.  Opening Br. 53, 57; *but see id.* 53 ("Sigg never teaches that a sterility assurance level of $10^{-6}$ or greater can be achieved."). As explained below, the Board's rejection of Novartis's argument is well-supported by substantial evidence.

First, the Board found that Sigg discloses achieving an SAL of $10^{-6}$ using VHP because "Sigg defines 'sterility' for a health care product as $10^{-6}$ and describes VHP as a 'sterilization' treatment."  Appx110 (citing Appx3895, 7:6-13; Appx3908, 20:11-16; Appx3607, ¶ 237).  The Board also found that Mr. Koller and Mr. Agalloco persuasively explained that Sigg discloses using VHP to achieve an SAL of $10^{-6}$ because Sigg describes that the "'*required SALs* for health care products are

defined to be at least $10^{-6}$,' which includes syringes." Appx110-111 (citing Appx3895, 7:8-13; Appx6641, ¶ 81; Appx6320-6323, ¶¶ 43-48); *see also* Appx110 (quoting Appx6642, ¶ 82). Indeed, the Board determined that a POSITA would have known an SAL of $10^{-6}$ was based on regulatory requirements and was required for PFS. Appx110 (citing Appx6320, ¶ 43). The Board also relied on the testimony of Mr. Koller and Mr. Agalloco regarding why a POSITA would have expected Sigg's terminal sterilization method to achieve an SAL of $10^{-6}$. Appx108-111 (citing Appx6641, ¶ 81; Appx6320, ¶ 43).

Second, the Board determined that Dr. Sigg's testimony confirmed its interpretation of Sigg. The Board recognized that "Dr. Sigg explained that an SAL of $10^{-6}$ is understood to mean 'sterilization,' while an SAL of $10^{-3}$ is understood to mean 'sanitization,'" and thus, "[b]y using the term 'sterilization' in the Sigg application, Dr. Sigg intended to communicate that the method he developed was able to achieve an SAL of $10^{-6}$." Appx6642, ¶ 82 (citing Appx11529-11530, 63:8-64:5).

Finally, the Board further confirmed its interpretation with reference to the '380 Sigg Application, where Novartis submitted claims directed to "allowing vaporized-hydrogen peroxide … to decontaminate the prefilled syringe to a sterility assurance level of at least $10^{-6}$." Appx111. The Board thus concluded that Novartis had previously represented to the USPTO that Sigg discloses and enables VHP to

achieve an SAL of $10^{-6}$. Appx111. Therefore, substantial evidence supports the Board's finding.

### A.  The Court Should Reject Novartis's Argument that Sigg Does Not Disclose Achieving an SAL of $10^{-6}$ or Greater

Novartis argues that Sigg "never teaches that a [SAL] of $10^{-6}$ or greater can be achieved, without damage to a sensitive VEGF antagonist inside the syringe, *using ethylene oxide or hydrogen peroxide*." Opening Br. 53. But the Board concluded otherwise based on substantial evidence, including explicit disclosures in Sigg and supporting testimony from Mr. Koller, Mr. Agalloco, and Dr. Sigg. Appx110-111 (citing Appx3895, 7:8-13; Appx6641, ¶ 81; Appx6320-6323, ¶¶ 43-48; Appx11529-11530, 63:8-64:5).

Novartis further argues that the Board improperly relied on Mr. Koller's testimony that "sterilization" refers to an SAL of $10^{-6}$ and "sanitization" refers to an SAL of $10^{-3}$ because Sigg uses "sterilization" and "sanitization" interchangeably. Opening Br. 54-55. According to Novartis, this was error because an expert's declaration cannot alter the meaning of terms defined in the specification. Opening Br. 55. But this is not an issue of claim construction; it is a question of how a POSITA would understand the prior art. Here, the Board properly relied on Mr. Koller's declaration to inform that view—a conclusion reviewed for substantial evidence. *In re Inland Steel Co.*, 265 F.3d 1354, 1361 (Fed. Cir. 2001). In any event, Novartis's argument fails because the Board concluded that Sigg discloses an

SAL of $10^{-6}$ using VHP based on explicit disclosures in Sigg. The Board's citation to Mr. Koller's testimony regarding the difference between sterilization and sanitization served only as further support. Appx110.

Novartis also argues that the Board improperly relied on the prosecution history of the '380 Sigg Application because the amended claims were proposed after the priority date of the '631 Patent. Opening Br. 56-57. This argument fails. The Board properly considered the prosecution history in assessing the credibility of Novartis's argument and Dr. Sigg's IPR testimony, both of which are blatantly inconsistent with representations Novartis made during prosecution of the '380 Sigg Application. Appx70 (Board finding that "the inventor's new testimony is not credible."); Appx111 ("We find the about-face in this proceeding unpersuasive").

The Board did not rely on the 2014 amendment as prior art, but rather as evidence that Novartis previously represented that Sigg, which *is* prior art, discloses using VHP to achieve an SAL of $10^{-6}$. Appx111. Critically, Novartis does not dispute that the 2014 amendment directly contradicts its position before the Board and in this appeal. That leads to only one conclusion: Novartis misrepresented the disclosure of Sigg to the USPTO during prosecution or during the IPR.

Novartis also argues that the 2014 amendment is irrelevant because the Examiner rejected it and Novartis later abandoned the application.[13]  Opening Br. 57, n.11.  But the Examiner rejected the 2014 amendment because the claims were obvious.  Appx13136 ("[A POSITA] would have ***found it obvious to have achieved a sterility assurance level of at least*** $10^{-6}$….") (emphasis added).  The rejection thus cannot support Novartis's argument that Sigg fails to disclose an SAL of $10^{-6}$, but it clearly supports the Board's conclusion that claim 21 would have been obvious.

## B.    The Court Should Reject Novartis's Argument that a POSITA Would Have Lacked a Reasonable Expectation of Success in Achieving an SAL of $10^{-6}$

Novartis argues that the Board ignored Mr. Agalloco's testimony that terminal sterilization was challenging as of 2012 in concluding that a POSITA would have had a reasonable expectation of success in achieving an SAL of $10^{-6}$.  Opening Br. 58-59.  The Court should reject this argument because it is not supported by the record.  Novartis quotes a portion of Mr. Agalloco's deposition testimony stating that "it can sometimes take 'extensive experimentation to try to make a particular method work to give you a $10^{-6}$ SAL.'"  Opening Br. 58 (quoting Appx23962, 113:11-114:9).  But Novartis conveniently left out Mr. Agalloco's subsequent testimony that "sometimes it's rather simple."  Appx23962, 114:7-8.

---

[13] Novartis's reliance on *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) is misplaced because the case pertains to judicial estoppel, which is not at issue here.

In any event, as explained above, the Board appreciated the difficulty in terminal sterilization, but still found that a POSITA would have had a reasonable expectation of success in achieving an SAL of $10^{-6}$ after balancing all the evidence. *See supra* Section Argument I.B.3.

\* \* \*

Therefore, substantial evidence supports the Board's conclusion that Sigg discloses achieving an SAL of $10^{-6}$ using VHP and that a POSITA would have reasonably expected to succeed in doing so.

## III. Substantial Evidence Supports the Board's Secondary Considerations Analysis

The Board found that Novartis failed to show that secondary considerations overcame the strong evidence of obviousness. As explained below, the Board's findings are supported by substantial evidence, which this Court should affirm.

### A. Substantial Evidence Supports the Board's Findings as to Each Factor

The Board concluded that secondary considerations did not shield the challenged claims from obviousness after providing detailed analyses of each factor. Appx74-99. The Board first examined evidence relating to Lucentis PFS, and found that Novartis failed to show a nexus between Lucentis PFS and the challenged claims. Specifically, the Board found that Lucentis PFS comprises significant unclaimed features, including an allegedly novel plunger rod, stopper, and tip cap,

and the use of baked-on siliconization. Appx75-80 (citing Appx22006-22008, ¶¶ 42, 46-48; Appx21279-21281, ¶¶ 104-106; Appx15463, Appx15489; Appx6650-6652, ¶¶ 102, 104; Appx18132; Appx22142; Appx13362, ¶ 52; Appx22121-22122, ¶ 36; Appx14313; Appx22125, Appx22132; Appx3495-3497, ¶¶ 65-66; Appx20958-20959, 142:17-143:2). The Board also concluded that the '631 Patent claims are broader than Lucentis PFS, and that embodiments within the scope of the claims would likely not be commercially successful. Appx80-81 (citing Appx6648-6650, ¶¶ 98-99; Appx21679, ¶ 57; Appx9342-9343, 112:13-113:4; Appx9476-9477, 18:21-19:5; Appx9539-9540, 81:1-82:8); Appx86 (finding that Beovu PFS, allegedly within the scope of the claims, would not be successful).

After determining that Lucentis PFS is commercially successful and practices certain challenged claims, the Board nevertheless found that such commercial success was not due to a novel claimed feature and therefore could not support patentability. Appx82-90. Specifically, the Board found that: (1) Lucentis PFS's commercial success was due to significant unclaimed features (Appx83 (citing Appx21279-21280, ¶¶ 104-105; Appx22007-22008, ¶¶ 46-48)); (2) physicians use Lucentis PFS due to its convenience, which was a prior art feature of a PFS (Appx84-85 (citing Appx22118, ¶ 31; Appx9732-9733, 115:8-14, 115:22-116:18; Appx6994-6997, ¶¶ 30-34)); (3) a significant portion of Lucentis PFS success is attributable to its active ingredient ranibizumab, which is not specifically claimed by most

challenged claims (Appx85-87 (citing Appx9634, 17:19-20; Appx9732-9733, 115:22-116:18; Appx6649-6650, ¶ 99; Appx3703; Appx6997-6998, ¶¶ 34-35; Appx10970, 58:5-15)); (4) the challenged claims cover ranges of silicone oil that would likely be unsuccessful (Appx87 (citing Appx9340, 110:2-17)); and (5) there lacks a nexus between the commercial success and the challenged claims (Appx87-89 (citing Appx7084-7089, ¶¶ 32-38; Appx21818-21825, ¶¶ 38-42)). Based on this extensive analysis, the Board concluded that commercial success did not support non-obviousness. Appx82-90.

The Board next examined evidence concerning long-felt need and failure of others. In particular, the Board determined that evidence related to Macugen, BD, and Genentech weighed slightly in favor of patentability, while evidence relating to EYLEA PFS was neutral. *See* Appx91-93 (evidence relating to Macugen PFS and BD slightly supporting patentability) (citing Appx3556-3558, ¶¶ 163-164; Appx20644, 44:19-21; Appx13356-13357, ¶ 42; Appx6071; Appx14404-14405; Appx11649-11650, ¶¶ 3-5; Appx9762-9767); Appx93-94 (evidence relating to Eylea PFS neutral); Appx94-96 (evidence relating to Genentech's attempt to develop a Lucentis PFS slightly favors patentability) (citing Appx6329-6331, ¶¶ 58-59; Appx21587-21589,  ¶¶ 51-55, Appx21600-21603, ¶¶ 83-88, Appx21605, ¶ 94; Appx23938, 18:18-20:11; Appx11344-11347, 132:16-135:3, Appx11362-11366,

CONFIDENTIAL INFORMATION OMITTED

150:6-154:2; Appx16514; Appx16093; Appx21994-21999, ¶¶ 5-18; Appx20853, 37:1-13).

The Board next found that evidence concerning alleged skepticism was neutral. Appx97-98. Specifically, the Board found that Novartis's proffered evidence—a statement by Vetter purportedly showing unwillingness to reduce silicone oil below ████ µg —does not show skepticism because claim 1 covers up to about 100 µg silicone oil. *Id.* (citing Appx22001-22003, ¶¶ 24-26, 28; Appx18334-18335; Appx18338-18341; Appx6656-6658, ¶¶ 117-120; Appx11567-11569, 101:9-103:3; Appx9791-9793; Appx18339).

The Board also analyzed Genentech's license to the '631 Patent, and found that the license had no nexus to the challenged claims. Appx98-99 (citing Appx16863; Appx6659-6665, ¶¶ 124-132; Appx7105-7115, ¶¶ 54-58; Appx22010-22011, ¶ 53. Specifically, the Board found that the Genentech license encompasses "████ intellectual property ████" and "is directed to data and know-how for FDA approval that are not disclosed in the '631 patent." Appx98-99 (citing Appx16863, Appx16872-16876, Appx16884; Appx6659-6665, ¶¶ 124-132; Appx7105-7115, ¶¶ 54-58; Appx22010-22011, ¶ 53).

After considering and weighing each factor in detail, the Board concluded that the "stronger evidence of obviousness cannot be overcome with the weaker evidence of long-felt need and failure of others." Appx100.

**B.     The Court Should Reject Novartis's Argument That Evidence of Licensing and Commercial Success Supports Patentability**

Novartis argues that the Board improperly discounted evidence of licensing and commercial success, and that the Board applied a flawed analysis as to nexus. Opening Br. 59-62.  To the contrary, the Board considered all relevant evidence, and reached its conclusion based on substantial evidence.  *See supra* Section Argument III.A.  Novartis offers no sound reason to disrupt the Board's findings.

First, Novartis argues that the unclaimed features are not meaningful in themselves, and that the Board's reasoning "essentially demanded perfect correspondence between the claims and the Lucentis prefilled syringe."  Opening Br. 64-65.  Not so.  The Board's finding is consistent with this Court's precedent that "'if the commercial success is due to an unclaimed feature of the device' or 'if the feature that creates the commercial success was known in the prior art, the success is not pertinent.'"  *Ethicon*, 812 F.3d at 1034 (internal citations omitted).  In *Ethicon*, the Court affirmed the Board's finding of no nexus because the product contained numerous unclaimed features such as "ergonomic design, precise articulation…staple line strength[,] and superior leak resistance."  *Id.* (internal quotation marks omitted).  The unclaimed features cited by the Court in *Ethicon* are no more "meaningful in themselves" than the unclaimed features of the Lucentis PFS, which Novartis had "touted as innovations and deemed important to both

terminal sterilization and commercialization." Appx75 (citing Appx22006-22008, ¶¶ 42, 46-48; Appx21279-21280, ¶ 104).

Novartis states in a footnote that the unclaimed features of Lucentis PFS were developed by the named inventors. Opening Br. 64-65, n.12. That is irrelevant: there is no dispute that these features are unclaimed. Indeed, Novartis admits that "the unique stopper and plunger rod of the Lucentis syringe [] are described" but not claimed. *Id.* Novartis also admits that certain unclaimed features, including tip cap and baked-on siliconization were known. *Id.* The case law is clear—"if the commercial success is due to an unclaimed feature of the device or if the feature that creates the commercial success was known in the prior art, the success is not pertinent." *Ethicon*, 812 F.3d at 1034 (internal quotation marks omitted).

Second, Novartis argues that Regeneron failed to disprove that the claimed features of the '631 Patent contributed to the success of the Lucentis PFS. Opening Br. 65-66. But the Board made that exact finding: "there is no persuasive evidence in the final record that Lucentis PFS was commercially successful primarily because of the claimed features." Appx83. Notably, while Novartis alleges that "[t]he idea that *no part* of that commercial success is due to features claimed in the '631 patent is fanciful," Novartis never identified *any* specific claimed features that contributed to Lucentis PFS's commercial success, other than the PFS presentation itself. Opening Br. 66; Appx835-836 ("The launch of the PFS presentation . . . caused sales

to climb higher…."). But as the Board correctly found, the PFS presentation and its convenience are not novel features. Appx84-85 (citing Appx22118, ¶ 31; Appx9732-9733, 115:8-14, 115:22-116:18; Appx6994-6997, ¶¶ 30-34).

Third, Novartis argues that the Board erred in finding that the Genentech license has a weak nexus. Opening Br. 66-67 (citing *Institut Pasteur & Université Pierre & Marie Curie v. Focarino*, 738 F.3d 1337, 1347 (Fed. Cir. 2013)). In *Pasteur*, however, the Court found that the Board erred by discounting evidence of licensing based on a "theoretical possibility" that the licensees intended to gain access to technology described in the patent but not claimed. 738 F.3d at 1347. The same cannot be said here, where substantial evidence supports the Board's finding that the Genentech license predominantly focuses on subject matter not claimed. *See supra* Section Argument III.A; Appx98 (citing Appx16863; Appx6659-6665, ¶¶ 124-132; Appx7105-7115, ¶¶ 54-58); Appx99 (citing Appx6659-6660, ¶ 125; Appx16884; Appx22010-22011, ¶ 53).

## C. The Court Should Reject Novartis's Argument that the Board Improperly Weighed Secondary Considerations

Novartis next argues that the evidence of long-felt need and failure of others, standing alone, mandates a finding of nonobviousness. Opening Br. 68-69. Specifically, Novartis points to Macugen PFS's high silicone oil content and Genentech's abandoned attempt to develop a Lucentis PFS. *Id.* Notably, Novartis's

CONFIDENTIAL INFORMATION OMITTED

*only* alleged long-felt need was for a PFS with low silicone oil amount.  Appx837-838.

The Board gave such evidence its due weight.  It found that evidence relating to Macugen PFS only slightly favors patentability because "evidence of problems attributable to silicone oil causing intravitreal contamination in Macugen PFS is scant…." Appx92.  The Board also noted that the alleged long-felt need of reducing silicone oil in the drug formulation is not fully met by the '631 Patent claims because they do not claim baked-on siliconization or anything that prevents silicone oil from being "introduced into a PFS via the stopper and filling process."  Appx96-97 (citing Appx21692, ¶ 80; Appx21700-21701, ¶ 91; Appx6653-6654, ¶¶ 110-112; Appx10774-10775, 22:2-23:14; Appx10787-10788, 35:20-36:6; Appx11409-11412, 32:18-35:16; Appx3493-3496, ¶¶ 63-65; Appx3558-3559, ¶ 165).[14]

As to evidence relating to Genentech, the Board recognized that such evidence is favorable to Novartis because Genentech abandoned the project partly due to ▮result▮ ▮result▮.  Appx95 (citing Appx23938, 18:18-20:11).  But the Board also found

---

[14] Novartis argues that the Board's statement relating to baked-on siliconization "makes no sense" because baked-on siliconization was disclosed in the prior art, but Genentech did not succeed in developing a PFS.  Opening Br. 69.  But Novartis mischaracterizes the Board's reasoning.  The Board explained that baked-on siliconization achieved a syringe that avoided silicone oil contamination, but is not claimed in the '631 Patent.  Appx97.  Therefore, the Board rightly concluded that the challenged claims failed to satisfy the need of avoiding silicone contamination.

CONFIDENTIAL INFORMATION OMITTED

that the failure is entitled to limited weight because ███████ does not necessarily

translate to a failure to reduce silicone oil levels.  Appx96.

The Board properly weighed the evidence, and correctly concluded that the

"stronger evidence of obviousness cannot be overcome with the weaker evidence of

long-felt need and failure of others."  Appx100.  The Board's well-reasoned

conclusion should not be disturbed. *Merck Sharp & Dohme Corp. v. Hospira, Inc.*,

874 F.3d 724, 731 (Fed. Cir. 2017) (reviewing for clear error lower court's

determination that "evidence of commercial success could not overcome the weight

of the evidence" of obviousness).

## <u>CONCLUSION</u>

The Court should affirm the Board's determination that all claims of the '631

Patent were unpatentable as obvious.

Dated: July 26, 2023                    Respectfully submitted,

                                        */s/Anish R. Desai*
                                        Anish R. Desai
                                        Elizabeth S. Weiswasser
                                        Adam B. Banks
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, NY 10153
                                        (212) 310-8000

                                        Christopher M. Pepe
                                        Priyata Y. Patel
                                        WEIL, GOTSHAL & MANGES LLP
                                        2001 M Street, NW, Suite 600
                                        Washington, DC 20036
                                        (202) 682-7000

                                        *Counsel for Appellee Regeneron*
                                        *Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2023, I served a copy of the foregoing APPELLEE REGENERON PHARMACEUTICALS, INC.'s RESPONSE BRIEF upon counsel of record, by electronic means via the Court's CM/ECF system and email.


Dated: July 26, 2023                    */s/Anish R. Desai*
                                        Anish R. Desai

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned certifies that this brief complies with the type-volume limitations in Fed. Cir. R. 32(b)(1).  Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2), the brief contains 13,999 words as calculated by the "Word Count" feature of Microsoft Word 2016, the word processing program used to create it.  The undersigned further certifies that this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14 point font.

Dated: July 26, 2023                             */s/Anish R. Desai*
                                                 Anish R. Desai

Trials@uspto.gov                                        Paper 113
571-272-7822                              Entered: October 25, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

REGENERON PHARMACEUTICALS, INC.,
Petitioner,

v.

NOVARTIS PHARMA AG,
NOVARTIS TECHNOLOGY LLC,
NOVARTIS PHARMACEUTICALS CORPORATION,
Patent Owner.

————————

IPR2021-00816
Patent 9,220,631 B2

————————

Before ERICA A. FRANKLIN, ROBERT L. KINDER, and
JAMIE T. WISZ, *Administrative Patent Judges*.

KINDER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2021-00816
Patent 9,220,631 B2

## I.    INTRODUCTION

On April 16, 2021, Regeneron Pharmaceuticals, Inc. ("Petitioner" or "Regeneron")[1] filed a Petition to institute *inter partes* review of claims 1–26 (all claims) of U.S. Patent No. 9,220,631 B2 (Ex. 1001, "the '631 patent"). Paper 1 ("Petition" or "Pet."). On October 26, 2021, we instituted the petitioned review (Paper 13, "Institution Decision" or "Inst. Dec.").

Novartis Pharma, AG, et al., ("Patent Owner" or "Novartis")[2] filed a Patent Owner Response (Papers 35, 40[3] "PO Resp.") to oppose the Petition. Regeneron filed a Reply (Papers 72, 73 "Pet. Reply") to the Patent Owner Response. Patent Owner filed a Sur-reply (Papers 92, 93 "Sur-reply") to the Reply. We conducted an oral hearing on July 21, 2022. A transcript has been entered into the record (Paper 112, "Tr.").

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a). This Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 1–26 of the '631 patent. We determine Petitioner has shown by a preponderance of the evidence that those claims are unpatentable.

---

[1] Petitioner identifies Regeneron Pharmaceuticals, Inc. as the real party in interest. Pet. 1.

[2] Patent Owner identifies the named parties (Novartis Pharma AG, Novartis Technology LLC, and Novartis Pharmaceuticals Corporation) as the real parties in interest. Paper 4, 2.

[3] Two papers listed include both the public, redacted, version and the sealed confidential version.

**Regeneron Exhibit 1257.002**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

## II.    BACKGROUND

### A. Related Cases and Proceedings

The '631 patent is involved in two district court cases.  Pet. 1–2.  On June 19, 2020, Patent Owner filed a complaint[4] in the United States District Court for the Northern District of New York (NDNY) alleging that Petitioner infringes at least claim 1 of the '631 patent.  Pet. 2 ("parallel district court litigation").  On July 17, 2020, Regeneron filed a complaint[5] in the Southern District of New York (SDNY) against Novartis and Vetter Pharma International GmbH seeking judgment that (i) Novartis's and Vetter's conduct violates Section 1 of the Sherman Act, (ii) Novartis's conduct violates Section 2 of the Sherman Act, and (iii) the '631 patent be declared unenforceable.  Pet. 2–3 ("antitrust litigation").

On June 19, 2020, Novartis filed a complaint at the International Trade Commission ("ITC") alleging that Regeneron infringes claims 1–6 and 11–26 of the '631 patent.  Pet. 1–2 ("ITC Investigation").  On April 8, 2021, Novartis filed a motion to terminate the ITC Investigation on the basis of withdrawal of the complaint.  Pet. 2; Ex. 1006.  On April 8, 2021, the Administrative Law Judge issued an initial determination terminating the ITC Investigation.  Ex. 1010.

On July 16, 2020, Petitioner filed petitions in IPR2020-01317 (IPR'1317) and IPR2020-01318 (IPR'1318) challenging claims 1–26 of

---

[4] Novartis Pharma AG et al. v. Regeneron Pharms., Inc., No. 20-cv-690 (N.D.N.Y.) (filed Jun. 19, 2020).
[5] Regeneron Pharms., Inc. v. Novartis Pharma AG et al., No. 20-cv-5502 (S.D.N.Y.) (filed July 17, 2020).

**Regeneron Exhibit 1257.003**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

the '631 patent.  Pet. 2.  On December 2, 2020, Petitioner filed a motion to

terminate IPR'1318 and the Board issued an order terminating the

proceeding on December 7, 2020.  On January 15, 2021, the Board exercised

its discretion under 35 U.S.C. § 314(a) and denied institution of IPR'1317

based on the ITC Investigation that was co-pending at that time.

### B. The '631 Patent

The '631 patent is titled "Syringe."  Ex. 1001, code (54).  The '631

patent "relates to a syringe, particularly to a small volume syringe such as a

syringe suitable for ophthalmic injections."  *Id.* at code (57).  The U.S.

application resulting in the '631 patent was filed on January 25, 2013 (*id.*

at code (22)), and identifies multiple purported foreign priority applications,

the earliest of which was filed in July 2012[6] (*id.* at code (30)).

The Specification notes that for small volume syringes intended for

eye injections, sterilization can present issues that are not necessarily

associated with larger syringes.  *Id.* at 1:22–30.  Further, certain therapeutics

are particularly sensitive to sterilization techniques, thus it is important for

the syringe to remain robustly sealed but also easy to use in that the force

required to depress the plunger to administer the medicament must not be

too high.  *Id.* at 1:31–40.

---

[6] Patent Owner contends that the claims are entitled to a priority date of July
3, 2012.  PO Resp. 7.  Whether the claims are entitled to the July 3, 2012
priority date, or to the date of October 23, 2012 (Ex. 1003 ¶ 20) alleged by
Petitioner, makes no difference in our ultimate patentability determination.

4

Regeneron Exhibit 1257.004
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Figure 2 of the '631 patent, reproduced below, illustrates a cross section through the syringe. *Id.* at 10:60–67.



Fig 2

Figure 2 (above) depicts a cross section of a top down view of a syringe. *Id.* at 10:48–49.

As described, syringe 1 comprises body 2, stopper 10 and plunger 4. *Id.* at 10:61–67. Syringe 1 extends along first axis A, and body 2 comprises outlet 12 at outlet end 14. *Id.* Stopper 10 is arranged within body 2 such that front surface 16 of stopper 10 and body 2 define variable volume chamber 18. *Id.* Variable volume chamber 18 contains injectable medicament 20 comprising an ophthalmic solution comprising a VEGF antagonist. *Id.* at 10:67–11:2. Injectable fluid 20 can be expelled though outlet 12 by movement of stopper 10 towards outlet end 14 thereby reducing the volume of variable volume chamber 18. *Id.* at 11:3–5.

*C. Challenged Claims*

The '631 patent includes twenty-six claims, and Petitioner challenges each claim. Claim 1 is illustrative and reads as follows:

5

Regeneron Exhibit 1257.005
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

> 1. A pre-filled, terminally sterilized syringe for intravitreal injection, the syringe comprising a glass body forming a barrel, a stopper and a plunger and containing an ophthalmic solution which comprises a VEGF-antagonist, wherein:
>
> a) the syringe has a nominal maximum fill volume of between about 0.5 ml and about 1 ml,
>
> (b) the syringe barrel comprises from about 1 µg to 100 µg silicone oil,
>
> (c) the VEGF-antagonist solution comprises no more than 2 particles >50 µm in diameter per ml and wherein the syringe has a stopper break loose force of less than about 11N.

Ex. 1001, 19:2–13. Claim 24 is "[a] method of treating a patient . . . using a pre-filled syringe according to claim 1." *Id.* at 20:29–38.

### D.  *Asserted Grounds of Unpatentability*

Petitioner asserts several grounds of unpatentability (Pet. 21–23), which are provided in the table below:

6

**Regeneron Exhibit 1257.006**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

| Claim(s) Challenged | 35 U.S.C. §[7] | Reference(s)/Basis |
|---|---|---|
| 1–3, 5–9, 14–22, 24 | 103(a) | Sigg,[8] Boulange,[9] "and if necessary USP789"[10] |
| 1–3, 5–9, 14–22, 24 | 103(a) | Lam[11] and Boulange |
| 4, 10, 23 | 103(a) | Sigg, Boulange, Fries[12] |
| 4, 10, 23 | 103(a) | Lam, Boulange, Fries |
| 11–13 | 103(a) | Sigg, Boulange, Furfine[13] |
| 11–13 | 103(a) | Lam, Boulange, Furfine |

---

[7] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103. Because the challenged claims of the '631 patent have an effective filing date before the effective date of the applicable AIA amendments, we refer to the pre-AIA version of 35 U.S.C. § 103 in this Decision.

[8] PCT Patent Publication No. WO 2011/006877 (Ex. 1007).

[9] PCT Patent Publication No. WO 2009/030976 (Ex. 1008).

[10] U.S. Pharmacopeia, USP 789, Particulate Matter in Ophthalmic Solutions, USP 34 NF 29 (2011) ("USP789") (Ex. 1019). Petitioner contends that "USP789 demonstrates a POSITA would have known that Sigg and Lam were required to meet the claimed particle amounts. . . . Petitioner's obviousness arguments remain the same if USP789 should be explicitly listed in Grounds 1-10." Pet. 21 n.7.

[11] PCT Patent Publication No. WO 2008/077155 (Ex. 1029).

[12] Arno Fries, Drug Delivery of Sensitive Biopharmaceuticals With *Prefilled Syringes*, 9(5) DRUG DELIVERY TECH. 22 (2009) (Ex. 1012).

[13] PCT Patent Publication No. WO 2007/149334 (Ex. 1021).

7

Regeneron Exhibit 1257.007
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

| Claim(s) Challenged | 35 U.S.C. §[7] | Reference(s)/Basis |
|---|---|---|
| 25 | 103(a) | Sigg, Boulange, 2008 Macugen Label[14] |
| 25 | 103(a) | Lam, Boulange, 2008 Macugen Label |
| 26 | 103(a) | Sigg, Boulange, Dixon[15] |
| 26 | 103(a) | Lam, Boulange, Dixon |

The parties rely on numerous declarations and exhibits relevant to our determination as we examine below.

III.    ANALYSIS

*A. Legal Standards of Obviousness*

Section 103(a) forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).

The question of obviousness is resolved on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art;

---

[14] Internet Archive WayBack Machine, March 7, 2011 Record of Drugs.com, Macugen Prescribing Information, available at https://web.archive.org/web/20110307065238/http://www.drugs.com:80/pro/macugen.html (Ex. 1009).
[15] James A. Dixon, et al. "VEGF Trap-Eye for the treatment of neovascular age-related macular degeneration." *Expert opinion on investigational drugs* 18.10 (2009): 1573–1580 (Ex. 1030).

Regeneron Exhibit 1257.008
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

(2) any differences between the claimed subject matter and the prior art;
(3) the level of ordinary skill in the art; and (4) when available, evidence
such as commercial success, long-felt but unsolved needs, and failure of
others. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18
(1966); *see KSR*, 550 U.S. at 407 ("While the sequence of these questions
might be reordered in any particular case, the [*Graham*] factors continue to
define the inquiry that controls."). The Court in *Graham* explained that
these factual inquiries promote "uniformity and definiteness," for "[w]hat is
obvious is not a question upon which there is likely to be uniformity of
thought in every given factual context." *Graham*, 383 U.S. at 18.

The Supreme Court made clear that we apply "an expansive and
flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415.
Whether a patent claiming the combination of prior art elements would have
been obvious is determined by whether the improvement is more than the
predictable use of prior art elements according to their established functions.
*Id*. at 417. To reach this conclusion, however, it is not enough to show
merely that the prior art includes separate references covering each separate
limitation in a challenged claim. *Unigene Labs., Inc. v. Apotex, Inc*., 655
F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness additionally requires
that a person of ordinary skill at the time of the invention "would have
selected and combined those prior art elements in the normal course of
research and development to yield the claimed invention." *Id*.

A claimed invention may be obvious even when the prior art does not
teach each claim limitation, so long as the record shows why one of skill in
the art would have modified the prior art to obtain the claimed invention.

9

**Regeneron Exhibit 1257.009**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

*See Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1307 (Fed. Cir. 2006).
As a factfinder, we also must be aware "of the distortion caused by hindsight
bias and must be cautious of arguments reliant upon *ex post* reasoning."
*KSR*, 550 U.S. at 421. This does not deny us, however, "recourse to
common sense" or to that which the prior art teaches. *Id.*

### B. Level of Ordinary Skill in the Art

We are faced with the unusual situation where Petitioner advocates for
two different standards for the person of ordinary skill in the art: one level
of skill for the apparatus claims (1–23), and another unique level of skill for
"the method of treating a patient" claims (24–26) of the '631 patent.

Petitioner first contends, with respect to claims 1–23, that

> A person having ordinary skill in the art ("POSITA")
> relevant to the '631 Patent as of July 3, 2012 would have had at
> least an advanced degree (Dipl.Ing, M.S., or Ph.D.), with
> research experience in mechanical engineering, biomedical
> engineering, materials science, chemistry, or a related field, or at
> least 2-3 years of professional experience in one or more of those
> fields.

Pet. 24 (citing Ex. 1003 ¶¶ 30–32). Petitioner also contends that "a POSITA
would have had experience with (i) the design of pre-filled syringes; and (ii)
sterilization of drug delivery devices, including those containing sterilization
sensitive therapeutics." *Id.*

With respect to "method claims 24–26, a POSITA would have an
M.D. with a specialty in ophthalmology." *Id.* (citing Ex. 1003 ¶¶ 30–32;
Ex. 1031 ¶¶ 22–23). Petitioner's declarant, Mr. Horst Koller, explains:

> Claims 24-26 relate to methods of treating a patient
> suffering from eye disease, by administering an ophthalmic

10

Regeneron Exhibit 1257.010
Regeneron v. Novartis
IPR2021-00816

> solution using the pre-filled syringe described in claim 1. Because such intravitreal administration must be performed by an ophthalmologist, it is my opinion that a POSITA with respect to claims 24-26 would be an ophthalmologist with experience administering VEGF-antagonist drugs to patients via the intravitreal route.

Ex. 1003 ¶ 32. Petitioner also provides the declaration of Dr. Szilard Kiss, an ophthalmologist, in support of its contentions with respect to claims 24–26. Ex. 1031 ¶¶ 4–6.

"Patent Owner disagrees with the split definition of POSA proposed by Petitioner, which presumes that a POSA would have had sufficient expertise to single-handedly develop a PFS,[16] or a method of treatment using a PFS, as claimed in the '631 patent." PO Resp. 6. Patent Owner proposes that "a POSA designing a PFS or method of treatment using a PFS would have worked *in collaboration with others* having complementary skills and experience." *Id.* (emphasis added). Similar to Petitioner, Patent Owner further proposes that the person of ordinary skill in the art would have had an advanced degree and at least 2–3 years of professional experience. *Id.* Patent Owner further advocates that "[s]uch a person would have been a member of a product development team and would have drawn upon not only his or her own skills, but also the specialized skills of team members in complementary fields including ophthalmology, microbiology and toxicology." *Id.*

---

[16] PFS stands for pre-filled syringe and it "is a syringe that is packaged and sold with a drug formulation already loaded into the syringe." Ex. 1003 ¶ 36.

11

**Regeneron Exhibit 1257.011
Regeneron v. Novartis
IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

In reply, Petitioner disagrees that a person of ordinary skill in the art would "consult someone with 'specialized skills' in toxicology." Pet. Reply 1. Petitioner further notes that "Novartis previously acknowledged that toxicology was immaterial, as its definition in the ITC investigation included no such requirement." *Id.* (citing Ex. 1253, 18–19).

As both parties recognize, the disagreement in the level of ordinary skill in the art has no bearing on the ultimate determination of obviousness. *See* PO Resp. 7 ("Under either party's proposed POSA definition, however, the challenged claims of the '631 patent would not have been obvious."); Pet. Reply 1 ("the claims would have been obvious under either definition").

Based on the final record, we adopt Petitioner's unique approach for identifying the person of ordinary skill in the art. Specifically, for claims 1–23, the person of ordinary skill in the art would have had at least an advanced degree with research experience in mechanical engineering, biomedical engineering, materials science, chemistry, or a related field, or at least 2–3 years of professional experience. Further, the person of ordinary skill in the art would have had experience with the design of pre-filled syringes and sterilization of drug delivery devices. We recognize that claims 24–26 require administering an ophthalmic solution using the pre-filled syringe described in claim 1, and agree with Petitioner that that a person of ordinary skill in the art for these claims would be an ophthalmologist with experience administering VEGF-antagonist drugs to patients via the intravitreal route.

12

**Regeneron Exhibit 1257.012**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

### C. Claim Construction

Petitioner proposes claim interpretations for several claim terms or phrases. Pet. 24–26. Patent Owner does not object to Petitioner's proposed constructions, or to our preliminary constructions set forth in the Institution Decision. *See* Inst. Dec. 31–34. We address those claim terms in the following discussion.

#### "Stopper Break Loose Force"

Claim 1 requires "the syringe has a stopper break loose force of less than about 11N." In the Petition, Petitioner proposes construing the term "stopper break loose force" to mean "the force required to make the plunger/stopper move from its resting position in the syringe barrel." Pet. 24 (citing Ex. 1003 ¶¶ 47–52, 121). As for timing, Petitioner further argues that "[t]he '631 Patent does not specify when the break loose force is measured (*i.e.*, storage time prior to testing)." *Id.*

Having reviewed the evidence of record, including the Specification of the '631 patent, we find Petitioner's proposed construction persuasive. *See* Ex. 1001, 5:15–21. Mr. Koller also persuasively shows that the term "stopper break loose force," would have been known in the art. Ex. 1003 ¶¶ 47–52; Ex. 1001, 5:34–45. Thus, based on the final record, we are persuaded by Petitioner's proposed construction. We do not find cause to limit the break loose force measurement to any specific time.

#### "Stopper Slide Force"

Claims 14–16 recite "a stopper slide force of less than" a specified amount. Petitioner also proposes construing the related term "stopper slide force" to mean "the force required to sustain movement of the stopper after

13

Regeneron Exhibit 1257.013
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

movement has already begun." Pet. 25 (citing Ex. 1003 ¶¶ 47–52, 121). As for timing, Petitioner further argues that "the '631 Patent does not specify when the stopper slide force is measured (*i.e.*, storage time prior to testing)." *Id.*

Mr. Koller has also persuasively shown that the term "stopper slide force," would have been known in the art. Ex. 1003 ¶¶ 47–52; Ex. 1001, 5:34–45. Based on the final record, we are persuaded by Petitioner's proposed construction. We do not find cause to limit the stopper slide force measurement to any specific time.

"Terminally Sterilized"

Petitioner proposes construing "terminally sterilized." Pet. 25. We agree with Petitioner that the term "terminally sterilized" should be construed because one issue in contention is whether or not the asserted prior art fully enables terminally sterilizing a VEGF antagonist-filled syringe for purposes of an obviousness analysis.

Petitioner first notes that "'[t]erminal sterilization' can refer to sterilizing both the drug product in the container and the surface of the container in a single process." *Id.* (citing Ex. 1003 ¶ 81). Petitioner contends that the '631 patent discloses that in its specific "terminal sterilisation" methods, "[t]he package is exposed to the sterilising gas until the outside of the syringe is sterile," but that "significant amounts of the sterilising gas should not enter the variable volume chamber of the syringe." *Id.* (quoting Ex. 1001 at 9:49–56; 10:2–4) (alteration in original). Petitioner, and Mr. Koller, conclude that "in the '631 Patent 'terminally sterilized' refers to a process whereby the outside of a pre-filled syringe is sterilized,

14

Regeneron Exhibit 1257.014
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

while contact between the sterilizing agent and the drug product within the syringe is minimized." *Id.* (citing Ex. 1003 ¶ 120).

The Specification explains that traditional "[s]terilisation can be achieved by terminal sterilisation in which the assembled product, typically already in its associated packaging, is sterilised using heat or a sterilising gas." Ex. 1001, 1:17–21. The Background section of the Specification also describes a goal "to ensure that while a suitable level of sterilisation is carried out, the syringe remains suitably sealed, such that the therapeutic is not compromised." *Id.* at 1:33–36. In the section of the Specification labeled "Sterilisation," it describes that "a terminal sterilisation process may be used to sterilise the syringe and such a process may use a known process such as an ethylene oxide (EtO) or a hydrogen peroxide ($H_2O_2$) sterilisation process," and "[t]he package is exposed to the sterilising gas until the outside of the syringe is sterile." *Id.* at 9:48–56. Further, the Specification notes that significant amounts of the sterilizing gas should not enter the chamber and then defines what significant amounts encompass. *Id.* at 10:2–7.

Based on the final record, we are persuaded that a person of ordinary skill in the art would understand that the term "terminally sterilized," as used in the '631 patent, includes the sterilization of the outside of a pre-filled syringe (*i.e.*, primary packaging component) while minimizing contact between the drug product within the pre-filled syringe and the sterilizing agent being applied. *See* Ex. 1003 ¶ 120. Notably, the '631 patent recognizes that some amounts of the sterilizing gas may interact with the ophthalmic solution so long as the amount does not "cause unacceptable

15

**Regeneron Exhibit 1257.015**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

modification of the ophthalmic solution within the variable volume chamber." Ex. 1001, 10:5–7.

"About"

The claimed silicone oil ranges (claims 1, 3, 22), break loose force (claims 1, 14), stopper slide force (claims 14–16), and silicone oil thickness (claim 2) use the modifier "about." Petitioner notes that the '631 patent has provided its own definition for the term "about." Pet. 25 (quoting Ex. 1001, 10:24–29). Petitioner argues that for the term "about," it is unnecessary to determine "the outer boundaries of the claimed ranges (e.g., whether 'about 1 µg to 100 µg' encompasses 110 µg, 150 µg, etc.)." Pet. 25–26.

We disagree with Petitioner that it is unnecessary to determine the boundaries of the term "about," because the issue is before us for at least claim 14's requirement of "a stopper slide force of less than about 5N." We, however, agree with Petitioner's remaining argument that the term "about" in relation to a numerical value x is defined by the '631 patent to mean "for example, x±10%." Ex. 1001, 10:24–29.

### D. Obviousness over Sigg, Boulange, and USP789

Petitioner asserts that claims 1–3, 5–9, 14–22, and 24 would have been obvious over Sigg, Boulange, and USP789. Pet. 26–54, 71–74; Pet. Reply 1–17, 21–27. Patent Owner disagrees. PO Resp. 8–39, 46–60; Sur-reply 1–27.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a

16

Regeneron Exhibit 1257.016
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

preponderance of the evidence that claims 1–3, 5–9, 14–22, and 24 are
unpatentable.

### 1.    *Sigg*

Sigg is titled, "Surface Decontamination of Prefilled Containers in
Secondary Packaging." Ex. 1007, code (54). Sigg is directed to "terminal-
sterilization methods suitable for prefilled containers containing sensitive
products, such as biotech (biological) drug solutions." *Id.* at 7:29–8:2. Sigg
explains that the "invention relates to a method and system for terminal
sterilization of the outer surface and/or surface decontamination of prefilled
containers in secondary packaging, wherein the prefilled container contains
a pharmaceutical or biological drug product." *Id.* at 1:5–7.

Sigg notes that prior art sterilization techniques like high temperature
steam and gamma irradiation risked denaturing or chemically modifying
biologic drug solutions. *Id.* at 2:20–29. To solve this problem, Sigg
proposes "treatment of prefilled containers in secondary packaging by an
application of vaporized-hydrogen peroxide, in which vapors are
controllable by certain post-treatment measures." *Id.* at 8:8–13.

Sigg discloses two post-application methods for removing or
inactivating the hydrogen peroxide residue and thereby preventing the
hydrogen peroxide from leaching into the pre-filled syringe: application of a
vacuum to reverse the direction of vapor flow, and inactivation of the
hydrogen peroxide vapors. *Id.* at 3:19–30, 14:9–23. Sigg provides
Example 1, which discloses vaporized $H_2O_2$ (VHP) sterilization of 0.5 mL
syringes filled with a protein solution such as the anti-VEGF antibody
ranibizumab intended for intravitreal injection. *Id.* at 20:10–21:11, 9:11–14;

17

Regeneron Exhibit 1257.017
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Ex. 1003 ¶ 123. The results showed that with respect to byproducts and degradation products "there were no differences between the results of the untreated syringes and with hydrogen-peroxide treated syringes." Ex. 1007, 21:2–3.

## 2. Boulange

Boulange is titled "Medical Device and Smooth Coating Therefor." Ex. 1008, code (54). Boulange discloses several syringes, including pre-filled syringes. *Id.* at code (71), 14:19–21. Boulange also discloses a series of examples in which the break loose and glide forces of syringes internally coated with silicone oil are compared to un-siliconized syringes. *Id.* at 18:15–19:10.

Boulange relates "to a medical device, for example a syringe, comprising at least one smooth coated part, [] for example a container and/or a piston, said parts being able to move one relative to the other, for example translationally and/or rotationally, when the medical device is operated." *Id.* at 1:3–7. Boulange discloses a pre-filled syringe with decreased silicone oil to limit the risk of interaction between the silicone oil and any drug stored in the syringe. *Id.* at 6:10–32 ("with the medical device of the invention, it is possible to decrease the total amount of lubricant, for example silicone oil, that is necessary in such a medical device"). Boulange further discloses that the pre-filled syringe has decreased break loose (activation) and slide (sustainable) forces while preserving a tight seal between the piston and barrel. *Id.*

Boulange describes tests conducted to evaluate break loose and slide forces on 1 mL pre-filled glass syringes with different piston (stopper)

18

**Regeneron Exhibit 1257.018**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

configurations—labeled as A, B1, B2, and C, in Table 1 ("configurations of pistons"). *Id.* at 14 ("Table 1"), 13:11–12 ("[C]ontainer 2 is a glass syringe body accommodating a piston 3"), 14:19–21 ("tests were applied on containers filled with 1 mL of demineralised water"). "Regarding the coated pistons, several surface finishes or roughnesses of the outer surface of coating were tested, as summarized in Table 1 below." *Id.* at 13:19–21.

**Table 1 : configurations of pistons A, B1 and C**

| Piston reference | Viscoelastic substrate | Coating | Coating thickness | Surface finish |
|---|---|---|---|---|
| A (comparative) | Bromobutyl rubber | No | --- | Smooth Ra = 0.7 µm Rt = 11.4 µm |
| B1 (invention) | Bromobutyl rubber | Yes | 3 µm | Smooth Ra = 0.9 µm Rt =12.0 µm |
| B2 (comparative) | Bromobutyl rubber | Yes | 3 µm | Rough Ra = 3.1 µm Rt = 24.0 µm |
| C (comparative) | Chlorobutyl rubber | No | --- | Smooth Ra = 0.7 µm Rt = 11.0 µm |

Table 1 from Boulange shows configurations of pistons A, B1, and C, with column headings of "Viscoelastic substrate," "Coating," "Coating thickness," and "Surface finish." Ex. 1008, 14.

Boulange discloses measurements of "friction force B," which corresponds to the claimed break loose force. *Id.* at 15:6–8 ("the force required, under static conditions, to break the contact . . . between the piston 3 and the container 2"). Boulange also discloses forces S and F, which are slide forces measured at different stopper positions. *Id.* at 15:9–11 ("S is the force . . .

19

Regeneron Exhibit 1257.019
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

for moving the piston 3 . . . measured half way of the piston travel."), 15:13–16 ("F is the force . . . to move the piston 3 when it reaches the end of its travel").

Boulange provides "Example 5," wherein the forces with silicone oil either baked on ("Scenario 1") or sprayed on ("Scenario 2") to the syringe barrel are measured. Ex. 1008, 20:13–21. Boulange discloses baked-on silicone oil was applied to the barrel at "a rate of 40 µg for a surface area of 10 cm$^2$," while spray-on silicone was applied "at a rate of 500 µg for a surface area of 10 cm$^2$." *Id.* at 20:15–21. Boulange's Table 7 discloses that Pistons A and C had certain break loose and slide forces with the baked-on syringes when tested unaged (T=0), while Piston B1 had break loose and slide forces less than 5 N for both the unaged (T=0) and aged (T=1) syringe. *Id.* at 21.

Boulange tested syringes with baked-on silicone oil, where the pistons (A, B1, and C) were also coated with silicone oil. For those syringes, Table 5 discloses break loose and slide forces for Pistons B1 and C for both unaged (T=0) and aged (T=1) syringes.

20

Regeneron Exhibit 1257.020
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

### Table 5 : Activation Gliding Forces, Pistons A, B1 and C

| Silicone/internal surface of container | | 4 µg/cm² | | | 4 µg/cm² | | | 4 µcm² | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Silicone/piston | | 5 µg/cm² | | | 15 µg/cm² | | | 50 µg/cm² | | |
| Force (N) | | B | S | F | B | S | F | B | S | F |
| Piston | A T=0 | 6.6 (0.6) | 5.8 (1.0) | 4.7 (1.0) | 7.2 (0.5) | 6.9 (1.9) | 4.7 (1.9) | 6.6 (0.8) | 6.5 (1.5) | 4.0 (1.5) |
| | A T=1 | 12.0 (2.3) | 8.4 (2.0) | 3.2 (1.3) | 11.0 (0.8) | 8.0 (1.9) | 3.3 (1.0) | 10.7 (1.2) | 6.7 (1.5) | 3.6 (1.7) |
| | B1 T=0 | 2.2 (0.2) | 2.7 (0.4) | 2.7 (0.4) | 2.2 (0.2) | 3.0 (0.6) | 3.0 (0.6) | 2.1 (0.1) | 2.6 (0.5) | 2.6 (0.5) |
| | B1 T=1 | 2.8 (0.3) | 4.3 (1.2) | 4.3 (1.2) | 2.6 (0.6) | 3.3 (0.3) | 3.3 (0.3) | 2.5 (0.2) | 3.4 (0.3) | 3.4 (0.3) |
| | C T=0 | 4.7 (0.4) | 6.5 (0.6) | 4.6 (0.6) | 4.2 (0.3) | 6.0 (0.7) | 4.2 (0.7) | 3.9 (0.5) | 5.2 (0.7) | 4.0 (0.7) |
| | C T=1 | 8.4 (0.6) | 8.3 (1.9) | 4.1 (1.6) | 7.5 (0.6) | 8.3 (1.4) | 4.8 (2.2) | 7.8 (1.1) | 6.2 (1.0) | 3.7 (1.5) |

Petitioner's highlighted Table 5 of Boulange depicts activation and gliding
forces for pistons A, B1, and C.  Pet. 31; Ex. 1008, Table 5.

### 3. USP789

USP789 is a monograph in United States Pharmacopeia.  Ex. 1019.
USP789 is a well-known standard in the art for ophthalmic solutions.
Pet. 36, 45, 59.  Mr. Koller testifies that "[t]he applicable limits on
particulate content are set forth in USP789."  Ex. 1003 ¶ 90 & n.10 ("USP is
a nonprofit scientific organization founded in 1820 that develops and
disseminates public compendial standards for drug products.").  According
to Mr. Koller, although "the USP is not legally binding, it was well known
in the art that USP specifications are de facto requirements for regulatory
approval of a drug product."  Id. ¶ 92 (citing Ex. 1057, 1).  Further,
Mr. Koller opines that "a POSITA would have understood that it is
effectively a requirement for all ophthalmic products to meet the USP789
guidelines, including VEGF-antagonists for intravitreal administration."  Id.
USP789 is also mentioned in the '631 patent, "[i]n one embodiment, the

21

Regeneron Exhibit 1257.021
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

syringe has low levels of silicone oil sufficient to meet USP789." Ex. 1001, 2:1–4, 6:15–30.

According to USP789, ophthalmic solutions are required to contain fewer than 50 particles per mL ≥ 10 μm, fewer than 5 particles per mL ≥ 25 μm, and fewer than 2 particles per mL ≥ 50 μm. Ex. 1019, 6 (citations to added pagination). "Every ophthalmic solution . . . is subject to the particulate matter limits set forth . . . unless otherwise specified." *Id.* at 5.

Petitioner relies on USP789 to demonstrate that a POSITA would have known that Sigg and Lam were required to meet the claimed particle amounts. Pet. 21 n.7. "Petitioner does not believe that USP789 needs to be listed in Grounds 1-10," but nonetheless includes this reference in each ground, "if necessary." *Id.* For example, Petitioner alleges that "[a] POSITA would understand that ranibizumab solution disclosed in Sigg is an ophthalmic solution," and as such, "when making a pre-filled syringe as disclosed in Sigg, a POSITA would have been motivated to comply with the prior art particulate requirements for ophthalmic solutions set forth in USP789." Pet. 36.

Patent Owner notes that it "accepts Petitioner's position that it did not need to list USP 789 in its Grounds because Sigg discloses an 'ophthalmic solution' and a POSA would have understood that USP 789 is a 'de facto requirement for regulatory approval' of an ophthalmic solution." PO Resp. 19 n.3 (quoting Ex. 1003 ¶ 92).

We include USP789 in each asserted ground for clarity and because at least one argument made by Patent Owner relates to USP789.

22

Regeneron Exhibit 1257.022
Regeneron v. Novartis
IPR2021-00816

### 4.     Independent Claim 1

Below, we first set forth Petitioner's arguments and evidence.  Next, we examine Patent Owner's arguments and evidence.  In the following section, we examine each parties' evidence and argument related to the objective indicia of nonobviousness.  Finally, we provide our analysis by examining the totality of the evidence and argument before us.  As explained more below, Petitioner has shown by a preponderance of the evidence that claim 1 would have been obvious over Sigg, Boulange, and USP789.

#### a)     Petitioner's Arguments

[1.a] A pre-filled, terminally sterilized syringe for intravitreal injection

Petitioner contends Sigg discloses terminal sterilization of pre-filled syringes for intravitreal injection. Pet. 40–41 (citing Ex. 1007, 2:15–19 ("[T]here is a strong market need for terminally antimicrobially-treated [*i.e.* sterilized] medical devices, such as prefilled syringes used for intravitreal injections."), 3:8–19, 9:4–14, 12:15–16:21, 20:10–21:11; Ex. 1003 ¶¶ 188–189).

[1.b] the syringe comprising a glass body forming a barrel, a stopper and a plunger

Petitioner relies on Figure 1 of Sigg as evidence of the claimed structure, whereas Figure 1 shows a barrel, stopper, and plunger. Pet. 41 (citing Ex. 1003 ¶ 190).

Regeneron Exhibit 1257.023
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2



Petitioner's annotated and highlighted Figure 1 of Sigg, with the barrel
labeled in green, the plunger labeled in yellow, and the stopper labeled in
red.  Pet. 41.

For the "glass body" limitation, Petitioner argues that it would have been
obvious to use a glass barrel in Sigg because it was a known design option
for ranibizumab and was known to be impermeable to sterilizing gasses.
Pet. 41 (citing Ex. 1003 ¶¶ 124, 191; Ex. 1002, 1274–75 (Patent Owner
explaining during prosecution that "syringes which are prefilled with
biologics are comprised of glass barrels.")).

Alternatively, Petitioner argues that "Boulange discloses a syringe
comprising a glass barrel and a piston (*i.e.*, stopper)."  Pet. 41–42 (citing
Ex. 1008, 9:21–35, 13:11–12; Ex. 1003 ¶ 192).  Petitioner contends that "a
POSITA would understand that the stopper would be coupled to a plunger to
enable the user to advance the stopper during use."  Pet. 42 (citing Ex. 1003
¶ 193).  Mr. Koller provides an annotated Figure 2 of Boulange showing
where the plunger would be coupled to the stopper.  Ex. 1003 ¶ 193.

[1.c] and containing an ophthalmic solution which comprises a VEGF-
antagonist, wherein:

Sigg discloses a pre-filled syringe containing an ophthalmic solution

24

Regeneron Exhibit 1257.024
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

comprising ranibizumab, which is one of the three VEGF-antagonists
identified in the '631 patent. Pet. 43 (citing Ex. 1007, 9:11–14 ("[T]he drug
product is a protein solution, such as ranibizumab."); *see also id.* at 20:17–
21, 24:21–22, 26:10–11; Ex. 1003 ¶¶ 194–195).

[1.d] (a) the syringe has a nominal maximum fill volume of between about
0.5 ml and about 1 ml

Petitioner relies on teachings from both Sigg and Boulange for this
limitation. Pet. 43–44. Petitioner notes that Sigg discloses a syringe with a
nominal maximum fill volume of 0.5 mL. Pet. 43 (citing Ex. 1007, 20:20–
21 ("Filling of 0.5 mL syringes was performed in a sterile lab.")). Relying
on the testimony of Mr. Koller, Petitioner contends that "[i]t also would
have been obvious to use a 0.5 to 1 mL syringe for ranibizumab because
only a small volume of fluid can be injected intravitreally." *Id.* (citing
Ex. 1003 ¶¶ 196; Ex. 1031 ¶ 27; Ex. 1027, 1 (2010 Lucentis Label
describing injection of 0.05 mL of solution)).

Petitioner additionally argues that "Boulange discloses a syringe with
a nominal maximum fill volume of 1 mL." Pet. 43 (citing Ex. 1008, 14:19–
21 ("Activation Gliding Force (AGF) tests were applied on containers filled
with 1 mL of demineralised water."); Ex. 1003 ¶ 197). According to
Petitioner, and Mr. Koller, "[a] POSITA would also understand that 'a
surface area of 10 cm$^2$, disclosed in Boulange is the approximate inner
surface area of a 1 mL syringe." *Id.* at 43–44 (citing Ex. 1008, 20:15–17;
Ex. 1003 ¶¶ 197–198).

25

**Regeneron Exhibit 1257.025**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

[1.e] (b) the syringe barrel comprises from about 1 μg to 100 μg silicone
oil

Petitioner relies on the teachings of Boulange for this limitation.
Pet. 44.  According to Petitioner, "Boulange discloses that for the syringes
with baked-on silicone oil, 40 μg was deposited (*i.e.*, applied) to an internal
surface area of 10 cm$^2$ (*i.e.*, 4 μg/cm2)."  *Id.* (citing Ex. 1008, 20:15–17
("[S]ilicone lubricant was deposited and baked onto the internal surface of
the syringe body 2, at a rate of 40 μg for a surface area of 10 cm$^2$."), 21:1–3
(Table 7 disclosing "4 μg/cm$^2$" for Scenario 1); Ex. 1003 ¶¶ 199–202.
Petitioner relies on Mr. Koller's calculations and concludes that "[a]
POSITA would understand that the rate of application disclosed in Boulange
(4 μg/cm$^2$) would apply to other syringe sizes, and would result in
approximately 28 μg of silicone oil for a 0.5 mL syringe."  Pet. 44 (citing
Ex. 1003 ¶ 200 ("Thus, at a rate of 4 μg/cm$^2$, a total of 27.8, or ~28, μg of
silicone oil, would be applied for a 0.5 mL standard syringe as disclosed in
Sigg using the method of Boulange.")).

[1.f] (c) the VEGF-antagonist solution comprises no more than 2 particles
>50 μm in diameter per ml

As noted above, this particulate content limitation relies on the
industry standard set forth in USP789.  Ex. 1003 ¶¶ 90–92.  Petitioner
contends that "[a] POSITA would understand that an ophthalmic solution, as
disclosed in Sigg, should meet USP789, including comprising no more than
2 particles >50 μm in diameter per ml."  Pet. 44–45 (citing Ex. 1003 ¶¶ 60–
61, 66, 161, 165, 195, 203–205).  Petitioner further contends that
    a POSITA would have had a reasonable expectation that

Regeneron Exhibit 1257.026
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

> combining Sigg and Boulange would satisfy USP789 given that
> Boulange discloses a pre-filled syringe with less than 50 μg of
> silicone oil and is designed to "limit the risk of interaction
> between a lubricant, for example silicone oil, and the therapeutic
> molecules potentially stored in the container."

Pet. 45 (citing Ex. 1008, 6:26–29; Ex. 1003 ¶ 206).

[1.g] and wherein the syringe has a stopper break loose force of less than about 11N.

Petitioner contends that "Boulange discloses a stopper break loose force less than 11 N." Pet. 45 (citing Ex. 1003 ¶¶ 207–209). Petitioner relies on two unique stoppers, either of which would allegedly be acceptable for the combination – stopper B1 (Parylene-C)[17] and stopper C. Pet. 37 ("Boulange discloses multiple stopper configurations that a POSITA would have been motivated to combine with Sigg."), 38–39 (examining stopper C), 45–47; See Tr. 10:1–19 ("Either stopper would be considered acceptable for this combination.")

Relying on the testimony of Mr. Koller, Petitioner argues that a person of ordinary skill in the art would have been motivated to utilize stopper C in Table 5 of Boulange. Pet. 38. Petitioner recognizes that "Boulange states that stopper C in Table 7 'does not appear to be acceptable for a medical device,'" but Petitioner explains that person of ordinary skill in the art "would have understood that is because stopper C in Table 7 did not

---

[17] Because we determine Petitioner's arguments and evidence related to stopper C of Boulange are sufficient to ultimately prove by a preponderance of the evidence that claim 1 is unpatentable, we focus on each party's arguments and evidence related to stopper C, and not stopper B1.

27

Regeneron Exhibit 1257.027
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

include any coating." *Id.* at 38–39 (citing Ex. 1003 ¶ 181). Mr. Koller relies on Table 5 of Boulange, set forth below, which "discloses break loose forces (B) of less than about 11N for stoppers that were coated with silicone oil[] and tested with baked-on syringes having 40 µg of silicone oil (*i.e.*, 4 µg/cm$^2$):" Ex. 1003 ¶ 208.

Table 5 : Activation Gliding Forces, Pistons A, B1 and C

| Silicone/internal surface of container | 4 µg/cm² | | | 4 µg/cm² | | | 4 µcm² | | |
|---|---|---|---|---|---|---|---|---|---|
| Silicone/piston | 5 µg/cm² | | | 15 µg/cm² | | | 50 µg/cm² | | |
| Force (N) | B | S | F | B | S | F | B | S | F |
| Piston  A T=2 | 6.6 (0.6) | 5.8 (1.0) | 4.7 (1.0) | 7.2 (0.5) | 6.9 (1.9) | 4.7 (1.9) | 6.6 (0.8) | 6.5 (1.5) | 4.0 (1.5) |
| A T=1 | 12.0 (2.3) | 8.4 (2.0) | 3.2 (1.3) | 11.0 (0.8) | 8.0 (1.9) | 3.3 (1.0) | 10.7 (1.2) | 6.7 (1.5) | 3.6 (1.7) |
| B1 T=0 | 2.2 (0.2) | 2.7 (0.4) | 2.7 (0.4) | 2.2 (0.2) | 3.0 (0.6) | 3.0 (0.6) | 2.1 (0.1) | 2.6 (0.5) | 2.6 (0.5) |
| B1 T=1 | 2.8 (0.3) | 4.3 (1.2) | 4.3 (1.2) | 2.6 (0.6) | 3.3 (0.3) | 3.3 (0.3) | 2.5 (0.2) | 3.4 (0.3) | 3.4 (0.3) |
| C T=0 | 4.7 (0.4) | 6.5 (0.6) | 4.6 (0.6) | 4.2 (0.3) | 6.0 (0.7) | 4.2 (0.7) | 3.9 (0.5) | 5.2 (0.7) | 4.0 (0.7) |
| C T=1 | 8.4 (0.6) | 8.3 (1.9) | 4.1 (1.6) | 7.5 (0.8) | 8.3 (1.4) | 4.8 (2.2) | 7.8 (1.1) | 6.2 (1.0) | 3.7 (1.5) |

Mr. Koller provides annotated Table 5 depicting activation gliding forces for pistons A, B1, and C with added yellow highlights for certain break loose forces (B) in the 4 µg/cm$^2$ column. *Id.*

Mr. Koller explains that "Table 5 of Boulange discloses stoppers siliconized with 5 µg/cm2 of silicone oil." *Id.* ¶ 208 n.23. Petitioner argues that "Table 5 likewise discloses break loose forces less than 11N for the baked-on syringes with 40 µg of silicone oil (4 µg/cm2) for stoppers B1 and C at T=0 and T=1." Pet. 46.

Petitioner concludes that "[a] POSITA would understand that the break loose forces disclosed in Table 5 and 7 of Boulange would remain the same even with a ranibizumab solution contained in the syringe instead of water because the break loose force is independent of the viscosity of the

28

Regeneron Exhibit 1257.028
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

fluid." Pet. 47 (citing Ex. 1003 ¶ 209).

<u>Reasons for Combining</u>

Petitioner contends that

[a] POSITA would have been motivated to combine Sigg with Boulange to minimize the amount of silicone oil in Sigg's terminally sterilized pre-filled syringe, which would reduce the risk of interaction between the silicone oil and drug product, and minimize the amount of silicone oil that could be transferred to the patient's eye upon administration.

Pet. 31 (citing Ex. 1003 ¶¶ 128, 145–147, 159–167). According to Petitioner and Mr. Koller, "[a] POSITA would have understood that a lubricant is required on the syringe barrel to enable movement of the stopper, and that baked-on and spray-on siliconization were the two known application options." *Id.* (citing Ex. 1003 ¶¶ 54–71). Petitioner reasons that "the combination of Sigg with Boulange also would have been obvious as the use of a known technique (baked-on siliconization) to a known device (pre-filled syringe) that yields a predictable result (reduced amount of silicone oil)." Pet. 31–32 (citing Ex. 1003 ¶ 163).

Petitioner also relies on substantial testimony and evidence showing the known risks of silicone oil for drug products in general, and specifically for intravitreal injections. Pet. 32 (citing Ex. 1003 ¶¶ 159–162; Ex. 1015, 330; Ex. 1013, 4; Ex. 1012, 6). Petitioner contends that "it was well-known that injecting silicone oil into a patients' eye can cause complications," including persistent elevations in intraocular pressure. *Id.* (citing Ex. 1003 ¶¶ 61, 66, 161; Ex. 1025, 11). Petitioner alleges that "by 2010 that it was desirable to minimize the amount of silicone oil in syringes used for

29

Regeneron Exhibit 1257.029
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

intravitreal injection." Pet. 32–33 (citing Ex. 1067, 5; Ex. 1080, 2; Ex. 1003 ¶¶ 159–167).

Based on this evidence and reasons for minimizing the risks of silicone oil for intravitreal injections, Petitioner contends

> a POSITA would have looked to Boulange because it discloses that "it is possible to decrease the total amount of lubricant, for example silicone oil, that is necessary" and limits "the risk of interaction between . . . silicone oil, and the therapeutic molecules potentially stored in the container of the medical device."

Pet. 33 (quoting Ex. 1008, 6:23–29). For these reasons, Petitioner contends that "a POSITA would have been motivated to use the baked-on syringes in Boulange, which utilized approximately one-tenth the silicone oil quantity of sprayed-on syringes, while retaining low break loose and slide forces and a tight seal between the stopper and the barrel." *Id.* at 33–34 (citing Ex. 1003 ¶¶ 163, 185–186).

Petitioner further contends that "[a] POSITA would have had a reasonable expectation of success that the combination of Sigg and Boulange would result in a terminally sterilized pre-filled syringe having silicone oil and forces within the claimed ranges." Pet. 34 (citing Ex. 1003 ¶¶ 182–187). Petitioner provides several reasons, including "Boulange explicitly discloses a 1 mL glass syringe with 40 µg silicone oil (*i.e.*, 4 µg/cm$^2$) and resulting break loose and slide forces of less than 11N and 5N." *Id.* (citing Ex. 1008, 20:15–21:14). Petitioner notes that "[i]t was known that baked-on siliconization applies one-tenth the amount of silicone oil relative to spray-on siliconization (*e.g.*, 40 µg versus 500 µg for a 1.0 mL

30

Regeneron Exhibit 1257.030
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

syringe) with comparable break loose and slide forces," and as such "the claimed forces are nothing more than the quantification of the results of a known process and cannot be used to argue non-obviousness." *Id.* (citing Ex. 1003 ¶¶ 63–71, 182–183). Petitioner also argues "a POSITA would not expect incompatibility between the VHP[18] terminal sterilization disclosed in Sigg and the baked-on syringe disclosed in Boulange," because "Sigg discloses that its VHP process is broadly applicable to pre-filled syringes, and does not affect the contents of the container." *Id.* (citing Ex. 1003 ¶¶ 184–186; Ex. 1007, 9:16–17, 14:27–15:20). "Thus," Petitioner concludes that "a POSITA would have understood that Sigg's terminal sterilization would not impact the siliconization levels or the forces of Boulange because Sigg's VHP method prevents the sterilizing gas from ingressing into the syringe." Pet. 34–35 (citing Ex. 1003 ¶ 184).

Petitioner reasons that "Boulange clearly discloses a pre-filled syringe suitable for Sigg's terminal sterilization method." Pet. 35. Mr. Koller testifies that it was standard in the art to design pre-filled syringes to be gas-tight to protect the drug product from degradation during its shelf life. Ex. 1003 ¶ 172. Petitioner also relies on the teachings of Boulange to show that "a POSITA would have readily understood that Boulange's syringe is designed to be gas-tight, which would prevent any sterilizing gas from entering the syringe," because "Boulange describes that the 'invention allows to have decreased activation, sustainable and final forces . . . without having to add lubricant and ***while preserving the tightness*** of the contact

---

[18] VHP stands for vaporized hydrogen peroxide ($H_2O_2$).

31

Regeneron Exhibit 1257.031
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

region between said two parts.'"  Pet. 35 (quoting Ex. 1008, 6:10–14) (citing Ex. 1003 ¶¶ 172, 184–186).  Petitioner also notes that "Boulange explicitly discloses that its syringe can accommodate a drug product in a gaseous phase," thus demonstrating "that Boulange's syringe was sufficiently tight to prevent gas from exiting or entering the syringe." *Id.* (citing Ex. 1008, 1:14–16; Ex. 1003 ¶¶ 172, 184–186).

As for the motivation to combine Sigg and Boulange with USP789 to arrive at the claimed particulate content, Petitioner contends "[a] POSITA would understand that ranibizumab solution disclosed in Sigg is an ophthalmic solution," and as such, "when making a pre-filled syringe as disclosed in Sigg, a POSITA would have been motivated to comply with the prior art particulate requirements for ophthalmic solutions set forth in USP789."  Pet. 36 (citing Ex. 1003 ¶¶ 90–92, 122–123, 168).

Petitioner also alleges that the person of ordinary skill in the art "would have expected to succeed in combining Sigg and Boulange to meet USP789 requirements."  *Id.*  Petitioner states that "Boulange discloses a pre-filled syringe with silicone oil amounts within the claimed ranges," and "a POSITA would have reasonably expected that the combination of Sigg and Boulange would result in a terminally sterilized pre-filled glass syringe having the claimed silicone oil content and operational forces in conjunction with a VEGF antagonist (*i.e.*, ranibizumab) solution that meets USP789." *Id.* (citing Ex. 1003 ¶¶ 168–170).

Petitioner next argues that although "[t]he '631 Patent includes no limitations regarding the lubrication or coating for the stopper, Boulange discloses multiple stopper configurations that a POSITA would have been

Regeneron Exhibit 1257.032
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

motivated to combine with Sigg." Pet. 37. These include stopper C in
Table 5 of Boulange. Pet. 38. Petitioner contends that "a POSITA would
have been motivated to utilize stopper C in Table 5 of Boulange." Pet. 38.
Petitioner acknowledges that "[a]lthough Boulange states that stopper C in
Table 7 'does not appear to be acceptable for a medical device,' a POSITA
would have understood that is because stopper C in Table 7 did not include
any coating." Pet. 38–39 (quoting Ex. 1008, 21:4–5) (citing Ex. 1003
¶ 181). Mr. Koller testifies that "[a] POSITA would recognize that
Boulange only tested configurations A and C in Table 7 (no coating at all) to
provide a baseline for assessing the improvements that can be attributed to
the use of a Parylene C coating." Ex. 1003 ¶ 181 n.20 (citing Ex. 1008,
21:4–14). Petitioner notes that "[i]n contrast, Table 5 discloses stopper C
with a coating of silicone oil (5 $\mu g/cm^2$), which was conventional in the art."
Pet. 39 (citing Ex. 1003 ¶¶ 178–180). Petitioner further recognizes that
"Boulange describes that stopper C in Table 5 was 'markedly inferior' to
stopper B1 (Ex. 1008 at 19:6–7)," but Petitioner contends "a POSITA would
have understood that the resulting break loose and slide forces for stopper C
would have been suitable for intravitreal injection." Pet. 39 (citing Ex. 1003
¶¶ 178–180; Ex. 1001, 5:31–36 (acknowledging that known pre-filled
syringes used for intravitreal injection had forces less than 20 N)).
Mr. Koller testifies that "the results for Configuration C in Table 5 are
consistent with typical industry expectations," and "[t]he results for
Stopper C in Table 5 are substantially less than 20 N." Ex. 1003 ¶ 180.

　　　　Based on this evidence and testimony, Petitioner argues that
"Boulange's statement that stopper C in Table 5 is inferior cannot constitute

Regeneron Exhibit 1257.033
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

teaching away of the *claimed invention* because the forces for stopper C are
well within the ranges claimed." Pet. 40 (citing *In re Gurley*, 27 F.3d 551,
553 (Fed. Cir. 1994) ("A known or obvious composition does not become
patentable simply because it has been described as somewhat inferior to
some other product for the same use.").

> b)   *Patent Owner's Arguments*

Patent Owner does not necessarily challenge whether the individual
references in the combination teach each element of claim 1. *See* PO Resp.
8–25. Instead, Patent Owner makes several arguments directed to the
combination of references. *See id.* First, Patent Owner argues a person of
ordinary skill in the art (POSITA) would not have been motivated to
combine Sigg and Boulange to arrive at the claimed invention because of the
force profile of Boulange syringe (stopper) C and because Boulange teaches
away from Syringe C. *Id.* at 13–18. Further, Patent Owner contends a
POSITA would not have been motivated to use a solution having no more
than two particles greater than 50 μm in diameter per mL. *Id.* at 18–20.
Patent Owner argues a POSITA would not have had a reasonable
expectation of success because they would not have reasonably expected
Boulange's syringes to be compatible with VHP. *Id.* at 20–25. Patent
Owner also argues that Petitioner has failed to show that Sigg enables a
sterilization method for a PFS. *Id.* at 25–32. Patent Owner relies heavily on
several declarants as discussed below. We highlight each of Patent Owner's

34

**Regeneron Exhibit 1257.034**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

contents in turn.[19]

Patent Owner notes that a POSITA would have balanced the need to minimize silicone oil "with more pressing concerns, such as ensuring that (1) the PFS had sufficiently low break loose forces that remained consistent over time; (2) the VEGF-antagonist did not degrade; and (3) potentially toxic substances were not introduced into the patient's eye." PO Resp. 9; *see also* Tr. 50:1–3 ("For intravitreal injection a person of skill in the art would want a syringe where the forces were low and consistent over time." (citing Ex. 2204 ¶¶ 67, 70, 99) (Declaration of Andrew F. Calman, M.D., Ph.D)).

     i.    Force Profile of Syringe (Stopper) C

Patent Owner contends that a POSITA "would not have been motivated to use Boulange Syringe C in a PFS for intravitreal administration of a VEG-F antagonist because Syringe C has inconsistent forces that increase over time." PO Resp. 8. Patent Owner notes that Boulange makes disparaging statements about stopper C and the data shows that its forces are inconsistent and increasing with time. *Id.* at 13–14. Patent Owner argues that a POSITA "would have known that a PFS for intravitreal injection must maintain consistent, low break loose forces over time to avoid injuring a patient's eye," and Boulange emphasizes the importance of maintaining forces over time, even after storage. *Id.* at 14 (citing Ex. 2204 ¶¶ 67, 70, 99; Ex. 1008, 6).

---

[19] As noted above, because we do not rely on Petitioner's arguments related to Boulange stopper (syringe) B1 (containing Parylene-C), we do not address Patent Owner's arguments related to the same.

Regeneron Exhibit 1257.035
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Examining Boulange Table 5, Patent Owner argues that "while the break loose force for Syringe C was initially 4.7 N, it nearly doubled to 8.4 N within just one month of accelerated storage, which simulated three months of actual storage time." PO Resp. 14 (citing Ex. 1008, 21). Patent Owner alleges that because of this force profile (4.7 to 8.4 N), "Boulange characterizes Syringe C as 'markedly inferior' and not 'acceptable for a medical device.'" *Id.* (quoting Ex. 1008, 19:7, 21:4–5).

Patent Owner contends "that the break loose forces for Syringe C in Table 7 and Table 5 were essentially identical, showing that that the statement of discouragement logically applied to both." PO Resp. 15 (citing Ex. 2001 ¶ 89–90) (Declaration of Karl Leinsing). Patent Owner argues that "[g]iven the data in Table 5 and Boulange's explicit statements, a POSA would not have been motivated to use Syringe C in combination with Sigg." *Id.* Further, Patent Owner notes "that even if the forces were 'acceptable' at $T_0$ and $T_1$, as Mr. Koller argues (Ex. 1003 ¶179), Syringe C could not be used for a PFS for intravitreal injections because the forces are inconsistent over time and may continue to rise over the shelf life of the PFS." *Id.* (citing Ex. 2204 ¶ 72; Ex. 2201 ¶¶ 43–44) (Supplemental Declaration of Karl Leinsing); *see also* Tr. 48:19–49:25 ("[T]he question about the change from 4.7 to 8.4, . . . it's not acceptable because of the one-month aging change. So the magnitude, it's not the magnitude of the numbers, it's the fact that they jump up over one month that Boulange . . . says it's markedly inferior."). For these reasons, Patent Owner argues "[c]onsidered as a whole, Boulange teaches away from Syringe C," and "Boulange would have discouraged a POSA from using Syringe C in a PFS," thus, "Petitioner's

36

Regeneron Exhibit 1257.036
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

argument that a POSA would have been motivated to combine Syringe C
with Sigg must fail." PO Resp. 16, 18 (citing Ex. 2201 ¶ 38–46).

      ii.    2 particles > 50 µm in diameter per ml

As noted above, Petitioner relies on the industry standard set forth in
USP789 to teach the claim requirement of "2 particles > 50 µm in diameter
per ml" (particulate content limitation). *See* Pet. 44–45 ("POSITA would
understand that an ophthalmic solution, as disclosed in Sigg, should meet
USP789, including comprising no more than 2 particles >50 µm in diameter
per ml."). Patent Owner disagrees with this conclusion and argues that
"even if a POSA would have been motivated to comply with USP 789, that
does not mean the POSA would have been motivated to meet this claim
limitation," because USP789 does not require an ophthalmic solution to
meet this particulate content limitation. PO Resp. 19 (citing Ex. 2189,
205:17–20; 208:15–209:6; Ex. 1003 ¶ 205).

Patent Owner contends that "USP 789 provides a two-stage test
approach," and only ophthalmic solutions that fail the first test (no more than
50 particles greater than or equal to 10 µm in diameter per mL) are required
to pass the microscopic method test (the requirement of having no more than
2 particles greater than or equal to 50 µm in diameter per mL). *Id.* (citing
Ex. 1019, 5–6; Ex. 2189, 204:1–205:20). Patent Owner relies on the
statement in USP789 that "[i]t is expected that most articles will meet the
requirements on the basis of the light obscuration test alone." *Id.* (quoting
Ex. 1019, 5). Patent Owner further argues "Petitioner has provided no
motivation for a POSA to have met this claim element," because Petitioner
has not explained "why a POSA would have anticipated that the VEGF-

37

**Regeneron Exhibit 1257.037**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

antagonist solution of Sigg would be among the minority of solutions that fail the first test and are thus subject to the second test with its additional requirement." PO Resp. 20 (citing Ex. 2201 ¶¶ 82–84). Mr. Leinsing similarly testifies that "having fewer than 2 particles greater than 50 μm in diameter per milliliter is not a requirement," and "USP789 only has a specific limit on particles greater than 50 μm in diameter for solutions that fail to satisfy the light obscuration test." Ex. 2201 ¶¶ 82–84.

iii.    Reasonable Expectation of Success – Compatibility of Boulange's Syringes with VHP

Patent Owner questions whether Boulange's syringe could withstand terminal sterilization with VHP when filled with a VEGF-antagonist solution and contends Petitioner failed to establish a reasonable expectation of success. PO Resp. 20. Patent Owner relies on Mr. Koller's cross examination testimony and argues that "not every combination of barrel and stopper would work to protect a sensitive drug product." *Id.* (citing Ex. 2189, 92:4–93:8). Mr. Leinsing testifies that terminal sterilization with VHP is conducted under vacuum and extreme pressure, which can permit gas to pass between the syringe barrel and stopper in a way that does not occur under standard pressure conditions. *See* Ex. 2201 ¶ 49. He further notes that "Boulange mentions nothing about using VHP to sterilize its syringes," and "[n]othing in Boulange suggests that the authors had considered terminal sterilization of any of the syringes they used, or that the syringes would be suitable for terminal sterilization." *Id.* ¶ 65. Mr. Leinsing concludes that "[a] POSA would not assume that any syringe was compatible with VHP sterilization unless specifically designed for that

38

Regeneron Exhibit 1257.038
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

purpose." *Id.*

Patent Owner examines and challenges evidence relied on by Mr. Koller from Boulange that relates to whether a POSITA would have sterilized the syringe by a VHP method. PO Resp. 21–23. Patent Owner first argues that the statement in Boulange that "possible degradation is sometimes initiated by the processes used to sterilize the medical devices containing them," refers only to degradation of the piston, or the stopper, and not the drug product stored in the syringe. *Id.* at 22 (citing Ex. 2189, 182:8–15; Ex. 2201 ¶ 131; Ex. 1008, 4:3–5). Next, Patent Owner addresses Mr. Koller's testimony related to a statement in Boulange that "tightness in the region of contact between the piston and the container can be guaranteed to be maintained." *Id.* (quoting Ex. 1003 ¶ 172 (citing Ex. 1008, 3:20–27)). Patent Owner contends that this statement "has nothing to do with ingress of gases, but rather refers to the ability to ensure that liquid drug product 'escapes only via the distal end of the container' and does not leak out of the back during injection." *Id.* (quoting Ex. 1008, 3:20–27, 6:10–22). Thus, according to Patent Owner, "[a] POSA would have understood that a syringe must be significantly tighter to prevent gaseous ingress during terminal sterilization by VHP than merely to prevent liquid drug product from leaking out." *Id.* (citing Ex. 2201 ¶ 54). Patent Owner argues that other similar statements in Boulange convey "nothing about the syringe's ability to preserve the medical product if sterilized with VHP or other sterilizing gases." *Id.* at 23–24. Patent Owner concludes that "without any indication that Boulange's syringe was designed to permit terminal sterilization by sterilizing gases, a POSA would have had no reason to expect that it would

39

Regeneron Exhibit 1257.039
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

be among the 'very few' syringes tight enough to be amenable to such a process." *Id.* at 24–25 (citing Ex. 2201 ¶ 129).

    iv.    Enablement of Sigg's VHP Method

Patent Owner contends that Sigg is not self-enabled because it fails to identify any syringe designs that can withstand its VHP method, and, neither Mr. Koller's opinions nor the prior art cited by Petitioner supports enablement. PO Resp. 25. Patent Owner, and its declarant, both contend that because "VHP sterilization is performed under vacuum and subjects the PFS to extreme pressure," an enabling disclosure must teach a person of ordinary skill in the art "how to design a syringe for these circumstances." *Id.* at 26 (citing Ex. 2201 ¶¶ 51, 93; Ex. 2189, 51:14–51:13).

Patent Owner dismisses Mr. Koller's opinion that "it was conventional that a pre-filled syringe should be gas-tight to protect certain drug products from exposure to oxygen and degradation," because "[t]he issue facing the POSA was not how to prevent ingress of oxygen during *normal storage conditions*; it was how to prevent ingress of sterilizing gas under the *extreme conditions* of VHP." *Id.* Patent Owner presents additional evidence alleging ███████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████ *Id.* (citing Ex. 2140, 2; Ex. 2206 ¶¶ 33, 40 (Declaration of Juergen Sigg, Ph.D)). Patent Owner makes a similar argument with respect to ███████████████████

████████████████████████████████████████████████████████

██████ *Id.* at 27 (citing Ex. 2140, 2; Ex. 2206 ¶¶ 33, 40). According to Patent Owner, the "evidence demonstrates that a POSA would have had to

40

IPR2021-00816
Patent 9,220,631 B2

engage in undue experimentation to identify a PFS that could be terminally sterilized using Sigg's VHP method without unacceptably modifying the VEGF-antagonist solution in the syringe." *Id.*

Patent Owner questions Mr. Koller's testimony related to enablement based on the 2008 Macugen Label because "that label does not show the Macugen PFS design, does not state that the product was terminally sterilized, and does not disclose the sterilization technique used." *Id.* at 28 (citing Ex. 2189, 186:18–187:3; 196:12–21; Ex. 2001 ¶ 99); *see also* Tr. 52:19–53:2. Patent Owner argues that the description of a "sterile foil pouch" does not necessarily suggest to a POSITA that Macugen PFS was terminally sterilized because a product does not have to be terminally sterilized to receive the label "sterile." PO Resp. 28 (quoting Ex. 2189, 186:18–186:22) (citing Ex. 2203 ¶ 102 (Declaration of Michael Miller, Ph.D); Ex. 2201 ¶ 115). Thus, Patent Owner concludes that "[t]he Macugen 2008 label therefore would have offered no guidance to a POSA who wanted to practice Sigg's VHP method." *Id.* at 29.

Patent Owner further notes that its syringe described in the '631 patent provides an enabling disclosure for terminal sterilization, but "[t]he fact the '631 patent does not claim the details of its syringe design that provide an enabling disclosure is not legally relevant." PO Resp. 30 n.7. Patent Owner argues that "the possibility that prior-art syringe components could have been cobbled together to permit terminal sterilization of a PFS for intravitreal injection containing a VEGF-antagonist does not satisfy Petitioner's burden." *Id.* at 31.

41

Regeneron Exhibit 1257.041
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

c)    *Arguments Related to Objective Evidence of*
      *Nonobviousness*[20]

Patent Owner's Arguments

Patent Owner contends that "[s]everal objective indicia strongly
support the nonobviousness of the challenged claims."  PO Resp. 46.
According to Patent Owner, "there was a need for a terminally sterilized PFS
for intravitreal injection of VEGF-antagonists containing low silicone oil
levels and operable with acceptable break loose forces," yet Patent Owner
contends "no pharmaceutical company could put such a PFS on the market
before the inventions of the '631 patent." *Id.* at 47–48.  Patent Owner
examines PFS products made by Genentech, Pfizer, and Becton Dickinson
and argues that these products used high levels of silicone oil despite the
long felt need for low silicone oil syringes. *Id.* at 49.  Patent Owner alleges
another company, Vetter, ██████████████████████████████████
████████████████████████████████████████████████ *Id.* (citing
Ex. 2206 ¶ 24).

Nexus

Patent Owner contends it "is entitled to a presumption of nexus
because Lucentis PFS, marketed in the United States by Genentech, is an
embodiment of at least Claims 1, 3, 7, 8, 14, 17, 21, 22, and 24 of the
'631 patent, and is co-extensive with them." *Id.* at 50 (citing Ex. 2201

---

[20] We examine secondary considerations under the heading for claim 1
because the parties largely argue secondary considerations together for the
claims.  To the extent that unique arguments are made for other claims (*e.g.*,
claims 8, 22), we note those arguments and address them.

42

**Regeneron Exhibit 1257.042**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

¶ 166; Ex. 2204 ¶ 31). Patent Owner provides a claim chart and argues that claims 1, 3, 7, 8, 14, 17, 21, 22, and 24 of the '631 patent are co-extensive with the Lucentis PFS. *Id.* at 50–52 (citing Ex. 2201 ¶¶ 170–285, as well as various exhibits related to Lucentis PFS). Lucentis PFS contains ranibizumab in an ophthalmic solution, which Patent Owner equates to the claimed "VEGF-antagonist" of claim 1. *Id.* at 51. Patent Owner alleges that "the claims above cover the entirety of the Lucentis PFS, and the Lucentis PFS does not contain any unclaimed features," because "the Lucentis PFS is not a component of a larger product," and "[i]t consists only of the claimed syringe body filled with a VEGF-antagonist." *Id.* at 53 (citing Ex. 2201 ¶ 287).

Patent Owner relies on the claimed combination as a whole and contends that "[a] nexus may be presumed even if the individual limitations of a claimed invention are all in the prior art." *Id.* Patent Owner believes that "Petitioner is mistaken when it suggests that the commercial success of Lucentis 'could only plausibly be relevant to claims 8–10, which are the only claims that are limited to ranibizumab (*i.e.*, Lucentis).' (Pet. 72 n.20[])," because not every embodiment of the claims must be sold in order to rely upon evidence of commercial success. *Id.* at 54 (quoting *In re Huai-Hung Kao*, 639 F.3d 1057, 1069 (2011) ("there would never be commercial success evidence for a claim that covers more than one embodiment")). Patent Owner also contends that the evidence shows the existence of a nexus between the objective evidence and the challenged claims. *Id.*

<u>Commercial Success</u>

Relying on the testimony of James E. Malackowski (Ex. 2205), Patent

43

Regeneron Exhibit 1257.043
Regeneron v. Novartis
IPR2021-00816

Appx43

IPR2021-00816
Patent 9,220,631 B2

Owner contends that the Lucentis PFS has achieved significant commercial success since its launch in 2017.  PO Resp. 55 (citing Ex. 2205 ¶¶ 36–44). Patent Owner notes that in ███████████████████████████████████ ███████████████████████████████████.  *Id.*  Patent Owner contends that "the commercial success of Lucentis PFS is due to the inventions claimed in the '631 patent."  *Id.*  Patent Owner alleges that "Genentech's ability to sell Lucentis in a PFS presentation, under a license to the '631 patent, substantially increased both the absolute sales and the market share Lucentis achieved."  *Id.*  Patent Owner notes that a Lucentis product was launched by Genentech in 2006 as a vial presentation.  *Id.* Patent Owner notes that "Lucentis vial sales generally increased through 2014, but began to decline in 2015 due to market competition," but when the PFS presentation was launched in 2017, Lucentis PFS reversed the prior sales decline and caused sales to climb higher than they had been at any previous time.  *Id.* (citing Exs. 2266, 2275, 2161, 2099, 2205 ¶ 20).  Patent Owner claims that "the PFS launch turned around Lucentis's market share trajectory . . . leading to sustained share increases against other VEGF-antagonist competitors."  *Id.* at 56 (citing Ex. 2205 ¶¶ 36–43, Figs. 6–9).

Long-Felt Need

Patent Owner alleges there was a long-felt need for the claimed invention, specifically "a terminally sterilized PFS for intravitreal injection of a VEGF-antagonist containing the claimed amounts of silicone oil."  *Id.* at 56–57.  Patent Owner contends that this "need had not been met in the marketplace prior to the launch of the Lucentis PFS."  *Id.* at 57.  Patent Owner argues that "as of the priority date, the only PFS for intravitreal

44

**Regeneron Exhibit 1257.044**
**Regeneron v. Novartis**
**IPR2021-00816**

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

injection of a VEGF-antagonist on the market (Macugen) had ███ of silicone oil and was known to cause 'intravitreal contamination by silicone oil droplets.'" *Id.* (quoting Ex. 1003 ¶ 66) (citing Ex. 2001 ¶¶ 41, 182; Ex. 2257, 51:20–52:4). Patent Owner contends that "Pfizer, the developer and marketer of Macugen, had every incentive to meet the market need by offering Macugen with the silicone oil levels described in *Boulange*, but did not do so." *Id.* Patent Owner alleges that "[i]f it were obvious that a syringe with silicone oil amounts within the ranges claimed by the '631 patent could function properly, Genentech would likewise have been motivated to develop it," yet, Patent Owner points to evidence suggesting that "Genentech still believed that the preferred silicone oil amount for a PFS containing a biologic like a VEGF-antagonist was between 200–500 µg." *Id.* (citing Ex. 2022, 11).

Patent Owner also notes that "Becton Dickinson, the assignee of the Boulange application . . . never pursued a patent based on the Boulange application, while its Hypak for Biotech SCF syringe, which it marketed to Novartis and others as its low silicone oil prefillable syringe for sensitive biological products, had ███ of silicone oil." *Id.* at 58 (citing Ex. 2206 ¶ 21; Ex. 2141, 30).

<u>Failure of Others</u>

Patent Owner contends, "[t]he evidence shows that others had attempted, but failed, to develop a terminally sterilized PFS for intravitreal injection of a VEGF-antagonist within the claims of the '631 patent." PO Resp. 58. Patent Owner relies on the "███████████████

████████████████████████████████

45

**Regeneron Exhibit 1257.045**
**Regeneron v. Novartis**
**IPR2021-00816**

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

████████████████████.” *Id.* ("[T]he current record contains substantial
additional support, including internal Genentech documents, the testimony
of Genentech witness Mr. Overcashier, and the first-hand knowledge and
contemporaneous documents of Dr. Juergen Sigg." *Id.* (citing Ex. 2206
¶¶ 5–18; Exs. 2099–2115, Ex. 2194, 37:1–13).

<u>Skepticism</u>

Patent Owner relies on evidence related to communications between
████ and Novartis.  PO Resp. 59.  Specifically, "████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████
████████████"" *Id.* (citing Ex. 2206 ¶¶ 24–26, 28; Exs. 2142, 2143).  Patent
Owner asserts that "████████ skepticism is particularly relevant to claim 22,
which requires 'from about 1 to 50 µg silicone oil.'" *Id.*

<u>Licensing</u>

Patent Owner contends that "Genentech's licensing of the '631 patent
is likewise strong evidence of nonobviousness." PO Resp. 60.  According to
Patent Owner, "████████████████████████████████████████,"
and ████████████████████████████████████████████
████████████████████████████████ *Id.* (citing Ex. 2121).
Patent Owner notes that "████████████████████████████████
████████████████████████████████████" *Id.*  Further, "Genentech
used the license to the '631 patent by commercializing Lucentis PFS in the
U.S. with a syringe that practices the '631 patent." *Id.*

46

IPR2021-00816
Patent 9,220,631 B2

Petitioner's Arguments

In its Petition, "Petitioner provides a preliminary statement explaining why there is no evidence of secondary considerations that could overcome the clear evidence of obviousness set forth herein." Pet. 71.

> Petitioner first notes that
>
> the unsupported assertion of unexpected results in the '631 Patent (Ex. 1001 at 5:15-25) with respect to reducing silicone oil amounts while maintaining acceptable break loose and slide forces is clearly contradicted by Boulange, which discloses the claimed silicone oil amounts in conjunction with the claimed break loose and slide forces.

Pet. 71–72 (citing Ex. 1003 ¶¶ 305–314).

Petitioner next argues that "long-felt need cannot demonstrate non-obviousness because all claim elements were already described in the prior art (e.g., Sigg, Lam, Boulange)," and "Macugen® PFS was a VEGF antagonist sold in a 1 mL glass pre-filled syringe and sold in a sterile blister pack by August 2008." Pet. 72 (Ex. 1003 ¶¶ 295–304, 148–153).

As for the commercial success of Lucentis PFS,[21] Petitioner alleges that Novartis cannot demonstrate non-obviousness because it cannot demonstrate that Lucentis PFS is co-extensive with the challenged claims. *Id.* Additionally, Petitioner contends that "because all the claimed features were already known in the art, any success of Lucentis PFS is not relevant." Pet. 72–73. Petitioner also alleges that "Patent Owner's licenses for the '631 Patent cannot demonstrate nonobviousness," because "Patent Owner

---

[21] Genentech brought Lucentis PFS to market in 2016 (Ex. 2015) and licensed the '631 patent from Patent Owner as discussed more below.

47

Regeneron Exhibit 1257.047
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

will be unable to show that there is a nexus between its license agreement
with Genentech and the '631 Patent." Pet. 73.

Petitioner contends that Patent Owner will not be able to show failure
of others "because the evidence will show that others succeeded before
Patent Owner." *Id.* For example, "[b]y June 2010, Petitioner had reduced to
practice a 1 mL Eylea pre-filled syringe that was (i) terminally sterilized,
(ii) used a baked-on syringe with less than 100 µg of silicone oil on the
syringe barrel, and (iii) met the requirements of the USP789." *Id.* (citing
Ex. 1005, 109–110, 114–125). Petitioner notes that its "Eylea PFS was
subsequently used in clinical studies and approved by regulatory authorities
in Australia in 2012." *Id.* (citing Ex. 1066).

In its Reply, Petitioner addresses Patent Owner's evidence of
objective indicia of nonobviousness as follows and argues "Novartis's
secondary considerations evidence, which lack nexus and is otherwise
irrelevant, cannot overcome the compelling evidence of obviousness." Pet.
Reply 21.

<u>Nexus and Commercial Success</u>

Petitioner first argues that there is no nexus between any commercial
success of Lucentis PFS and the '631 patent because "non-patented features
and features known in the prior art underlay the commercial success." Pet.
Reply 21 (quoting *Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d
1023, 1034 (Fed. Cir. 2016)). Petitioner relies on Patent Owner's evidence
and testimony to support its position "that numerous unclaimed features
contribute to the success of Lucentis PFS:"

- ███████████████████████████ critical to

48

**Regeneron Exhibit 1257.048**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

> terminal sterilization and commercialization.  Ex. 2206
> ¶¶ 46–48; Ex. 2201 ¶¶ 105–106.
>
> - A "baked silicone" application process critical to
>   preventing silicone oil being injected into the eye.
>   Ex. 2209 ¶ 36 (Declaration of Jeremy Wolfe, M.D.).
> - A ███ critical to terminal sterilization.  Ex. 2141, 51.
> - ████████████████████ critical to
>   achieving low break loose and slide forces.  Ex. 2141, 33;
>   Ex. 2064, 30.

Pet. Reply 22 (also citing Ex. 1105 ¶¶ 100–106 (Reply Declaration of Mr. Koller)).

Petitioner next relies on admissions of Patent Owner and its witnesses to argue "that the success of Lucentis PFS is due to features that were known in the art."  Pet. Reply 22.  For example, "Dr. Wolfe and ████████ ████████████████—testified that physicians use Lucentis PFS due to its convenience, which was a known PFS feature and not attributable to the '631 Patent claims."  *Id.* (citing Ex. 2209 ¶ 31; Ex. 1161, 115:8–14, 115:22–116:18; Ex. 1106 ¶¶ 30–34)

Petitioner next contends that "[t]here is also no nexus because Lucentis PFS is not coextensive with the claims," and "there must be some evidence that other embodiments within the claim would produce the same results."  *Id.* at 23 (citations omitted).  Petitioner first notes that "Lucentis PFS contains a single VEGF-antagonist—ranibizumab—but the '631 Patent functionally claims any VEGF-antagonist."  *Id.* (citing Ex. 1105 ¶ 99). Petitioner alleges that "there is no evidence that a PFS comprising other VEGF-antagonists within the claim scope would be successful," but "there is evidence that the Beovu PFS, which Novartis contends practices

**Regeneron Exhibit 1257.049**
**Regeneron v. Novartis**
**IPR2021-00816**

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

multiple claims, ***would not*** be successful." *Id.* at 23–24 (citing Ex. 1005, 42; Ex. 1106 ¶ 35; Ex. 1208, 58:5–15).

Petitioner next argues that because Lucentis PFS contains between ███████████████████████ but the claims cover up to about 100 µg (claims 1–21, 23–26) or about 50 µg (claim 22), the claims actually cover embodiments that would not be suitable for a commercial product. *Id.* at 24. Petitioner relies on the cross-examination testimony of Dr. Sigg, "██████ ████████████████████████████████ (Ex. 1158, 110:2–17), meaning the claims cover embodiments unsuitable for a commercial product." *Id.*

As for commercial success regardless of presumed nexus, Petitioner argues that "Novartis has not set forth evidence linking any commercial success to the specific claimed features, and instead has only shown a correlation between increased sales and introduction of Lucentis PFS." *Id.* at 24 (Ex. 1107 ¶¶ 39–51). Petitioner contends that "Novartis ignores that Lucentis was also approved for new indications when the PFS launched," and "Novartis's Global Head of Ophthalmology did not believe '█████████ ████████████'" Ex. 1161, 100:22–101:11; Ex. 1107 ¶ 48.

<u>Long-Felt Need</u>

Petitioner first responds that the need for a terminally sterilized PFS for intravitreal injection of a VEGF-antagonist containing the claimed amounts of silicone oil was a need that was met by the prior art. Pet. Reply 24–25. Petitioner contends that "Macugen PFS was a terminally sterilized PFS containing a VEGF-antagonist with sufficiently low operational forces by 2008," and "Becton Dickinson had disclosed in

50

Regeneron Exhibit 1257.050
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

Boulange ███████████ 1 mL glass syringes comprising less than
50 µg silicone oil by May 2011." *Id.* (citing Ex. 1105 ¶¶ 107–109, 113;
Ex. 1106 ¶¶ 19–20; Ex. 1215 ¶¶ 3–5; Ex. 1162, 1–6).

 Petitioner next alleges that the claims do not satisfy the need
identified by Novartis. *Id.* at 25. Petitioner notes that "Novartis
characterized the need as including a 'syringe with low levels of silicone oil'
to prevent silicone oil injection into the eye." *Id.* (citing Ex. 2204 ¶¶ 80, 91).
According to Petitioner, however, the '631 patent only claims silicone oil
applied to the syringe barrel, yet, silicone oil also can be introduced into a
PFS via the stopper and filling process, neither of which are claimed. *Id.*
(citing Ex. 1105 ¶ 111; Ex. 1207, 35:20–36:6). Petitioner also contends the
process used to apply the oil is important as to whether the silicone oil
migrates from the syringe barrel and into the patient's eye, but yet again, the
process is not claimed. *Id.* (citing Ex. 1105 ¶ 111; Ex. 1207, 35:20–36:6).
"Thus," according to Petitioner, "the claims do not satisfy the need for a
'syringe with low levels of silicone oil' that avoids silicone oil injection into
the eye," and "[t]o the extent Lucentis PFS does, it is due to unclaimed
features." *Id.* (citing Ex. 1105 ¶¶ 110–112).

 Petitioner next argues that "there is no evidence that others actually
made efforts to meet the need as characterized by Novartis," because
"Macugen PFS already met every need expressed by Novartis, except for the
claimed silicone oil amount." *Id.* at 26 (citing Ex. 1105 ¶¶ 108–116).
Petitioner further asserts that "the silicone oil amounts were met by [Becton
Dickinson's (BD's)] baked-on syringes," yet, "while it was clearly obvious
as of 2011 to use a baked-on syringe for a VEGF-antagonist PFS, sales of

51

**Regeneron Exhibit 1257.051**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

Macugen PFS had declined by that time due to more effective drug products (e.g., Lucentis, EYLEA)." *Id.* (citing Ex. 1105 ¶¶ 113–116). "Thus," according to Petitioner, "there is no evidence that the makers of Macugen PFS made efforts to incorporate BD's baked-on syringe." *Id.*

<u>Failure of Others</u>

Petitioner addresses each of Patent Owner's alleged failures by others. Pet. Reply 26. Petitioner contends "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" *Id.* (citing Ex. 1100 ¶¶ 58–59) (Declaration of James Agalloco). Petitioner next argues that "Macugen PFS successfully terminally sterilized a PFS by 2008," and "Regeneron successfully manufactured commercial-scale batches of a terminally sterilized Eylea PFS in 2010, which were used in clinical trials from 2011–2014 and approved in Europe and Australia in 2012." *Id.* at 26–27 (Ex. 1102 ¶¶ 14–29, 36, 40–41).

<u>Skepticism</u>

Petitioner contends that "Novartis's argument that Vetter was allegedly skeptical about applying less than 100 µg of silicone oil is unsupported," because "[t]he challenged claims cover up to 'about 100µg,' meaning ██████████████████████████████████████████████████████" Pet. Reply 27 (citing Ex. 1105 ¶¶ 117–120). Petitioner further relies on correspondence between Novartis and Vetter to contradict Novartis's position that Vetter was ████████████████████████████. *Id.* (citing Ex. 1213, 101:9–103:3; Ex. 1168, 2–4; Ex. 2143, 2 (████████████████████████████████████████████)).

52

**Regeneron Exhibit 1257.052**
**Regeneron v. Novartis**
**IPR2021-00816**

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

Licensing

Petitioner contends that "Genentech's license has no nexus to the '631

Patent," because it "is clearly directed to ███████████████████

██████ that are not disclosed in the '631 Patent."  Pet. Reply 27 (citing

Ex. 2121, 1; Ex. 1105 ¶¶ 124–132; Ex. 1107 ¶¶ 54–58).  Petitioner argues

"[t]hat the license also provided rights to the '631 Patent is insufficient to

demonstrate a nexus."  *Id.*

### d) Analysis

Having now considered the evidence in the complete record

established during trial, we are persuaded that, based on this record,

Petitioner has demonstrated by a preponderance of the evidence that claim 1

of the '631 patent would have been obvious to the person of ordinary skill in

the art based on the combination of Sigg, Boulange, and USP789.  Petitioner

persuasively shows how each element of claim 1 is taught by the

combination of references and provides sound reasoning for the combination

of references.  Pet. 31–47; Pet. Reply 21–27.  Patent Owner has not shown

that the combined evidence of secondary considerations of nonobviousness

is persuasive enough to overcome Petitioner's strong case of obviousness.

The combination of Sigg and Boulange teaches that pre-filled syringes

may be made of glass because Boulange discloses a syringe comprising a

glass barrel and a piston (*i.e.*, stopper) that would work in Sigg's device.

*See* Pet. 41–42 (citing Ex. 1008, 9:21–35, 13:11–12; Ex. 1003 ¶ 192).  Sigg

also teaches a pre-filled terminally sterilized syringe containing a VEGF-

antagonist for intravitreal injection with a nominal maximum fill volume of

between 0.5 mL and 1 mL.  Ex. 1003 ¶ 159.  The current record establishes

**Regeneron Exhibit 1257.053**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

that the claim limitation "2 particles >50 μm" comes from the USP-789 standard, which is an accepted standard for ophthalmic drugs such a VEGF-antagonist solution intended for intravitreal use. Ex. 1019; Ex. 1003 ¶¶ 90–92. We are persuaded by Mr. Koller that, because Sigg discloses a PFS with ranibizumab, a known VEGF-antagonist solution intended for intravitreal use, Petitioner has established that it would have obvious to a POSITA that the VEGF-antagonist solution in Sigg must comply with the USP-789 standard. Ex. 1003 ¶ 92.

As for the limitation requiring about 1 μg to 100 ug silicone oil and a specific break loose force (less than about 11 N), Sigg does not disclose any particular break loose force, but Boulange discloses several tests of "friction force B" of various syringes. Ex. 1008, 15:6–8. We find persuasive Petitioner's evidence that Table 5 of Boulange discloses break loose forces (B) of less than about 11 N for stoppers that were coated with silicone oil[] and tested with baked-on syringes having 40 μg of silicone oil (*i.e.*, 4 μg/cm2). Ex. 1003 ¶ 208; Pet. 46 ("Table 5 likewise discloses break loose forces less than 11 N for the baked-on syringes with 40 μg of silicone oil (4 μg/cm2) for stoppers B1 and C at T=0 and T=1.").

Based on the final record, we also find Petitioner's reasoning and evidentiary underpinnings show by a preponderance of the evidence that a POSITA would have been motivated to combine Sigg's terminally sterilized PFS comprising a VEGF-antagonist with Boulange's low-silicone and low break loose/gliding force syringe and the combination would have had a reasonable expectation of success. *See* Ex. 1003 ¶¶ 159–187. Because Sigg discloses that the pre-filled syringe can contain a sensitive protein or

54

**Regeneron Exhibit 1257.054**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

biologic drug product, such as a VEGF-antagonist solution, a POSITA
would have been motivated to minimize the amount of silicone oil used in
the syringe barrel in order to reduce or avoid the negative interactions that
were known to occur between silicone oil and protein or biologic
formulation. *Id.* ¶ 159. We determine that it was known in the art that pre-
filled syringes are typically siliconized to achieve desired break loose and
gliding forces. *See, e.g.*, Ex. 1001, 4:48–50. The evidence of record
establishes that the person of ordinary skill in the art was aware that
reducing the amount of silicone oil in intravitreal injections was desirable to
avoid potential "incompatibilities includ[ing] aggregation, deformation, and
inactivation of native protein structures of the delivered drug." *See* Ex. 1003
¶¶ 159–160 (quoting Ex. 1012, 6).

Further, the advantages of using baked-on siliconization as disclosed
in Boulange would help reduce the amount of "residual" or "free" silicone
oil that can enter the protein formulation and cause negative effects because
the baking attaches the silicone oil to the inner surface of the syringe barrel.
*Id.* ¶ 165. Accordingly, and based on the final record, we determine that
Petitioner has provided sufficient articulated reasons and evidentiary
underpinnings for its reasons for combining Sigg's terminally sterilized PFS
comprising a VEGF-antagonist with Boulange's low-silicone and low break
loose/gliding force syringe.

We address each of Patent Owner's arguments in more detail below.

i.      Force Profile of Syringe (Stopper) C

As noted above, Patent Owner contends that a POSITA "would not
have been motivated to use Boulange Syringe C in a PFS for intravitreal

55

**Regeneron Exhibit 1257.055**
**Regeneron v. Novartis**
**IPR2021-00816**

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

administration of a VEG-F antagonist because Syringe C has inconsistent forces that increase over time." PO Resp. 8; Sur-reply 5 ("Even though the forces remain under 11N, they almost double over that period. A POSA would be concerned those inconsistent forces would continue to rise, making the syringe unsuitable for intravitreal use.").

We first note that claim 1 does not require any particular break loose force at a particular time. *See* Tr. 15:17–16:5. Patent Owner's contentions are not challenging whether the prior art teaches any particular limitation, but instead whether the POSITA would have been motivated to use Boulange Stopper C in a PFS for intravitreal administration of a VEGF-antagonist. We determine that the combined evidence demonstrates the POSITA would have been motivated to use Boulange Stopper C as proposed by Petitioner.

Stopper C is lubricated with silicone oil, which was a typical stopper configuration and used in a prior art terminally sterilized PFS comprising a VEGF-antagonist. *See* Ex. 1105 ¶¶ 30–33; Ex. 1207, 41:9–12, 46:4–10 (Deposition of Karl Leinsing). More specifically, a POSITA would have known that siliconized Stopper C was suitable for a terminally sterilized PFS comprising a VEGF-antagonist because siliconized rubber stoppers had already been used for that purpose in the Macugen PFS. *See* Pet. Reply 3; Ex. 1008, 13:11–15, Table 1 and 5; Ex. 1220, 97, 229 (█████████████ ███████████████████████████); Ex. 1105 ¶¶ 30–33.

The final record establishes that stopper C in Boulange has acceptable break loose forces and side forces both at time zero and after accelerated aging. Ex. 1008, 13:11–15, Tables 1, 5. As seen in Table 5 of Boulange

56

IPR2021-00816
Patent 9,220,631 B2

below, the siliconized Stopper C maintained break loose forces less than
11 N (8.4 N, 7.5 N, 7.8 N) after accelerated aging. *Id.*

**Table 5 : Activation Gliding Forces, Pistons A, B1 and C**

| Silicone/internal surface of container | | 4 µg/cm² | | | 4 µg/cm² | | | 4 µcm² | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Silicone/piston | | 5 µg/cm² | | | 15 µg/cm² | | | 50 µg/cm² | | |
| Force (N) | | B | S | F | B | S | F | B | S | F |
| Piston | A $_{T=0}$ | 6.6 (0.6) | 5.8 (1.0) | 4.7 (1.0) | 7.2 (0.5) | 6.9 (1.9) | 4.7 (1.9) | 6.6 (0.8) | 6.5 (1.5) | 4.0 (1.5) |
| | A $_{T=1}$ | 12.0 (2.3) | 8.4 (2.0) | 3.2 (1.3) | 11.0 (0.8) | 8.0 (1.9) | 3.3 (1.0) | 10.7 (1.2) | 6.7 (1.5) | 3.6 (1.7) |
| | B1 $_{T=0}$ | 2.2 (0.2) | 2.7 (0.4) | 2.7 (0.4) | 2.2 (0.2) | 3.0 (0.6) | 3.0 (0.6) | 2.1 (0.1) | 2.6 (0.5) | 2.6 (0.6) |
| | B1 $_{T=1}$ | 2.8 (0.3) | 4.3 (1.2) | 4.3 (1.2) | 2.6 (0.6) | 3.3 (0.3) | 3.3 (0.3) | 2.5 (0.2) | 3.4 (0.3) | 3.4 (0.3) |
| | C $_{T=0}$ | 4.7 (0.4) | 6.5 (0.6) | 4.6 (0.6) | 4.2 (0.3) | 6.0 (0.7) | 4.2 (0.7) | 3.9 (0.5) | 5.2 (0.7) | 4.0 (0.7) |
| | C $_{T=1}$ | 8.4 (0.6) | 8.3 (1.9) | 4.1 (1.6) | 7.5 (0.6) | 8.3 (1.4) | 4.8 (2.2) | 7.8 (1.1) | 6.2 (1.0) | 3.7 (1.5) |

Petitioner's highlighted Table 5 of Boulange depicts activation and gliding
forces for pistons A, B1, and C. Pet. 31; Ex. 1008, Table 5.

We have considered the testimony from Patent Owner's experts but
determine that a POSITA would not have been deterred from using Stopper
C because the break loose force increases from 4.7 N to 8.4 N (Δ 3.7 N)
after accelerated aging. *See* PO Resp. 14–15; Ex. 2201 ¶ 88; Ex. 2204 ¶¶
67–73; Sur-reply 5–6. We find Petitioner's position more persuasive—
because Stopper C's forces after aging are within the claimed range and
suitable for intravitreal injection, the POSITA would not be deterred from
using Stopper C. Pet. Reply 4; Ex. 1105 ¶¶ 38–42; Ex. 1208, 17:1–7, 27:10–
17 (Dr. Calman acknowledging his preferred PFS for intravitreal injection
requires up to 10 N force). As Mr. Koller explains, "[a] POSITA would
have understood that most pre-filled syringes are expected to experience

57

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

some level of force increase over the shelf-life of the syringe," and such an
entirely expected increase would not deter the POSITA. Ex. 1105 ¶ 39.

    We also agree with Mr. Koller that Stopper C's increase in force from
4.7 N to 8.4 N would not be an inconsistent "force profile" that would affect
an ophthalmologist's use of the syringe. *Id.* ¶ 41. Mr. Koller persuasively
shows how a force increase of less than 4 N after aging would have been
expected and acceptable "based on tolerances and variations in
manufacturing processes," as evidenced by data from Regeneron
demonstrating that the break loose force for Eylea PFS can vary from
approximately ▮▮▮▮▮▮▮▮. *Id.* ¶ 42 (citing Ex. 1154, 15). Further,
even Patent Owner's declarants agreed that they found the Eylea PFS to
have consistent forces from syringe to syringe despite this stated variance.
Ex. 1105 ¶ 42 (citing Ex. 1212 (Wolfe Dep. Tr.), 28:7–9; Ex. 1208 (Calman
Dep. Tr.), 22:3–9).

    Patent Owner contends that Boulange describes all configurations of
Stopper C as "unacceptable," however, based on the final record, we
disagree. *See* PO Resp. 14; Sur-reply 5–6; Ex. 2001 ¶¶ 89–90. Boulange
only states that Stopper C *in Table 7* "does not appear to be acceptable for a
medical device." Ex. 1008, 21:5. As Mr. Koller explains, Stopper C in
Table 7 is distinct from other embodiments because it is not siliconized.
Ex. 1105 ¶¶ 34–37. In contrast, Stopper C in Table 5 is siliconized and had
much lower break loose forces after accelerated aging (8.4 N, 7.5 N, 7.8 N)
than Stopper C in Table 7 (14.4 N). *Id.* ¶ 35 ("the statement in Boulange . . .
comes directly after Table 7 of Boulange and is clearly referring to the
configuration of Stopper C that has no lubrication on it at all"). We agree

58

Regeneron Exhibit 1257.058
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

with Mr. Koller that this "statement would not be understood to apply to the results in Table 5 of Boulange because that is an entirely different configuration of Stopper C (*i.e.*, it includes a silicone oil lubricant)." *Id.*; *see also* Tr. 18:4–14, 41:18–42:8.

Even though Boulange describes siliconized Stopper C as "markedly inferior" to Stopper B1 (coated with Parylene C), we do not see this as a teaching away as argued by Patent Owner. *See* Sur-reply 5. Although Stopper C's 8 N (after accelerated aging) is inferior to the values for Stopper B1 (less than 3 N), the values for Stopper C are still within the claimed "about 11N," but more importantly, well under the 20 N that the '631 patent acknowledges was "known in the art" to be acceptable for intravitreal injection. Ex. 1105 ¶ 37; Ex. 1001, 5:31–38 ("Break loose and slide forces for prefilled syringes *known in the art* are typically in the region of less than 20N.") (emphasis added).

We find persuasive Mr. Koller's testimony that a POSITA would recognize Boulange's aging conditions correspond to the intended storage life for a VEGF-antagonist. Further, because the results from Stopper C are low even after 12 months of shelf life, a POSITA would understand Stopper C is an acceptable alternative to Stopper B1 (Parylene C), even though it is categorized as "markedly inferior" to Stopper B1. *Id.* A POSITA would have understood that Stopper C's low force profile would indeed work, but also that Stopper B1 has an extremely low force profile making it the superior alternative for that one condition. Further, as Mr. Koller explains, a POSITA would have been motivated to use Stopper C as opposed to Stopper B1, because Stopper C was "comprised of rubber and coated with silicone

59

Regeneron Exhibit 1257.059
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

oil, which was a common stopper design in the prior art."  Ex. 1105 ¶ 33
("[A] POSITA would have known that rubber stoppers coated with silicone
oil had been used in a PFS comprising a VEGF-antagonist for intravitreal
injection before the '631 Patent.").

  Thus, we determine the descriptions in Boulange are distinct from
those set forth in *AstraZeneca AB v. Mylan Pharm. Inc.*, 19 F.4th 1325, 1337
(Fed. Cir. 2021), relied on by Patent Owner.  *See* PO Resp. 16.  In
*AstraZeneca*, the Federal Circuit determined that a reference teaches away
when a POSITA "would be discouraged from following the path set out in
the reference." *AstraZeneca AB*, 19 F.4th at 1337 (Fed. Cir. 2021)
("reference that properly teaches away can preclude a determination that the
reference renders a claim obvious").

  The prior art in *AstraZeneca* taught a control formulation and a novel
formulation (similar to Boulange Stoppers C and B1 (novel Parylene C)) and
the Federal Circuit affirmed that the prior art taught away from the control
formulation (Rogueda).  *Id.*  The district court, and Federal Circuit, relied on
"AstraZeneca's expert . . . testify[ing] that a skilled artisan looking at the
adhesion test results in Rogueda would conclude that the control
formulations 'were not suitable' and 'clearly don't work,'" and the "control
formulations" had "poor adhesion."  *Id.* at 1336.  Further, "the particle size
reported by Rogueda was significantly larger, indicating that there were
'huge agglomerates . . . floating around' in the formulations, rendering them
'completely unsuitable.'"  *Id.* at 1337.

  The force profiles set forth in Boulange for Stopper C would not have
discouraged the skilled artisan from following the path set out in Boulange

60

Regeneron Exhibit 1257.060
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

because Stopper C's force profiles were markedly low, even though Stopper
B1 was superior in comparison. *See* Ex. 1105 ¶ 37 ("Although 8N is inferior
to the values for Stopper B1 (less than 3N), the values for Stopper C are
within the claimed 'about 11N' and" below those "known to be acceptable
for intravitreal injection."). The control formulation examined in
*AstraZeneca* is distinct from Stopper C in Boulange because a skilled artisan
at the time of invention would have viewed Stopper C as having acceptable
break loose forces and slide forces both at time zero and after accelerated
aging. Further, a variance of 4.7 N to 8.4 N (Δ 3.7 N) after accelerated
aging is within accepted industry standards and would have been a viable
option for the POSITA. *See* Ex. 1154, 15 (break loose force for Eylea PFS
varying from approximately ███ ); Tr. 16:7–20; Ex. 1212, 28:7–9;
Ex. 1208, 22:3–9.

    ii.    2 particles > 50 μm in diameter per ml

The parties agree that Sigg discloses an ophthalmic solution and a
POSITA would have understood that USP789 is a de facto requirement for
regulatory approval of an ophthalmic solution. *See* PO Resp. 19 n.3;
Ex. 1003 ¶ 92. As noted above, however, Patent Owner contends that
USP789 does not require an ophthalmic solution to meet the particulate
content limitation (2 particles > 50 μm in diameter per ml). PO Resp. 19.

Even accepting Patent Owner's contention as true – that USP789 does
not dictate that the particulate content limitation be met in every situation –
USP789 nonetheless teaches use of the particulate content limitation. The
limitation comes directly from the microscopic test of USP789, which
explains that it "may be necessary to test . . . by the light obscuration test

61

**Regeneron Exhibit 1257.061**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

followed by the microscopic test." Ex. 1019, 5; *see also id.* ("[M]icroscopic testing may be used exclusively" where "the ophthalmic solution cannot be tested by light obscuration."). Accordingly, USP789 provides clear motivation for a POSITA to design an ophthalmic solution to pass the light obscuration *and* microscopic tests to ensure compliance, including having no more than 2 particles > 50 μm. Ex. 1105 ¶¶ 43–45; Ex. 2002, 10 (Declaration of Marie Picci asserting that "USP<789> standard requires no more than 2 particles > 50 μm").

    iii.    Reasonable Expectation of Success

As noted above, Patent Owner questions whether Boulange's syringe could withstand terminal sterilization with VHP when filled with a VEGF-antagonist solution and Patent Owner contends that not every combination of barrel and stopper would work to protect a sensitive drug product. PO Resp. 20–25; Ex. 2201 ¶ 135. Based on the final record, Petitioner has persuasively shown that Boulange's pre-filled syringe would have been compatible with Sigg's terminal sterilization method (VHP) and a POSITA would have reasonably expected the combination to work as proposed by Petitioner.

First, it is important to reiterate our claim construction for "terminally sterilized," as the sterilization of the outside of a pre-filled syringe (*i.e.*, primary packaging component) while *minimizing contact* between the drug product within the pre-filled syringe and the sterilizing agent being applied. *See* Ex. 1003 ¶ 120. As we previously emphasized, the '631 patent recognizes that some amounts of the sterilizing gas may interact with the ophthalmic solution so long as the amount does not "cause unacceptable

62

Regeneron Exhibit 1257.062
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

modification of the ophthalmic solution within the variable volume chamber." Ex. 1001, 10:5–7. Thus, some amount of contact between the drug product within the pre-filled syringe and the sterilizing agent is contemplated within the scope of the claims.

We find persuasive Mr. Koller's testimony that it was standard in the art to design pre-filled syringes like those in Boulange to be gas-tight to protect the drug product from degradation during its shelf life. Ex. 1003 ¶ 172 (quoting Ex. 1008, 1:18–21 ("The piston is preferably made at least partially from a viscoelastic material so as to ensure tightness in the region of contact between the container and the piston."), 3:20–27, 4:21-32 (explaining that the disclosed coating ensures tightness and enables "gliding between the two parts intended to cooperate together and also tightness between these two parts at the contact region")). Petitioner's position that a POSITA would have readily understood that Boulange's syringe to be gas-tight, preventing sterilizing gas from entering the syringe, is more persuasive because "Boulange describes that the 'invention allows to have decreased activation, sustainable and final forces . . . without having to add lubricant and *while preserving the tightness* of the contact region between said two parts.'" Pet. 35 (quoting Ex. 1008, 6:10–14) (citing Ex. 1003 ¶¶ 172, 184–186); *see also* Ex. 1008, 1:14–16 (Boulange describing that its syringe can accommodate a drug product in a gaseous phase).

Patent Owner posits that a syringe would not be able to withstand sterilization conditions unless specially designed to do so. PO Resp. 21; Ex. 2201 ¶ 65 (explaining also that Boulange does not discuss terminal sterilization). Regardless of Boulange's lack of discussion of terminal

63

Regeneron Exhibit 1257.063
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

sterilization, a POSITA would have still had an expectation of success. Boulange discloses use of structure for achieving gas tightness, similar to the '631 patent, and notes that it preserves the tightness, such that a POSITA would reasonably expect compatibility with VHP sterilization. *See* Pet. Reply 8; Pet. 34–35. The evidence does not support Patent Owner's contention that Boulange's discussion of gas tightness was just "aspirational." Sur-reply 8. Boulange instead describes a functional siliconized rubber stopper (Stopper C), similar to that which had already been used in the ███ terminally sterilized Macugen PFS approved by the FDA. Ex. 1105 ¶¶ 48–52, 264.

Patent Owner contends that Boulange discloses that the syringe components are sterilized before the syringe is filled with the active (aseptic filling), whereas terminal sterilization takes place after the syringe is filled. Sur-reply 6–7. Thus, according to Patent Owner, a POSITA would not have been motivated to combine Boulange with a reference that teaches terminal sterilization (Sigg). *Id.* First, Boulange makes no reference to aseptic filling and the evidence cited by Patent Owner does not support such a conclusion. Regardless, we are not persuaded that a POSITA would have been dissuaded from combining the syringe structure taught by Boulange with the terminal sterilization technique taught by Sigg because all PFSs are designed to be gas-tight during normal storage to prevent air from negatively interacting with the drug product – Boulange's relied upon structure remains consistent. Ex. 1105 ¶ 48; Ex. 1003 ¶ 172; Ex. 1008, 4:21–32.

Patent Owner further argues that terminal sterilization requires special tightness beyond the tightness described in Boulange because of pressure

64

Regeneron Exhibit 1257.064
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

variations that may cause stopper movement.  PO Resp. 22–23; Ex. 2201 ¶ 54.  Petitioner demonstrates, however, that "[t]his argument is not applicable to the VHP method disclosed in Sigg, which can be done at ambient pressure."  Pet. Reply 9 (citing Ex. 1213, 71:3–8; Ex. 1252, 222 (¶ 9); Ex. 1105 ¶¶ 59–61); *see also* Ex. 1207, 120:17–22 ("Q. Now, with respect to terminal sterilization using ethylene oxide or vaporized hydrogen peroxide, is your understanding that the pressure changes associated with those sterilization cycles would cause the stopper to move?  A. Not necessarily, no.").  As Mr. Koller persuasively explains, "a POSITA would understand that Sigg teaches a VHP method that attempts to minimize the use of pressure changes" during the VHP process such that terminal sterilization process could be achieved without causing the stopper to move.  Ex. 1105 ¶ 61 (citing Ex. 1007, 14:3–6, 14:9–11, 14:18–20).  The evidence in the final record does not demonstrate that any special tightness or specific stopper material, coating, or dimensions, would have been required to achieve terminal sterilization within the scope of the claims of the '631 patent.  *See* Ex. 1207, 109:1–13, 113:10–17; Ex. 1105 ¶ 49.  Further, the '631 patent does not claim any specific structure for achieving the same result.  Accordingly, we determine that a POSITA would have determined that the stoppers disclosed in Boulange would result in an acceptably tight seal for terminal sterilization (even with pressure changes), and thus, Boulange discloses a stopper compatible with VHP sterilization.

> iv.    Enablement of Sigg's VHP Method

For the reasons previously examined, and as set forth below, we determine that Petitioner demonstrates that Sigg is enabled for the portions

65

**Regeneron Exhibit 1257.065**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

of its disclosure that are cited.  Further, we determine that evidence in the
final record establishes that a skilled artisan would have been able to make
and use the claimed invention as set forth in Petitioner's proposed
combination of reference without undue experimentation.

In a § 103 analysis, we need not consider a prior art reference in a
vacuum.  Instead, as the Federal Circuit stated in *Raytheon*:

> We have explained that there is no absolute requirement
> for a relied-upon reference to be self-enabling in the § 103
> context, so long as the overall evidence of what was known at
> the time of invention establishes that a skilled artisan could have
> made and used the claimed invention.  We have also previously
> expounded the principle that if an obviousness case is based on
> a non-self-enabled reference, and no other prior art reference or
> evidence would have enabled a skilled artisan to make the
> claimed invention, then the invention cannot be said to have been
> obvious.

*Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1376–77 (Fed. Cir.
2021).  Based on the final record, we do not find this to be a case where no
other prior art reference or evidence would have enabled a skilled artisan to
make the claimed invention.  The final record, including Sigg, contains
persuasive teachings demonstrating that a POSITA would have known how
to use a VHP method to terminally sterilize a PFS containing sensitive
biological solutions.  *See* Ex. 1003 ¶¶ 78–89.

We again note our claim construction for "terminally sterilized,"
which Patent Owner has not challenged.  The '631 patent recognizes that
some amounts of the sterilizing gas may interact with the ophthalmic
solution.  Ex. 1001, 10:5–7.

66

**Regeneron Exhibit 1257.066**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

Next, we consider that the '631 patent discloses, but does not claim, any specific structure that enables terminal sterilization of a PFS. The claims of the '631 patent are not directed to a particular stopper or plunger rod design, and instead appear to encompass any stopper and plunger rod that allow terminal sterilization in the manner claimed. *See* Ex. 1003 ¶ 108. Typically, unclaimed features cannot be used to distinguish a patent over the prior art.

Patent Owner contends that Sigg is not self-enabled because it fails to identify any syringe designs that can withstand its VHP method, and, neither Mr. Koller's opinions nor the prior art cited by Petitioner supports enablement. PO Resp. 25–26. Many of Patent Owner's arguments are similar to those we have already considered, but found unpersuasive. Our reasoning carries over to the issue here and we add the following analysis.

Weighing the testimony in the final record, and examining all of the evidence before us, we recognize that terminally sterilizing a PFS with VHP was technically challenging at the time of invention. Even still, we are more persuaded by Mr. Koller's testimony that conducting terminal sterilization of a PFS with VHP in light of the prior art of record would not require undue experimentation. *See* Ex. 1003 ¶¶ 83–88; Ex. 1105 ¶¶ 66–71. Mr. Koller provides persuasive testimony as to how Sigg's disclosure of "the VHP sterilization methods would be applied to pre-filled syringes containing sensitive protein formulations such as VEGF-antagonists in order to sterilize the outside surface of the syringe (and not the drug formulation itself)." Ex. 1003 ¶ 83. Mr. Koller relies on a quotation from Sigg that describes its VHP sterilization method of

67

**Regeneron Exhibit 1257.067**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

> treating prefilled containers within secondary packaging with
> controllable vaporized-hydrogen peroxide (VHP). The principle
> is the formation of a vapor of hydrogen peroxide in containment
> and a subsequent removal or inactivation of vapors in a
> controlled manner. Prior to removal or inactivation, VHP
> condenses on all surfaces, creating a microbiocidal film that
> decontaminates the container surface.

*Id.* ¶ 84 (quoting Ex. 1007, 3:11–16). Mr. Koller then provides testimony about cold sterilization using EtO (*id.* ¶¶ 85–87) but then notes that:

> While VHP works by a different mechanism than EtO, it still has
> the potential to damage biologic drug products. Thus, for pre-
> filled syringes, the syringe itself would have to be sufficiently
> closed off to prevent substantial amounts of the sterilizing gas
> from coming into contact with the drug formulation within. Sigg,
> for example, describes that removal of VHP vapors "ensures that
> the long-term stability of the protein is not compromised." Sigg
> (Ex. 1007) at 3:24-27.

*Id.* ¶ 87.

Mr. Koller further testifies that the POSITA would be aware of certain regulations that seek to minimize the amount of sterilizing agent residue that is permissible for exposure. *Id.* ¶ 88. With that awareness, the person of ordinary skill in the art would understand that "the gas or vapor must be allowed to sufficiently exit the secondary packaging of pre-filled syringe after the sterilization process is over" and would thus be able to effectively carry out Sigg's step in the VHP sterilization process "to remove VHP by 'applying post-treatment measures, within a decontamination chamber.'" *Id.* (citing Ex. 1007, 10:5–6).

Patent Owner bases many of its arguments on the disclosure in Sigg that "very few" (Ex. 1007, 4) syringe components are capable of making the

68

Regeneron Exhibit 1257.068
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

tight seal required for terminal sterilization. *See* Ex. 1007, 3:27–30
("[T]here are only very few packaging material combinations that provide
the required tightness of the system such as to avoid ingress of sterilizing
gasses"); PO Resp. 25–26, 28.  The final record, including Sigg, contains
persuasive evidence showing that a POSITA would have been capable of
making and using the invention without undue experimentation, and would
have understood which of the "very few" components described by Sigg
would have worked in a PFS that was terminally sterilized with VHP.

Patent Owner's contentions that Sigg is not enabling are also
contradicted by its prior representations to the USPTO.  *See* Pet. Reply 11.
As Petitioner points out, "Sigg is a Novartis patent publication, which it
prosecuted extensively as Application No. 13/382,380 ('380 Application').
Ex. 1252." *Id.*  As explained by Petitioner, "[f]rom January 2012 to April
2014, across six office actions and five responses, Novartis repeatedly
attempted to obtain claims directed to a PFS terminally sterilized with VHP
comprising a VEGF-antagonist—the ***exact*** subject matter that Novartis
presently alleges that Sigg does not enable," but the claims were rejected as
obvious.  Pet. Reply 11–12 (citing Ex. 1252, 170–177, 192–201, 223–230,
249–255, 277–284, 302–310).

Thus, even if "very few" syringe components are capable of making
the tight seal and development of the Lucentis PFS with VHP was
"technically very challenging" (PO Resp. 26), the Sigg '380 Application
provides further evidence that a POSITA would have read Sigg as providing
sufficient support to enable VHP sterilization as claimed.  For example,
Dr. Sigg submitted a declaration with the '380 Application testifying, "[t]he

69

Regeneron Exhibit 1257.069
Regeneron v. Novartis
IPR2021-00816

present application disclosed for the first time, and contrary to conventional thinking, that it is possible to obtain sufficient sterilization of the outer surface of a syringe in secondary packaging at ambient pressure." Ex. 1252, 222 (declaration dated May 2, 2013); *see also* Tr. 22:21–23:17. This statement, filed as a declaration, provides further evidence demonstrating that a POSITA would not have had to engage in undue experimentation to make and use a PFS that could be terminally sterilized using Sigg's VHP method. We have considered Dr. Sigg's new testimony that he knew by 2011 that the VHP sterilization method in Sigg did not work. Ex. 2206; Ex. 1213, 79:15–80:17; PO Resp. 26. In light of his prior declaration and the totality of the evidence, we find that the inventor's new testimony is not credible.

Patent Owner contends that Sigg is not enabled because VHP sterilization is "performed under vacuum and subjects the PFS to extreme pressure." PO Resp. 26. We do not find this position persuasive. First, Dr. Sigg previously represented to the USPTO that Sigg's VHP method does not require a vacuum, contradicting Patent Owner's current position. *See* Ex. 1252, 222 (¶ 9) ("[I]t is possible to obtain sufficient sterilization . . . *at ambient pressure*." (emphasis added)). Next, as previously examined, even if Sigg's VHP sterilization does require a vacuum, Mr. Leinsing admitted that a vacuum may not cause the stopper to move at all (Ex. 1207, 120:17–22, 145:17–20); *see also* Ex. 1105 ¶¶ 59–60 ("Mr. Leinsing's assertion that pressure changes could cause movement of the stopper during Sigg's terminal sterilization process is unsupported," because "[a] POSITA would understand that Sigg's VHP process would not necessarily cause a stopper to

70

Regeneron Exhibit 1257.070
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

move, and Mr. Leinsing has not demonstrated why using Sigg's VHP
method on the Boulange syringe specifically would cause such
movement.").  Finally, even if stopper movement would occur due to
pressure variations, Mr. Koller presents persuasive testimony explaining
prior art mechanisms that can be used to prevent stopper movement due to
these pressure changes.  Ex. 1105 ¶¶ 65–71.  We examine this testimony
more below.

     Mr. Koller persuasively explains that "[a] POSITA would have thus
readily understood that stopper movement could occur during terminal
sterilization, and would have known how to incorporate one of many
features known in the art to prevent such movement." *Id.* ¶ 55.  Mr. Koller
relies on one such feature found in the Macugen PFS, and explains that the
device uses "a clip that locked the plunger rod and stopper in place to inhibit
stopper movement during terminal sterilization." *Id.*  The Macugen PFS was
a sterilized PFS containing a VEGF-antagonist with sufficiently low
operational forces that was known by 2008.  Ex. 1105 ¶¶ 107–109; Ex. 1106
¶¶ 19–20 (Reply Declaration of Dr. Kiss).  The parties dispute whether the
Macugen PFS is prior art and whether it was terminally sterilized.  PO
Resp. 28; Ex. 2201 ¶¶ 113–117; Pet. Reply 14.  Regardless of its status as
prior art, the evidence surrounding its development and launch is still
relevant to the knowledge base of the POSITA.  *See Yeda Research v. Mylan
Pharm. Inc.*, 906 F.3d 1031, 1041 (Fed. Cir. 2018) ("[N]on-prior art
evidence of what was known . . . can be relied on for their proper supporting
roles, e.g., indicating the level of ordinary skill in the art.").  Accordingly,
the          terminally sterilized Macugen PFS, which was FDA approved and

71

Regeneron Exhibit 1257.071
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

on-sale in the United States before the filing date of the '631 patent, further

supports that ███ terminal sterilization was within the level of ordinary

skill in the art upon based on the teachings of Sigg.  Pet. Reply 14; Ex. 1254,

9.

      The evidence in the final record before us also suggests that the

inventors of the '631 patent pursued VHP sterilization at least in part

because they knew it was ███████████████████████ *Id.* (quoting

Ex. 1254, 9 ("███████████████████████████")) (citing

Ex. 2063, 92).  Petitioner also relies on the Eylea PFS, and Mr. Koller

persuasively explains how this device was terminally sterilized with VHP

and approved in Australia by February 2012.  Ex. 1003 ¶ 124 n.15.

      Based on the totality of the evidence presented, we find persuasive

Mr. Koller's testimony that "Sigg teaches a VHP method that attempts to

minimize the use of pressure changes," and "features for minimizing stopper

movement during a terminal sterilization process . . . were likewise well-

known in the art." *Id.* ¶ 61 (citing Ex. 1007, 14:3–6, 14:9–11, 14:18–20);

Ex. 1105 ¶ 66.  Further, we agree with Mr. Koller that "prior art pre-filled

syringe designs were known in the art for preventing gas from ingressing

into the drug product, as reflected in Boulange." Ex. 1105 ¶ 66.  Based on

the background knowledge examined above, and Mr. Koller's testimony, we

determine a POSITA would have found Sigg's VHP method enabled.

      Patent Owner submits additional evidence and testimony related to

███████████████████████████████████████, and relies on

the statement that VHP was "███████████." PO Resp. 27 (quoting

Ex. 2206 ¶ 17).  Petitioner presents contradictory evidence showing that

72

Regeneron Exhibit 1257.072
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

████████████████████████████████████████████

████████████████████████████████████████

████    Pet. Reply 13 (citing Ex. 2148, 2 ████████████████

████████████████████████████████████████

████████████████████); Ex. 1100 ¶ 51.  We have considered both

parties' arguments and evidence related to ██████    work and find it

unpersuasive for either party.

The evidence in the final record demonstrates persuasively how a
POSITA would know to use the teachings of Sigg and Boulange to achieve
the tight seal required for terminal sterilization using a VHP method.  A
POSITA would need only perform routine optimization to perform the VHP
terminal sterilization process described in Sigg in the manner claimed by
the '631 patent.

v.    Objective Indicia of Nonobviousness

Before any final obviousness determination, we must consider the
evidence of obviousness in light of any objective evidence of
nonobviousness presented by Patent Owner.  *See Graham*, 383 U.S. at 17–
18 ("Such secondary considerations as commercial success, long felt but
unsolved needs, failure of others, etc., might be utilized to give light to the
circumstances surrounding the origin of the subject matter sought to be
patented."); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk
Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012) ("This objective
evidence must be 'considered as part of all the evidence, not just when the
decisionmaker remains in doubt after reviewing the art.'" (quoting

Regeneron Exhibit 1257.073
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

*Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed. Cir. 1983))).

Objective evidence of nonobviousness is relevant only if there is a nexus between the evidence and the claimed invention. *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019). A presumption of nexus applies if the asserted objective evidence "is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Artic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). To the extent that a presumption of nexus does not apply, Patent Owner may still prove nexus "by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996). The stronger the showing of nexus, the greater the weight accorded the objective evidence of nonobviousness. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 (Fed. Cir. 1985).

As set forth above, Patent Owner presents arguments and evidence directed to objective indicia of non-obviousness, including nexus, commercial success, satisfaction of a long-felt but unmet need, failure of others, skepticism, and licensing. PO Resp. 46–60. Petitioner challenges each indicium. Pet. Reply 21–27. We address each of these below.

Nexus

As noted above, Patent Owner contends that the Lucentis PFS, marketed in the United States by Genentech (licensee of the '631 patent), is an embodiment of certain claims of the '631 patent, and is co-extensive with them. PO Resp. 50 (citing Ex. 2201 ¶ 166; Ex. 2204 ¶ 31). Patent Owner

74

Regeneron Exhibit 1257.074
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

provides a claim chart showing how Lucentis PFS meets all the limitations
of these claims.  *Id.* at 50–52.  Patent Owner argues that the Federal Circuit
has "never held that the existence of one or more unclaimed features,
standing alone, means nexus may not be presumed."  *Id.* at 53 (quoting *Fox
Factory,* 944 F.3d at 1374).  All that is required for a presumption of nexus
is that "the patentee demonstrate that the product is essentially the claimed
invention."  *Id.*  Patent Owner alleges that Lucentis PFS does not contain
any unclaimed features and it is not a component of a larger product.
Ex. 2201 ¶ 287.

　　Based on the final record before us, Patent Owner has not established
that the Lucentis PFS is coextensive with the claims and essentially the
claimed invention.  The claims of the '631 patent are broader than the
Lucentis PFS, and cover embodiments well beyond Lucentis PFS that may
not be successful.  Ex. 1105 ¶ 98.  Petitioner has presented persuasive
evidence demonstrating that several unclaimed features are significant to the
structure and function of the Lucentis PFS and these unclaimed features also
contribute to the success of the Lucentis PFS.  *See* Pet. Reply 22.  We find
Petitioner's reasoning persuasive and address these features below.

　　<u>Significant Unclaimed Features</u>

　　The Lucentis PFS utilizes ███████████████████████
███████████████████████ that Patent Owner, and its
declarants, have touted ███████████████████
███████████████████████. Ex. 2206 ¶¶ 42, 46–48;
Ex. 2201 ¶¶ 104 ███████████████████████

75

**Regeneron Exhibit 1257.075**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2



), 105–106.

In his declaration, Dr. Sigg discusses a report submitted to a regulatory authority describing "████████████████████████████████████" Ex. 2206 ¶ 46. In a section of the report related to "████████████████████████████████████████" Dr. Sigg discusses "████████████████████████████████" and explains that these "████████████████████████████████████████████████████████████████████████████████████" *Id.* (quoting Ex. 2141, 49). Dr. Sigg testifies that "████████████████████████████████████████████" was addressed by "████████████████████████████████" *Id.* ¶ 47. Further, the ████████████████████████████████████████████████████████████ *Id.* ¶ 48.

Patent Owner's expert, Mr. Leinsing, testifies that "the inventors of the '631 patent also redesigned the stopper to increase the distance between the first and last circumferential ribs of the stopper," which addressed the risk of sterility breach during sterilization of the outer surface of the syringe." Ex. 2201 ¶ 104; *see also* Ex. 2064, 4 ("Change of plunger stopper design to reduce risk of sterility breach."). "This modification increased the size of the 'sterility zone,' which improved the syringe's tolerance for stopper movement during sterilization without breaching the sterility (and

76

**Regeneron Exhibit 1257.076**
**Regeneron v. Novartis**
**IPR2021-00816**

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

thus the integrity of the drug product)." Ex. 2201 ¶ 104 (quoting Ex. 2141,

54–55). According to Mr. Leinsing, "[t]hese new design elements work

together to reduce the risk of sterility breach and enable sterilization to

acceptable sterility assurance levels by ensuring that any stopper movement

that occurs during sterilization (or at other times) does not result in a sterility

breach." *Id.* ¶ 105 ("The inventors' syringe design thus allowed them to

develop ███████████████████████████████████████

██████████████████████████████████████

████"). As explained by Mr. Leinsing, "[t]he '631 patent also describes

these innovations and their significance for terminal sterilization." Ex. 2201

¶ 106.

    Mr. Koller testifies that "the Lucentis PFS includes a stopper coated

with silicone oil, which Novartis documents describe as ████████

████████████████████████████████ Ex. 1105 ¶ 104

(quoting Ex. 2064, 30 (██████████████████████████████

███████████████████████") (citing Ex. 2141, 33

████████████████████████████████████████

████████████████████████████████████.

Mr. Koller further explains that "the stopper used in the Lucentis PFS is

coated with ████████ on the product contacting side," and "Mr. Leinsing

opined that polymer coatings are critical to a PFS because they can 'reduc[e]

the degree to which leachables from the rubber closure may enter into the

drug formulation.'" *Id.* at 102 (citing Ex. 2224, 9; Ex. 2001 ¶ 52).

    Although these new design features to the plunger rod and stopper

may be described, in part, in the '631 patent (Ex. 2201 ¶ 106), none of these

Regeneron Exhibit 1257.077
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

features were claimed.  *See* Tr. 31:13–34:21.  The claims require a "stopper and plunger," but as Mr. Leinsing recognizes, the important design innovations for the Lucentis PFS plunger and stopper, 

, are not claimed.  *See* Ex. 2201 ¶ 104; *see also* Ex. 1105 ¶¶ 102, 104. Based on the final record, each of these plunger rod and stopper features contribute to the commercial success of Lucentis PFS, but these features are not captured in the claims of the '631 patent.  For example, according to Dr. Sigg,

.  Ex. 2206 ¶ 48.  Indeed, the

."  Ex. 2201 ¶ 105.

Next, although the claims recite a specific amount of silicone oil as part of the syringe barrel, the claims are not limited to syringes using the baked silicone process used in the Lucentis PFS.  *See* '631 patent, claim 1 ("about 1 μg to 100 ug silicone oil").  Each party agrees that two features of the Lucentis PFS were critical to reducing residual silicone oil that could be injected into the eye: a reduction in the amount of silicone oil used (claimed) and the "baked silicone" application technique (not claimed).  Ex. 1105 ¶ 103; Ex. 2209 ¶ 36 (Declaration of Jeremy Wolfe, M.D.).

Dr. Wolfe (Patent Owner's declarant) explains the dangers of silicone oil mixing with medication, and further details that the Lucentis PFS carries "a very low risk of silicone oil being injected into the eye," because of "the

78

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

use of an optimized application process of the silicone oil to the syringe wall
in pre-filled syringes, and to a reduction in the amount of silicone oil used in
this new application process." Ex. 2209 ¶ 36 (citing Ex. 2018, 3)
(describing the baked silicone process as reducing the incidence of
silicone-related complications). Dr. Wolfe opines that "[t]his is an important
consideration in light of the large number of repeating anti VEGF
intravitreal injections performed on a particular patient, and given that
treatment of retinal pathologies can require years of repeated injections." *Id.*
(citing Ex. 2215, 1, 8).

Mr. Koller, testifying for Petitioner, agrees. Ex. 1105 ¶ 103. He
testifies that "the method of siliconization (spray-on or baked-on) impacts
the way silicone oil interact with drug products," and "baked-on
siliconization creates a thin layer of silicone oil to the inner surface of glass
syringe barrels, thereby reducing the amount of 'residue' or 'free' silicone
oil." *Id.*; Ex. 1003 ¶¶ 65, 66. Mr. Koller opines that "[u]sing baked-on
siliconization is therefore important for a PFS containing a protein drug
formulation because excessive silicone oil can cause protein aggregation and
drug degradation." Ex. 1105 ¶ 103. Even though this optimized application
process is an important feature of the Lucentis PFS, the '631 patent claims
do not require a specific siliconization process, and thus cover both baked-
on and spray-on siliconization. *Id.*

Another product feature important to the Lucentis PFS, but
unclaimed, is the ██████ *Id.* ¶ 105. Mr. Koller persuasively explains that
"████████████████████████████████████████████
████████████████," because ███████████████████

79

**Regeneron Exhibit 1257.079**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

████████████████████████████████████████████.” *Id.*
(citing Ex. 2194 (Overcashier Dep. Tr.)), 142:17–143:2.  Mr. Koller relies
on ██████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████              *Id.* (quoting Ex. 2141, 51).  As Mr. Koller
notes, "the '631 Patent does not claim a tip cap."  *Id.*

<u>The Claims of the '631 Patent Are Broader than the Lucentis PFS</u>

Petitioner has also produced persuasive evidence showing that other
embodiments within the claim scope would not necessarily produce the
same results as Lucentis PFS and be commercially successful.  *See* Pet.
Reply at 23.  We find persuasive Mr. Koller's testimony that nearly all of the
claims (except claims 8–10) do not require the PFS to contain an ophthalmic
solution comprising the drug Lucentis, but encompass a PFS that contains an
ophthalmic solution that comprises any VEGF-antagonist, regardless of the
effectiveness of such drug product.  Ex. 1105 ¶¶ 98–99.  Specifically,
Lucentis PFS[22] contains a single VEGF-antagonist—ranibizumab—but
claim 1, for example, recites that the ophthalmic solution comprises "a
VEGF-antagonist," without limiting it to any particular VEGF-antagonist.
Yet, Patent Owner offers no evidence that a PFS comprising other VEGF-
antagonists within the claim scope would be commercially successful.  *Id.*

---

[22] "The Lucentis® drug formulation and the Lucentis® active ingredient
molecule (ranibizumab) are the same in the vial presentation as in the PFS
presentation.  In the PFS presentation, the Lucentis® drug formulation is
stored in the PFS for the entirety of its shelf life."  Ex. 2204 ¶ 57.

**Regeneron Exhibit 1257.080**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

Mr. Koller also testifies persuasively that the Lucentis PFS contains
only ▮▮▮ of silicone oil on the syringe barrel, but the claims broadly cover
silicone oil amounts as high as 100 µg (claims 1–21, 23–26) or about 50 µg
(claim 22).  Ex. 1105 ¶ 98.  There is evidence showing that Novartis deemed
that a syringe comprising ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮.  *Id.* (citing Ex. 1158, 112:13–113-4; Ex. 1159, 81:1–82:8).
For example, as explained by Juergen Roettele, Ph.D (a Novartis technical
project lead for Lucentis PFS), a process using 100 micrograms of silicone
oil for a prefilled syringe, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮" Ex. 1159, 81:1–82:8, 18:21–19:5.  Because the upper bounds
of the claimed silicone oil range were purportedly not commercially feasible,
the nexus and coextensiveness become more of a challenge for Patent Owner
to establish.

Summary

Considering the totality of the unclaimed features and components of
the Lucentis PFS, and the evidence that demonstrates these features and
components were deemed important to the function and success of the
product, Patent Owner has not met its burden to establish that the Lucentis
PFS embodies the claimed features and is coextensive with them.  We are
cognizant of *Fox Factory*'s caution that the existence of one or more
unclaimed features, standing alone, does not necessarily mean that nexus
cannot be presumed.  *Fox Factory, Inc.*, *944 F.*3d at 1374.  Considering the
evidence as a whole, including Patent Owner's lack of persuasive rebuttal as
to the importance of each feature examined above, we cannot reach a

81

**Regeneron Exhibit 1257.081
Regeneron v. Novartis
IPR2021-00816**

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

determination that the Lucentis PFS "is the invention disclosed and claimed." *Id.*

The features of the Lucentis PFS examined above, even according to Patent Owner's own declarants, are not "additional insignificant features," or merely "standard components of any PFS." *Id.*; Sur-reply 21. To the contrary, these features are described by Patent Owner's own documents and witnesses as: █████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████ *See supra.*

Commercial Success

"When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention." *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997); *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016). "Demonstrating that an invention has commercial value, that it is commercially successful, weighs in favor of its non-obviousness." *WBIP*, 829 F.3d at 1337. Further, "non-patented features and features known in the prior art underlay the commercial success." *Ethicon Endo-Surgery, Inc.*, 812 F.3d at 1034.

82

Regeneron Exhibit 1257.082
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

     There is little dispute that Lucentis PFS practices certain claims of the '631 patent and that Lucentis PFS was commercially successful. For reasons set forth below, however, Patent Owner has not persuasively shown that the commercial success of Lucentis PFS was due to a claimed feature that was not already known in the art prior to the '631 patent. Based on the full record developed during trial, we determine that the success of Lucentis PFS was driven by a number of unclaimed product design features and the efficacy of the Lucentis drug (ranibizumab).[23] Further, we find that there is no persuasive evidence in the final record that Lucentis PFS was commercially successful primarily because of the claimed features, *i.e.*, a terminal sterilization and 1–100 µg of silicone oil with break loose forces less than 11 N.

     Patent Owner claims that "Lucentis PFS is a  and product that enjoys ' ' which doctors

" Sur-reply 20 (emphasis added) (citing Ex. 2348, 24:6–8, 37:21–38:6, 40:10–18). As examined above, however, many of the features that make the Lucentis PFS " are not claimed in the '631 patent. Some of the reasons that it was are due to unclaimed features such as the

. Ex. 2201 ¶¶ 104–105; Ex. 2206 ¶¶ 46–48.

---

[23] These arguments related to the efficacy of the drug (ranibizumab) are relevant to claim 1 and to all claims that do not require ranibizumab.

**Regeneron Exhibit 1257.083**
**Regeneron v. Novartis**
**IPR2021-00816**

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

Petitioner persuasively argues, "Dr. Wolfe and ███████ ████████████████████████████████ testified that physicians use Lucentis PFS due to its convenience, which was a known PFS feature and not attributable to the '631 Patent claims." Pet. Reply 22 (citing Ex. 2209 ¶ 31; Ex. 1161, 115:8–14, 115:22–116:18; Ex. 1106 ¶¶ 30–34). As for convenience, this is also a feature not directly attributable to the claims of the '631 patent as we examine below.

As Petitioner's testifying ophthalmologist, Dr. Kiss, persuasively explains, "physicians overwhelmingly prefer a PFS over vial," and they do

> so for reasons that were already known in the prior art (e.g., Macugen PFS). A PFS requires fewer steps and less time to administer. For example, using a vial requires two needles while using a PFS requires only one. *See* Ex. 2209, ¶ 32. Because administering a PFS requires fewer steps and less time than a vial and syringe, using a PFS allows an ophthalmologist to treat more patients. Moreover, fewer steps with PFS translates to a clinically meaningful reduction in the rate of endophthalmitis. *See* Ex. 2215.003; *see also* Ex. 2209, ¶ 35 . . . . Therefore, ophthalmologists strongly prefer using the Lucentis PFS over the vial presentation of Lucentis because the PFS provides efficiency, convenience, and reduced risk of infection due to fewer administration steps.

Ex. 1106 ¶ 30.

Dr. Kiss and Dr. Wolfe (Patent Owner's testifying ophthalmologist) seem to agree that certain factors make a PFS much more preferable to use over a vial. Ex. 1106 ¶ 31; Ex. 2209 ¶ 31. These factors include that "PFS are 'significantly more convenient, save physician time, minimize risk of physician error, and decrease the risk of infection,'" and, a "reduced risk of infection from using a PFS" due "to the elimination of several steps in the

84

**Regeneron Exhibit 1257.084
Regeneron v. Novartis
IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

process required to transfer the medication from the vial to the syringe."
Ex. 1106 ¶ 31 (citing Ex. 2209 ¶ 35).  Dr. Kiss relies on ███████



███████      *Id.* ¶ 32 (citing Ex. 2171, 2).  Dr. Kiss testifies, and we find

persuasive, that "███████████████████████████████

████████████████████████████████████████

████████████████████████████████████." *Id.*

Thus, many of the attributes identified above that drive

ophthalmologists' use of the Lucentis PFS existed in prior art PFSs for

intravitreal injection.  *See id.*  "For example," Dr. Kiss points to the

"Macugen PFS and Trivaris PFS, both commercially available as pre-filled

syringes prior to 2012," as "provid[ing] ophthalmologists with efficiency,

convenience, reduced risk of infection due to fewer administration steps, and

more accurate dosing." *Id.* ¶ 33.  For these reasons, Dr. Kiss testifies

persuasively that "an ophthalmologist would very much prefer to use the

Lucentis PFS over a Lucentis vial format." *Id.* ¶ 34.

Testimony and evidence produced by both parties attributes a

significant portion of the success of the Lucent PFS to the drug used in the

product—ranibizumab.  For example, a Novartis employee overseeing all of

Novartis's development activities in ophthalmology testified that ███████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████. Ex. 1161,

85

**Regeneron Exhibit 1257.085**
**Regeneron v. Novartis**
**IPR2021-00816**

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

17:19–20, 115:22–116:18 ███████████████████████████
████████████████████████████████████████). As
Petitioner shows, however, "Lucentis PFS contains a single VEGF-
antagonist—ranibizumab—but the '631 Patent functionally claims any
VEGF-antagonist." Pet. Reply 23 (citing Ex. 1105 ¶ 99) (also noting claims
8–10 are limited to ranibizumab). Patent Owner has not persuasively shown
that a PFS comprising other VEGF-antagonists within the claim scope of
claim 1 would be successful.[24]  For instance, Petitioner produces persuasive
evidence showing that Beovu PFS, also developed by Novartis, and
allegedly within the scope of the claims, would not be successful. *See*
Ex. 1005, 42; Ex. 1106 ¶ 35 (noting "reports of Beovu causing 'severe
vision loss, retinal artery occlusion and/or vasculitis' (Ex. 1250)"; Ex. 1208,
58:5–15. Even though the PFS version of this drug has apparently "not yet
been launched" (Sur-reply 23) we find this presents additional evidence
showing the importance of ranibizumab to the success of the Lucentis PFS.
Because claim 1 encompasses any PFS that comprises any VEGF-
antagonist, regardless of how effective the drug product is, this presents

-------------------

[24] As noted above, claim 8 specifically requires "ranibizumab." The burden
is on Patent Owner to establish the significance of ranibizumab to the
secondary considerations asserted. Although a Novartis witnesses testifies
that the ██████████████████████████████████████████████
██████████████████" Patent Owner has not persuasively
argued or explained how embodiments of the invention requiring
ranibizumab (claims 8–10) would have been uniquely commercially
successful or how the drug relates to other secondary considerations.
Ex. 1161, 17:19–20.

86

Regeneron Exhibit 1257.086
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

further evidence that a nexus is lacking between the alleged commercial success of the Lucentis PFS and claim 1. Ex. 1105 ¶ 99; Ex. 1106 ¶ 34.

The low silicone oil content of Lucentis PFS presents a safer delivery system (as examined above) and this is achieved because Lucentis PFS "████████████████████████████████" (PO Resp. 51). The claims, however, cover up to about 100 µg of silicone oil (claims 1–21, 23–26) or about 50 µg (claim 22). Pet. Reply 24 (citing Ex. 1105 ¶ 98). There is evidence in the final record which suggests that 100 µg would have been unsuitable for Lucentis PFS. For example, "Dr. Sigg testified ████████ ████████████████████████████████ (Ex. 1158, 110:2–17), meaning the claims cover embodiments unsuitable for a commercial product." Pet. Reply 24. In essence, the breadth of claim scope up to about 100 µg of silicone oil encompasses successful ranges (Lucentis PFS) as well as the upper bounds that may be ████████████████████████████ ████ We do not give this 100 µg testimony considerable weight, however, because other evidence suggests that a "silicone oil level (*i.e.*, 100 µg) was low enough to avoid unwanted interactions with sensitive drugs." Ex. 1105 ¶ 119. Regardless, the upper bounds of claim 1 (up to 100 µg of silicone oil), would most likely "████████████████████████████ ████████████████████████████████," as testified by Dr. Sigg. Ex. 1158, 110:2–17.

We have considered Patent Owner's evidence related to the significant commercial success of the Lucentis PFS, including the declaration of Mr. Malackowski. PO Resp. 55–56; Ex. 2205. The data presented by Patent Owner shows that the launch of the Lucentis PFS

87

Regeneron Exhibit 1257.087
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

presentation in January 2017 helped to slow declining sales of the vial
presentation and sales eventually climbed higher than they had been at any
previous time.  PO Resp. 55 (citing Ex. 2099).  We disagree, however, with
Patent Owner's conclusion that "these data confirm nexus because they
show that it was the PFS presentation, embodying the '631 patent, that
enabled Genentech to reverse the downward trend for Lucentis and to
capture incremental sales and market share."  *Id.* at 56.  Patent Owner and
Mr. Malackowski wrongly focus on the purported nexus between
commercial success and the Lucentis PFS, instead of the nexus between
commercial success and the claimed inventions of the '631 patent.  *See*
Ex. 1107 ¶¶ 32–38 (Declaration of Lisa J. Cameron, Ph.D).  We agree with
Dr. Cameron that "Mr. Malackowski assumes that the Lucentis PFS is
coextensive with the claimed inventions of the '631 Patent," and thus,
"makes no attempt to establish a nexus between the claimed inventions of
the '631 Patent and the alleged commercial success of the PFS form of
Lucentis." *Id.* ¶ 34 (emphasis omitted).

   Although the Lucentis PFS earned significant sales,
"Mr. Malackowski fails to provide a systematic analysis of Lucentis PFS
revenues relative to those of other anti-VEGF treatments." *Id.* ¶ 33.  As one
example, Eylea, a leading FDA-approved, anti-VEGF treatment, was used to
treat more eyes than Lucentis both before and after the launch of the
Lucentis PFS and appears to have gained considerable market share over
Lucentis both before and after launch of the Lucentis PFS.  Ex. 1107 ¶ 23;
Ex. 2205 ¶ 42.

Regeneron Exhibit 1257.088
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

Further, we agree with Dr. Cameron that "Mr. Malackowski never addresses the critical issue of whether the PFS form of Lucentis has generated substantial incremental profits over and above those associated with the vial form of Lucentis." *Id.* For example, Mr. Malackowski relies on data showing that "Lucentis vial sales had generally increased from 2010 through 2014," and the sales of the Lucentis vial in the 12-month period before launch of the Lucentis PFS ███████████. Ex. 2205 ¶¶ 38–39. For the 12-month period after the launch of Lucentis PFS in 2017, however, sales remained fairly flat at ████████ showing almost no growth due to the PFS launch. *Id.* Mr. Malackowski presents evidence showing how Lucentis was losing market share to Eylea, but with the launch of Lucentis PFS the market ██████████████████████████████. *Id.* ¶¶ 39–42 ("Beginning in 2015 Lucentis vial sales began to decline," but "in 2017, Lucentis sales 'increased by 1% in the US, mainly driven by the launch of prefilled syringes' and growth in new indications."). Thus, although market share data is not required to show commercial success, Patent Owner's analysis of Lucentis PFS revenues relative to those of other anti-VEGF treatments is not persuasive to demonstrate the patented invention was a noticeable driver of commercial success. As a result, we find Mr. Malackowski's testimony less persuasive as to commercial success.

Based on the final record, the commercial success of Lucentis PFS was inadequately linked to the claimed invention. We determine that there is no nexus between any commercial success of Lucentis PFS and the '631 patent because "non-patented features and features known in the prior art underlay the commercial success." *Ethicon Endo-Surgery, Inc.*, 812 F.3d at

89

Regeneron Exhibit 1257.089
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

1034.  As set forth in our analysis above, all the claimed features were
already known in the art as demonstrated by Boulange and Sigg, and Patent
Owner has not persuasively established how claim 1 as a whole would have
driven the commercial success of Lucentis PFS apart from the non-patented
features.  Finally, although Patent Owner need not produce evidence of
commercial success for every potential embodiment of the claims, in this
instance, Novartis has not provided an adequate basis to support the
conclusion that other embodiments falling within the claims will behave in
the same manner.

Claim 8 of the '631 patent recites "the anti-VEGF antibody is
ranibizumab."  Apart from pointing out that Lucentis PFS contains
ranibizumab, Patent Owner has not persuasively explained why the subject
matter of this claim, apart from other claims, would have been commercially
successful.  *See* PO Resp. 51, 54 ("Claim 1 includes, but is not limited to,
ranibizumab.").  Similarly, claim 22 requires up to about 50 μg of silicone
oil, yet the Lucentis PFS uses "███████████████████████" *Id.*
Patent Owner has not shown whether a product with more than ███ of
silicone oil would have been viable, no less commercially successful.

<u>Long-felt Need, Failure of Others</u>

Because the evidence between long-felt need and failure of others is
so intertwined, we examine these indicia together.  "The existence of a long-
felt but unsolved need that is met by the claimed invention is further
objective evidence of non-obviousness."  *Millennium Pharms., Inc. v.
Sandoz Inc.*, 862 F.3d 1356, 1369 (Fed. Cir. 2017).  Establishing long-felt
need first requires objective evidence that a recognized problem existed in

90

**Regeneron Exhibit 1257.090**
**Regeneron v. Novartis**
**IPR2021-00816**

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

the art for a long period without solution.  *See Orthopedic Equip. Co., Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376 (Fed. Cir. 1983).  Second, another must not have satisfied the long-felt need before the invention of the challenged patent.  *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988).  Third, the invention of the challenged patent must satisfy the long-felt need.  *In re Cavanagh*, 436 F.2d 491, 496 (CCPA 1971); *see also Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332–33 (Fed. Cir. 2009) (articulating all three factors).

As noted above, Patent Owner makes arguments related to others attempting to solve the problem of high levels of silicone oil known to cause intravitreal contamination but ultimately failing.  The evidence in the final record establishes that others had PFS products that were terminally sterilized with VHP by at least 2010.  Ex. 1102 ¶¶ 14–21; Ex. 1105 ¶¶ 63–64.  Patent Owner has, however, shown how certain of these products had shortcomings as compared to the claimed invention.  Below, we consider each of these products, and how their development and commercialization impact long-felt need, failure of others, and skepticism.

Macugen PFS

Patent Owner alleges there was a long-felt need for the claimed invention, specifically "a terminally sterilized PFS for intravitreal injection of a VEGF-antagonist containing the claimed amounts of silicone oil," and "the only PFS for intravitreal injection of a VEGF-antagonist on the market (Macugen) had ████ of silicone oil and was known to cause 'intravitreal contamination by silicone oil droplets.'"  PO Resp. 56–57.  Petitioner counters that Macugen PFS successfully terminally sterilized a PFS by 2008.

91

Regeneron Exhibit 1257.091
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

Pet. Reply 26.  Further, Becton Dickson had already made public syringes
with less than 100 µg of silicone oil and break loose force less than 11 N,
i.e., Boulange.  Ex. 1003 ¶¶ 163–164.

      Based upon our review of the final record, Becton Dickinson
successfully manufactured Macugen PFS, a terminally sterilized 1 mL
syringe.  Ex. 1105 ¶ 62.  This product, however, never integrated the
teachings set forth in Becton Dickinson's Boulange application of reducing
the amount of silicone oil used in the pre-filled syringe.  *Id.*  As such, Patent
Owner has shown that the problems solved by reduced silicone oil in the
claimed invention were encountered by Macugen PFS and not solved.
Specifically, because Macugen PFS had up to █████ of silicone oil, the
excessive silicone oil caused some degree of intravitreal contamination.
PO Resp. 56–57; Ex. 2189, 44:19–21; Ex. 2001 ¶ 42 ("known to be
associated with accumulation of silicone oil droplets in patients' eyes")
(citing Ex. 1080, 1; Ex. 2023, 11–12).  Patent Owner's evidence of problems
attributable to silicone oil causing intravitreal contamination in Macugen
PFS is scant, thus, it does not appear to be a substantial recognized problem.
Although Becton Dickinson had disclosed (Boulange) ██████████
1 mL glass "███████" syringes comprising less than 50 µg silicone oil by
May 2011 (Ex. 1105 ¶ 138), Becton Dickinson never integrated its low
silicone oil know-how into the commercialized Macugen PFS to address any
issues with silicone oil causing intravitreal contamination.  Ex. 1105 ¶ 113;
Ex. 1215 ¶¶ 3–5; Ex. 1162, 1–6.

      The evidence and argument related to Macugen PFS is mixed, but
slightly in favor of Patent Owner.  The development of Macugen PFS does

**Regeneron Exhibit 1257.092**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

not necessarily evince a failure of others because the problems purportedly addressed by the claims of the '631 patent were either already met by Macugen PFS, or not a concern based on the evidence before us.  We agree with Petitioner that "Macugen PFS already met every need expressed by Novartis, except for the claimed silicone oil amount."  Pet. Reply 26 (citing Ex. 1105 ¶¶ 108–116).  Where we diverge from Petitioner's position is the argument that "[i]n turn, the silicone oil amounts were met by BD's baked-on syringes."  *Id.*  The evidence shows that Macugen PFS never integrated the teachings related to low silicone oil in a commercialized product.  Thus, there was a need to reduce silicone oil contamination that was not necessarily met by Macugen PFS.

Eylea PFS (2010)

As noted above, in an attempt to demonstrate that others succeeded before Patent Owner, Petitioner relies on the Eylea PFS, and alleges that "[b]y June 2010, Petitioner had reduced to practice a 1 mL Eylea pre-filled syringe that (i) was terminally sterilized, (ii) used a baked-on syringe with less than 100 µg of silicone oil on the syringe barrel, and (iii) met the requirements of the USP789," and thereafter "used in clinical studies and approved by regulatory authorities in Australia in 2012."  Pet. 73 (citing 14 pages of an ITC Brief – Ex. 1005, 109–110, 114–125; Ex. 1066); Pet. Reply 26–27 (citing 19 paragraphs of Dr. Graham's expert report – Ex. 1102 ¶¶ 14–29, 36, 40–41).

Petitioner's attempt to rely on Eylea PFS by making three bullet points with no supporting explanation as to how the arguments relate to the claims, and then incorporating dozens of pages of supporting material, is a

93

Regeneron Exhibit 1257.093
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

classic example of improper incorporation by reference, which we forbid.
37 CFR § 42.6(a)(3) ("Arguments must not be incorporated by reference
from one document into another document.").  Further, significant portions
of Ex. 1005 are redacted.  We decline to dig through excess, redacted,
material to discovery Petitioner's case.  Accordingly, Petitioner has not
shown that Eylea PFS is a proper example of others succeeding before
Patent Owner.

Patent Owner does not persuasively argue or point to evidence
showing that the Eylea PFS is an example of others striving to satisfy a long-
felt need, or that the Eylea PFS otherwise evinces a failure of others.
Instead, Patent Owner points out that "there is no evidence that the
Australian syringe that Mr. Koller points to was ever launched or that the
makers were actually successful in making a syringe that could be marketed
to physicians to treat patients."  Ex. 2201 ¶ 122.  Accordingly, the evidence
related to Eylea PFS does not support either party for this indicium.

Lucentis PFS – Genentech

Petitioner contends that "Novartis has not established that others
failed at developing a terminally sterilized PFS," because "███████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████."  Pet. Reply 26 (citing Ex. 1100 ¶¶ 58–59); *see*
Ex. 1100 ¶ 59 ("███████████████████████████████████████
█████████████████████████████████████████████████
████████").

94

**Regeneron Exhibit 1257.094**
**Regeneron v. Novartis**
**IPR2021-00816**

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

Patent Owner contends that "[t]he evidence does not support Petitioner's claim that Genentech █████████████████████████ ██████████████████████████████████ ███████ ██████ '" Sur-reply 18. Patent Owner argues, and we agree, that '█████████ ███████████████████████████████████████ ████████████ " *Id.* (citing Ex. 2203 ¶¶ 51–55, 83–88, 94). Petitioner's claim that █████████████████████████████████ ██████████████████ is not supported. ████████████ █████████████████████████████████ ████████████████████████████████████████ █████████████████████ Sur-reply 18 (citing Ex. 2339, 18:18–20:11). Thus, Patent Owner's position that ████ ████████████████████████████████████████ is supported. *Id.*

We find persuasive Patent Owner's explanation as to how ████████ ████████████████████████████████████████ ███████████████████████ *Id.* at 19 (citing Ex. 1210, 132:16–135:3, 150:6–154:2; Ex. 2115, 8). Further, we agree with Patent Owner's conclusion that ███████████████████████ ██████ █████████████████████████████ ████████████████████████████████ ████████ Ex. 2100, 164. Patent Owner persuasively shows that "[e]ven as of 2012, Genentech still believed that the preferred silicone oil amount for a

95

Regeneron Exhibit 1257.095
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

PFS containing a biologic like a VEGF-antagonist was between 200–
500 µg." PO Resp. 57 (citing Ex. 2022, 11).  However, the fact that █
████████████████████████████████████████████████ does not
necessarily translate to a failure to reduce silicone oil levels, as Patent
Owner recognizes it was not a concern.  The evidence related to ████████
█████████████████████████████████████████████████████
██████████████████ weighs slightly favorable to Patent Owner.
Ex. 2206 ¶¶ 5–18; Ex. 2194, 37:1–13.

Overall, we give Patent's Owner's evidence of long-felt need and
failure of others some weight in favor of patentability, but for the reasons set
forth below the weight is not significant when evaluating all evidence of
obviousness and non-obviousness.  Novartis characterizes the need that was
not met as including a "syringe with low levels of silicone oil" to prevent
silicone oil injection into the eye.  Ex. 2204 ¶¶ 80, 91 ("the problem of
silicone oil in the eye").  As Petitioner persuasively argues, "[t]he '631
Patent, however, only claims silicone oil applied to the syringe barrel,"
whereas "[s]ilicone oil can also be introduced into a PFS via the stopper and
filling process, neither of which are claimed."  Pet. Reply 25 (citing
Ex. 1105 ¶¶ 110–112; Ex. 1207, 22:2–23:14; Ex. 1211, 32:18–35:16).
Further, "whether the silicone oil migrates from the syringe barrel and into
the patient's eye depends on the process used to apply the oil, which also is
not claimed." *Id.* (citing Ex. 1105 ¶ 111; Ex. 1207, 35:20–36:6).  As we
have previously determined, the application of silicone oil through a baked-
on process is more precise and more homogenous, using approximately one-
tenth the silicone oil quantity of sprayed-on syringes. *See* Ex. 1003 ¶¶ 63–

96

**Regeneron Exhibit 1257.096**
**Regeneron v. Novartis**
**IPR2021-00816**

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**
IPR2021-00816
Patent 9,220,631 B2

65, 165 ("baking attaches the silicone oil to the inner surface of the syringe barrel, which reduces the amount of 'residual' or 'free' silicone oil that can enter the protein formulation and cause negative effects").

This evidence shows that producing a syringe that avoided silicone oil contamination was achieved not just by reducing the volume of oil coating the syringe, but also by the baked-on application process. Thus, for these reasons, the claims do not necessarily satisfy the need for a "syringe with low levels of silicone oil" that avoids silicone oil release into the eye. These other factors, including the oil on the stopper and filling process, are also important to satisfying that need, yet they are not claimed. As noted above, the invention of the challenged patent must satisfy the long-felt need.

Skepticism

As far as skepticism, we have considered both parties' contentions and find the evidence does not persuasively support either position, except for claim 22. Patent Owner's position is focused on communications between Vetter and Novartis. PO Resp. 59. Specifically, Patent Owner cites a statement that a syringe with ██████████████████████████████ ██████████████████████████████████████████" Ex. 2206 ¶¶ 24–26, 28; Exs. 2142, 2143.

We find no skepticism because the challenged claims cover up to about 100 µg, meaning ████████████████████████████████ █████████████████████████████████████████ ██████████. Ex. 1105 ¶¶ 117–120. Other evidence cited by Petitioner suggests that Vetter was ████████████████████████████████. *See*

97

Regeneron Exhibit 1257.097
Regeneron v. Novartis
IPR2021-00816

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

Ex. 1213, 101:9–103:3; Ex. 1168, 2–4; Ex. 2143, 2 (███████████████
███████████████████████████).

For claim 22, however, Patent Owner separately asserts that "████████
skepticism is particularly relevant to claim 22, which requires 'from about 1
to 50 µg silicone oil.'" PO Resp. 59. With regard to claim 22, we find the
████ communications show some skepticism by industry experts in
achieving the invention claimed, which requires a maximum of 50 µg
silicone oil. However, Petitioner has produced evidence showing that
Becton Dickinson was offering 1 mL syringes (but not PFS) with as low as
████████ of silicone oil on the barrel, consistent with Boulange, which
likewise discloses less than 50 µg of silicone oil for a 1 mL syringe barrel.
Ex. 1105 ¶ 120. Accordingly, the evidence in favor of patentability for
claim 22 is only slightly in Patent Owner's favor related to skepticism.

<u>Licensing</u>

Novartis asserts that licenses show the non-obviousness of the
'631 patent claims, specifically noting its license with Genentech ████████
██████████████████████. Sur-reply 26 (citing Ex. 2346,
54:1–13). Patent Owner does not, however, provide details as to how the
patent license shows a nexus to the claims at issue in the '631 patent.

Petitioner contends, and we agree, that Genentech's license has a
weak nexus to the '631 patent claims, because it is directed to ██████████
███████████████████ that are not disclosed in the '631 patent. Pet.
Reply 27 (citing Ex. 2121, 1; Ex. 1105 ¶¶ 124–132; Ex. 1107 ¶¶ 54–58).
The conveyed rights encompassed the ████████████████████████████
████████████████████ related to a pre-filled syringe. Ex. 1105

98

**Regeneron Exhibit 1257.098**
**Regeneron v. Novartis**
**IPR2021-00816**

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

¶ 125 (citing Ex. 2121, 10–14).  Notably, the '631 patent was licensed ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮    *Id.* (citing Ex. 2121, 22); Ex. 2206, 19–20 ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

In considering the Genentech license, "the relevant inquiry is whether there is a nexus between the patent and the licensing activity itself, such that the factfinder can infer that the licensing 'arose out of recognition and acceptance of the subject matter claimed' in the patent."  *GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995)).  Novartis does not persuasively establish that the licensing arose out of recognition and acceptance of the subject matter claimed in the '631 patent claims.  ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮  Yet, these things do not demonstrate a nexus between the '631 patent and the licensing activity itself.  Novartis has not cited to evidence showing that the value of the license was driven by the '631 patent specifically, as opposed to the value of the other ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮.  The licensing evidence provides, at most, a scant basis for assessing the value of the '631 patent.  The Genentech license provides little or no evidence of non-obviousness.

vi.    Overall Determination of Obviousness Based on all *Graham* Factors

In sum, having considered the complete record developed during trial, we conclude that Petitioner has demonstrated by a preponderance of the

99

Regeneron Exhibit 1257.099
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

evidence that the subject matter of claim 1 would have been obvious over the combined disclosures of Boulange, Sigg, and USP789.

Petitioner presents a strong case of obviousness and provides articulated reasons with sound support in the record for combining the references. Patent Owner's reasons why the person of skill in the art would not have made the combination run contrary to the teachings of the references and to the knowledge base of the skilled artisan at the time of invention. Patent Owner has not established a nexus between the commercial success of the Lucentis PFS and the subject matter of claim 1, in part because of "patentee's own assertions about the significance of the unclaimed features," and also because each claimed element was already known in the art and commercialized. *Fox Factory, Inc.*, 944 F.3d at 1375. The stronger evidence of obviousness cannot be overcome with the weaker evidence of long-felt need and failure of others tending to show nonobviousness. The evidence of licensing is weak at best because the '631 patent is but a minor piece of a larger agreement and the license provides a scant basis for assessing the value of the '631 patent.

Considering the totality of the evidence before us, Petitioner has established by a preponderance of the evidence that claim 1 would have been obvious for the reasons set forth above.

### 5.    *Claim 14*

We next consider five dependent claims that Patent Owner alleges are separately patentable over the combination of Sigg, Boulange, and USP789. *See* PO Resp. 32–41. We address each claim in turn.

100

**Regeneron Exhibit 1257.100**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

Claim 14 recites, "[a] pre-filled syringe according to claim 1, wherein the syringe has a stopper break loose force of less than about 5N, and wherein the syringe has a stopper slide force of less than about 5N."

Petitioner persuasively shows that the Table 5 of Boulange teaches a break loose force of 4.7 N for Stopper C, meeting claim 14's requirement of a stopper break loose force of less than about 5 N. Pet. 49–50.

Next, we examine the limitation requiring that "the syringe has a stopper slide force of less than about 5N." According to Mr. Koller, Boulange "discloses measurements of glide forces, labeled in Boulange as 'friction force S' and 'friction force F,' both of which are types of slide forces, measured at different points along the syringe barrel." Ex. 1003 ¶ 142. The disclosed slide force "F" for Stopper C in Table 5 of Boulange is less than 5 N (4.6 N), while the slide force "S" is 6.5 N. Mr. Koller testifies that "[b]ecause the '631 patent is silent as to when the stopper break loose force and glide forces are measured, or where along the syringe barrel the glide force is measured, a POSITA would understand that these forces could be measured at any time and glide force can be measured at any place along the syringe barrel." Ex. 1003 ¶ 146.

Mr. Koller also testifies that "it would have been a matter of routine optimization to achieve a force of less than 5 N for Force S for Stopper C in Table 5," because "a POSITA would have understood that the stopper slide force is proportional to the speed at which the stopper is tested." *Id.* Mr. Koller notes that "Boulange, for example, discloses that the tests were performed at 380 mm/min," and then testifies that "a POSITA would have known that the slide force of 6.5 N for Stopper C could be reduced to less

101

Regeneron Exhibit 1257.101
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

than 5 N by reducing the stopper speed, which a POSITA would have been
motivated to do to assess the forces at different speeds at which the user
could operate the syringe." *Id.* (citing Ex. 1008, 16:13–15; Ex. 1076, 5)
(describing testing at 4 mm/sec (*i.e.*, 240 mm/min), which is "representative
of manual syringe delivery").

Patent Owner contends that Petitioner's assertion of "routine
optimization" to achieve a slide force less than 5 N is a conclusory assertion
that is insufficient for Petitioner to meet its burden.  PO Resp. 32.  Patent
Owner argues that Petitioner failed to set forth some rational underpinning
for a routine optimization argument.  *Id.*  Patent Owner also believes that
Petitioner improperly incorporated by reference arguments from
Mr. Koller's declaration.  *Id.*

According to Patent Owner and its expert, Mr. Leinsing, "Mr. Koller's
'routine optimization' opinion is flawed," because "completely changing the
test used to assess a syringe's slide force in order to get a more favorable
result is not 'optimization,' particularly since the most obvious way for a
POSA to optimize a syringe to achieve lower forces would have been to add
more silicone oil." *Id.* at 33 (citing Ex. 2201 ¶ 144).  Mr. Leinsing directs us
to a test in Boulange using 500 µg of silicone and testifies that "the most
straightforward way for a POSA to optimize the syringe to address excessive
slide force would have been to increase the lubrication of the syringe by
increasing the amount of silicone oil." Ex. 2201 ¶ 144.  Without doing so,
Mr. Leinsing explains, a POSITA would not have expected to be able to
achieve lower slide forces.  *Id.*

102

**Regeneron Exhibit 1257.102
Regeneron v. Novartis
IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

We first consider that the break loose and slide forces are a measure of the force that would in practice be asserted by a clinician to depress the plunger.  Ex. 1001, 1:36–39.  Such a force, as pointed out by Mr. Koller, will be dependent on several factors, including the speed of depression, and also upon the type and volume of syringe coating, as discussed above and examined by Mr. Leinsing.  *See* Ex. 2201 ¶ 144.  Despite the fact that the speed of depressing the plunger will alter the force required to slide the plunger, it is unclear on the current record if there is an industry standard of the appropriate speed to conduct such tests.  For example, the '631 patent states that "[t]he forces are typically measured at a stopper travelling speed of 190 mm/min."  Ex. 1001, 5:44–45.

With that background in mind, Mr. Koller suggests that the speed of pressing the plunger is a variable that impacts force and testifies that changing the speed would have been routine optimization.  Specifically, changing Boulange's "380 mm/min" speed to "240 mm/min" as taught in an article from "Pharmaceutical Review – Technical Considerations in the Development of Pre-filled Syringes for Protein Products" (Ex. 1076) would have been simple optimization.  The speed (240 mm/min) is described in the article as "representative of manual syringe delivery."  Ex. 1076, 5.

Mr. Leinsing does not contest that the "240 mm/min" speed is an accurate "representative of manual syringe delivery," but instead he suggests that the most straightforward way to optimize slide forces would have been to increase the lubrication.  Even if true, we find Mr. Koller's optimization approach and explanations credible and more persuasive because the impetus for combining Sigg with Boulange was to minimize the volume of

103

**Regeneron Exhibit 1257.103**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

silicone oil on the syringe body, which would be defeated by Mr. Leinsing's optimization approach. *See* Ex. 1003 ¶ 159.

Next, we also are cognizant that the claim limitation requires "less than *about* 5N," which creates a degree of variance. The '631 patent states that "[t]he term 'about' in relation to a numerical value x means, *for example*, x±10%." Ex. 1001, 10:28–29 (emphasis added). Further, when the term "about" is used, it avoids a strict numerical boundary to the specified parameter. *See Cohesive Techs. v. Water Corp.*, 543 F.3d 1351 (Fed. Cir. 2008).

Within this context, we determine that Petitioner has persuasively established that it would have been a matter of routine optimization for a POSITA to achieve a slide force of "less than about 5N," for Force S for Stopper C in Table 5 (disclosed as 6.5 N with a speed of 380 mm/min). A POSITA would have understood that the stopper slide force is proportional to the speed at which the stopper is tested and that a speed of "240 mm/min" would have been representative of manual syringe delivery[25] such that the slide force of Stopper C in Table 5 of Boulange would have been less than about 5 N in optimized conditions that were more representative of manual syringe delivery. Ex. 1003 ¶¶ 183, 222. As persuasively explained by Mr. Koller, physicians typically inject at lower speeds. *Id.*

--------

[25] Although we do not rely on the teachings of the '631 patent, had Boulange's tests been conducted at the testing speed disclosed in the '631 patent, the resulting forces in Table 5 of Boulange would have been much less because of the decrease from 380 mm/min to 190 mm/min. *See* Ex. 1003 ¶¶ 183, 222 (explaining relationship of speed to force).

Regeneron Exhibit 1257.104
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

In addition, we credit Mr. Koller's testimony that the friction force S and friction force F disclosed in Boulange represent slide forces. Ex. 1003 ¶ 142. Based on that testimony, we agree with Mr. Koller that friction force "F"[26] for Stopper C in Table 5 of Boulange, which is less than 5 N (4.6 N), satisfies the slide force limitation in claim 14. Ex. 1003 ¶ 222. As Mr. Koller explained, claim 14 does not limit when or where along the syringe barrel the glide force is measured, thus, slide force "F" (4.6 N) alone would also satisfy claim 14. *Id.* ¶ 144.

Because the POSITA was already attempting to minimize the silicone content in the Boulange and Sigg combination (as detailed above) we disagree that a POSITA would have been more inclined to just add more silicone oil as proposed by Mr. Leinsing. Finally, we do not see Petitioner's citation to one supporting paragraph in Mr. Koller's declaration as improper incorporation by reference.

Having now considered the evidence in the complete record established during trial, we are persuaded that, based on this record, Petitioner has demonstrated by a preponderance of the evidence that claim 14 would have been obvious over Sigg, Boulange, and USP789.

---

[26] "[T]he friction force F is the force required, again in dynamic mode, to move the piston 3 when it reaches the end of its travel in the container 2." Ex. 1008, 15:13–15.

**Regeneron Exhibit 1257.105
Regeneron v. Novartis
IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

6.    *Claim 17*

Claims 17 depends from claim 1 and further requires "[a] blister pack comprising a pre-filled syringe according to claim 1, wherein the syringe has been sterilized using $H_2O_2$ or EtO."

Petitioner asserts that "Sigg discloses a pre-filled syringe in a blister pack that is terminally sterilized by vaporized hydrogen peroxide ($H_2O_2$)." Pet. 51 (citing Ex. 1007, 6:26–28, 9:1–4; Ex. 1003 ¶¶ 228–229). Petitioner relies on Sigg's disclosure that "a prefilled container 100 previously filled . . . is decontaminated on surfaces 102 following encasement or packaging in a secondary package 104 by vaporized-hydrogen peroxide.  Ex. 1007, 8:21–24.

Patent Owner challenges Petitioner's assertion as lacking both motivation and reasonable expectation of success.  PO Resp. 33–34.  Patent Owner asserts that a POSITA would have preferred Sigg's beta irradiation method, which is outside the scope of claim 17.  Novartis examines "Example 1 of Sigg, which uses VHP," but allegedly "provides no information about experiment conditions and no data demonstrating whether, or how well, the method worked to sterilize the syringes."  *Id.* at 34 (citing Ex. 2021 ¶ 64; Ex. 1007, 20:10–21:11).  Patent Owner argues that "there is no indication that sterility testing was even done."  *Id.* (citing Ex. 2001 ¶ 64; Ex. 1007, 20:10–21:11); Ex. 2203 ¶ 59.  Patent Owner contends that "Example 2, which uses beta irradiation, contains far more useful information" about specific performance "under the test conditions."  *Id.*  Novartis reasons that picking "Sigg's VHP method while ignoring its beta irradiation method is based purely on the hindsight knowledge."  *Id.*

106

Regeneron Exhibit 1257.106
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Further, Patent Owner alleges that a POSITA "would not have reasonably expected to combine Boulange with Sigg's VHP method," because "[t]here is no example in Sigg of successful use of VHP to terminally sterilize a PFS." *Id.*

We have already considered, and found unpersuasive, Patent Owner's related arguments – Sigg's enablement and reasonable expectation of success of a VHP method to terminally sterilize a PFS. We incorporate that analysis from above. Further, we add that a disclosed motivation does not necessarily have to be the best option, only that it be a suitable option. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800 (Fed. Cir. 2021) ("It's not necessary to show that a combination is 'the best option, only that it be a suitable option.'" (quoting *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1197–98 (Fed. Cir. 2014)). Sigg encourages the use of VHP as "ideal for surface decontamination of prefilled containers," and, as such, it is a suitable option. Pet. Reply 15 (quoting Ex. 1007, 8:8–13). As examined above, we find the disclosures in Sigg persuasive.

Further, a POSITA would have had a reasonable expectation of success with Sigg's VHP method, even in light of Example 1, which Patent Owner alleges contains insufficient details. Sigg discloses that syringes were "treated with a vaporized hydrogen peroxide sterilization treatment" without affecting protein stability. Ex. 1007, 20:11–21:3. Further, Sigg describes that VHP is "*ideal* for surface decontamination of prefilled containers, yet not harmful to the stability or integrity of the contents of the prefilled container." *Id.* at 8:8–13 (emphasis added). As Mr. Koller persuasively testifies, "Sigg teaches using VHP to sterilize prefilled syringes

107

Regeneron Exhibit 1257.107
Regeneron v. Novartis
IPR2021-00816

  
IPR2021-00816
Patent 9,220,631 B2

without impacting the drug product, which provides further motivation for
its use." Ex. 1105 ¶ 78; *see also* Ex. 1100 ¶¶ 40–42.

Having now considered the evidence in the complete record
established during trial, we are persuaded that, based on this record,
Petitioner has demonstrated by a preponderance of the evidence that claim
17 would have been obvious over Sigg, Boulange, and USP789.

### 7.    *Claim 21*

Claim 21, depending from Claim 17, further requires "a pre-filled
syringe . . . wherein the syringe has been sterilized using EtO or $H_2O_2$ with a
Sterility Assurance Level of at least $10^{-6}$."

Petitioner relies on Sigg and its disclosure of sterilizing the syringe
with $H_2O_2$. Pet. 53. According to Petitioner, "Sigg defines sterile to mean
the complete absence of microbial life, and discloses that the desired sterility
assurance level (SAL) is at least $10^{-6}$." *Id.* (citing Ex. 1007, 7:8–13
("'Sterility' as used herein is meant to refer to complete absence of
microbial life as defined by . . . a sterility assurance level (SAL) . . . . SALs
for health care products are defined to be at least $10^{-6}$.")). Petitioner relies
on the testimony of Mr. Koller, who reasons that because Sigg discloses a
SAL of at least $10^{-6}$, "[i]t would also be routine optimization for a POSITA
to achieve a sterility assurance level of $10^{-6}$ for the syringe." Ex. 1003
¶¶ 236–238. Petitioner further contends that "Novartis's assertion that
Sigg's disclosure of an SAL of $10^{-6}$ does not apply to VHP is contradicted
by Sigg, and also by Novartis's prior representations to the USPTO." Pet.
Reply 15–16.

108

**Regeneron Exhibit 1257.108**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

Patent Owner argues that "Mr. Koller's opinions contain fundamental mistakes about sterility assurance levels." PO Resp. 35. Specifically, "Mr. Koller[] opines that a log reduction and an SAL are the same thing, and that a 6-log reduction equates to an SAL of $10^{-6}$," is "incorrect, as is confirmed by Patent Owner's expert, Dr. Miller, who, unlike Mr. Koller, is a microbiologist and expert in sterilization." *Id.* at 36 (citing Ex. 2209 ¶ 90) (Declaration of Michael J. Miller, Ph.D). As counsel for Patent Owner elaborated at oral hearing, "an SAL of $10^{-6}$, as is explained by our expert Dr. Miller, is a stringent sterility requirement," and "[i]t requires longer treatment often, harsher treatment conditions, and it can lead to additional exposure of the drug to the sterilizing gases and to damage to the drug and it would lower the reasonable expectation of success." Tr. 52:12–16.

Patent Owner contends that "Petitioner's general statement that 'Sigg discloses a SAL of at least $10^{-6}$' (Pet. 53) is insufficient to meet its burden on claim 21, as the claim specifically requires an SAL of at least $10^{-6}$ *using VHP or ETO.*" PO Resp. 37. Patent Owner argues that because Sigg identifies two methods of terminal sterilization, beta irradiation and VHP, but only links its beta irradiation method with achieving a SAL of $10^{-6}$, Petitioner has failed to meet its burden. *Id.* (citing Ex. 2189, 64:15–65:1, 58:9–13, 59:11–14). Patent Owner notes that "claim 15 of Sigg recites achieving an SAL of $10^{-6}$ using beta irradiation," yet, "[t]here is no similar claim for VHP." *Id.* Patent Owner argues that Example 1, which uses VHP, provides no information on SAL. *Id.* at 34. Patent Owner contends that "Petitioner has not even attempted to provide a specific motivation for a POSA to use Sigg's VHP method to achieve an SAL of $10^{-6}$," and "Mr.

109

Regeneron Exhibit 1257.109
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

Koller fails to explain how this 'routine optimization' would have been achieved." *Id.* at 38. Patent Owner relies on the real-world example of the difficulty using sterilizing gases to terminally sterilize the Lucentis PFS to an SAL of $10^{-6}$. *Id.*

We find Petitioner's contentions more persuasive. Sigg defines "sterility" for a health care product as $10^{-6}$ and describes VHP as a "sterilization" treatment. Ex. 1007, 7:6–13, 20:11–16; Ex. 1003 ¶ 237. Mr. Koller and Dr. Agalloco persuasively explain that Sigg discloses that VHP achieves an SAL of $10^{-6}$, because Sigg describes that the "*required SALs* for health care products are defined to be at least $10^{-6}$," which includes syringes. Ex. 1007, 7:8–13 (emphasis added); Ex. 1105 ¶ 81; Ex. 1100 ¶¶ 43–48. Establishing an SAL of $10^{-6}$ is based on regulatory requirements and a requirement for all PFS syringes. Ex. 1100 ¶ 43 ("a person knowledgeable in microbiology and sterilization techniques would understand that Sigg's VHP method is expected to achieve an SAL of $10^{-6}$ for the disclosed syringes because that was the required SAL for syringes"). Mr. Koller testifies that "Sigg repeatedly refers to VHP as a terminal sterilization method," and "a POSITA would interpret Sigg as disclosing that VHP is a method of achieving sterility for syringes, which Sigg defines as an SAL of $10^{-6}$." Ex. 1105 ¶ 81.

We find persuasive Mr. Koller's explanation of the difference between the terms "sterilization" and "sanitization." *Id.* ¶ 82. As explained by Mr. Koller, "Dr. Sigg explained that an SAL of $10^{-6}$ is understood to mean 'sterilization,' while an SAL of $10^{-3}$ is understood to mean 'sanitization,'" and thus, "[b]y using the term 'sterilization' in the Sigg

110

**Regeneron Exhibit 1257.110**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

application, Dr. Sigg intended to communicate that the method he developed was able to achieve an SAL of $10^{-6}$." *Id.* (citing Ex. 2206 ¶ 14; Ex. 1213, 63:8–64:5).

Our analysis is further confirmed by examining the prosecution history of the Sigg '380 Application (previously discussed above). Ex. 1252. In the '380 Application, Novartis submitted claims during prosecution directed to an SAL of $10^{-6}$ using VHP. Specifically, Novartis represented to the Office that the following was encompassed within the scope of the Sigg '380 Application:

> applying vaporized-hydrogen peroxide to the surface of the prefilled syringe in secondary packaging;

> allowing vaporized-hydrogen peroxide to remain in contact with the prefilled syringe surface for a sufficient time to decontaminate the prefilled syringe <u>to a sterility assurance level of at least $10^{-6}$</u>;

*Id.* at 292. Thus, Novartis previously represented to the USPTO that Sigg includes such a disclosure to enable VHP to achieve a sterility assurance level of at least $10^{-6}$. *See* Tr. 28:21–24 ("That's an admission that the Sigg references discloses VHP sterilization to an SAL of $10^{-6}$."). We find the about-face in this proceeding unpersuasive.

Having now considered the evidence in the complete record established during trial, we are persuaded that, based on this record, Petitioner has demonstrated by a preponderance of the evidence that claim 21 would have been obvious over Sigg, Boulange, and USP789.

**Regeneron Exhibit 1257.111**
**Regeneron v. Novartis**
**IPR2021-00816**

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

        8.    *Claim 22*

Claim 22 depends from claim 1 and further requires, "wherein the syringe barrel has an internal coating of from about 1-50 μg silicone oil."

Petitioner argues "Boulange discloses an internal coating of silicone oil on the syringe barrel of 40 μg." Pet. 48 (citing Ex. 1008, 20:15–17 ("a silicone lubricant was deposited . . . onto the internal surface of the syringe body 2, at a rate of 40 μg for a surface area of 10 cm$^2$"); Ex. 1003 ¶¶ 214–216).

Patent Owner contends that "Claim 22 further limits the amount of silicone oil on the syringe barrel to 'from about 1-50 μg,'" and "Petitioner's arguments fail for the same reasons discussed above for claim 1, and based on the objective indicia of nonobviousness discussed below." PO Resp. 39. As we previously mentioned, the commercial Lucentis PFS uses ███████ █████████████████████, yet, Patent Owner has not shown whether a product with more than ██████ of silicone oil would have been viable, no less commercially successful. Further, Patent Owner argues "███████ skepticism is particularly relevant to claim 22." *Id.* at 59.

We previously determined that the evidence in favor of patentability for claim 22 is only slightly in Patent Owner's favor related to skepticism. Similarly, although claim 22 is closer to being coextensive with the Lucentis PFS than claim 1, claim 22 still covers a larger range of silicone oil. Weighing all the evidence of record before us, including Boulange's disclosure of an internal coating of silicone oil on the syringe barrel of 40 μg, the evidence of nonobviousness does not overcome Petitioner's stronger case of obviousness for claim 22.

112

**Regeneron Exhibit 1257.112**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

Having now considered the evidence in the complete record established during trial, we are persuaded that, based on this record, Petitioner has demonstrated by a preponderance of the evidence that claim 22 would have been obvious over Sigg, Boulange, and USP789.

### 9. *Claim 24*

Claim 24 is "[a] method treating a patient suffering from of an ocular disease," requiring, *inter alia*, "administering an ophthalmic solution to the patient using a pre-filled syringe according to claim 1."

Petitioner relies on Sigg's disclosure of "ranibizumab (e.g. 6mg/ml or 10 mg/ml) solution for intravitreal injection," as teaching the requirement of claim 24 of treating wet AMD or macular edema. Pet. 54 (quoting Ex. 1007, 9:11–14). Petitioner notes that "[b]y 2010, ranibizumab was approved for at least the treatment of wet AMD and macular edema following RVO." *Id.* (citing Ex. 1031 ¶¶ 33–37; Ex. 1027, 1 (Lucentis Label)).

Petitioner further relies on the testimony of Dr. Kiss as to how "ophthalmologists were well aware that the listed diseases were caused by or related to abnormal VEGF expression and therefore could be treated by a VEGF-antagonist." Ex. 1031 ¶ 34. Dr. Kiss testifies that based on Sigg disclosing a sterilized, pre-filled syringe including Lucentis, an ophthalmologist would have understood that the very purpose of a pre-filled syringe including Lucentis is to treat a patient suffering from ocular diseases listed in claim 24. *Id.* ¶ 36. Dr. Kiss opines that if "the pre-filled syringe of claim 1 is obvious, then the step of using an ophthalmic solution in a prefilled syringe to treat the recited list of diseases would also have been

113

**Regeneron Exhibit 1257.113**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

obvious and well within the ordinary skill and routine practice of an ophthalmologist." *Id.* ¶ 37.

Patent Owner contends that Petitioner's showing how ranibizumab was approved for treatment of two of the specified ocular diseases is "insufficient for Petitioner to meet its burden of proving motivation and reasonable expectation of success for Claims 24–26." PO Resp. 39–40. Patent Owner argues the appropriate "questions are whether a POSA would have been motivated to combine Sigg and Boulange to make a PFS within claim 1 that could be used by a doctor to treat a patient with those ocular diseases, and whether the POSA would have reasonably expected success in doing so." *Id.* at 40. Patent Owner contends that a POSITA would need a reasonable expectation of success of using a PFS up until its expiration date. *Id.* at 41.

Patent Owner further argues "[a]n ophthalmologist would similarly not be motivated to use a PFS that had inconsistent forces because it could damage a patient's eye." Sur-reply 17.

We begin by addressing Patent Owner's last contention – an ophthalmologist would be dissuaded from using the proposed combination if it had an inconsistent or high force profile. *See* Ex. 2204 ¶¶ 67–73. We have fully examined this argument above and found it unpersuasive. Stopper C was tested at a speed of 380 mm/min (Ex. 1008, 16:13–15) and it displayed an increase in force from 4.7 N to 8.4 N (after accelerated aging), which we determine would not be an inconsistent "force profile" that would affect an ophthalmologist's use of the syringe. *Id.*; Ex. 1105 ¶¶ 37, 41. The values for Stopper C are within the claimed "about 11N," but more importantly,

114

**Regeneron Exhibit 1257.114**
**Regeneron v. Novartis**
**IPR2021-00816**

**PROTECTIVE ORDER MATERIAL HAS BEEN REDACTED**

IPR2021-00816
Patent 9,220,631 B2

well under the 20 N that the '631 patent acknowledges was known to be
acceptable for intravitreal injection. *Id.* Mr. Koller persuasively shows how
a force increase of less than 4 N after aging would have been expected and
acceptable "based on tolerances and variations in manufacturing processes,"
as evidenced by data from Regeneron demonstrating that the break loose
force for Eylea PFS can vary from approximately ███████████. *Id.*
Ex. 1105 ¶ 41 (citing Ex. 1154, 15). Further, Dr. Calman, on behalf of
Patent Owner, fails to identify what constitutes a "high" force, or what
amount of variation would make the forces "unpredictable" for an
ophthalmologist. *See* Ex. 2204 ¶¶ 67–73; Ex. 1106 ¶ 13.

Next, Patent Owner improperly injects FDA expiration dates into the
scope of the claimed subject matter. The '631 patent does not claim any
efficacy over any time period. Petitioner must prove only that a POSITA
would have had a motivation to combine accompanied by a reasonable
expectation of achieving what is actually claimed. Petitioner has met its
burden of showing a reasonable expectation of achieving what
is claimed. Petitioner demonstrated that combining Sigg, Boulange and
USP789 would result in a sterile syringe comprising reduced silicone oil and
forces suitable for intravitreal injection. Pet. 32 (silicone oil), 35 (USP789
compliance), 38–39 (break loose and slide forces). Petitioner further
demonstrated that an ophthalmologist would have administered the resulting
syringe, as required by claims 24–26, because ranibizumab was a known
treatment for wet-AMD. *Id.* at 54, 68–71; *see also* Ex. 1105 ¶¶ 89–94.

Having now considered the evidence in the complete record
established during trial, we are persuaded that, based on this record,

115

**Regeneron Exhibit 1257.115**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

Petitioner has demonstrated by a preponderance of the evidence that claim
24 would have been obvious over Sigg, Boulange, and USP789.

### 10.    *Remaining Claims Not Separately Challenged*

Petitioner asserts that Claims 2, 3, 5–9, 15, 16, and 18–20 would have
been obviousness based on the combination of Sigg, Boulange, and USP789.
Pet. 31–40, 47–53.  Petitioner identifies disclosures in the prior art
references that teach the limitations of these claims, and provides persuasive
reasoning as to why the claimed subject matter would have been obvious to
one of ordinary skill in the art.  *Id.*  Petitioner also supports its contentions
for these claims with expert testimony, including from Mr. Koller.  Ex. 1003
¶¶ 211–235.  For the same reasons discussed above, and for the additional
reasons set forth by Petitioner, we determine that Petitioner has met its
burden of demonstrating by a preponderance of the evidence that claims 2,
3, 5–9, 15, 16, and 18–20 are unpatentable.  *See id.*

Patent Owner does not present any arguments for these claims other
than those we have already considered and, more specifically, Patent Owner
has not made any argument that these remaining dependent claims are
separately patentable.  Accordingly, we determine that Patent Owner has
waived that right.  *See* Paper 14, 8 (Scheduling Order) ("Patent Owner is
cautioned that any arguments not raised in the response may be deemed
waived.").

Having now considered the evidence in the complete record
established during trial, we are persuaded that, based on this record,
Petitioner has demonstrated by a preponderance of the evidence that claims

116

**Regeneron Exhibit 1257.116**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

2, 3, 5–9, 15, 16, and 18–20 would have been obvious over Sigg, Boulange, and USP789.

### E. Obviousness over Sigg, Boulange, USP789, and Fries

Petitioner contends that claims 4, 10, and 23 of the '631 patent would have been obvious over the combined teachings of Sigg, Boulange, USP789, and Fries. Pet. 65–66.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claims 4, 10, and 23 are unpatentable.

### 1. Fries

Fries is a 2009 article titled "Drug Delivery of Sensitive Biopharmaceuticals With Prefilled Syringes." Ex. 1012. Fries details that silicone oil has displayed incompatibilities with "sensitive biopharmaceuticals" including "aggregation, deformation, and inactivation of native protein structures," and likewise recommends baked-on siliconization as a preferred method. *Id.* at 6. Fries further describes the benefits of baked-on siliconization for pre-filled syringes. *Id.* ("[I]interactions with sensitive biopharmaceuticals have been Observed . . . . Advanced siliconization technology has been developed to lower the level of free (non-bound) silicone oil in prefilled syringes."). Fries discloses that Dow Corning 365 (*i.e.*, DC365) is used for baked-on siliconization in pre-filled syringes. *Id.*

117

**Regeneron Exhibit 1257.117**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

>    2.    *Claims 4, 10, and 23*

Dependent claims 4, 10, and 23 require that the silicone oil is DC365 and has a viscosity of about 350 cP and claim 10 further recites particulate content requirements from USP789.  Petitioner contends, and we agree, that these limitations would have been obvious based on Sigg, Boulange, USP789, and Fries.  Pet. 65–66; Ex. 1003 ¶¶ 239–242.

We find persuasive Mr. Koller's testimony that "it was well known in the art prior to 2012 that DC365 was used as a silicone oil emulsion in the baked-on process, and was a preferred commercially-available emulsion for baking silicone onto syringe barrels."  Ex. 1003 ¶ 240.  Further, Mr. Koller persuasively testifies that Fries teaches that DC365 is used for baked-on siliconization in pre-filled syringes and that DC365, which contains DC360 oil, was typically used for syringe siliconization.  *Id.* (citing Ex. 1012, 6).  Finally, we also agree with Mr. Koller that "[a] POSITA would [] have been motivated to combine the design option disclosed in Fries regarding the type of silicone oil with the siliconized syringe disclosed in Boulange given that both publications pertain to lowering the amount of silicone oil and using baked-on siliconization."  *Id.* ¶ 241.

Patent Owner does not present any arguments for these claims other than those we have already considered and, more specifically, Patent Owner has not made any argument that these dependent claims are separately patentable.  Accordingly, we determine that Patent Owner has waived that right.

We have considered the evidence and arguments of record, including those directed to claim 1 addressed above, and we determine that Petitioner

118

**Regeneron Exhibit 1257.118**
**Regeneron v. Novartis**
**IPR2021-00816**

**Appx118**

IPR2021-00816
Patent 9,220,631 B2

has demonstrated by a preponderance of the evidence that claims 4, 10, and 23 would have been obvious over the combined teachings of Sigg, Boulange, USP789, and Fries for the reasons discussed in the Petition and as supported by the testimony of Mr. Koller. *See, e.g.*, Pet. 65–66; Ex. 1003 ¶¶ 239–242.

### F. Obviousness over Sigg, Boulange, USP789, and Furfine

Petitioner contends that claims 11–13 of the '631 patent would have been obvious over the combined teachings of Sigg, Boulange, USP789, and Furfine. Pet. 67–68.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claims 11–13 are unpatentable.

### 1. Furfine

Furfine is a patent publication titled "VEFG Antagonist Formulations Suitable for Intravitreal Administration," and assigned to Regeneron Pharmaceuticals, Inc. (Petitioner). Ex. 1021, codes (54), (71). Furfine "is directed to pharmaceutical formulations suitable for intravitreal administration comprising agents capable of inhibiting vascular endothelial growth factor (VEGF), and to methods for making and using such formulations." *Id.* ¶ 1. Further, "[t]he invention includes liquid pharmaceutical formulations having increased stability, as well as formulations that may be lyophilize and reconstituted for intravitreal administration." *Id.* According to Mr. Koller, "Furfine discloses aflibercept,

119

Regeneron Exhibit 1257.119
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

which is a non-antibody VEGF-antagonist for intravitreal injection."
Ex. 1003 ¶¶ 156–157, 243–246, 293.

> ### 2. *Claims 11–13*

Dependent claims 11–13 require that the VEGF-antagonist is a non-antibody VEGF antagonist, which can be aflibercept at a concentration of 40 mg/ml.

Petitioner persuasively shows how "Furfine discloses the non-antibody VEGF-antagonist aflibercept in a 1 ml pre-filled glass syringe." Pet. 68 (citing Ex. 1021 ¶¶ 5, 6, 36, 45, 59, 61; Ex. 1003 ¶¶ 239–242. Specifically, Furfine discloses "VEGF Trap," which the '631 patent acknowledges is aflibercept. Ex. 1021 ¶ 59; Ex. 1001, 6:37–41. Petitioner argues, and we agree, that "[a] POSITA would have been motivated to use aflibercept in a terminally sterilized pre-filled syringe, as disclosed in Sigg," because of the advantages of prefilled containers described by Sigg and because "Sigg further discloses that its terminal sterilization method is applicable to 'all drug products' and 'provide[s] the device to an end user with a low bioburden and low risk of contaminants.'" Pet. 67; Ex. 1003 ¶¶ 243–246, 293. "Thus," Petitioner persuasively shows that "a POSITA would have recognized that it would be desirable to administer aflibercept . . . via a terminally sterilized pre-filled syringe (Sigg []) using a baked-on syringe (Boulange) to achieve the resulting benefits described above." Pet. 67; Ex. 1003 ¶¶ 243–246, 293.

Patent Owner does not present any arguments for these claims other than those we have already considered and, more specifically, Patent Owner has not made any argument that these dependent claims are separately

Regeneron Exhibit 1257.120
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

patentable.  Accordingly, we determine that Patent Owner has waived that right.

We have considered the evidence and arguments of record, including those directed to claim 1 addressed above, and we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 11–13 would have been obvious over the combined teachings of Sigg, Boulange, USP789, and Furfine for the reasons discussed in the Petition and as supported by the testimony of Mr. Koller.  *See, e.g.*, Pet. 67–68; Ex. 1003 ¶¶ 243–246, 293.

### G. Obviousness over Sigg, Boulange, USP789, and 2008 Macugen Label

Petitioner contends that claim 25 of the '631 patent would have been obvious over the combined teachings of Sigg, Boulange, USP789, and 2008 Macugen Label.  Pet. 68–70.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claim 25 is unpatentable.

#### 1.    2008 Macugen Label

We have previously discussed Macugen and its delivery system as a PFS.  *See* Ex. 1009, 11.  The 2008 Macugen Label is the prescribing information from the "Drugs.com" website (available March 7, 2011), which "presents product monographs approved by the US Food and Drug Administration (FDA) and compiled by drug manufacturers."  Ex. 1039, 1; Ex. 1009.

121

**Regeneron Exhibit 1257.121**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

The 2008 Macugen Label describes using a pre-filled syringe to treat wet AMD with the VEGF-antagonist Macugen. Ex. 1009, 7–8. The 2008 Macugen Label describes a priming step in which the physician depresses the plunger "to eliminate all the bubbles and to expel the excess drug so that the top edge of the 3rd rib on the plunger stopper aligns with the preprinted black dosing line." *Id.* at 7.

       *2.*    *Claim 25*

Dependent claim 25, which depends from claim 24, comprises an initial priming step in which a physician depresses the plunger of the pre-filled syringe to align the predetermined part of the stopper with the priming mark. Petitioner contends, and we agree, that these limitations would have been obvious based on Sigg, Boulange, USP789, and 2008 Macugen Label as explained by the testimony of Dr. Kiss. Pet. 68–70; Ex. 1031 ¶¶ 32, 38–39.

We find persuasive Petitioner's contention that "[a] priming step to align a plunger with a dosing line (*i.e.*, priming mark) was a known design that is broadly applicable to pre-filled syringes containing a drug product." Pet. 69–70 (citing Ex. 1031 ¶¶ 32, 38–39). The '631 patent describes the priming mark as "allow[ing] the physician to align a pre-determined part of the stopper . . . with the mark, thus expelling excess ophthalmic solution and any air bubbles from the syringe." Ex. 1001, 2:25–32. "Thus," as Petitioner contends, "the 'priming mark' of the '631 Patent is synonymous with the 'dosing line' of the 2008 Macugen Label." *Id.* at 69. Dr. Kiss persuasively explains that this priming step was a known technique, and a POSITA would have been motivated to include this feature in the pre-filled syringe disclosed

122

**Regeneron Exhibit 1257.122**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

in Sigg to remove air bubbles and expel excess drug product to ensure accurate dosing, as described in the 2008 Macugen Label.  Ex. 1031 ¶¶ 32, 38–39.

Patent Owner does not present any arguments for this claim other than those we have already considered and, more specifically, Patent Owner has not made any argument that this dependent claim is separately patentable. Accordingly, we determine that Patent Owner has waived that right.

We have considered the evidence and arguments of record, including those directed to claim 1 addressed above, and we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 25 would have been obvious over the combined teachings of Sigg, Boulange, USP789, and 2008 Macugen Label for the reasons discussed in the Petition and as supported by the testimony of Dr. Kiss.  *See, e.g.*, Pet. 68–70; Ex. 1031 ¶¶ 32, 38–39.

### *H. Obviousness over Sigg, Boulange, USP789, and Dixon*

Petitioner contends that claim 26 of the '631 patent would have been obvious over the combined teachings of Sigg, Boulange, USP789, and Dixon.  Pet. 70–71.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claim 26 is unpatentable.

123

**Regeneron Exhibit 1257.123**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

### 1.  Dixon

Dixon is an article from *Expert Opinion on Investigational Drugs* (Volume 18, October 2009), which is a recurring publication.  Ex. 1030, 1. Dixon describes advantages associated with using aflibercept, including less frequent injections that would provide "the opportunity to significantly reduce treatment burden on patients and physicians."  Ex. 1030, 8.  Dixon further describes that "[i]n contrast to current anti-VEGF antibodies, which are rapidly cleared, [aflibercept] is relatively inert, and is degraded more slowly."  *Id*.  Before aflibercept was approved, "[b]y far the most commonly used anti-VEGF drugs currently in use for neovascular AMD are ranibizumab and bevacizumab," which are both antibody VEGF-antagonists. *Id.* at 5.

### 2.  Claim 26

Dependent claim 26 further requires that the VEGF-antagonist to be administered is a non-antibody VEGF-antagonist where the patient has previously received treatment with an antibody VEGF-antagonist.

Petitioner, supported by the testimony of Dr. Kiss, persuasively argues that because "[a]flibercept was ultimately approved by the FDA in 2011 and viewed as a superior option for the treatment of neovascular AMD . . . it would have been obvious to treat a patient with aflibercept (a non-antibody VEGF-antagonist), wherein the patient has previously received treatment with ranibizumab (an antibody VEGFantagonist)."  Pet. 70–71; Ex. 1031 ¶¶ 40–42.

Patent Owner does not present any arguments for this claim other than those we have already considered and, more specifically, Patent Owner has

124

Regeneron Exhibit 1257.124
Regeneron v. Novartis
IPR2021-00816

IPR2021-00816
Patent 9,220,631 B2

not made any argument that claim 26 is separately patentable.  Accordingly,
we determine that Patent Owner has waived that right.

We have considered the evidence and arguments of record, including
those directed to claim 1 addressed above, and we determine that Petitioner
has demonstrated by a preponderance of the evidence that claim 26 would
have been obvious over the combined teachings of Sigg, Boulange, USP789,
and Dixon for the reasons discussed in the Petition and as supported by the
testimony of Dr. Kiss.  *See, e.g.*, Pet. 70–71; Ex. 1031 ¶¶ 40–42.

### I.  *Obviousness Grounds with Lam*

Petitioner relies upon Lam as being interchangeable with Sigg in each
ground.  *See* Pet. 1, 21, 55 ("For the reasons set forth above with respect to
Sigg, a POSITA would have been motivated to combine the terminally
sterilized pre-filled syringe comprising ranibizumab disclosed in Lam."), 65,
67, 68, 70.

As discussed in detail above, Petitioner has demonstrated by a
preponderance of the evidence that each challenged claim would have been
obvious over Sigg, Boulange, USP789, and an additional reference for
certain dependent claims.  Because we have already determined that each
challenged claim is unpatentable based on the Sigg, Boulange and USP789
combinations, we need not reach these additional grounds where Lam is
substituted for Sigg in each ground.  *See Boston Sci. Scimed, Inc. v. Cook
Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) ("[T]he Board need not
address issues that are not necessary to the resolution of the proceeding.").

125

**Regeneron Exhibit 1257.125
Regeneron v. Novartis
IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

## IV.    CONCLUSION

In summary:[27]

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 5–9, 14–22, 24 | 103 | Sigg, Boulange, USP789 | 1–3, 5–9, 14–22, 24 | |
| 4, 10, 23 | 103 | Sigg, Boulange, USP789, Fries | 4, 10, 23 | |
| 11–13 | 103 | Sigg, Boulange, USP789, Furfine | 11–13 | |
| 25 | 103 | Sigg, Boulange, USP789, 2008 Macugen Label | 25 | |
| 26 | 103 | Sigg, Boulange, USP789, Dixon | 26 | |
| 1–3, 5–9, 14–22, 24 | | Lam,[28] Boulange, USP789 | | |
| 4, 10, 23 | | Lam, Boulange, USP789, Fries | | |
| 11–13 | | Lam, Boulange, USP789, Furfine | | |

---

[27] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[28] As noted above, because we have already determined that each challenged claim is unpatentable based on the combinations containing Sigg, we need not reach grounds where Lam is substituted for Sigg.

126

**Regeneron Exhibit 1257.126**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

| | | | | |
|---|---|---|---|---|
| 25 | | Lam, Boulange, USP789, 2008 Macugen Label | | |
| 26 | | Lam, Boulange, USP789, Dixon | | |
| **Overall Outcome** | | | 1–26 | |

## V.    ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 1–26 of the '631 patent have been shown to be unpatentable; and,

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

127

**Regeneron Exhibit 1257.127**
**Regeneron v. Novartis**
**IPR2021-00816**

IPR2021-00816
Patent 9,220,631 B2

FOR PETITIONER:

Anish Desai
Christopher Pepe
Elizabeth Weiswasser
WEIL GOTSHAL & MANGES, LLP
anish.desai@weil.com
christopher.pepe@weil.com
elizabeth.weiswasser@weil.com

FOR PATENT OWNER:

Elizabeth Holland
William James
Nicholas Mitrokostas
ALLEN & OVERY LLP
elizabeth.holland@allenovery.com
william.james@allenovery.com
nicholas.mitrokostas@allenovery.com

Linnea Cipriano
Joshua Weinger
Duncan Greenhalgh
GOODWIN PROCTER LLP
lcipriano@goodwinlaw.com
jweinger@goodwinprocter.com
dgreenhalgh@goodwinlaw.com

128

**Regeneron Exhibit 1257.128**
**Regeneron v. Novartis**
**IPR2021-00816**



US009220631B2

(12) **United States Patent**
Sigg et al.

(10) **Patent No.:**     **US 9,220,631 B2**
(45) **Date of Patent:**     **Dec. 29, 2015**

(54) **SYRINGE**

(71) Applicant: **Novartis AG**, Basel (CH)

(72) Inventors: **Juergen Sigg**, Loerrach (DE);
**Christophe Royer**, Munich (DE);
**Andrew Mark Bryant**, Basel Land
(CH); **Heinrich Martin Buettgen**,
Rheinfelden (CH); **Marie Picci**,
Ranspack-le-bas (FR)

(73) Assignee: **Novartis AG**, Basel (CH)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/750,352**

(22) Filed: **Jan. 25, 2013**

(65) **Prior Publication Data**

US 2014/0012227 A1     Jan. 9, 2014

(30) **Foreign Application Priority Data**

| | | |
|---|---|---|
| Jul. 30, 2012 | (EP) | .................................... 12174860 |
| Oct. 23, 2012 | (EP) | .................................... 12189649 |
| Nov. 16, 2012 | (AU) | ................................ 2012101677 |
| Nov. 16, 2012 | (AU) | ................................ 2012101678 |
| Nov. 23, 2012 | (DE) | .................... 20 2012 011 016 U |
| Nov. 23, 2012 | (DE) | .................... 20 2012 011 259 U |
| Nov. 23, 2012 | (DE) | .................... 20 2012 011 260 U |
| Dec. 3, 2012 | (EP) | .................................... 12195360 |
| Jan. 23, 2013 | (AU) | ................................ 2013100070 |
| Jan. 23, 2013 | (AU) | ................................ 2013100071 |
| Jan. 23, 2013 | (DE) | .................... 20 2013 000 688 U |

(51) **Int. Cl.**
| | |
|---|---|
| *A61M 5/00* | (2006.01) |
| *A61F 9/00* | (2006.01) |
| *A61M 5/178* | (2006.01) |

(Continued)

(52) **U.S. Cl.**
CPC ............. *A61F 9/0008* (2013.01); *A61K 9/0019*
(2013.01); *A61K 9/0048* (2013.01); *A61K*
*38/179* (2013.01); *A61M 5/002* (2013.01);
*A61M 5/178* (2013.01); *A61M 5/28* (2013.01);
*A61M 5/31* (2013.01); *A61M 5/315* (2013.01);
*A61M 5/31505* (2013.01); *A61M 5/31513*
(2013.01);

(Continued)

(58) **Field of Classification Search**
CPC ........ A61K 9/0048; A61F 9/008; A61M 5/31
USPC .................................................. 604/218, 294
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,090,081 | A * | 7/2000 | Sudo et al. .................... | 604/230 |
| 7,141,042 | B2 * | 11/2006 | Lubrecht ....................... | 604/230 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 2012101677 A4 | 12/2012 |
| AU | 2012101678 A4 | 12/2012 |

(Continued)

OTHER PUBLICATIONS

Badkar et al., "Development of biotechnology products in pre-filled
syringes: technical considerations and approaches", AAPS
PharmaSciTech, vol. 12, No. 2, pp. 564-572, (Jun. 2011).

(Continued)

*Primary Examiner* — Aarti B Berdichevsky
(74) *Attorney, Agent, or Firm* — Michael Mazza

(57) **ABSTRACT**

The present invention relates to a syringe, particularly to a
small volume syringe such as a syringe suitable for oph-
thalmic injections.

**26 Claims, 1 Drawing Sheet**



Fig 2

**Regeneron Exhibit 1001.001**

**US 9,220,631 B2**

Page 2

(51) **Int. Cl.**

| | |
|---|---|
| *A61M 5/315* | (2006.01) |
| *A61M 9/00* | (2006.01) |
| *A61K 38/17* | (2006.01) |
| *A61M 5/28* | (2006.01) |
| *A61M 5/31* | (2006.01) |

(52) **U.S. Cl.**
CPC ................. A61M 2005/3104 (2013.01); A61M 2005/3139 (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,303,748 | B2 * | 12/2007 | Wiegand et al. | .......... 424/134.1 |
| 2006/0172944 | A1 * | 8/2006 | Wiegand et al. | ............... 514/12 |
| 2006/0293270 | A1 | 12/2006 | Adamis et al. | |
| 2007/0190058 | A1 * | 8/2007 | Shams | ...................... 424/145.1 |
| 2008/0312607 | A1 * | 12/2008 | Delmotte et al. | ............ 604/230 |
| 2010/0310309 | A1 | 12/2010 | Abendroth et al. | |
| 2011/0257601 | A1 | 10/2011 | Furfine et al. | |
| 2011/0276005 | A1 * | 11/2011 | Hioki et al. | ................... 604/187 |
| 2012/0078224 | A1 | 3/2012 | Lerner et al. | |
| 2013/0012918 | A1 | 1/2013 | Foster | |
| 2014/0249484 | A1 * | 9/2014 | Jones et al. | ................... 604/230 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 201578690 U | 9/2010 |
| DE | 10 2008 005938 A1 | 7/2009 |
| EP | 0264273 A2 | 4/1988 |
| EP | 0879611 A2 | 11/1998 |
| EP | 2371406 | 10/2011 |
| JP | 2001-104480 | 4/2001 |
| JP | 2002241264 A2 | 8/2002 |
| WO | 97/44068 A1 | 11/1997 |
| WO | 2006047325 A1 | 5/2006 |
| WO | 2006128564 A1 | 12/2006 |
| WO | WO 2007/035621 A1 | 3/2007 |
| WO | 2007084765 A2 | 7/2007 |
| WO | WO 2007/149334 A2 | 12/2007 |
| WO | WO2010/060748 | 6/2010 |
| WO | 2010136492 | 12/2010 |
| WO | WO 2011/123722 A1 | 10/2011 |
| WO | WO2011/135067 | 11/2011 |
| WO | WO 2012/134528 A1 | 10/2012 |
| WO | WO 2012/149040 A2 | 11/2012 |
| WO | 2014/005728 A1 | 1/2014 |

OTHER PUBLICATIONS

Ausubel et al., "Current Protocols in Molecular Biology", 7.7.18 of Current protocols in Molecular Biology, eds., supplement 30, (1987).
Badkar et al., Analysis of Two Commercially Available Bortezomib Products : Differences in Assay of Active Agent and Impurity Profile >> AAPS PharmaSciTech, vol. 12, No. 2, pp. 564-572, (Jun. 2011).

Schoenknecht, "Requirements on pre-fillable glass suringes", AAPS National Biotechnology Conference 2007—Abstract No. NBC07-000488, 2007.
Holash et al., "VEGF-Trap: A VEGF blocker with potent anitumor effects", PNAS USA, vol. 99, No. 17, pp. 11393-11398, (Aug. 20, 2002).
Riely & Miller, "Vascular Endothelial Growth Factor Trap in Non-Small Cell lung Cancer", Clin Cancer Res, 13:4623-7s, (Aug. 1, 2007).
Li et al., "KH906, a recombinant human VEGF receptor fusion protein, is a new effective topical treatment for corneal neovascularization", Molecular Vision, 17:797-803,(Mar. 25, 2011).
Smith & Waterman, "Comparison of Biosequences", Adv Appl. Math, 2:482-489, (1981).
Chan et al: "Syringe Siliconization Process Investigation and Optimization" Journal of Pharmaceutical Science and Technology, Issue 66, pp. 137, 147-148, Mar. 2012.
Lankers: "The Relationship Between Silicone Layer Thickness, Free Silicone Oil and Protein Aggregation in Prefilled Syringes" 2010 AAPS National Biotechnology Conference San Francisco, Slides 25, 39, 46, May 19, 2010.
Majumdar et al: "Evaluation of the Effect of Syringe Surfaces on Protein Formulations" Journal of Pharmaceutical Sciences, Issue 100, pp. 2563-2573, Jul. 2011.
Bakri and Ekdawi: "Intravitreal Silicone Oil Droplets after Intravitreal Drug Injections" Retina, Issue 28, pp. 996-1001, Jul. 2008.
Daikyo Ru Crystal Zenith Insert Needle Syringe System, West Delivering Innovative Solutions, 2010.
Meyer et al: "Steps for a Safe Intravitreal Injection Technique",Meyer et al. "Steps for a Safe Intravitreal Injection Technique"Retinal Physician, p. 3, Jul. 1, 2009.
"Biopharmaceuticals—SPE applications", RapID Particle Systems, Single Particle Explore, D6a, Sep. 28, 2015, http //www.particle-explorer.com/yourapplications/biopharaceuticals/index.html[Sep. 16, 2015 11:12:45].
Email dated Sep. 9, 2015 from Elizabeth Scuderl, Senior meeting Manager, AAPS to Teresa Homnch re Inquiry about publication of conference abstract.
Tibor Hlobik: "Reducing quality risks to drug products and meeting needs of patients with enhanced components for prefilled syringe systems". West Delivering Innovative Solutions, www. ondrugdelivery.com, 2012 No. 33, pp. 32-34.
Summary of Product Characteristics—Zaltrap (undated).
"Ranibizumab", Scientific Discussion, EMEA, 2007, pp. 1-54.
"Avastin", Scientific Discussion, EMEA, 2005, pp. 1-61.
Melmet Selim Kocabora, et al. "Intreavitreal silicone oil droplets following pegaptanib injection", Acta Ophthalmologica, 2010 e44-345.
N. Clunas, et al: "Ranibizumab pre-filled syringe: recently approved innovation in the Eurpean Union with the potential to reduce infection risk, improve does accuracy, and enhance efficient treatment administration". Congress on Controversies in Ophthamology, Abstract, 2014.
"COPHy Poster List—Group A"(Poster 17), The 5th World congress on Controversies in Opthalmology (COPHy) Mar. 20-23, 2014, Lisbon, Portugal.

* cited by examiner

Regeneron Exhibit 1001.002

U.S. Patent                    Dec. 29, 2015            US 9,220,631 B2



Fig 1

Fig 2

Fig 3

Fig 4

Fig 5

Regeneron Exhibit 1001.003

US 9,220,631 B2

**1**

# SYRINGE

## TECHNICAL FIELD

The present invention relates to a syringe, particularly to a small volume syringe such as a syringe suitable for ophthalmic injections.

## BACKGROUND ART

Many medicaments are delivered to a patient in a syringe from which the user can dispense the medicament. If medicament is delivered to a patient in a syringe it is often to enable the patient, or a caregiver, to inject the medicament. It is important for patient safety and medicament integrity that the syringe and the contents of that syringe are sufficiently sterile to avoid infection, or other, risks for patients. Sterilisation can be achieved by terminal sterilisation in which the assembled product, typically already in its associated packaging, is sterilised using heat or a sterilising gas.

For small volume syringes, for example those for injections into the eye in which it is intended that about 0.1 ml or less of liquid is to be injected the sterilisation can pose difficulties that are not necessarily associated with larger syringes. Changes in pressure, internal or external to the syringe, can cause parts of the syringe to move unpredictably, which may alter sealing characteristics and potentially compromise sterility. Incorrect handling of the syringe can also pose risks to product sterility.

Furthermore, certain therapeutics such as biologic molecules are particularly sensitive to sterilisation, be it cold gas sterilisation, thermal sterilisation, or irradiation. Thus, a careful balancing act is required to ensure that while a suitable level of sterilisation is carried out, the syringe remains suitably sealed, such that the therapeutic is not compromised. Of course, the syringe must also remain easy to use, in that the force required to depress the plunger to administer the medicament must not be too high.

There is therefore a need for a new syringe construct which provides a robust seal for its content, but which maintains ease of use.

## DISCLOSURE OF THE INVENTION

The present invention provides a pre-filled syringe, the syringe comprising a body, a stopper and a plunger, the body comprising an outlet at an outlet end and the stopper being arranged within the body such that a front surface of the stopper and the body define a variable volume chamber from which a fluid can be expelled though the outlet, the plunger comprising a plunger contact surface at a first end and a rod extending between the plunger contact surface and a rear portion, the plunger contact surface arranged to contact the stopper, such that the plunger can be used to force the stopper towards the outlet end of the body, reducing the volume of the variable volume chamber, characterised in that the fluid comprises an ophthalmic solution. In one embodiment, the ophthalmic solution comprises a VEGF-antagonist.

In one embodiment, the syringe is suitable for ophthalmic injections, more particularly intravitreal injections, and as such has a suitably small volume. The syringe may also be silicone oil free, or substantially silicone oil free, or may comprise a low level of silicone oil as lubricant. In one embodiment, despite the low silicone oil level, the stopper break loose and slide force is less than 20N.

**2**

For ophthalmic injections, it is particularly important for the ophthalmic solution to have particularly low particle content. In one embodiment, the syringe meets US Pharmacopeia standard 789 (USP789).

Syringe

The body of the syringe may be a substantially cylindrical shell, or may include a substantially cylindrical bore with a non circular outer shape. The outlet end of the body includes an outlet through which a fluid housed within the variable volume chamber can be expelled as the volume of said chamber is reduced. The outlet may comprise a projection from the outlet end through which extends a channel having a smaller diameter than that of the variable volume chamber. The outlet may be adapted, for example via a luer lock type connection, for connection to a needle or other accessory such as a sealing device which is able to seal the variable volume chamber, but can be operated, or removed, to unseal the variable volume chamber and allow connection of the syringe to another accessory, such as a needle. Such a connection may be made directly between the syringe and accessory, or via the sealing device. The body extends along a first axis from the outlet end to a rear end.

The body may be made from a plastic material (e.g. a cyclic olefin polymer) or from glass and may include indicia on a surface thereof to act as an injection guide. In one embodiment the body may comprise a priming mark. This allows the physician to align a pre-determined part of the stopper (such as the tip of the front surface or one of the circumferential ribs, discussed later) or plunger with the mark, thus expelling excess ophthalmic solution and any air bubbles from the syringe. The priming process ensures that an exact, pre-determined dosage is administered to the patient.

The stopper may be made from rubber, silicone or other suitable resiliently deformable material. The stopper may be substantially cylindrical and the stopper may include one or more circumferential ribs around an outer surface of the stopper, the stopper and ribs being dimensioned such that the ribs form a substantially fluid tight seal with an internal surface of the syringe body. The front surface of the stopper may be any suitable shape, for example substantially planar, substantially conical or of a domed shape. The rear surface of the stopper may include a substantially central recess. Such a central recess could be used to connect a plunger to the stopper using a snap fit feature or thread connection in a known manner. The stopper may be substantially rotationally symmetric about an axis through the stopper.

The plunger comprises a plunger contact surface and extending from that a rod extends from the plunger contact surface to a rear portion. The rear portion may include a user contact portion adapted to be contacted by a user during an injection event. The user contact portion may comprise a substantially disc shaped portion, the radius of the disc extending substantially perpendicular to the axis along which the rod extends. The user contact portion could be any suitable shape. The axis along which the rod extends may be the first axis, or may be substantially parallel with the first axis.

The syringe may include a backstop arranged at a rear portion of the body. The backstop may be removable from the syringe. If the syringe body includes terminal flanges at the end opposite the outlet end the backstop may be configured to substantially sandwich terminal flanges of the body as this prevent movement of the backstop in a direction parallel to the first axis.

The rod may comprise at least one rod shoulder directed away from the outlet end and the backstop may include a backstop shoulder directed towards the outlet end to cooperate with the rod shoulder to substantially prevent movement

Regeneron Exhibit 1001.004

US 9,220,631 B2

3

of the rod away from the outlet end when the backstop shoulder and rod shoulder are in contact. Restriction of the movement of the rod away from the outlet end can help to maintain sterility during terminal sterilisation operations, or other operations in which the pressure within the variable volume chamber or outside the chamber may change. During such operations any gas trapped within the variable volume chamber, or bubbles that may form in a liquid therein, may change in volume and thereby cause the stopper to move. Movement of the stopper away from the outlet could result in the breaching of a sterility zone created by the stopper. This is particularly important for low volume syringes where there are much lower tolerances in the component sizes and less flexibility in the stopper. The term sterility zone as used herein is used to refer to the area within the syringe that is sealed by the stopper from access from either end of the syringe. This may be the area between a seal of the stopper, for example a circumferential rib, closest to the outlet and a seal of the stopper, for example a circumferential rib, furthest from the outlet. The distance between these two seals defines the sterility zone of the stopper since the stopper is installed into the syringe barrel in a sterile environment.

To further assist in maintaining sterility during the operations noted above the stopper may comprise at a front circumferential rib and a rear circumferential rib and those ribs may be separated in a direction along the first axis by at least 3 mm, by at least 3.5 mm, by at least 3.75 mm or by 4 mm or more. One or more additional ribs (for example 2, 3, 4 or 5 additional ribs, or between 1-10, 2-8, 3-6 or 4-5 additional ribs) may be arranged between the front and rear ribs. In one embodiment there are a total of three circumferential ribs.

A stopper with such an enhanced sterility zone can also provide protection for the injectable medicament during a terminal sterilisation process. More ribs on the stopper, or a greater distance between the front and rear ribs can reduce the potential exposure of the medicament to the sterilising agent. However, increasing the number of ribs can increase the friction between the stopper and syringe body, reducing ease of use. While this may be overcome by increasing the siliconisation of the syringe, such an increase in silicone oil levels is particularly undesirable for syringes for ophthalmic use.

The rod shoulder may be arranged within the external diameter of the rod, or may be arranged outside the external diameter of the rod. By providing a shoulder that extends beyond the external diameter of the rod, but still fits within the body, the shoulder can help to stabilise the movement of the rod within the body by reducing movement of the rod perpendicular to the first axis. The rod shoulder may comprise any suitable shoulder forming elements on the rod, but in one embodiment the rod shoulder comprises a substantially disc shaped portion on the rod.

In one embodiment of the syringe, when arranged with the plunger contact surface in contact with the stopper and the variable volume chamber is at its intended maximum volume there is a clearance of no more than about 2 mm between the rod shoulder and backstop shoulder. In some embodiments there is a clearance of less than about 1.5 mm and in some less than about 1 mm. This distance is selected to substantially limit or prevent excessive rearward (away from the outlet end) movement of the stopper.

In one embodiment the variable volume chamber has an internal diameter greater than 5 mm or 6 mm, or less than 3 mm or 4 mm. The internal diameter may be between 3 mm and 6 mm, or between 4 mm and 5 mm.

In another embodiment the syringe is dimensioned so as to have a nominal maximum fill volume of between about 0.1 ml

4

and about 1.5 ml. In certain embodiments the nominal maximum fill volume is between about 0.5 ml and about 1 ml. In certain embodiments the nominal maximum fill volume is about 0.5 ml or about 1 ml, or about 1.5 ml.

The length of the body of the syringe may be less than 70 mm, less than 60 mm or less than 50 mm. In one embodiment the length of the syringe body is between 45 mm and 50 mm.

In one embodiment, the syringe is filled with between about 0.01 ml and about 1.5 ml (for example between about 0.05 ml and about 1 ml, between about 0.1 ml and about 0.5 ml, between about 0.15 ml and about 0.175 ml) of a VEGF antagonist solution. In one embodiment, the syringe is filled with 0.165 ml of a VEGF antagonist solution. Of course, typically a syringe is filled with more than the desired dose to be administered to the patient, to take into account wastage due to "dead space" within the syringe and needle. There may also be a certain amount of wastage when the syringe is primed by the physician, so that it is ready to inject the patient.

Thus, in one embodiment, the syringe is filled with a dosage volume (i.e. the volume of medicament intended for delivery to the patent) of between about 0.01 ml and about 1.5 ml (e.g. between about 0.05 ml and about 1 ml, between about 0.1 ml and about 0.5 ml) of a VEGF antagonist solution. In one embodiment, the dosage volume is between about 0.03 ml and about 0.05 ml. For example, for Lucentis, the dosage volume is 0.05 ml or 0.03 ml (0.5 mg or 0.3 mg) of a 10 mg/ml injectable medicament solution; for Eylea, the dosage volume is 0.05 ml of a 40 mg/ml injectable medicament solution. Although unapproved for ophthalmic indications, bevacizumab is used off-label in such ophthalmic indications at a concentration of 25 mg/ml; typically at a dosage volume of 0.05 ml (1.25 mg). In one embodiment, the extractable volume from the syringe (that is the amount of product obtainable from the syringe following filling, taking into account loss due to dead space in the syringe and needle) is about 0.09 ml.

In one embodiment the length of the syringe body is between about 45 mm and about 50 mm, the internal diameter is between about 4 mm and about 5 mm, the fill volume is between about 0.12 and about 0.3 ml and the dosage volume is between about 0.03 ml and about 0.05 ml.

As the syringe contains a medicament solution, the outlet may be reversibly sealed to maintain sterility of the medicament. This sealing may be achieved through the use of a sealing device as is known in the art. For example the OVS™ system which is available from Vetter Pharma International GmbH.

It is typical to siliconise the syringe in order to allow ease of use, i.e. to apply silicone oil to the inside of the barrel, which decreases the force required to move the stopper. However, for ophthalmic use, it is desirable to decrease the likelihood of silicone oil droplets being injected into the eye. With multiple injections, the amount of silicone oil droplets can build up in the eye, causing potential adverse effects, including "floaters" and an increase in intra-ocular pressure. Furthermore, silicone oil can cause proteins to aggregate. A typical 1 ml syringe comprises 100-800 µg silicone oil in the barrel, though a survey of manufacturers reported that 500-1000 µg was typically used in pre-filled syringes (Badkar et al. 2011, AAPS PharmaSciTech, 12(2):564-572). Thus, in one embodiment, a syringe according to the invention comprises less than about 800 µg (i.e. about less than about 500 µg, less than about 300 µg, less than about 200 µg, less than about 100 µg, less than about 75 µg, less than about 50 µg, less than about 25 µg, less than about 15 µg, or less than about 10 µg) silicone oil in the barrel. If the syringe comprises a low level of silicone oil, this may be more than about 1 µg, more than

Regeneron Exhibit 1001.005

US 9,220,631 B2

about 3 µg, more than about 5 µg, more than about 7 µg or more than about 10 µg silicone oil in the barrel. Thus, in one embodiment, the syringe may comprise about 1 µg-about 500 µg, about 3 µg-about 200 µg, about 5 µg-about 10 µg or about 10 µg-about 50 µg silicone oil in the barrel. Methods for measuring the amount of silicone oil in such a syringe barrel are known in the art and include, for example, differential weighing methods and quantitation by infrared-spectroscopy of the oil diluted in a suitable solvent. Various types of silicone oil are available, but typically either DC360 (Dow Corning®; with a viscosity of 1000 cP) or DC365 emulsion (Dow Corning®; DC360 with a viscosity of 350 cP) are used for syringe siliconisation. In one embodiment, the pre-filled syringe of the invention comprises DC365 emulsion.

During testing it was surprisingly found that, for syringes having small dimensions, such as those discussed above, and particularly those described in conjunction with the Figures below, the break loose and sliding forces for the stopper within the syringe are substantially unaffected by reducing the siliconisation levels far below the current standard to the levels discussed here. This is in contrast to conventional thinking that would suggest that if you decrease the silicone oil level, the forces required would increase (see e.g. Schoenknecht. AAPS National Biotechnology Conference 2007— Abstract no. NBC07-000488, which indicates that while 400 µg silicone oil is acceptable, usability improves when increased to 800 µg). Having too great a force required to move the stopper can cause problems during use for some users, for example accurate dose setting or smooth dose delivery may be made more difficult if significant strength is required to move, and/or keep in motion, the stopper. Smooth administration is particularly important in sensitive tissues such as the eye, where movement of the syringe during administration could cause local tissue damage. Break loose and slide forces for pre-filled syringes known in the art are typically in the region of less than 20N, but where the pre-filled syringes contain about 100 µg-about 800 µg silicone oil. In one embodiment the glide/slide force for the stopper within the pro-filled syringe is less than about 11N or less than 9N, less than 7N, less than 5N or between about 3N to 5N. In one embodiment, the break loose force is less than about 11N or less than 9N, less than 7N, less than 5N or between about 2N to 5N. Note that such measurements are for a filled syringe, rather than an empty syringe. The forces are typically measured at a stopper travelling speed of 190 mm/min. In one embodiment, the forces are measured with a 30 G×0.5 inch needle attached to the syringe. In one embodiment, the syringe has a nominal maximal fill volume of between about 0.5 ml and 1 ml, contains less than about 100 µg silicone oil and has a break loose force between about 2N to 5N.

In one embodiment the syringe barrel has an internal coating of silicone oil that has an average thickness of about 450 nm or less (i.e. 400 nm or less, 350 nm or less, 300 nm or less, 200 nm or less, 10 nm or less, 50 nm or less, 20 nm or less). Methods to measure the thickness of silicone oil in a syringe are known in the art and include the rap.ID Layer Explorer® Application, which can also be used to measure the mass of silicone oil inside a syringe barrel.

In one embodiment, the syringe is silicone oil free, or substantially silicone oil free. Such low silicone oil levels can be achieved by using uncoated syringe barrels and/or by avoiding the use of silicone oil as a lubricant for product contacting machine parts, or pumps in the syringe assembly and fill line. A further way to reduce silicone oil and inorganic silica levels in a pre-filled syringe is to avoid the use of silicone tubing in filling lines, for example between storage tanks and pumps.

The syringe according to the invention may also meet certain requirements for particulate content. In one embodiment, the ophthalmic solution comprises no more than 2 particles ≥50 µm in diameter per ml. In one embodiment, the ophthalmic solution comprises no more than 5 particles ≥25 µm in diameter per ml. In one embodiment, the ophthalmic solution comprises no more than 50 particles ≥10 µm in diameter per ml. In one embodiment, the ophthalmic solution comprises no more than 2 particles ≥50 µm in diameter per ml, no more than 5 particles ≥25 µm in diameter per ml and no more than 50 particles ≥10 µm in diameter per ml. In one embodiment, a syringe according to the invention meets USP789 (United States Pharmacopoeia: Particulate Matter in Ophthalmic Solutions). In one embodiment the syringe has low levels of silicone oil sufficient for the syringe to meet USP789.

VEGF Antagonists
Antibody VEGF Antagonists

VEGF is a well-characterised signal protein which stimulates angiogenesis. Two antibody VEGF antagonists have been approved for human use, namely ranibizumab (Lucentis®) and bevacizumab (Avastin®).

Non-Antibody VEGF Antagonist

In one embodiment, the non-antibody VEGF antagonist is an immunoadhesin. One such immuoadhesin is aflibercept (Eylea®), which has recently been approved for human use and is also known as VEGF-trap (Holash et al. (2002) PNAS USA 99:11393-98; Riely & Miller (2007) Clin Cancer Res 13:4623-7s). Aflibercept is the preferred non-antibody VEGF antagonist for use with the invention. Aflibercept is a recombinant human soluble VEGF receptor fusion protein consisting of portions of human VEGF receptors 1 and 2 extracellular domains fused to the Fc portion of human IgG1. It is a dimeric glycoprotein with a protein molecular weight of 97 kilodaltons (kDa) and contains glycosylation, constituting an additional 15% of the total molecular mass, resulting in a total molecular weight of 115 kDa. It is conveniently produced as a glycoprotein by expression in recombinant CHO K1 cells. Each monomer can have the following amino acid sequence (SEQ ID NO: 1):

```
SDTGRPFVEMYSEIPEIIHMTEGRELVIPCRVTSPNITVTLKKFPLDTLIPDGKRIIWDSRKGFIISNATY

KEIGLLTCEATVNGHLYKTNYLTHRQTNTIIDVVLSPSHGIELSVGEKLVLNCTARTELNVGIDFNWEYPS

SKHQHKKLVNRDLKTQSGSEMKKFLSTLTIDGVTRSDQGLYTCAASSGLMTKKNSTFVRVHEKDKTHTCPP

CPAPELLGGPSVFLFPPKPKDTLMISRTPEVTCVVVDVSHEDPEVKFNWYVDGVEVHNAKTKPREEQYNST

YRVVSVLTVLHQDWLNGKEYKCKVSNKALPAPIEKTISKAKGQPREPQVYTLPPSRDELTKNQVSLTCLVK

GFYPSDIAVEWESNGQPENNYKTTPPVLDSDGSFFLYSKLTVDKSRWQQGNVFSCSVMHEALHNHYTQKSL

SLSPG
```

Regeneron Exhibit 1001.006

US 9,220,631 B2

7

8

and disulfide bridges can be formed between residues 30-79, 124-185, 246-306 and 352-410 within each monomer, and between residues 211-211 and 214-214 between the monomers.

Another non-antibody VEGF antagonist immunoadhesin currently in pre-clinical development is a recombinant human soluble VEGF receptor fusion protein similar to VEGF-trap containing extracellular ligand-binding domains 3 and 4 from VEGFR2/KDR, and domain 2 from VEGFR1/Flt-1; these domains are fused to a human IgG Fc protein fragment (Li et al., 2011 *Molecular Vision* 17:797-803). This antagonist binds to isoforms VEGF-A, VEGF-B and VEGF-C. The molecule is prepared using two different production processes resulting in different glycosylation patterns on the final proteins. The two glycoforms are referred to as KH902 (conbercept) and KH906. The fusion protein can have the following amino acid sequence (SEQ ID NO:2):

be produced by the addition or deletion of amino acids. Ordinarily, these amino acid sequence variants will have an amino acid sequence having at least 60% amino acid sequence identity with the amino acid sequences of SEQ ID NO: 1, SEQ ID NO: 2 or SEQ ID NO: 3, preferably at least 80%, more preferably at least 85%, more preferably at least 90%, and most preferably at least 95%, including for example, 80%, 81%, 82%, 83%, 84%, 85%, 86%, 87%, 88%, 89%, 90%, 91%, 92%, 93%, 94%, 95%, 96%, 97%, 98%, 99%, and 100%. Identity or homology with respect to this sequence is defined herein as the percentage of amino acid residues in the candidate sequence that are identical with SEQ ID NO: 1, SEQ ID NO: 2 or SEQ ID NO: 3, after aligning the sequences and introducing gaps, if necessary, to achieve the maximum percent sequence identity, and not considering any conservative substitutions as part of the sequence identity.

```
MVSYWDTGVLLCALLSCLLLTGSSSGGRPFVEMYSEIPEIIHMTEGRELVIPCRVTSPNITVTLKKFPLDT
LIPDGKRIIWDSRKGFIISNATYKEIGLLTCEATVNGHLYKTNYLTHRQTNTIIDVVLSPSHGIELSVGEK
LVLNCTARTELNVGIDFNWEYPSSKHQHKKLVNRDLKTQSGSEMKKFLSTLTIDGVTRSDQGLYTCAASSG
LMTKKNSTFVRVHEKPFVAPGSGMESLVEATVGERVRLPAKYLGYPPPEIKWYKNGIPLESNHTIKAGHVL
TIMEVSERDTGNYTVILTNPISKEKQSHVVSLVVVVPPGPGDKTHTCPLCPAPELLGGPSVFLFPPKPKDT
LMISRTPEVTCVVVDVSHEDPEVKFNWYVDGVEVHNAKTKPREEQYNSTYRVVSVLTVLHQDWLNGKEYKC
KVSNKALPAPIEKTISKAKGQPREPQVYTLPPSRDELTKNQVSLTCLVKGFYPSDIAVEWESNGQPENNYK
ATPPVLDSDGSFFLYSKLTVDKSRWQQGNVFSCSVMHEALHNHYTQKSLSLSPGK
```

and, like VEGF-trap, can be present as a dimer. This fusion protein and related molecules are further characterized in EP1767546.

Other non-antibody VEGF antagonists include antibody mimetics (e.g. Affibody® molecules, affilins, affitins, anticalins, avimers, Kunitz domain peptides, and monobodies) with VEGF antagonist activity. This includes recombinant binding proteins comprising an ankyrin repeat domain that binds VEGF-A and prevents it from binding to VEGFR-2. One example for such a molecule is DARPin® MP0112. The ankyrin binding domain may have the following amino acid sequence (SEQ ID NO: 3):

Sequence identity can be determined by standard methods that are commonly used to compare the similarity in position of the amino acids of two polypeptides. Using a computer program such as BLAST or FASTA, two polypeptides are aligned for optimal matching of their respective amino acids (either along the full length of one or both sequences or along a pre-determined portion of one or both sequences). The programs provide a default opening penalty and a default gap penalty, and a scoring matrix such as PAM 250 [a standard scoring matrix; see Dayhoff et al., in Atlas of Protein Sequence and Structure, vol. 5, supp. 3 (1978)] can be used in conjunction with the computer program. For example, the

```
GSDLGKKLLEAARAGQDDEVRILMANGADVNTADSTGWTPLHLAVPWGHLEIVEVLLKYGADVNAKDFQGW
TPLHLAAAIGHQEIVEVLLKNGADVNAQDKFGKTAFDISIDNGNEDLAEILQKAA
```

Recombinant binding proteins comprising an ankyrin repeat domain that binds VEGF-A and prevents it from binding to VEGFR-2 are described in more detail in WO2010/060748 and WO2011/135067.

Further specific antibody mimetics with VEGF antagonist activity are the 40 kD pegylated anticalin PRS-050 and the monobody angiocept (CT-322).

The afore-mentioned non-antibody VEGF antagonist may be modified to further improve their pharmacokinetic properties or bioavailability. For example, a non-antibody VEGF antagonist may be chemically modified (e.g., pegylated) to extend its in vivo half-life. Alternatively or in addition, it may be modified by glycosylation or the addition of further glycosylation sites not present in the protein sequence of the natural protein from which the VEGF antagonist was derived.

Variants of the above-specified VEGF antagonists that have improved characteristics for the desired application may

percent identity can then be calculated as: the total number of identical matches multiplied by 100 and then divided by the sum of the length of the longer sequence within the matched span and the number of gaps introduced into the longer sequences in order to align the two sequences.

Preferably, the non-antibody VEGF antagonist of the invention binds to VEGF via one or more protein domain(s) that are not derived from the antigen-binding domain of an antibody. The non-antibody VEGF antagonist of the invention are preferably proteinaceous, but may include modifications that are non-proteinaceous (e.g., pegylation, glycosylation).

Therapy

The syringe of the invention may be used to treat an ocular disease, including but not limited to choroidal neovascularisation, age-related macular degeneration (both wet and dry forms), macular edema secondary to retinal vein occlusion

Regeneron Exhibit 1001.007

US 9,220,631 B2

9

(RVO) including both branch RVO (bRVO) and central RVO (cRVO), choroidal neovascularisation secondary to pathologic myopia (PM), diabetic macular edema (DME), diabetic retinopathy, and proliferative retinopathy.

Thus the invention provides a method of treating a patient suffering from of an ocular disease selected from choroidal neovascularisation, wet age-related macular degeneration, macular edema secondary to retinal vein occlusion (RVO) including both branch RVO (bRVO) and central RVO (cRVO), choroidal neovascularisation secondary to pathologic myopia (PM), diabetic macular edema (DME), diabetic retinopathy, and proliferative retinopathy, comprising the step of administering an initial priming step in which the physician depresses the plunger of the pre-filled syringe to align the pre-determined part of the stopper with the priming mark.

In one embodiment, the invention provides a method of treating an ocular disease selected from choroidal neovascularisation, wet age-related macular degeneration, macular edema secondary to retinal vein occlusion (RVO) including both branch RVO (bRVO) and central RVO (cRVO), choroidal neovascularisation secondary to pathologic myopia (PM), diabetic macular edema (DME), diabetic retinopathy, and proliferative retinopathy, comprising administering a non-antibody VEGF antagonist with a pre-filled syringe of the invention, wherein the patient has previously received treatment with an antibody VEGF antagonist.

Kits

Also provided are kits comprising the pre-filled syringes of the invention. In one embodiment, such a kit comprises a pre-filled syringe of the invention in a blister pack. The blister pack may itself be sterile on the inside. In one embodiment, syringes according to the invention may be placed inside such blister packs prior to undergoing sterilisation, for example terminal sterilisation.

Such a kit may further comprise a needle for administration of the VEGF antagonist. If the VEGF antagonist is to be administered intravitreally, it is typical to use a 30-gauge×½ inch needle, though 31-gauge and 32-gauge needles may be used. For intravitreal administration, 33-gauge or 34-gauge needles could alternatively be used. Such kits may further comprise instructions for use. In one embodiment, the invention provides a carton containing a pre-filled syringe according to the invention contained within a blister pack, a needle and optionally instructions for administration.

Sterilisation

As noted above, a terminal sterilisation process may be used to sterilise the syringe and such a process may use a known process such as an ethylene oxide (EtO) or a hydrogen peroxide (H$_2$O$_2$) sterilisation process. Needles to be used with the syringe may be sterilised by the same method, as may kits according to the invention.

The package is exposed to the sterilising gas until the outside of the syringe is sterile. Following such a process, the outer surface of the syringe may remain sterile (whilst in its blister pack) for up to 6 months, 9 months, 12 months, 15 months, 18 months, 24 months or longer. Thus, in one embodiment, a syringe according to the invention (whilst in its blister pack) may have a shelf life of up to 6 months, 9 months, 12 months, 15 months, 18 months, 24 months or longer. In one embodiment, less than one syringe in a million has detectable microbial presence on the outside of the syringe after 18 months of storage. In one embodiment, the pre-filled syringe has been sterilised using EtO with a Sterility Assurance Level of at least 10$^{-6}$. In one embodiment, the

10

pre-filled syringe has been sterilised using hydrogen peroxide with a Sterility Assurance Level of at least 10$^{-6}$. Of course, it is a requirement that significant amounts of the sterilising gas should not enter the variable volume chamber of the syringe. The term "significant amounts" as used herein refers to an amount of gas that would cause unacceptable modification of the ophthalmic solution within the variable volume chamber. In one embodiment, the sterilisation process causes ≤10% (preferably ≤5%, ≤3%, ≤1%) alkylation of the VEGF antagonist. In one embodiment, the pre-filled syringe has been sterilised using EtO, but the outer surface of the syringe has ≤1 ppm, preferably ≤0.2 ppm EtO residue. In one embodiment, the pre-filled syringe has been sterilised using hydrogen peroxide, but the outer surface of the syringe has ≤1 ppm, preferably ≤0.2 ppm hydrogen peroxide residue. In another embodiment, the pre-filled syringe has been sterilised using EtO, and the total EtO residue found on the outside of the syringe and inside of the blister pack is ≤0.1 mg. In another embodiment, the pre-filled syringe has been sterilised using hydrogen peroxide, and the total hydrogen peroxide residue found on the outside of the syringe and inside of the blister pack is ≤0.1 mg.

General

The term "comprising" means "including" as well as "consisting" e.g. a composition "comprising" X may consist exclusively of X or may include something additional e.g. X+Y.

The term "about" in relation to a numerical value x means, for example, x±10%.

References to a percentage sequence identity between two amino acid sequences means that, when aligned, that percentage of amino acids are the same in comparing the two sequences. This alignment and percent homology or sequence identity can be determined using software programs known in the art, for example those described in section 7.7.18 of *Current Protocols in Molecular Biology* (F. M. Ausubel et al., eds., 1987) Supplement 30. A preferred alignment is determined by the Smith-Waterman homology search algorithm using an affine gap search with a gap open penalty of 12 and a gap extension penalty of 2, BLOSUM matrix of 62. The Smith-Waterman homology search algorithm is disclosed in Smith & Waterman (1981) *Adv. Appl. Math.* 2: 482-489

BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** shows a side view of a syringe
FIG. **2** shows a cross section of a top down view of a syringe
FIG. **3** shows a view of a plunger
FIG. **4** shows a cross section though a plunger
FIG. **5** shows a stopper

MODES FOR CARRYING OUT THE INVENTION

The invention will now be further described, by way of example only, with reference to the drawings.

FIG. **1** shows a view from a side of a syringe **1** comprising a body **2**, plunger **4**, backstop **6** and a sealing device **8**.

FIG. **2** shows a cross section through the syringe **1** of FIG. **1** from above. The syringe **1** is suitable for use in an ophthalmic injection. The syringe **1** comprises a body **2**, a stopper **10** and a plunger **4**. The syringe **1** extends along a first axis A. The body **2** comprises an outlet **12** at an outlet end **14** and the stopper **10** is arranged within the body **2** such that a front surface **16** of the stopper **10** and the body **2** define a variable volume chamber **18**. The variable volume chamber **18** con-

**Regeneron Exhibit 1001.008**

US 9,220,631 B2

11

tains an injectable medicament 20 comprising an ophthalmic solution comprising a VEGF antagonist such as ranibizumab. The injectable fluid 20 can be expelled though the outlet 12 by movement of the stopper 10 towards the outlet end 14 thereby reducing the volume of the variable volume chamber 18. The plunger 4 comprises a plunger contact surface 22 at a first end 24 and a rod 26 extending between the plunger contact surface 22 and a rear portion 25. The plunger contact surface 22 is arranged to contact the stopper 10, such that the plunger 4 can be used to move the stopper 10 towards the outlet end 14 of the body 2. Such movement reduces the volume of the variable volume chamber 18 and causes fluid therein to be expelled though the outlet.

The backstop 6 is attached to the body 2 by coupling to a terminal flange 28 of the body 2. The backstop 6 includes a sandwich portion 30 which is adapted to substantially sandwich at least one of the terminal flange 28 of the body 2. The backstop 6 is adapted to be coupled to the body 2 from the side by leaving one side of the backstop 6 open so that the backstop 6 can be fitted to the syringe 2.

The body 2 defines a substantially cylindrical bore 36 which has a bore radius. The rod 26 comprises a rod shoulder 32 directed away from the outlet end 14. The rod shoulder 32 extends from to a rod shoulder radius from the first axis A which is such that it is slightly less than the bore radius so that the shoulder fits within the bore 36. The backstop 6 includes a backstop shoulder 34 directed towards the outlet end 14. The shoulders 32, 34 are configured to cooperate to substantially prevent movement of the rod 26 away from the outlet end 14 when the backstop shoulder 34 and rod shoulder 32 are in contact. The backstop shoulder 34 extends from outside the bore radius to a radius less than the rod shoulder radius so that the rod shoulder 32 cannot pass the backstop shoulder 34 by moving along the first axis A. In this case the rod shoulder 32 is substantially disc, or ring, shaped and the backstop shoulder 34 includes an arc around a rear end 38 of the body 2.

The backstop 6 also includes two finger projections 40 which extend in opposite directions away from the body 2 substantially perpendicular to the first axis A to facilitate manual handling of the syringe 1 during use.

In this example the syringe comprises a 0.5 ml body 2 filled with between about 0.1 and 0.3 ml of an injectable medicament 20 comprising a 10 mg/ml injectable solution comprising ranibizumab. The syringe body 2 has an internal diameter of about between about 4.5 mm and 4.8 mm, a length of between about 45 mm and 50 mm.

The plunger 4 and stopper 10 will be described in more detail with reference to later figures.

12

FIG. 3 shows a perspective view of the plunger 4 of FIG. 1 showing the plunger contact surface 22 at the first end 24 of the plunger 4. The rod 26 extends from the first end 24 to the rear portion 25. The rear portion 25 includes a disc shaped flange 42 to facilitate user handling of the syringe. The flange 42 provides a larger surface area for contact by the user than a bare end of the rod 26.

FIG. 4 shows a cross section though a syringe body 2 and rod 26. The rod 26 includes four longitudinal ribs 44 and the angle between the ribs is 90°.

FIG. 5 shows a detailed view of a stopper 10 showing a conical shaped front surface 16 and three circumferential ribs 52, 54, 56 around a substantially cylindrical body 58. The axial gap between the first rib 52 and the last rib 56 is about 3 mm. The rear surface 60 of the stopper 10 includes a substantially central recess 62. The central recess 62 includes an initial bore 64 having a first diameter. The initial bore 64 leading from the rear surface 60 into the stopper 10 to an inner recess 66 having a second diameter, the second diameter being larger than the first diameter.

Stopper Movement Forces

0.5 ml syringes siliconised with <100 μg silicone oil, filled with Lucentis, comprising one of two different stopper designs were tested for maximal and average break out and slide force. Prior to testing, 30 G×0.5″ needles were attached to the syringes. The testing was carried out at a stopper speed of 190 mm/min over a travel length of 10.9 mm. Stopper design 2 had a 45% increase in the distance between the front circumferential rib and rear circumferential rib.

| | | Stopper design 1 | | | Stopper design 2 | |
|---|---|---|---|---|---|---|
| | | Batch A | Batch B | Batch C | Batch D | Batch E |
| Break loose force of syringes | Average of 10 syringes | 2.2N | 2.3N | 1.9N | 2.1N | 2.5N |
| | Max individual value | 2.5N | 2.5N | 2.3N | 2.6N | 2.7N |
| Sliding force | Average of 10 syringes | 3.1N | 3.2N | 3.1N | 4.1N | 4.6N |
| | Max individual value | 3.5N | 3.5N | 3.6N | 4.7N | 4.8N |

For both stopper designs, average and maximum break out force remained below 3N. For both stopper designs, average and maximum sliding force remained below 5N.

It will be understood that the invention has been described by way of example only and modifications may be made whilst remaining within the scope and spirit of the invention.

SEQUENCE LISTING

```
<160> NUMBER OF SEQ ID NOS: 3

<210> SEQ ID NO 1
<211> LENGTH: 431
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: aflibercept

<400> SEQUENCE: 1

Ser Asp Thr Gly Arg Pro Phe Val Glu Met Tyr Ser Glu Ile Pro Glu
1               5                   10                  15

Ile Ile His Met Thr Glu Gly Arg Glu Leu Val Ile Pro Cys Arg Val
            20                  25                  30
```

Regeneron Exhibit 1001.009

US 9,220,631 B2

**13**

**14**

-continued

```
Thr Ser Pro Asn Ile Thr Val Thr Leu Lys Lys Phe Pro Leu Asp Thr
        35                  40                  45

Leu Ile Pro Asp Gly Lys Arg Ile Ile Trp Asp Ser Arg Lys Gly Phe
    50                  55                  60

Ile Ile Ser Asn Ala Thr Tyr Lys Glu Ile Gly Leu Leu Thr Cys Glu
65                  70                  75                  80

Ala Thr Val Asn Gly His Leu Tyr Lys Thr Asn Tyr Leu Thr His Arg
                85                  90                  95

Gln Thr Asn Thr Ile Ile Asp Val Val Leu Ser Pro Ser His Gly Ile
            100                 105                 110

Glu Leu Ser Val Gly Glu Lys Leu Val Leu Asn Cys Thr Ala Arg Thr
        115                 120                 125

Glu Leu Asn Val Gly Ile Asp Phe Asn Trp Glu Tyr Pro Ser Ser Lys
    130                 135                 140

His Gln His Lys Lys Leu Val Asn Arg Asp Leu Lys Thr Gln Ser Gly
145                 150                 155                 160

Ser Glu Met Lys Lys Phe Leu Ser Thr Leu Thr Ile Asp Gly Val Thr
                165                 170                 175

Arg Ser Asp Gln Gly Leu Tyr Thr Cys Ala Ala Ser Ser Gly Leu Met
            180                 185                 190

Thr Lys Lys Asn Ser Thr Phe Val Arg Val His Glu Lys Asp Lys Thr
        195                 200                 205

His Thr Cys Pro Pro Cys Pro Ala Pro Glu Leu Leu Gly Gly Pro Ser
    210                 215                 220

Val Phe Leu Phe Pro Pro Lys Pro Lys Asp Thr Leu Met Ile Ser Arg
225                 230                 235                 240

Thr Pro Glu Val Thr Cys Val Val Val Asp Val Ser His Glu Asp Pro
                245                 250                 255

Glu Val Lys Phe Asn Trp Tyr Val Asp Gly Val Glu Val His Asn Ala
            260                 265                 270

Lys Thr Lys Pro Arg Glu Glu Gln Tyr Asn Ser Thr Tyr Arg Val Val
        275                 280                 285

Ser Val Leu Thr Val Leu His Gln Asp Trp Leu Asn Gly Lys Glu Tyr
    290                 295                 300

Lys Cys Lys Val Ser Asn Lys Ala Leu Pro Ala Pro Ile Glu Lys Thr
305                 310                 315                 320

Ile Ser Lys Ala Lys Gly Gln Pro Arg Glu Pro Gln Val Tyr Thr Leu
                325                 330                 335

Pro Pro Ser Arg Asp Glu Leu Thr Lys Asn Gln Val Ser Leu Thr Cys
            340                 345                 350

Leu Val Lys Gly Phe Tyr Pro Ser Asp Ile Ala Val Glu Trp Glu Ser
        355                 360                 365

Asn Gly Gln Pro Glu Asn Asn Tyr Lys Thr Thr Pro Pro Val Leu Asp
    370                 375                 380

Ser Asp Gly Ser Phe Phe Leu Tyr Ser Lys Leu Thr Val Asp Lys Ser
385                 390                 395                 400

Arg Trp Gln Gln Gly Asn Val Phe Ser Cys Ser Val Met His Glu Ala
                405                 410                 415

Leu His Asn His Tyr Thr Gln Lys Ser Leu Ser Leu Ser Pro Gly
            420                 425                 430
```

```
<210> SEQ ID NO 2
<211> LENGTH: 552
<212> TYPE: PRT
```

**Regeneron Exhibit 1001.010**

US 9,220,631 B2

**15**

-continued

**16**

```
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: conbercept

<400> SEQUENCE: 2

Met Val Ser Tyr Trp Asp Thr Gly Val Leu Leu Cys Ala Leu Leu Ser
1               5                   10                  15

Cys Leu Leu Leu Thr Gly Ser Ser Ser Gly Gly Arg Pro Phe Val Glu
                20                  25                  30

Met Tyr Ser Glu Ile Pro Glu Ile Ile His Met Thr Glu Gly Arg Glu
        35                  40                  45

Leu Val Ile Pro Cys Arg Val Thr Ser Pro Asn Ile Thr Val Thr Leu
    50                  55                  60

Lys Lys Phe Pro Leu Asp Thr Leu Ile Pro Asp Gly Lys Arg Ile Ile
65                  70                  75                  80

Trp Asp Ser Arg Lys Gly Phe Ile Ile Ser Asn Ala Thr Tyr Lys Glu
                85                  90                  95

Ile Gly Leu Leu Thr Cys Glu Ala Thr Val Asn Gly His Leu Tyr Lys
            100                 105                 110

Thr Asn Tyr Leu Thr His Arg Gln Thr Asn Thr Ile Ile Asp Val Val
        115                 120                 125

Leu Ser Pro Ser His Gly Ile Glu Leu Ser Val Gly Glu Lys Leu Val
    130                 135                 140

Leu Asn Cys Thr Ala Arg Thr Glu Leu Asn Val Gly Ile Asp Phe Asn
145                 150                 155                 160

Trp Glu Tyr Pro Ser Ser Lys His Gln His Lys Lys Leu Val Asn Arg
                165                 170                 175

Asp Leu Lys Thr Gln Ser Gly Ser Glu Met Lys Lys Phe Leu Ser Thr
        180                 185                 190

Leu Thr Ile Asp Gly Val Thr Arg Ser Asp Gln Gly Leu Tyr Thr Cys
    195                 200                 205

Ala Ala Ser Ser Gly Leu Met Thr Lys Lys Asn Ser Thr Phe Val Arg
    210                 215                 220

Val His Glu Lys Pro Phe Val Ala Phe Gly Ser Gly Met Glu Ser Leu
225                 230                 235                 240

Val Glu Ala Thr Val Gly Glu Arg Val Arg Leu Pro Ala Lys Tyr Leu
                245                 250                 255

Gly Tyr Pro Pro Pro Glu Ile Lys Trp Tyr Lys Asn Gly Ile Pro Leu
            260                 265                 270

Glu Ser Asn His Thr Ile Lys Ala Gly His Val Leu Thr Ile Met Glu
        275                 280                 285

Val Ser Glu Arg Asp Thr Gly Asn Tyr Thr Val Ile Leu Thr Asn Pro
    290                 295                 300

Ile Ser Lys Glu Lys Gln Ser His Val Val Ser Leu Val Val Tyr Val
305                 310                 315                 320

Pro Pro Gly Pro Gly Asp Lys Thr His Thr Cys Pro Leu Cys Pro Ala
                325                 330                 335

Pro Glu Leu Leu Gly Gly Pro Ser Val Phe Leu Phe Pro Pro Lys Pro
            340                 345                 350

Lys Asp Thr Leu Met Ile Ser Arg Thr Pro Glu Val Thr Cys Val Val
        355                 360                 365

Val Asp Val Ser His Glu Asp Pro Glu Val Lys Phe Asn Trp Tyr Val
    370                 375                 380

Asp Gly Val Glu Val His Asn Ala Lys Thr Lys Pro Arg Glu Glu Gln
```

**Regeneron Exhibit 1001.011**

US 9,220,631 B2

17                                                          18

-continued

```
385                390                395                400

Tyr Asn Ser Thr Tyr Arg Val Val Ser Val Leu Thr Val Leu His Gln
               405                410                415

Asp Trp Leu Asn Gly Lys Glu Tyr Lys Cys Lys Val Ser Asn Lys Ala
               420                425                430

Leu Pro Ala Pro Ile Glu Lys Thr Ile Ser Lys Ala Lys Gly Gln Pro
        435                440                445

Arg Glu Pro Gln Val Tyr Thr Leu Pro Pro Ser Arg Asp Glu Leu Thr
    450                455                460

Lys Asn Gln Val Ser Leu Thr Cys Leu Val Lys Gly Phe Tyr Pro Ser
465                470                475                480

Asp Ile Ala Val Glu Trp Glu Ser Asn Gly Gln Pro Glu Asn Asn Tyr
               485                490                495

Lys Ala Thr Pro Pro Val Leu Asp Ser Asp Gly Ser Phe Phe Leu Tyr
               500                505                510

Ser Lys Leu Thr Val Asp Lys Ser Arg Trp Gln Gln Gly Asn Val Phe
        515                520                525

Ser Cys Ser Val Met His Glu Ala Leu His Asn His Tyr Thr Gln Lys
    530                535                540

Ser Leu Ser Leu Ser Pro Gly Lys
545                550
```

```
<210> SEQ ID NO 3
<211> LENGTH: 126
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: DARPin MP0112

<400> SEQUENCE: 3

Gly Ser Asp Leu Gly Lys Lys Leu Leu Glu Ala Ala Arg Ala Gly Gln
1                5                10                15

Asp Asp Glu Val Arg Ile Leu Met Ala Asn Gly Ala Asp Val Asn Thr
               20                25                30

Ala Asp Ser Thr Gly Trp Thr Pro Leu His Leu Ala Val Pro Trp Gly
        35                40                45

His Leu Glu Ile Val Glu Val Leu Leu Lys Tyr Gly Ala Asp Val Asn
    50                55                60

Ala Lys Asp Phe Gln Gly Trp Thr Pro Leu His Leu Ala Ala Ala Ile
65                70                75                80

Gly His Gln Glu Ile Val Glu Val Leu Leu Lys Asn Gly Ala Asp Val
               85                90                95

Asn Ala Gln Asp Lys Phe Gly Lys Thr Ala Phe Asp Ile Ser Ile Asp
               100                105                110

Asn Gly Asn Glu Asp Leu Ala Glu Ile Leu Gln Lys Ala Ala
        115                120                125
```

Regeneron Exhibit 1001.012

US 9,220,631 B2

19

The invention claimed is:

1. A pre-filled, terminally sterilized syringe for intravitreal injection, the syringe comprising a glass body forming a barrel, a stopper and a plunger and containing an ophthalmic solution which comprises a VEGF-antagonist, wherein:

(a) the syringe has a nominal maximum fill volume of between about 0.5 ml and about 1 ml,

(b) the syringe barrel comprises from about 1 µg to 100 ug silicone oil,

(c) the VEGF antagonist solution comprises no more than 2 particles >50 µm in diameter per ml and wherein the syringe has a stopper break loose force of less than about 11N.

2. A pre-filled syringe according to claim 1, wherein the syringe barrel has an internal coating of silicone oil that has an average thickness of about 450 nm or less.

3. A pre-filled syringe according to claim 1, wherein the syringe barrel has an internal coating of from about 3 µg to about 100 ug silicone oil.

4. A pre-filled syringe according to claim 1, wherein the silicone oil is DC365 emulsion.

5. A pre-filled syringe according to claim 1, wherein the VEGF antagonist solution further comprises one or more of (i) no more than 5 particles ≥25 µm in diameter per ml, and (ii) no more than 50 particles ≥10 µm in diameter per ml.

6. A pre-filled syringe according to claim 1, wherein the VEGF antagonist solution meets USP789.

7. A pre-filled syringe according to claim 1, wherein the VEGF antagonist is an anti-VEGF antibody.

8. A pre-filled syringe according to claim 7, wherein the anti-VEGF antibody is ranibizumab.

9. A pre-filled syringe according to claim 8, wherein the ranibizumab is at a concentration of 10 mg/ml.

10. A pre-filled syringe according to claim 8, wherein the silicone oil has a viscosity of about 350 cP, and the VEGF antagonist solution further comprises one or more of (i) no more than 5 particles ≥25 µm in diameter per ml, and (ii) no more than 50 particles ≥10 µm in diameter per ml.

11. A pre-filled syringe according to claim 1 wherein the VEGF antagonist is a non-antibody VEGF antagonist.

12. A pre-filled syringe according to claim 11, wherein the non-antibody VEGF antagonist is aflibercept or conbercept.

13. A pre-filled syringe according to claim 12, wherein the non-antibody VEGF antagonist is aflibercept at a concentration of 40 mg/ml.

14. A pre-filled syringe according to claim 1, wherein the syringe has a stopper break loose force of less than about 5N, and wherein the syringe has a stopper slide force of less than about 5N.

20

15. A pre-filled syringe according to claim 14, wherein the stopper break loose force or stopper slide force is measured using a filled syringe, at a stopper travelling speed of 190 mm/min, with a 30 G×0.5 inch needle attached to the syringe.

16. A pre-filled syringe according to claim 1, wherein the syringe has a stopper slide force of less than about 11N.

17. A blister pack comprising a pre-filled syringe according to claim 1, wherein the syringe has been sterilised using $H_2O_2$ or EtO.

18. A blister pack comprising a pre-filled syringe according to claim 17, wherein the outer surface of the syringe has ≤1 ppm EtO or $H_2O_2$ residue.

19. A blister pack comprising a pre-filled syringe according to claim 17, wherein the syringe has been sterilised using EtO or $H_2O_2$ and the total EtO or $H_2O_2$ residue found on the outside of the syringe and inside of the blister pack is ≤0.1 mg.

20. A blister pack comprising a pre-filled syringe according to claim 18, wherein ≤5% of the VEGF antagonist is alkylated.

21. A blister pack comprising a pre-filled syringe according to claim 17, wherein the syringe has been sterilised using EtO or $H_2O_2$ with a Sterility Assurance Level of at least $10^{-6}$.

22. A pre-filled syringe according to claim 1, wherein the syringe barrel has an internal coating of from about 1-50 µg silicone oil.

23. A pre-filled syringe according to claim 1, wherein the silicone oil has a viscosity of about 350 cP.

24. A method of treating a patient suffering from of an ocular disease selected from choroidal neovascularisation, wet age-related macular degeneration, macular edema secondary to retinal vein occlusion (RVO) including both branch RVO (bRVO) and central RVO (cRVO), choroidal neovascularisation secondary to pathologic myopia (PM), diabetic macular edema (DME), diabetic retinopathy, and proliferative retinopathy, comprising the step of administering an ophthalmic solution to the patient using a pre-filled syringe according to claim 1.

25. The method of claim 24, further comprising an initial priming step in which the physician depresses the plunger of the pre-filled syringe to align the pre-determined part of the stopper with the priming mark.

26. A method according to claim 24, wherein the VEGF antagonist administered is a non-antibody VEGF antagonist and wherein the patient has previously received treatment with an antibody VEGF antagonist.

* * * * *

Regeneron Exhibit 1001.013